# EXHIBIT A



The world leader
in serving science

November 9, 2012

Mr. Douglas Kundrat
Chief IP Counsel
Agilent Technologies, Inc.
5301 Stevens Creek Blvd.
Santa Clara, CA 95051
United States

Re:     Thermo Fisher Scientific
        U.S. Patent Nos. 7,202,470, 7,230,232, 7,339,163, 7,211,788

Dear Mr. Kundrat,

I write to bring your attention to certain Thermo Fisher Scientific patents that Agilent Technologies, Inc.'s new 8800 Triple Quadrupole ICP-MS product practices.

Thermo Fisher holds the following patents directed to ICP-MS instruments of the type having two quadrupoles separated by a collision cell, using the collision cell to remove polyatomic interferences to enhance detection of ions in the second quadrupole analyzer.

| U.S. Patent | Current Foreign Coverage[1] |
|---|---|
| 7,202,470 | Canada, Germany, Great Britain, Ireland, Japan |
| 7,230,232 | Canada, Germany, Great Britain, Ireland, Japan |
| 7,339,163 | Canada, Germany, Great Britain, Ireland, Japan |
| 7,211,788 | Australia, Canada, China, Great Britain |

The following pages provide illustrations of how Agilent's 8800 product appears to practice at least one independent claim from each of the listed Thermo Fisher US patents, based on Agilent's marketing literature, with the claimed elements circled in red.

Please contact me to discuss the above, by December 10, 2012.

Very truly yours,

Peter Y. Lee
Chief Counsel, Intellectual Property
Thermo Fisher Scientific Inc.

Cc:     Thomas Redder – Agilent Technologies
        Jim Hurst – Thermo Fisher Scientific Inc.

---

[1] Other foreign coverage is pending.



# Sample Infringement Position '470 Patent, Claim 13



13. A method of operating a mass spectrometer that incorporates a collision cell pressurized with a target gas, the method comprising:

• generating an ion beam by introducing a sample into a plasma, the ion beam including analyte ions having an analyte mass to charge ratio and unwanted ions;

• mass selecting at least a portion of the ion beam at the analyte mass to charge ratio;

• transmitting at least a portion of the mass selected ion beam into the collision cell, the mass selecting step being effective substantially to minimize the formation in the collision cell of interfering ions having the analyte mass to charge ratio;

• receiving at least a portion of the ion beam from the collision cell at a mass analyzer; and

• mass analyzing the received ion beam at the same analyte mass to charge ratio as in the mass selecting step.



interference ions are removed. On the other hand, the new system places Q1 in front of the cell. In MS/MS mode, Q1 is driven as mass filter with unit mass resolving power.  As a result, only the selected ions whose mass is the same as the targeted analyte ion can pass through Q1 and enter the cell. The target



**Thermo Fisher**
SCIENTIFIC

# Sample Infringement Position '232 Patent, Claim 1



1. A mass spectrometer, comprising:

• an ion source for generating an ion beam from a sample
introduced into a plasma, the beam containing unwanted gas
components and artifact ions;

• a collision cell within an evacuation chamber, the collision cell
being disposed to receive at least a portion of the ion beam from the
ion source and arranged to be pressurized with a target gas for
removing unwanted artifact ions from the ion beam in the collision
cell;

• an ion optical device configured upstream of the collision cell to
reduce gas loading from the ion source on the collision cell; and

• a mass-to-charge ratio analyzer disposed within an analyzing
chamber and arranged to receive at least a portion of the ion beam
from the collision cell and to mass analyze the received ion beam to
produce a mass spectrum of the received ion beam.



# Sample Infringement Position '163 Patent, Claim 16



16. An elemental mass spectrometer comprising:

• a mass-selective ion optical device for receiving an ion beam, the ion optical device configured only to transmit at least a portion of the ion beam having a first selected range of mass-to-charge ratios to form a first transmitted ion beam;

• a collision or reaction cell arranged to receive at least a portion of the first transmitted ion beam, and being configured such that at least a portion of the received first transmitted ion beam is transmitted therethrough as a second transmitted ion beam; and

• a mass analyser arranged to receive at least a portion of the second transmitted ion beam and being configured only to transmit at least a portion of the received second transmitted ion beam having mass-to-charge ratios from the selected range of mass-to-charge ratios.



interference ions are removed. On the other hand, the new system places Q1 in front of the cell. In MS/MS mode, Q1 is driven as mass filter with unit mass resolving power. As a result, only the selected ions whose mass is the same as the targeted analyte ion can pass through Q1 and enter the cell. The target



# Sample Infringement Position '788 Patent, Claim 18



18. A method for producing a mass spectrum of an ion beam having mass/charge ratios within a range of mass/charge ratios, comprising:
• emitting the ion beam from a beam source into a first mass filter stage,
• selecting only ions having a sub-range of mass/charge ratios which includes a selected mass/charge ratio at the first mass filter stage for transmission on to a second mass filter stage arranged in series with the first mass filter stage,
• selecting only ions having the selected mass/charge ratio at the second mass filter stage for transmission on to a detector for detecting any ions having the selected mass/charge ratio,
• controlling at least the second filter stage so that the selected mass/charge ratio is scanned over a scanned range, and
• detecting the number of ions selected by the second filter stage at any given mass/charge ratio to provide a mass spectrum,
• wherein the first and second filter stages operate at pressures below $10^{-3}$ torr.

**Table 1.** Pressure and mean free path at each vacuum region. Mean free path is calculated assuming the collision of an Ar ion with an Ar gas molecule.

|  | 5 stage vacuum system | | 4 stage vacuum system | |
|---|---|---|---|---|
|  | Pressure [Pa] | Mean free path [m] | Pressure [Pa] | Mean free path [m] |
| Interface chamber | 500 | -- | 500 | -- |
| Ion lens chamber | 0.13 | 7.5x10$^{-2}$ | 0.2 | 5x10$^{-2}$ |
| Q1 chamber | 5x10$^{-4}$ | 19 | 2x10$^{-2}$ | 0.44 |
| ORS chamber | 2x10$^{-4}$ | 48 | 5x10$^{-4}$ | 19 |
| Q2 chamber | 5x10$^{-4}$ | 19 | 2x10$^{-4}$ | 48 |

# EXHIBIT B



Agilent Technologies, Inc.                    408-553-3052 telephone
5301 Stevens Creek Boulevard              408-553-2365 facsimile
Santa Clara, CA 95052-8059                 doug_kundrat@agilent.com
                                                          www.agilent.com



Douglas A. Kundrat
Vice President, Deputy General Counsel
and Director of Intellectual Property
Legal Department

January 18, 2013

Mr. Peter Y. Lee
Chief Counsel, Intellectual Property
Thermo Fisher Scientific, Inc.
81 Wyman Street
Waltham, MA 02451

### Re:   Patent Nos: 7,202,470; 7,230,232; 7,339,163; and 7,211,788.

Dear Mr. Lee:

This responds to your letter of November 9, 2012 in which you accuse Agilent's 8800 of
infringing the above listed patents. You do not explain how each claim element is allegedly found in
Agilent's 8800. Instead, you submit marked-up drawings and text excerpts from an Agilent
marketing paper, without any indication of how these citations correspond to the individual claim
elements. This obscures the claim interpretation behind your infringement contentions, making it
difficult for us to fully assess your position. However, since the features depicted in these excerpts
were all known in the art long before Thermo Fisher Scientific, Inc. filed for its patent applications,
whatever claim interpretation you have in mind would render the asserted claims invalid.

#### 1. The '470 Patent.

As proof of Agilent's alleged infringement of the '470 patent, you circle generic images of
the basic components of a three stage spectrometer with a plasma source. The use of a plasma
source with a "triple quadrupole spectrometer" was known in the prior art. For example, a prior art
PCT application (international publication no. WO 97/07530), illustrates essentially the same
components of a triple quadrupole as those you cite as evidence of infringement, and states that
the ion source can be any type, including a plasma source:[1]

---

[1] Ex. A, PCT Publication, no. WO 97/07530.



FIG. 1

The PCT Publication was filed in 1995, three years before Thermo Fisher's earliest filing. However, the PCT Publication acknowledged that even in 1995 this tandem structure was known in the "prior art." Examples of such earlier triple quadrupoles include King[2] (who coupled a triple quadrupole to a plasma source), McLafferty[3] and Dawson.[4]

You next cite to features of our brochure that describe the operation of the mass filters, $Q_1$, $Q_2$. First, you cite to an excerpt that reads: "in MS/MS mode, Q1 is driven as mass filter with unit mass resolving power." However, the prior art PCT Publication explains that using Q1 as a mass filter to select a single mass was then considered "conventional:"

> "Rod set Q1 normally has both RF and DC applied to it, so that it acts as an ion filter, transmitting ions of desired mass (or in a desired mass range), as is conventional."[5]

---

[2] Ex. C, King and Harrison, "Collision-Induced Dissociation of Polyatomic Ions In Glow Discharge Mass Spectrometry," International Journal of Mass Spectrometry and Ion Processes, Vol. 89, Pages 171 – 185 (1989).

[3] Ex. F, McLafferty, "Tandem Mass Spectrometry," John Wiley & Sons (1983).

[4] Ex. B, Dawson et. al., "The Use of Triple Quadrupoles for Sequential Mass Spectrometry," Organic Mass Spectrometry, Vol. 17, No. 5, 1982.

[5] Ex. A, PCT Publication, page 8, lines 4 - 6.

Similarly, the prior art King article describes this use of Q1 when it says that "the first quadrupole, Q1, [] can be operated in an r.f.-only mode (passing all ions), or in a mass filtering mode (selecting a mass window)."[6]

You also copy text from our brochure that states: "as a result, only the selected ions whose mass is the same as the target analyte ion can pass through Q1 and enter the cell." However, linking the mass selected by $Q_1$ to the mass of the target analyte (e.g., the mass selected by $Q_2$) was one on the many available scan modes known in the art. An article by Schwartz demonstrates that as early as 1990, those skilled in the art knew that in tandem devices such as triple quadrupoles, the mass selection at each filter stage could be operated in many different "scan modes," and it was merely a matter of design choice as to which type to use.[7] In one pertinent example, Schwartz describes a mode in which the mass selections of the filters are linked, such that the mass selected by the second filter, $m_2$, is a function of the mass selected by the first (i.e., $m_2 = f(m_1)$).[8] Schwartz further says that the pair of filters can be scanned with ANY desired mass relationship:

> "More generally, *any prescribed relationship between the masses, i.e., $m_2 = f(m_1)$, may be chosen* as the defined transition; hence, the constant neutral loss(gain) scan is just one particular member of the more general class of scans referred to as "functional relationship" scans."[9]

Furthermore, a prior art text by McLafferty[10] depicts several such functional relationships below, including one identified by the dash line that "represents reactions which do not involve a change in mass," (which would also include reactions that leave the analyte unchanged but alter unwanted ions).



| | |
|---|---|
| Ⓐ SCAN for DAUGHTER IONS | Ⓓ SCAN for NEUTRAL GAIN (g) |
| Ⓑ SCAN for PARENT IONS | Ⓔ SCAN for CLUSTER PRODUCTS |
| Ⓒ SCAN for NEUTRAL LOSS (l) | Ⓕ SCAN for CLUSTER PRECURSORS |

---

[6] Ex. C, King, "Collision Induced Dissociation of Polyatomic Ions In Glow Discharge Mass Spectrometry," page 174.

[7] Ex. E, Schwartz et. al., "Systematic Delineation of Scan Modes in Multidimensional Mass Spectrometry," Anal. Chem. 1990, 62, pages 1809 – 1818.

[8] Ex. E, Schwartz, page 1812, col. 1.

[9] Ex. E, Schwartz, page 1812, col. 1 (emphasis added).

[10] Ex. F, McLafferty, "Tandem Mass Spectrometry," John Wiley & Sons (1983).

Lastly, you copy the diagram below and circle several arrows that depict the selection of ions by filters $Q_1$, $Q_2$ (discussed above) and the removal of ions due to a reaction in the cell.



The removal of unwanted ions due to reactions in the cell (e.g., reactions which do not involve a change in mass for the target), was known in the art. For example, King published several articles that describe the removal of polyatomic interferences via dissociation reactions in the collision cell of a triple quadrupole.[11] In sum, your infringement contentions cite to features known in the prior art, and therefore appear premised upon a claim interpretation that would render the '470 patent invalid.

### 2. The '232 Patent.

To prove your infringement allegation for the '232 patent, you circle the same components as in your contentions for the '470 patent, plus an additional component – the "extraction lens" shown below:



However, the use of an optical device upstream from a tandem spectrometer was known in the prior art. For example, the prior art PCT Publication describes a quadrupole Q0, located upstream from a tandem spectrometer, that directs ions into the tandem. This quadrupole Q0 serves the

---

[11] Ex. C, King, "Collision-Induced Dissociation of Polyatomic Ions In Glow Discharge Mass Spectrometry," page 174; Ex. D, King et. al., "Study of Molecular Interferences in Glow Discharge Mass Spectrometry," Journal of Analytical Atomic Spectrometry, Vol. 3, Sept. 1988.

exact same function as the corresponding optical device 17 disclosed in the '232 patent, i.e., directing ions through a region wherein neutrals from an ion source are removed:

> "Rod set Q0 acts as an ion transmission device, transmitting ions axially there through while permitting gas entering rod set Q0 from orifice 31a to be pumped away."[12]

Accordingly, your infringement contentions again appear premised upon a claim interpretation that would render the asserted patent invalid.

### 3. The '163 Patent.

The *structural* features of the Agilent system that you accuse of infringing the '163 patent are the same as those for the '470 patent, except that your '163 contentions do not cite to the ion source or detector. The *operational* feature that you accuse is the same MS/MS scan mode discussed above, in which "Q1 is driven as mass filter with unit mass resolving power." We cannot tell how you are interpreting the claim's requirement that the ions selected for transmission span "a **range** of mass-to-charge **ratios**" to reach your conclusion that this single mass mode infringes. However, given your assertion that the '163 patent covers essentially the same features as the '470 patent, our response to the '470 patent is equally applicable here: The claim is invalid if construed to encompass the accused tandem structure and scan mode.

### 4. The '788 Patent.

Lastly, your infringement contentions for the '788 patent circle the same components as your contentions for the '470 patent (except for the collision cell), but cite to different text from the brochure. Specifically, you cite to text that shows that the pressure in quadrupole filters Q1 and Q2 is $5 \times 10^{-4}$ Torr.

The pressure citations are obviously in reference to the claimed requirement that the "first and second filter stages operate at pressures below $10^{-3}$ torr." However, the PCT Publication, (which as explained earlier has the same structural components cited in your infringement contentions), also operated both filters at pressures below $10^{-3}$ torr:[13] The chamber 32b that houses these filters was pumped to a pressure of $3 \times 10^{-5}$ torr, which is below the claimed threshold of $10^{-3}$ torr.

---

[12] Ex. A. PCT Publication, page 7, lines 24 – 26; Cf, '232 patent, col. 7, lines 11 – 15.

[13] Ex. A. PCT Publication, page 7, lines 3 - 5.

In conclusion, we would be glad to accept your invitation to discuss these patents if you still want to. But based upon our analysis of your contentions, we see nothing to indicate that the Agilent 8800 practices any of the Thermo Fisher patents.

Regards,

*[signature]*

Douglas A. Kundrat
Vice President, Deputy General Counsel
and Director of Intellectual Property

# EXHIBIT C



The world leader
in serving science

March 29, 2013

Mr. Douglas A. Kundrat
Vice President, Deputy General Counsel
Agilent Technologies, Inc.
5301 Stevens Creek Boulevard
Santa Clara, CA  95052

Re:     Thermo Fisher Scientific
        U.S. Patent Nos. 7,202,470, 7,230,232, 7,339,163, 7,211,788

Dear Mr. Kundrat:

Thank you for your January 18, 2013 letter.  We appreciate your response.

We believe we have sufficiently identified how Agilent practices Thermo Fisher's patented technology.
We cannot find in your letter any legal position or any factual contention that Agilent does not infringe the
scope of the patents' claims, and therefore we assume that Agilent has none.  Instead, Agilent appears to
attempt to justify its commercial activities on the contention that every one of the Thermo Fisher patents,
and each of their claims, is invalid, and therefore the manufacture and sale of these "otherwise infringing"
products would not constitute either legal infringement or willful infringement.

Agilent also has not identified any prior art reference that you purport discloses all parts of a Thermo
Fisher patent claim.  This is an extraordinary admission that Agilent cannot locate any item of prior art
that shows the inventions we have explicitly claimed in our group of patents.  Instead, Agilent points to
various unrelated publications that show certain separate pieces of Thermo Fisher's inventions, and
suggests that someone might have cobbled these pieces together (in hindsight) to construct the claimed
inventions (even though no one did).  Agilent's positions do not cause Thermo Fisher to believe the
identified publications put the Thermo Fisher patents at any real risk.

Specifically, Agilent bears the heavy burden of proving the patent claims invalid by "clear and convincing
evidence."  The showing in your letter does not come close to meeting this heavy legal burden.  For
example, with regard to the '470 patent, your letter cites various references[1,2,3,4] as describing a "triple
quadrupole spectrometer."  However, each of these references describes triple quaduproles for use in
tandem mass spectrometry (MS/MS) to identify daughter ions that result from breaking apart parent ions.
Such descriptions of detecting daughter ions have no relevance to independent claim 13 of the '470 patent,
which does not pertain to detecting daughter ions resulting from breaking apart parent ions.

---

[1] Ex. A, PCT Publication, no. WO 97/07530.
[2] Ex. B. Dawson et. al., "The Use of Triple Quadrupoles for Sequential Mass Spectrometry." Organic MassSpectrometry. Vol. 17.
No.5, 1982.
[3] Ex. C, King and Harrison. "Collision-Induced Dissociation of Polyatomic Ions In Glow Discharge Mass
Spectrometry." International Journal of Mass Spectrometry and Ion Processes. Vol. 89. Pages 171-185 (1989).
[4] Ex. F. Mclafferty, "Tandem Mass Spectrometry." John Wiley & Sons (1983).

**ThermoFisher**
S C I E N T I F I C

Further, Agilent's argument that claim 13 is simply a design choice that is rendered obvious over Schwartz[5] is unpersuasive. Schwartz is similarly directed to detecting daughter ions. In fact, the cited quote regarding any "prescribed relationship" refers to a "defined transition" that causes a parent ion to be broken up into daughter ions. Thus, the discussion in Schwartz that mass selection can be operated in different scan modes does not suggest to a skilled artisan to design a system such as that reflected in the '470 patent. Indeed, the Schwartz reference pre-dated the '470 patent priority date by *eight years* and yet Agilent was unable to identify any reference during that span of time in which someone else adopted the "design choice" that Agilent suggests is so obvious.

Finally, the King references[6] that discuss removal of polyatomic interferences via dissociation reactions in a collision cell do not fill the above gaps. The remaining arguments in your letter with respect to the other Thermo Fisher patents suffer the same deficiencies.

In view of your letter, Thermo Fisher remains confident that any attempt to invalidate the four Thermo Fisher patents would fail, and that a legal position based on such an unlikely event is seriously flawed. Should Agilent believe it does have a non-infringement position, or there exists an anticipatory prior art reference, please inform us by April 30th, 2013, so that Thermo Fisher can fully consider them. Otherwise, we request that Agilent cease and desist from manufacturing, marketing, importing, using and/or selling the 8800 ICP/MS instruments immediately. If you are interested in discussing possible licenses for these patents, we would be prepared to send you a term sheet.

Very truly yours,

*Peter Y. Lee (signature)*

Peter Y. Lee
Vice President, Chief Counsel – Intellectual Property
Thermo Fisher Scientific Inc.

---

[5] Ex. E, Schwartz et. al., "Systematic Delineation of Scan Modes in Multidimensional Mass Spectrometry." Anal. Chem. 1990, 62. pages 1809 - 1818.
[6] Ex. C, King and Harrison. "Collision-Induced Dissociation of Polyatomic Ions In Glow Discharge Mass Spectrometry," page 174: Ex. D, King et. al.. "Study of Molecular Interferences in Glow Discharge Mass Spectrometry," Journal of Analytical Atomic Spectrometry, Vol. 3. Sept. 1988.

# EXHIBIT D

Agilent Technologies, Inc.
5301 Stevens Creek Boulevard
PO Box 58059
Santa Clara, California 95052-8059

408-553-3052 telephone
408-553-2365 facsimile
doug_kundrat@agilent.com
www.agilent.com

**Agilent Technologies**

Douglas A. Kundrat
Vice President, Deputy General Counsel
and Director of Intellectual Property
Legal Department

April 26, 2013

Mr. Peter Y. Lee
Chief Counsel, Intellectual Property
Thermo Fisher Scientific, Inc.
81 Wyman Street
Waltham, MA 02451

### Re:   U.S. Patent Nos. 7,202,470; 7,230,232; 7,339,163; and 7,211,788
Settlement Communication Pursuant to Fed. R. Evid. 408

Dear Mr. Lee:

Thank you for your letter of March 29, 2013. Agilent cannot agree to license Thermo Fisher's patents without reason to believe that they include valid claims that are relevant to Agilent's products. Based upon our analysis to date, Agilent is not aware of any such claim, and Thermo Fisher's correspondence has not demonstrated otherwise.

Thus far, Thermo Fisher has not provided any specific contentions supporting its assertion that any Agilent products practice any claim of the Thermo Fisher patents. Although we understand why Thermo Fisher might be reluctant to offer specific contentions at this time, including contentions regarding Thermo Fisher's interpretation of its patent claims, the suggestion in your letter that it is incumbent upon Agilent to do so in response to Thermo Fisher's vague infringement allegations is not a productive way to proceed.

Your "assumption" that Agilent has neither infringement defenses nor anticipatory prior art is incorrect and is contrary to the disclosures set forth in my previous letter. We did not specifically address the issue of infringement because it is not clear to us how Thermo Fisher is interpreting the claims to read on any Agilent product. Nor did we map the prior art to any specific claim because Thermo Fisher did not do so in its initial letter. Instead, we responded with the same level of detail as your assertions, identifying the prior art that shows that the accused features were all well known in the art and which anticipate or render obvious the four asserted claims. As I explain

below, claim 13 of the '470 patent, which is the only claim identified in your most recent letter, is clearly anticipated by at least one of those references.

First, with regard to the burden of proof on the issue of validity, you correctly note that in any litigation Agilent will bear the burden of proving invalidity by clear and convincing evidence. However, many of the claims in Thermo Fisher's patents qualify for review by the patent office. In an *inter partes* review, Agilent would only need to prove invalidity by a preponderance of the evidence, and the claims in such a review will be given their broadest reasonable interpretation when comparing them to the art.

Turning to claim 13 of the '470 patent, you contend that any prior art that dissociates ions and analyzes the fragments is irrelevant to claim 13. But there is no limitation in claim 13 that excludes dissociation reactions in the collision cell. The claim recites that the selected ions are transmitted into a collision cell, but does not require a particular type of reaction to occur there. The claim is thus anticipated by at least the following disclosure from the King reference identified in my previous letter:

| Claim 13 | King |
|---|---|
| A method of operating a mass spectrometer that incorporates a collision cell pressurized with a target gas, the method comprising: | "The mass spectrometer employed in these studies is a modified Finnigan MAT series 4500 system equipped with a collision cell of non-linear geometry." (page 173). In the experiment shown in figure 6 of King, the cell is pressurized with 1 mtorr of argon gas. |
| generating an ion beam by introducing a sample into a plasma, the ion beam including analyte ions having an analyte mass to charge ratio and unwanted ions; | King's spectrometer used a "glow discharge ion source." (page 173). In the example shown in figure 6, the source generated analyte ions of m/z 81 ($Ar_2H+$) from a sample of brass (page 183). The ion beam also included unwanted ions of other m/z values. |
| mass selecting at least a portion of the ion beam at the analyte mass to charge ratio; | In the example shown in figure 6, the ion beam formed from the brass sample was filtered to select ions having an m/z of 81: "Utilizing a brass sample, the daughter spectrum of m/z=81 shown in figure 6 was acquired." (page 183). |
| transmitting at least a portion of the mass selected ion beam into the collision cell, the mass selecting step being effective | Ions of m/z 81 were transmitted into the collision cell. The mass selective step prevented the |

| substantially to minimize the formation in the collision cell of interfering ions having the analyte mass to charge ratio; | unwanted ions from entering the collision cell, thereby preventing the unwanted ions from forming interfering ions in the cell at $m/z$ 81. |
|---|---|
| receiving at least a portion of the ion beam from the collision cell at a mass analyzer; and | The ion beam from the collision cell was received by the mass analyzer. |
| mass analyzing the received ion beam at the same analyte mass to charge ratio as in the mass selecting step. | As shown in figure 6, the ion beam was analyzed at an $m/z$ of 81, the same $m/z$ as selected by the input filter. |

Furthermore, contrary to your contentions, the triple quadrupole references we cited disclose reactions other than dissociations. For example, the Schwartz reference explicitly contemplated reactions other than dissociations and is not limited to detecting daughter ions as you argue. Indeed, Schwartz discloses that in the collision cell "**some reaction**, (dissociative, **associative**, **etc.**) is taking place," and goes on to disclose that such reactions could include "charge changes and simple ion removal processes."[1]

We appreciate the suggestion in your letter that any dispute between our companies on this subject may be resolved with a business arrangement. However, we will need a more open exchange of contentions to move any such discussions forward. Accordingly, I suggest that we sign a straightforward non-disclosure agreement that will allow us to exchange information and contentions with the assurance that they will be maintained in confidence and will not be used for any purpose in any subsequent litigation. I am enclosing a draft NDA for your consideration and look forward to hearing from you.

Regards,

Douglas A. Kundrat
Vice President, Deputy General Counsel
and Director of Intellectual Property

---

[1] Schwartz, page 1811, col. 1, 5th par.

3

## CONFIDENTIALITY AND NONDISCLOSURE AGREEMENT

This Agreement is between Thermo Fisher Scientific, Inc. and Agilent Technologies, Inc. (collectively "the Parties").

WHEREAS, the Parties have exchanged communications regarding a dispute related to the infringement and invalidity of U.S. Patent Nos. 7,202,470; 7,211,788; 7,230,232; and 7,339,163 (collectively and individually, the "Patents");

WHEREAS, the Parties intend to have discussions regarding a potential resolution of their dispute regarding the Patents (the "Discussions"), which may take place in writing, by email, by telephone, or in person, and may include the exchange of Confidential Information (defined below);

NOW, THEREFORE, the Parties agree as follows:

1.      "Confidential Information" means: (a) information in tangible, machine readable, or electronic form disclosed by either of the Parties to the other, which the disclosing party identifies as confidential or proprietary by means of a legend, marking, stamp, or other notice identifying the information to be confidential or proprietary; or (b) information disclosed orally or visually by a party, where the disclosing party identifies such information as confidential or proprietary at the time of disclosure. Any and all information disclosed during or in conjunction with any of the Discussions shall be automatically designated as Confidential Information unless that information is expressly designated by the disclosing party as non-confidential.

2.      With respect to any Confidential Information exchanged between the Parties, the party receiving such Confidential Information will: (a) not disclose the Confidential Information to any court, judge, jury, arbitrator, mediator, discovery referee, magistrate, or third party; (b) restrict disclosure of the Confidential Information to only those employees, agents, or consultants who must be directly involved in the Discussions and who are bound by confidentiality terms substantially similar to those in this Agreement; (c) only use Confidential Information for the purpose for which it was disclosed; and (d) promptly notify the disclosing party upon discovery of an unauthorized use or disclosure of the Confidential Information and prevent further unauthorized use or disclosure of the Confidential Information.

3.      For the purposes of clarity, and in addition to the protections set forth above, any Confidential Information consisting of or relating to patents, claim charts, invalidity charts or allegations, or infringement charts or allegations, may not be used or disclosed for the purpose of or as a basis for filing, supporting, or maintaining, a declaratory judgment action, reexamination, interference, or any other judicial or administrative proceeding.

4.      Confidential Information that is now available or becomes available to the public through no fault or negligence by the receiving party and without breach of this Agreement, or is explicitly approved for release by the Parties, or is lawfully obtained from a third party without a duty of confidentiality, or which is independently obtained or developed by persons not having access to the Confidential Information, is not subject to the provisions of paragraphs 2 and 3.

5.      The receiving party's obligations pursuant to paragraphs 2 and 3 shall not apply to any Confidential Information required by a court of law or government authority to be disclosed.

6.      Confidential Information may be designated as "Outside Counsel's Eyes Only" by affixing a designation so indicating on each designated page. In addition to the protections set forth above, Confidential Information designated pursuant to this provision may not be shared with or provided to any agent, officer, in-house attorney or employee of the receiving party.

7.      Any information disclosed or proposals made in the course of the Discussions, whether Confidential Information or otherwise, shall be treated as information obtained in the course of settlement negotiations and shall be inadmissible for any purpose in any judicial or administrative proceeding involving one or more of the Parties, including any litigation related to the Patents. This Agreement is intended and agreed to be broader than the protection and privileges offered by Federal Rule of Evidence 408 and any analogous provision of any state law. Nothing in this Agreement shall be construed as granting the receiving party any rights to the Confidential Information other than the limited right to use the Confidential Information during the Discussions as defined herein.

8.      The parties agree to treat the existence of the Discussions as Confidential Information and shall not rely on or introduce as evidence in any judicial or administrative proceeding involving one or more of the Parties, including any litigation related to the Patents, the views expressed or suggestions made by one or more of the Parties with respect to a potential resolution of the dispute regarding the Patents or admissions made in the course of the Discussions.

9.      This Agreement commences on the date of the last signature on this Agreement and continues for a period of five (5) years or until the Parties' dispute regarding the Patents is completely resolved, whichever is later.

10.     Upon written request of the producing party, any and all Confidential Information must be promptly destroyed or returned to the producing party.

11.     This Agreement is the entire agreement between the Parties with respect to the subject matter contained herein and supersedes all prior or contemporaneous oral or written agreements concerning this subject matter. This Agreement may only be modified with the written consent of all the Parties.

13.     This Agreement shall be governed by and construed in accordance with the laws of the State of California.

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the date forth below.

| Thermo Fisher Scientific, Inc. | Agilent Technologies, Inc. |
|---|---|
| By: _____ | By: _Josef A Kundet_ |
| Name: _____ | Name: __Douglas A. Kundrat___ |
| Title: _____ | Title: __VP, Deputy General Counsel &__ Director of Intellectual Property |
| Date: _____ | Date: __April 26, 2013_____ |