# EXHIBIT A

## IPR No. 2018-00298

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Agilent Technologies, Inc.,
Petitioner

v.

Thermo Fisher Scientific Inc. and
Thermo Fisher Scientific (Bremen) GmbH,
Patent Owner.

_____

Case No. <u>Unassigned</u>

U.S. Patent No. RE45,386

_____

**Petition for *Inter Partes* Review of U.S. Patent No. RE45,386**

Mail Stop **PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................1

II.    MANDATORY NOTICES ....................................................................1

    A.     Real Parties-in-Interest....................................................................1

    B.     Related Matters.................................................................................1

    C.     Lead and Back-Up Counsel...............................................................2

III.   PAYMENT OF FEES ...........................................................................3

IV.    STANDING ...........................................................................................3

V.     IDENTIFICATION OF CHALLENGE AND STATEMENT OF
       PRECISE RELIEF REQUESTED ........................................................3

VI.    THRESHOLD REQUIREMENT FOR INTER PARTES REVIEW ............3

VII.   STATEMENT OF REASONS FOR THE RELIEF REQUESTED ...............4

    A.     Grounds ............................................................................................4

    B.     Priority Date of the '386 Patent........................................................4

VIII.  STATE OF THE ART ............................................................................5

    A.     Person of Ordinary Skill in the Art ....................................................5

    B.     Scope and Content of the Art Before September 1998 ........................5

        1.     Mass Spectrometry...................................................................5

        2.     Quadrupole Mass Analyzer.......................................................6

        3.     Tandem Mass Spectometry.......................................................7

        4.     Plasma Ion Source..................................................................15

        5.     Spectroscopic Interferences ....................................................16

        6.     Photons and Neutral Species...................................................17

IX.    THE '386 PATENT ..............................................................................18

i

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## TABLE OF CONTENTS
(continued)

**Page**

A.     Patent-Owner's Admissions to European Patent Office ....................18

B.     The '386 Patent Claims ........................................................................19

X.   CLAIM CONSTRUCTION ........................................................................27

A.     "means (1) for generating ions from a sample introduced into a plasma" (Claim 1) ................................................................................27

B.     "mass-to-charge ratio analyzing means (37)" (Claim 1) ...................27

C.     "configured to" (Claim 28) .................................................................27

D.     "at the same mass-to-charge ratio"; "at the same analyte mass-to-charge ratio" (Claims 1, 13, and 28)..............................................28

XI.   GROUNDS FOR UNPATENTABILITY ....................................................29

A.     General Principles ...............................................................................29

B.     Apparatus Claims Reciting Manners of Operation .............................30

C.     Method Claims Reciting Operations of an Apparatus ........................31

D.     Claim Elements Directed to the Intended Use of a Component ........31

E.     Ground 1:  King Anticipates Claims 13, 16-17, 28, 41, and 46-50 under § 102(b) ..............................................................................32

      1.       King Anticipates Claim 13.......................................................33

      2.       King Anticipates Independent Claim 28...................................37

      3.       King Anticipates Many Dependent Claims ..............................40

F.     Ground 2: King in Combination with Douglas-1989 Renders Obvious Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 44, and 47-49 ......................................................................................................41

      1.       Motivation to Combine King and Douglas-1989 ....................42

      2.       King and Douglas-1989 Render Obvious Independent Claim 28.....................................................................................43

ii

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

# <u>TABLE OF CONTENTS</u>
(continued)

<u>Page</u>

|  |  |  |  |
|---|---|---|---|
| | 3. | King and Douglas-1989 Render Obvious Independent Claim 13 | 45 |
| | 4. | King and Douglas-1989 Render Obvious Dependent Claims | 46 |
| G. | | Ground 3:  King in Combination with Douglas-1989 and Eiden Renders Obvious Claims 43, 46, and 50 | 50 |
| H. | | Ground 4:  King in Combination with Douglas-1989 and Speakman Render Obvious Claims 1-3, 6-8, 10, 12, 18-20, 22-23, 33, 35-36, 39, 42-43 and 45-46 | 52 |
| | 1. | King in view of Douglas-1989 and Speakman Render Obvious Independent Claim 1 | 55 |
| | 2. | King in view of Douglas-1989 and Speakman Render Obvious Many Dependent Claims | 62 |
| I. | | Ground 5:  King in Combination with Douglas-1989, Speakman, and Yost Renders Obvious Claims 4, 5, 14, 25-27, 39, 42, and 45 | 66 |
| XII. | | CONCLUSION | 71 |
| XIII. | | CERTIFICATE OF WORD COUNT | 71 |

iii

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aller,*
220 F.2d 454 (C.C.P.A. 1955) ...........................................................64

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,*
320 F.3d 1339 (Fed. Cir. 2003) ........................................................32

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,*
246 F.3d 1368 (Fed. Cir. 2001) ........................................................32

*Catalina Marketing Intern. v. Coolsavings.Com,*
289 F.3d 801 (Fed. Cir. 2002) ..........................................................31

*Cuozzo Speed Techs., LLC v. Lee,*
136 S. Ct. 2131 (2016).......................................................................28

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,*
909 F.2d 1464 (Fed. Cir. 1990) ........................................................31

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.,*
780 F.3d 1376 (Fed. Cir. 2015) ........................................................31

*In re King,*
801 F.2d 1324 (Fed. Cir. 1986) ........................................................32

*Ex parte Masham,*
2 U.S.P.Q.2d 1647 (Bd. Pat. App. & Inter. 1987)............................32

*Ex Parte Mewherter,*
Appeal No. 2012-007692, Decision on Appeal (P.T.A.B. May 8,
2013) ...................................................................................................33

*In re Petering,*
301 F.2d 676 (1962)...........................................................................31

iv

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*
  No. 11–484–RGA, 2013 WL 3830416 (D. Del. July 23, 2013)........................29

*Schering Corp. v. Geneva Pharms.*,
  339 F.3d 1373 (Fed. Cir. 2003) .........................................................................30

**Statutes**

35 U.S.C. § 102 ...............................................................................1, 3, 30, 32

35 U.S.C. § 102(b) ........................................................................4, 33, 43, 51, 67

35 U.S.C. § 102(e) .........................................................................................53

35 U.S.C. § 103 .............................................................................1, 3, 4, 31, 32

35 U.S.C. § 311 ...............................................................................................1

35 U.S.C. § 314(a) ..........................................................................................3

**Regulations**

37 C.F.R. § 42.8 ..............................................................................................1

37 C.F.R. § 42.8(b)(2).....................................................................................1

37 C.F.R. § 42.10(b) .......................................................................................2

37 C.F.R. § 42.15(a).........................................................................................3

37 C.F.R. § 42.100(b) ....................................................................................28

37 C.F.R. § 42.103 ...........................................................................................3

37 C.F.R. § 42.104(a)........................................................................................3

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## <u>TABLE OF AUTHORITIES</u>
(continued)

<u>Page(s)</u>

37 C.F.R. § 42.104(b) ................................................................................................3

vi

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## TABLE OF EXHIBITS

| Exhibit Number | Document |
|---|---|
| 1001 | U.S. Patent No. RE45,386 ("the '386 Patent") |
| 1002 | Prosecution History of U.S. Patent No. 7,202,470 ("'470 Patent"), January 3, 2002 Non-final Rejection. |
| 1003 | Prosecution History of '470 Patent, July 9, 2002 Amendment and Remarks. |
| 1004 | Declaration of Richard Yost, Ph.D. |
| 1005 | The Complaint (served copy) |
| 1006 | Tanner, Scott D., and Vladimir I. Baranov. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). II. Reduction of interferences produced within the cell." *Journal of the American Society for Mass Spectrometry* 10.11 (1999): 1083-1094.  ("Tanner") |
| 1007 | U.S. Patent No. 6,191,417 ("Douglas") |
| 1008 | Declaration of Sylvia Hall-Ellis, Ph.D. |
| 1009 | JPH10214591A ("Saito") |
| 1010 | Certified Translation of JPH10214591A ("Saito") |
| 1011 | Baranov, Vladimir, and Scott D. Tanner. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). Part 1. The rf-field energy contribution in thermodynamics of ion-molecule reactions." *Journal of Analytical Atomic Spectrometry* 14, no. 8 (1999): 1133-1142.  ("Baranov") |
| 1012 | PCT International Application – International Publication Number WO 00/16375 ("PCT375") |
| 1013 | U.S. Patent No. 6,340,814 ("Vandermey") |
| 1014 | McLafferty, Fred W. "Tandem mass spectrometry." *Science* (1981): 280-287. |
| 1015 | Yost, Richard A., and Dean D. Fetterolf.  "Tandem mass spectrometry (MS/MS) instrumentation." *Mass Spectrometry Reviews* 2, no. 1 (1983): 1-45. |

## TABLE OF EXHIBITS
(continued)

| Exhibit Number | Document |
|---|---|
| 1016 | Miller, Philip E., and M. Bonner Denton. "The quadrupole mass filter: basic operating concepts." *J. Chem. Educ.* 63, no. 7 (1986): 617-623. |
| 1017 | Yost, R. A., and C. G. Enke. "Triple quadrupole mass spectrometry for direct mixture analysis and structure elucidation." *Analytical Chemistry* 51, no. 12 (1979): 1251-1264. |
| 1018 | European Patent Application Publication No. EP0237259A2 |
| 1019 | U.S. Patent No. 4,234,791 ("Enke") |
| 1020 | U.S. Patent No. 6,093,929 ("Javahery") |
| 1021 | Dawson, P. H., J. B. French, J. A. Buckley, D. J. Douglas, and D. Simmons. "The use of triple quadrupoles for sequential mass spectrometry: 1—The instrument parameters." *Journal of Mass Spectrometry* 17, no. 5 (1982): 205-211. |
| 1022 | Johnston, M., "Energy Filtering in Triple Quadrupole MS/MS," *Finnigan MAT*, San Jose, California, USA, no. 203, 1984. |
| 1023 | Eiden, Gregory C., Charles J. Barinaga, and David W. Koppenaal. "Beneficial ion/molecule reactions in elemental mass spectrometry." *Rapid Communications in Mass Spectrometry* 11, no. 1 (1997): 37-42. |
| 1024 | U.S. Patent No. 6,222,185 ("Speakman") |
| 1025 | U.S. Patent No. 6,011,259 ("Whitehouse") |
| 1026 | Koppenaal, David W. "Atomic mass spectrometry." *Analytical Chemistry* 64, no. 12 (1992): 320R-342R. |
| 1027 | Sass, Samuel, and Timothy L. Fisher. "Chemical ionization and electron impact mass spectrometry of some |

## TABLE OF EXHIBITS
(continued)

| Exhibit Number | Document |
|---|---|
| | organophosphonate compounds." *Journal of Mass Spectrometry* 14, no. 5 (1979): 257-264. |
| 1028 | King, F. L., and W. W. Harrison. "Glow discharge mass spectrometry: an introduction to the technique and its utility." *Mass Spectrometry Reviews* 9, no. 3 (1990): 285-317. |
| 1029 | Douglas, D. J. "Some current perspectives on ICP-MS." *Canadian Journal of Spectroscopy* 34, no. 2 (1989): 38-49. ("Douglas-1989") |
| 1030 | Louris, John N., Larry G. Wright, R. Graham Cooks, and Alan E. Schoen. "New scan modes accessed with a hybrid mass spectrometer." *Analytical Chemistry* 57, no. 14 (1985): 2918-2924. |
| 1031 | Houk, R. S. "Elemental and isotopic analysis by inductively coupled plasma mass spectrometry." *Accounts of Chemical Research* 27, no. 11 (1994): 333-339. |
| 1032 | Tanner, Scott D., Vladimir I. Baranov, and Dmitry R. Bandura. "Reaction cells and collision cells for ICP-MS: a tutorial review." *Spectrochimica Acta Part B: Atomic Spectroscopy* 57, no. 9 (2002): 1361-1452. |
| 1033 | Rowan, John T., and R. S. Houk. "Attenuation of polyatomic ion interferences in inductively coupled plasma mass spectrometry by gas-phase collisions." *Applied Spectroscopy* 43, no. 6 (1989): 976-980. |
| 1034 | Kishi, Yoko. "A benchtop inductively coupled plasma mass spectrometer." *HEWLETT PACKARD JOURNAL* 48 (1997): 72-79. ("Kishi") |
| 1035 | Montaser, Akbar et al., *An Introduction to ICP Spectrometries for Elemental Analysis* 1 in Inductively Coupled Plasma Mass Spectrometry (Akbar Montaser, ed. |

## TABLE OF EXHIBITS
(continued)

| Exhibit Number | Document |
|---|---|
|  | 1998). |
| 1036 | U.S. Patent No. 6,140,638 ("Tanner-Patent") |
| 1037 | King, F.L., et al., "Collision-Induced Dissociation of Polyatomic Ions in Glow Discharge Mass Spectrometry," *International Journal of Mass Spectrometry and Ion Processes*, 1989, vol. 89, pp. 171-185. |
| 1038 | Turner, Patrick, et al., "Instrumentation For Low and High-Resolution ICP/MS": Inductively Coupled Plasma Mass Spectrometry, Publication Wiley-VCH, edited by A. Montaser, 1998, p. 421-501. ("Turner") |
| 1039 | Terzić, I., and D. Ćirić. "The double cylindrical electrostatic sector as an ion energy analyzer." *Nuclear Instruments and Methods* 166, no. 3 (1979): 419-423. ("Terzic") |
| 1040 | 1992 Pittcon (The Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy) "Practical MS/MS Analysis" Short Course, Lecture 7 |
| 1041 | May 12, 2015 Response Regarding European Patent Application No. 14175305.3 |

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## I.  **INTRODUCTION**

Pursuant to 35 U.S.C. § 311, Agilent Technologies, Inc. ("Agilent" or

"Petitioner") submits this petition for *inter partes* review ("IPR"), seeking

cancellation of claims 1-8, 10, 12-20, 22-23, and 25-50 of U.S. Patent No.

RE45,386 ("the '386 Patent," Ex. 1001).  These claims are unpatentable under 35

U.S.C. §§ 102 and 103 over the prior art references identified in this petition.

## II.  **MANDATORY NOTICES**

Pursuant to 37 C.F.R. § 42.8, Petitioner provides the following mandatory

disclosures:

### A.  **Real Parties-in-Interest**

Agilent Technologies, Inc. ("Agilent") is the real party-in-interest.

### B.  **Related Matters**

Pursuant to 37 C.F.R. § 42.8(b)(2), the '386 Patent is the subject of a patent

litigation suit brought by Patent-Owner (Ex. 1005).  Petitioner is concurrently

filing another petition for IPR of the '386 Patent; and two petitions for IPR of two

other patents asserted in that litigation: related U.S. Patent No. 7,230,232 and U.S.

Patent No. RE45,553, respectively.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

### C.   **Lead and Back-Up Counsel**

Petitioner provides the following designation of counsel:

| Lead Counsel | Back-up Counsel |
|---|---|
| Brian M. Buroker<br>(Reg. No. 39125)<br>Gibson, Dunn & Crutcher LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, DC 20036-5306<br>Tel:  202-955-8541<br>bburoker@gibsondunn.com | Anne Y. Brody<br>(Reg. No. 54612)<br>Gibson, Dunn & Crutcher LLP<br>3161 Michelson Drive<br>Irvine, CA 92612-4412<br>Tel:  949-451-4192<br>abrody@gibsondunn.com |
|  | David L. Glandorf<br>(Reg. No. 62222)<br>Gibson, Dunn & Crutcher LLP<br>1801 California Street<br>Denver, CO 80202-4200<br>Tel:  303-298-5726<br>dglandorf@gibsondunn.com |

A Power of Attorney accompanies this petition in accordance with 37 C.F.R. § 42.10(b).  Service via hand delivery or postal mail may be made at the addresses of the lead and back-up counsel above.  Petitioner hereby consents to electronic service, and service via electronic mail may be made at the email addresses provided above for the lead and back-up counsel.

2

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## III.   <u>PAYMENT OF FEES</u>

Pursuant to 37 C.F.R. §§ 42.103 and 42.15(a), $40,600 is being paid via

deposit account 501408.  Any additional fees due in connection with this petition

may be charged to the foregoing account.

## IV.   <u>STANDING</u>

Pursuant to 37 C.F.R. § 42.104(a), Petitioner certifies that the '386 Patent is

available for IPR and that Petitioner is not barred or estopped from requesting IPR

of the claims on the grounds identified herein.

## V.   <u>IDENTIFICATION OF CHALLENGE AND STATEMENT OF PRECISE RELIEF REQUESTED</u>

Pursuant to 37 C.F.R. § 42.104(b), Petitioner requests that the Board institute

*inter partes* review of claims 1-8, 10, 12-20, 22-23, and 25-50 of the '386 Patent

on one or more grounds under pre-AIA 35 U.S.C. §§ 102 and/or 103.

## VI.   <u>THRESHOLD REQUIREMENT FOR INTER PARTES REVIEW</u>

Under 35 U.S.C. § 314(a), institution of *inter partes* review requires "a

reasonable likelihood that the petitioner would prevail with respect to at least one

of the claims challenged in the petition."  This petition meets this threshold for

each of the asserted grounds of unpatentability.

3

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## VII.  **STATEMENT OF REASONS FOR THE RELIEF REQUESTED**

Petitioner requests institution on the five grounds:

### A.  **Grounds**

Ground 1:    King Anticipates Claims 13, 16-17, 28, 41, and 46-50 under § 102(b)

Ground 2:    King in Combination with Douglas-1989 Renders Obvious Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 44, and 47-49 under § 103

Ground 3:    King in Combination with Douglas-1989 and Eiden Renders Obvious Claims 43, 46, and 50 under § 103

Ground 4:    King in Combination with Douglas-1989 and Speakman Renders Obvious Claims 1-3, 6-8, 10, 12, 18-20, 22-23, 33, 35-36, 39, 42-43, and 45-46 under § 103

Ground 5:    King in Combination with Douglas-1989, Speakman, and Yost Renders Obvious Claims 4, 5, 14, 25-27, 39, 42, and 45 under § 103

The Declaration of Richard Yost, Ph.D., a world-renowned expert in mass spectrometry, accompanies this petition.  Ex. 1004.

### B.  **Priority Date of the '386 Patent**

For purposes of this petition, Agilent assumes that the claims of the '386 Patent are entitled to a priority date of September 16, 1998.

4

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## VIII. STATE OF THE ART

### A. Person of Ordinary Skill in the Art

A person of ordinary skill in the art in September 1998 would have a Ph.D. or

a Master's degree, or an equivalent education or practical experience, in chemistry,

physics, or a related field, and at least two-to-three years of experience in

developing the instrumentation and/or the applications of plasma ionization mass

spectrometry and/or tandem mass spectrometry (hereinafter, "POSA").  Ex. 1004

¶¶20-22.

### B. Scope and Content of the Art Before September 1998

#### 1. Mass Spectrometry

Mass spectrometry ("MS") is an analytical technique used to identify and

quantify chemical elements and compounds (*i.e.*, atoms and molecules,

respectively) in a sample based on the atomic mass and charge state of the

constituents in the composition.  Ex. 1014, 281-282; Ex. 1004 ¶32.

Typically, a sample containing atoms or molecules of interest is introduced

into the ion source of a mass spectrometer.  *Id.*; Ex. 1015, 6-9; Ex. 1004 ¶¶33-34.

The ion source induces either a positive or a negative charge in the neutral atoms

and molecules, generating positive or negative ions.  Ex. 1014, 281-282; Ex. 1015,

5

6-9; Ex. 1004 ¶¶33-34.  In most instruments, only the positive ions are

electrostatically guided by ion optics into a portion of the mass spectrometer called

a "mass analyzer."  Ex. 1014, 281-282; Ex. 1015, 9; Ex. 1004 ¶¶33-34.  The mass

analyzer allows ions of a specific mass-to-charge ratio (m/z) to pass through to a

detector apparatus while preventing all other ions from reaching the detector when

the detector is measuring ions of a set m/z value.  Ex. 1015, 16; Ex. 1004 ¶¶33-34.

## 2. **Quadrupole Mass Analyzer**

A quadrupole is the most common mass analyzer used in modern mass

spectrometry.  Ex. 1016, 617; Ex. 1004 ¶35.  It comprises four parallel rods

arranged in a radial array at 90° intervals, with opposite pairs of rods electrically

connected.  *Id.*, 618; Ex. 1004 ¶35.  There are two main modes of operating a

quadrupole: RF-only and RF-DC mode.  *Id.*, 621-622; Ex. 1004 ¶35.  In the RF-

only mode, the quadrupole would transmit all ions above a certain m/z cutoff

("total ion mode").  *Id.*; Ex. 1004 ¶35.  When a combination of RF and DC

voltages is applied between the rod pairs, the quadrupole transmits ions between

upper and lower m/z cutoffs.  *Id.*; Ex. 1004 ¶35.  As the DC-to-RF ratio increases,

the quadrupole's transmission band narrows.  *Id.*; Ex. 1004 ¶35.  At a certain DC-

to-RF ratio, this transmission band would be so narrow as to allow only ions of a

specific integer m/z to pass through ("unit mass resolution"). *Id.*; Ex. 1004 ¶35. If

the magnitude of the DC and RF voltages is continuously increased over time

while keeping the DC/RF ratio constant, the mass filter will scan over a range of

m/z values and generate a mass spectrum ("full-scan mode"). Ex. 1016, 621; Ex.

1004 ¶35.

### 3.    Tandem Mass Spectometry

Quadrupole mass spectrometers may have two or more quadrupoles arranged

in tandem. Exs. 1018-1020; Ex. 1004 ¶36. Each of the quadrupoles can be

designed to operate independently and/or with one another. Exs. 1018-1020; Ex.

1004 ¶36.

Dr. Yost and his colleagues were the first to introduce a RF-driven collision

cell in a triple-quadrupole instrument. Ex. 1019; Ex. 1004 ¶37. This instrument

comprised a first quadrupole, an enclosed RF-only quadrupole used as a

collision/reaction cell, and a third quadrupole. *Id.*, Figure 2; Ex. 1004 ¶37. In that

device, the first quadrupole mass filters the selected ions of interest. *Id.*, 9:14-20;

10:12-17; Ex. 1004 ¶37. The second RF-only quadruple is part of a

collision/reaction cell pressurized with a gas, where fragmentation and/or reactions

of the ions may take place. *Id.*, 5:51-64; 9:27-61; Ex. 1004 ¶37. The third

7

quadrupole mass analyzes the resulting ions transmitted from the collision cell. *Id.* at 9:14-20; 10:12-17; Ex. 1004 ¶37. Such triple-quadrupole instruments are also known as tandem mass or MS/MS spectrometers. Exs. 1014-1016; Ex. 1004 ¶37.

There are a few fundamental control parameters in the triple-quadrupole instrument. Exs. 1014-1015, 1016, 1021-1022; Ex. 1004 ¶38. For instance, each of the first and third quadrupoles can be individually set to pass only ions of a single m/z, ions within a range of m/z ratios, or all ions (above a lower m/z limit inherent in the quadrupole). Ex. 1015, 3-5; Ex. 1021, 207-211; Ex. 1022, 1; Ex. 1004 ¶38. Where either a range of ions or all ions are passed by a quadrupole, that may be accomplished by either (i) allowing all ions in the selected range of m/z values to pass at once, or (ii) incrementally scanning over a range of m/z values such that at any given time only those ions having an m/z value within the open "window" will pass through the quadrupole. Ex. 1004 ¶38. The middle quadrupole can be pressurized with a target gas (acting as a collision/reaction cell) or not pressurized. Ex. 1015, 3-5; Ex. 1004 ¶38. These user-selectable parameters provide a variety of operational modes in a triple-quadrupole instrument. Exs. 1014-1015, 1016, 1021-1022; Ex. 1004 ¶¶39-49.

Figure 2 below depicts tandem MS (MS/MS) modes commonly used on a triple-quadrupole instrument.  Ex. 1004 ¶42.  In each of the four schemes of Figure 2, collision/reaction gas is introduced into the central quadrupole Q2, which is operating in RF-only mode.  *Id.*  Interaction with the collision/reaction gas might cause: fragmentation of polyatomic species, energy transfer, charge transfer, and/or ion-molecule reactions between the affected ions and the collision/reaction gas. Exs. 1028-1029; Exs. 1032-1033; Ex. 1004 ¶42.  Fragmentation results in new ions with lower m/z values, sometimes referred to as a neutral loss; energy transfer may result in ions with less kinetic energy, charge transfer may neutralize an interfering ion; and ion-molecule reactions may as result in new ions with new, often higher, m/z values, sometimes referred to as a neutral gain.  Exs. 1028-1029; Exs. 1032-1033; Ex. 1004 ¶42.



**Figure 2.  MS/MS scan modes on a triple-quadrupole mass spectrometer.**

<u>Daughter Scan</u>: In the top scheme of Figure 2, Q1 is set to pass only ions

with a specific m/z value, often referred to as "parent ions."  Ex. 1015, 3; Ex. 1017,

1252; Ex. 1004 ¶43.  Q3 incrementally scans over a user-specified range of m/z

10

values from low to high.  Ex. 1004 ¶43.  This mode may be used to identify all the

"daughter ions" formed in Q2 by either collisional fragmentation of the selected

parent ion, or reaction of the collision/reaction gas with the selected parent ion.  *Id*.

If no reaction with the parent ion occurs, Q3 would pass the parent ion when Q3

scans over the m/z value of the parent ion.  *Id*.  Notably, when interrogating

elemental samples, collisional fragmentation of selected ions would not be

expected to occur because the elements are already reduced to atomic ions from the

previous ionization process.  *Id*.

Parent Scan: In the second scheme of Figure 2, Q1 incrementally scans a

user-specified range of m/z values from low to high, and Q3 is set at a fixed m/z

value to pass only daughter ions with that specific m/z value.  Ex. 1004 ¶44.  This

type of scan may be used to identify all the parent ions from the ion source that

form the selected daughter ion by collision or reaction in Q2.  Ex. 1015, 3; Ex.

1017, 1252; Ex. 1004 ¶44.  If the daughter ion is initially present in the sample and

no reaction occurs in Q2, then the parent ion m/z value is the same as the daughter

ion m/z value.  Ex. 1004 ¶44.

Neutral Loss [or Gain] Scan:  In the third scheme of Figure 2, Q1 and Q3 are

both set to scan synchronously over an equivalent user-selected range of m/z

values with a fixed difference in m/z values (*e.g*, scanning of Q1 over a m/z value range of 80 to 100 with Q3 scanning a set m/z value range of 60 to 80).  Ex. 1004 ¶45.  The scheme depicts a neutral loss; *i.e.*, a mass shift from a parent ion with a higher m/z value to a daughter ion having a lower m/z value as a result of collisions/reactions.  *Id*.  This scan may be used to identify all the daughter ions which arise from a specific neutral loss known or hypothesized by the researcher during collision or reaction in Q2.  Ex. 1015, 3; Ex. 1017, 1252; Ex. 1004 ¶45.  Also, using a reaction gas, ions transmitted by Q1 could react in Q2 to form product ions of higher m/z.  These could be monitored by a neutral gain scan, with Q3 synchronously scanning with a positive mass offset from Q1.  Ex. 1004 ¶45.

Neutral Loss of Zero Scan.  Where ions of interest that pass through Q1 do not fragment or react in the collision cell and thus retain their initial m/z value, the neutral offset is zero.  Ex. 1004 ¶¶46-48.  If there are interfering ions that also pass through Q1, they may fragment to form lower m/z ions or react to form higher m/z ions in Q2.  *Id*.  Under these circumstances, Q1 and Q3 are synchronously scanned with no offset.  *Id*. That is, both Q1 and Q3 are set to transmit ions having the same m/z value.  Ex. 1022, Figs. 2 and 4; Ex. 1030, 2924; Ex. 1004 ¶¶46-48.  Neutral

loss of zero scan modes were known and routinely used since the 1980's.  Ex.

1030, 2919, 2924; Ex. 1022, 1-3; Ex. 1040; Ex. 1004 ¶¶46-48.

Selected Reaction Monitoring (SRM): In the last scheme of Figure 2, each of

Q1 and Q3 are set to filter out all but either a single parent ion and single daughter

ion at selected m/z values, or a series of selected parent ion/daughter ion pairs.  Ex.

1015, 3-5; Ex. 1017, 1252; Ex. 1004 ¶49.  In an SRM experiment, a researcher

typically knows the m/z value of the parent ions and can predict the m/z value of

the daughter ions resulting from collision/reaction in Q2.  Ex. 1029, 47-49

(describing an SRM experiment in which the parent ion resulted in a 16 amu mass

shift after reacting with a target gas in Q2); Ex. 1004 ¶49.

A schematic of a triple-quadrupole instrument available in the 1980s is

shown below.  Ex. 1015, 21; Figure 5.  This instrument offered automatic control

and data handling by a computer system.  *Id*.; Ex. 1004 ¶50.



**Figure 5.** Scale drawing (side view) of the Finnigan MAT TSQ triple-stage quadrupole MS/MS instrument (15).

Moreover, the quadrupoles may be placed in separate chambers with one or more vacuum pumps. Exs. 1020, 1025; Ex. 1004 ¶¶50-51. The use of differential pumping in mass spectrometers has been implemented by researchers and on commercial instruments for over 40 years. Exs. 1018, 1020, 1025; Ex. 1004 ¶¶50-51. The introduction of ion sources that operate at pressures higher than those at which mass analyzers and detectors can efficiently operate has made differential pumping a common element of most modern mass spectrometers. Ex. 1004 ¶¶50-51. High vacuum is required in the mass analysis and detection region of the mass spectrometer system for two primary reasons—first, to increase the mean-free-path of ions (*i.e.*, how far ions travel between collisions with background gas

14

molecules) to prevent collisions from diverting ions, and second, to prevent arcing

of the high voltages generally employed in mass analyzers and detectors.  *Id*.

Since the primary source of gas into the vacuum system arises from the ion source,

the pressures in successive stage of vacuum pumping generally are highest in the

first stage (by the ion source) and are lowest in the last stage (mass analyzer and

detector).  Ex. 1035, 18-19; Ex. 1004 ¶¶50-51.

### 4.   Plasma Ion Source

All ion sources serve the same purpose—to convert atoms and/or molecules

in a sample into ions that can be conveyed into a mass analyzer.  Ex. 1015, 6-9;

Exs. 1026-1028; Ex. 1004 ¶¶52-53.  A number of ion sources have been developed

for analyzing the elemental species (atoms) in a sample.  Ex. 1026; Ex. 1004 ¶¶52-

53.  Classic ion sources for ionizing atoms include a DC arc and an AC spark.

Exs. 1026, 1029; Ex. 1004 ¶¶52-53.  The preferred ionization source for the past

twenty years is the inductively coupled plasma ("ICP").  Ex. 1031, 333; Ex. 1032,

1431-1444; Ex. 1004 ¶¶52-53.  The ICP ion source typically uses argon gas to

form a plasma and converts the sample into atomic ions.  Ex. 1031, 333; Ex. 1004

¶¶52-53.  Other common types of plasma ion sources for elemental analysis are

microwave-induced plasma ("MIP") and glow discharge plasma ("GD").  Ex.

1026, 322-326; Exs. 1028-1029; Ex. 1004 ¶¶52-53.

### 5.    Spectroscopic Interferences

In elemental mass spectrometry, only certain atomic ions from the ion source

are of interest.  Ex. 1026, 321; Ex. 1004 ¶54.  However, one significant problem

with plasma ion sources remains to be other atomic or molecular ions from the ion

source that have m/z ratios similar to those of the atomic ions of interest.  Ex.

1024, 1:7-32; Ex. 1004 ¶54.  They would interfere with the detection of the atomic

ions of interest.  *Id*.  For example, the polyatomic ion $^{40}Ar^{16}O^+$ can interfere with

the detection of $^{56}Fe^+$.  Ex. 1033, 976; Ex. 1004 ¶54.  These interfering ions come

from the plasma gas, the sample matrix, and/or the vacuum background gases,

alone or in combination.  Ex. 1029, 47; Ex. 1012, 3:34–4:10; Ex. 1004 ¶54.

Researchers have used a collision/reaction cell to reduce the number of

interfering ions that reach the detector, and thereby reduce their impact on

elemental analysis.  Exs. 1006; 1012; 1023-1024; 1028-1029; 1032-1033; Ex. 1004

¶¶55-57.  As a result of the collisions/reactions with a target gas, interfering ions

from the ion source may form new ions with m/z ratios different from that of the

atomic ion of interest and thereby no longer interfere with the detection.  Exs.

1028-1029; Exs. 1032-1033; Ex. 1033, 979-980; Ex. 1004 ¶¶55-57.

However, there may also be other ions in the ion beam with m/z ratios

different from that of the atomic ion of interest.  Ex. 1033, 979-980; Ex. 1004

¶¶55-57.  These ions may form new product ions in the collision/reaction cell with

an m/z ratio similar to that of the atomic ion of interest (*i.e.*, new interfering ions).

*Id*.; Ex. 1004 ¶¶55-57.  Consequently, researchers suggested using a mass selective

device to filter out these ions before the collision cell.  *Id*.; Ex. 1004 ¶¶55-57.  By

allowing only ions with the m/z of interest to enter into the collision cell, any new

product ions formed in the cell would probably not have that m/z of interest.  *Id*.;

Ex. 1004 ¶¶55-57.   Thus, the formation of new interfering ions is reduced by mass

selecting the ions prior to the collision cell.  *Id*.; Ex. 1004 ¶¶55-57.

## 6.    **Photons and Neutral Species**

Many ion sources inevitably generate some amount of neutral species and

photons, including ICP and GD sources.  Ex. 1012, 3:34–4:10; Ex. 1018, 2:1-19;

Ex. 1004 ¶58.  In the absence of other means to divert their path (*e.g.*, vacuum

systems), these neutral species and photons are assumed to travel in a straight line

from the ion source to the detector, increasing the background noise.  Ex. 1018,

2:57-3:20; Ex. 1004 ¶58.  To reduce such background noise, many instruments use

ion optics to bend the path of the ions so that the ions would either travel around a

photon stop or be sent off-axis towards a detector mounted off-axis.  Ex. 1034, 2-3;

Ex. 1004 ¶58.  In contrast, the neutral species and the photons would still travel in

a straight line and strike the photon stop or not be bent towards an off-axis

detector.  *Id*.; Ex. 1018, 2:57-3:20; Ex. 1004 ¶58.

## IX.   THE '386 PATENT

The '386 Patent is a reissue from U.S. Patent No. 7,202,470.  The '470 patent

claimed priority to a GB patent application 98202104, filed on September 16,

1998.  The reissue application was filed on September 19, 2013 (Application

Number 14/032,096).

### A.   Patent-Owner's Admissions to European Patent Office

During the European prosecution of substantially similar claims to those

challenged in this petition, Thermo admitted that Douglas-1989 (Ex. 1029)

disclosed an ICP triple-quadrupole instrument that could be operated such that the

same range of mass-to-charge ratio is selected at the first and third quadrupoles.

Ex. 1041, 1-3 (discussing "D3," which is Ex. 1029 ("Douglas-1989")).  According

to Thermo, the novelty of the claimed invention is the configuration of prior art

instrumentation in a mode that was "not routinely used."  *Id.*, 1.  In other words,

Thermo only argued that the distinguishing feature is the configuration of the prior

art instrument such that the same range of mass-to-charge ratio is selected at the

first and third quadrupoles.  *Id.*, 2.  Moreover, as acknowledged by Thermo,

Douglas-1989's experiment disclosed synchronous scanning of the first and third

quadrupoles at a constant offset of 16 (neutral gain scan).  *Id.*

### B.    The '386 Patent Claims

The '386 Patent has three independent claims—Claim 1, 13, and 28.  Claim 1

is an apparatus claim for a mass spectrometer with three evacuated chambers, three

pumps, a collision cell, and multiple apertures between chambers.

Claim 13 is a method claim for operating a mass spectrometer where there is

mass selection before the collision cell and mass analyzing after the collision cell.

Claim 28 is an apparatus claim for a mass spectrometer which includes a

plasma ion source, an ion optical device, a collision cell, and a mass analyzer.  The

originally issued claim 28 recites a plasma ion source, whereas the reissued claim

28 requires an ICP source.

The full text of all the claims can be found in the chart below.  In the

following discussion, brackets are used to identify claim elements (*e.g.*, "[1E]").

| **'386 Patent Claims** |
|---|
| **[1Pre.]** A mass spectrometer comprising: |
| **[1A.]** means (1) for generating ions from a sample introduced into a plasma; |
| **[1B.]** a sampling aperture (2) for transmitting some of the ions into an evacuated expansion chamber (3) along a first axis (9) to form an ion beam; |
| **[1C.]** a second aperture (5) for transmitting some of the ion beam into a first evacuated chamber (6); |
| **[1D.]** a first pump (7) for maintaining the first evacuated chamber (6) at high vacuum; |
| **[1E.]** a first ion optical device (17) located in the first evacuated chamber (6) for containing the ion beam wherein the first ion optical device (17) is a mass selective device; |
| **[1F.]** a third aperture (19) for transmitting the ion beam into a second evacuated chamber (20); |
| **[1G.]** a second pump (21) for maintaining the second evacuated chamber (20) at a lower pressure than the first evacuated chamber (6); |
| **[1H.]** a collision cell (24) having an entrance aperture (27) and an exit aperture (28) and pressurized with a target gas (26), the collision cell (24) being disposed in the second evacuated chamber (20); |
| **[1I.]** a second ion optical device (25) located in the collision cell (24) for containing the ion beam; |
| **[1J.]** a fourth aperture (32) for transmitting the ion beam into a third evacuated chamber (33) containing mass-to-charge ratio analyzing means (37) disposed along a second axis (36), wherein the mass-to-charge analyzing means is configured to mass analyze the ion beam to produce a mass spectrum of the ion beam such that both the first ion optical device (17) and the mass-to-charge ratio analyzing means (37) operate at the same mass to charge ratio, so as substantially to minimize the formation in the collision cell of interfering ions having the said mass to charge ratio; and |

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

| |
|---|
| **[1K.]** a third pump (39) for maintaining the third evacuated chamber (33) at lower pressure than the second evacuated chamber (20). |
| **2.** A mass spectrometer according to claim **1**, wherein the first evacuated chamber (6) is maintained at a pressure of approximately $10^{-2}$ to $10^{-4}$ mbar. |
| **3.** A mass spectrometer according to claim **1**, wherein the first evacuated chamber (6) is maintained at a pressure of approximately $1\text{-}2\times10^{-3}$ mbar. |
| **4.** A mass spectrometer according to claim **1**, including a gap of at least 2 cm between the third aperture (19) and the entrance aperture (27) of the collision cell (24). |
| **5.** A mass spectrometer according to claim **1**, wherein the distance between the ion source (1) and the entrance aperture (27) of the collision cell (24) is 90 to 200 mm. |
| **6.** A mass spectrometer according to claim **1**, wherein the mass-to-charge ratio analyzing means (37) includes a main mass filter which preferably is an RF quadrupole. |
| **7.** A mass spectrometer according to claim **1**, wherein the first ion optical device (17) is an RF quadrupole. |
| **8.** A mass spectrometer according to claim **1**, wherein the second ion optical device (25) is an RF quadrupole. |
| **9.** A mass spectrometer according to claim **1**, wherein the second ion optical device (25) is mass selective. |
| **10.** A mass spectrometer according to claim **1**, wherein the second axis (36) of the mass to charge ratio analyzing means (37) is offset from the first axis (9). |
| **11.** A mass spectrometer according to claim **1**, wherein the first evacuated chamber (6) is divided into a first region (14) adjacent to the expansion chamber containing an extractor lens (8) driven at a negative potential, and a second region (15) adjacent to the collision cell (24) in which the ion optical device (17) is located, by a large diameter aperture (11) and the aperture is sealable by means of a flat plate (12) on an O-ring seal (13). |

**12.** A mass spectrometer according to claim **1**, wherein the first ion optical device and the mass-to-charge analyzing means are configured to scan synchronously.

**[13Pre]**  A method of operating a mass spectrometer that incorporates a collision cell pressurized with a target gas, the method comprising:

**[13A.]** generating an ion beam by introducing a sample into a plasma, the ion beam including analyte ions having an analyte mass to charge ratio and unwanted ions;

**[13B.]** mass selecting at least a portion of the ion beam at the analyte mass to charge ratio;

**[13C.]** transmitting at least a portion of the mass selected ion beam into the collision cell, the mass selecting step being effective substantially to minimize the formation in the collision cell of interfering ions having the analyte mass to charge ratio;

**[13D.]** receiving at least a portion of the ion beam from the collision cell at a mass analyzer; and

**[13E.]** mass analyzing the received ion beam at the same analyte mass to charge ratio as in the mass selecting step.

**14.** A method according to claim **13**, wherein a distance of 90 to 200 mm is maintained between the ion source and an entrance aperture of the collision cell.

**15.** A method according to claim **13**, wherein mass selecting and mass analyzing comprise scanning synchronously.

**16.** A method according to claim **13**, wherein the mass selecting is achieved by passing the ion beam through a first mass selective ion optical device.

**17.** A method according to claim **16**, wherein the first mass selective ion optical device is an RF quadrupole.

**18.** A method according to claim **16**, wherein the first mass selective ion optical device is located in a first evacuated chamber maintained at high vacuum.

**19.** A method according to claim **18**, wherein the first evacuated chamber is maintained at a pressure of approximately $10^{-2}$ to $10^{-4}$ mbar.

**20.** A method according to claim **18**, wherein the first evacuated chamber is maintained at a pressure of approximately $1\text{-}2\times10^{-3}$ mbar.

**21.** A method according to claim **18**, wherein the first evacuated chamber is divided into a first region adjacent to the expansion chamber containing an extractor lens driven at a negative potential, and a second region adjacent to the collision cell, by a large diameter aperture and the aperture is sealable by means of a flat plate on an O-ring seal.

**22.** A method according to claim **18**, wherein the collision cell is located in a second evacuated chamber operated at lower pressure than the first evacuated chamber, the ion beam being contained in the second evacuated chamber by a second ion optical device.

**23.** A method according to claim **22**, wherein the second ion optical device is an RF quadrupole.

**24.** A method according to claim **22**, wherein the second ion optical device is mass selective.

**25.** A method according to claim **22**, further comprising transmitting at least a portion of the ion beam from the ion source through a sampling aperture into an evacuated expansion chamber along a first axis, into the first evacuated chamber through a second aperture; wherein transmitting at least a portion of the mass selected ion beam into the collision cell includes transmitting at least a portion of the ion beam into the second evacuated chamber through a third aperture, wherein a gap of at least 2 cm is maintained between the third aperture and an entrance aperture of the collision cell.

**26.** A method according to claim **25**, wherein the mass analyzer is located in a third evacuated chamber operated at lower pressure than the second evacuated chamber, the mass analyzer being disposed along a second axis.

**27.** A method according to claim **26**, wherein the second axis is offset from the first axis.

| **28.** A mass spectrometer comprising: |
|---|
| **[28A.]** an inductively coupled plasma ion source for generating ions from a sample, the generated ions including first atomic ions having a first mass-to-charge ratio and artefact ions having a mass-to-charge ratio that interferes with the first mass-to-charge ratio; |
| **[28B.]** an ion optical device disposed to receive at least a portion of an ion beam generated by the ion source, the ion optical device being configured to mass select at least a portion of the ion beam generated by the ion source at the first mass-to-charge ratio, thereby removing, from the ion beam, ions not having the first mass-to-charge ratio; |
| **[28C.]** a collision cell disposed to receive at least a portion of a mass selected ion beam from the ion optical device and configured to remove, from the mass selected ion beam, artefact ions having a mass-to-charge ratio that interferes with the first mass-to-charge ratio, the ion optical device being configured substantially to minimize the formation in the collision cell of interfering artefact ions having the said first mass-to-charge ratio; and |
| **[28D.]** a mass analyzer disposed to receive at least a portion of the mass selected ion beam from the collision cell, the mass analyzer being configured to mass analyze the received ion beam at the same mass-to-charge ratio as the ion optical device, wherein the mass analyzer is configured to detect the first atomic ions when the same mass-to-charge ratio is the first mass-to-charge ratio. |
| **29.** A mass spectrometer according to claim **28**, wherein the ion optical device and the mass analyzer are configured to scan synchronously. |
| **30.** A mass spectrometer according to claim **28**, wherein the mass analyzer is configured to mass select the ion beam received from the collision cell at the mass-to-charge ratio. |
| **31.** A mass spectrometer according to claim **28**, wherein the ion optical device comprises a first RF quadrupole. |
| **32.** A mass spectrometer according to claim **31**, wherein the mass analyzer comprises a second RF quadrupole. |

**33.** A mass spectrometer according to claim **28**, wherein the ion optical device is disposed in a first evacuated chamber, the collision cell is disposed in a second evacuated chamber, and the mass analyzer is disposed in a third evacuated chamber.

**34.** A mass spectrometer according to claim **28**, further comprising a second ion optical device located in the collision cell for containing the ion beam.

**35**. A mass spectrometer according to claim **1**, wherein the means (1) for generating ions from a sample introduced into a plasma uses argon, and wherein the collision cell does not contain a significant partial pressure of argon.

**36.** A mass spectrometer according to claim **1**, wherein the operation of the first ion optical device (17) and the mass-to-charge ratio analyzing means (37) at the same mass to charge ratio to produce the mass spectrum of mass-to-charge ratios includes synchronously scanning the first ion optical device (17) and the mass-to-charge ratio analyzing means (37) over a spectrum of mass-to-charge ratios.

**37.** The method according to claim **13**, wherein mass analyzing the received ion beam at the same analyte mass to charge ratio as in the mass selecting step is performed at a plurality of analyte mass to charge ratios.

**38.** The method according to claim **37**, further comprising:

obtaining a mass spectrum of the ion beam by a synchronous scan that mass analyzes the received ion beam at the same analyte mass to charge ratio as in the mass selecting step at the plurality of analyte mass to charge ratios.

**39.** The method according to claim **13**, wherein the collision cell does not contain a significant partial pressure of argon.

**40.** The method according to claim **13**, wherein the collision cell is pressurized with a target gas that is not argon.

**41.** The method according to claim **13**, wherein the plasma is an inductively coupled plasma.

| **42.** The method according to claim **41**, wherein the inductively coupled plasma includes argon, and wherein the collision cell does not contain a significant partial pressure of argon. |
|---|
| **43.** The method according to claim **42**, wherein the collision cell is pressurized with helium or hydrogen. |
| **44.** A mass spectrometer according to claim **28**, wherein the generated ions further include second atomic ions having a second mass-to-charge ratio and artefact ions having a mass-to-charge ratio that interferes with the second mass-to-charge ratio, wherein the ion optical device is further configured to mass select at least a portion of the ion beam generated by the ion source at the second mass-to-charge ratio, and wherein the mass analyzer is configured to detect the second atomic ions when the same mass-to-charge ratio is the second mass-to-charge ratio. |
| **45.** A mass spectrometer according to claim **28**, wherein the inductively coupled plasma includes argon, and wherein the collision cell does not contain a significant partial pressure of argon. |
| **46.** A mass spectrometer according to claim **45**, wherein the collision cell is pressurized with helium or hydrogen. |
| **47.** A mass spectrometer according to claim **28**, wherein the artefact ion include molecular ions. |
| **48.** A mass spectrometer according to claim **28**, wherein the artefact ions are reacted or collided with a collision gas in the collision cell to form ions having mass-to-charge ratios that do not interfere with the first mass-to-charge ratio, thereby removing artefact ions. |
| **49.** A mass spectrometer according to claim **48**, wherein at least some of the artefact ions are collided with the collision gas to form ions that have lower mass-to-charge ratios than the first mass-to-charge ratio. |
| **50.** A mass spectrometer according to claim **48**, wherein at least some of the artefact ions are reacted with the collision gas to form ions that have higher mass-to-charge ratios than the first mass-to-charge ratio. |

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## X.   CLAIM CONSTRUCTION

A claim in *inter partes* review is given the broadest reasonable interpretation ("BRI") in light of the specification.  37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016).  Petitioner proposes the following BRIs:

### A.   "means (1) for generating ions from a sample introduced into a plasma" (Claim 1)

The function for this means-plus-function term is "generating ions from a sample introduced into a plasma."  The corresponding structure includes: (1) an ICP ion source based on 6:26-27; and (2) other plasma ion sources based on 1:15-23, and claims 13 and 41.

### B.   "mass-to-charge ratio analyzing means (37)" (Claim 1)

The function for this means-plus-function term is "analyzing ions based on their mass-to-charge ratios."  The corresponding structure includes: an RF quadrupole, a magnetic sector, and a time-of-flight ("TOF") mass analyzer based on the disclosures at 4:60-64 and claim 6.

### C.   "configured to" (Claim 28)

Claim 28 uses the phrase "configured to" three times, each in reference to a mode of operation of the mass spectrometer.  While an instrument that is configured to operate in a certain mode must be capable of operating in that mode,

courts have rejected the narrow interpretation that the claimed mode has to be the

default setting. *Riverbed Tech., Inc. v. Silver Peak Sys., Inc*. No. 11–484–RGA,

2013 WL 3830416, at *1 (D. Del. July 23, 2013) (holding that a system is

"configured to" perform a function "[i]f the system is expressly created so that the

user may take advantage of" that function, "[e]ven if the enablement of the

function is not the default setting"). There is nothing in the prosecution history or

specification here that suggests that "configured to" must be the sole or even

default setting. According, the BRI of "configured to" is "enabled for use by the

user to."

**D.** **"at the same mass-to-charge ratio"; "at the same analyte mass-to-charge ratio" (Claims 1, 13, and 28)**

Claims 1 and 28 describe that the mass analyzer operates "at the same mass-

to-charge ratio" as the ion optical device. Claim 13 describes that the step of mass

analyzing to be "at the same analyte mass-to-charge ratio" as the mass selecting

step. The BRI of this term is "at one or more mass-to-charge ratios, one of which

is the mass-to-charge ratio of an analyte ion."

The claim language and the other claims support this BRI. Claim 13

describes a method of operating a mass spectrometer using the transitional phrase

"comprising" in an open-ended manner.  Claims 37 and 38 depend on Claim 13,

and further describe that the step of mass analyzing is performed at a plurality of

analyte m/z ratios.  These claim elements do not explicitly exclude mass analyzing

at m/z ratios other than the analyte m/z ratios.  In other words, these claims' scope

encompass a method in which the mass analysis step is performed at many m/z

ratios, so long as one of the m/z ratios is the analyte m/z ratio.  In that case, the

step of mass analyzing would still be "at the same mass-to-charge ratio" as the

mass selecting step.

## XI.   GROUNDS FOR UNPATENTABILITY

### A.   General Principles

Under 35 U.S.C. § 102, if a single prior art reference discloses each

limitation of the claimed invention, a patent claim is anticipated and invalid.

*Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

Moreover, "a reference can anticipate a claim even if it 'd[oes] not expressly spell

out' all the limitations arranged or combined as in the claim, if a person of skill in

the art, reading the reference, would 'at once envisage' the claimed arrangement or

combination."  *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376,

1381 (Fed. Cir. 2015).

Under 35 U.S.C. § 103, a patent claim is obvious and invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

### B.   Apparatus Claims Reciting Manners of Operation

"[A]pparatus claims cover what a device *is,* not what a device *does*." *Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis in original). "[T]he patentability of apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure." *Catalina Marketing Intern. v. Coolsavings.Com*, 289 F.3d 801, 809 (Fed. Cir. 2002). Thus, a claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the apparatus claim. *Ex parte Masham*, 2 U.S.P.Q.2d 1647 (Bd. Pat. App. & Inter. 1987).

### C.   Method Claims Reciting Operations of an Apparatus

When a prior art apparatus is the same as the apparatus described in a claim for carrying out a claimed method, the prior art apparatus presumably will perform the claimed method in its normal and usual operation.  *In re King,* 801 F.2d 1324 (Fed. Cir. 1986).  Moreover, when a prior art reference describes using a prior art apparatus towards a particular purpose, a claimed method is anticipated if the claim merely recites newly discovered results of using the same apparatus for the same purpose. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001).

### D.   Claim Elements Directed to the Intended Use of a Component

Statements of an intended use or purpose of a component in a claimed structure or composition are not included in invalidity analysis under Sections 102 and 103. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003).

**Claims 46-50:**  Claims 46-50 ultimately depend from the apparatus Claim 28.  These claims only state the intended results of using certain plasma gas, sample, collision gas, and/or pressures.  These claims do not add any further structural limitations to the claimed apparatus.  Accordingly, prior art that discloses

31

the apparatus of Claim 28 anticipates (or render obvious) Claims 46-50 regardless

of whether the prior art discloses the results of using these gases and samples.

### E.   Ground 1:  King Anticipates Claims 13, 16-17, 28, 41, and 46-50 under § 102(b)

King (Ex. 1037) was published in 1989 and thus qualifies as prior art under

35 U.S.C. § 102(b).  Ex. 1008 ¶24.  King was not cited or considered during the

prosecution of the original '470 Patent.  During the reissue proceeding, King was

cited in an Information Disclosure Statement, but its substance was not discussed

in any of the communications between the examiner and the patent owner.

King discloses the use of plasma triple-quadrupole mass spectrometers for

elemental analysis.  Ex. 1037, 173-174; Ex. 1004 ¶59.  Specifically, King discloses

a glow-discharge triple-quadrupole mass spectrometer.  Ex. 1037, 173-174; Ex.

1004 ¶59.  King describes that the first and third quadrupoles can be operated in

RF-only mode (passing ions above an m/z cutoff) or in a mass selective mode.  Ex.

1037, 173-174; Ex. 1004 ¶59.  The second quadrupole in the collision cell operates

in RF-only mode and has a non-linear geometry.  Ex. 1037, 173-174; Ex. 1004

¶59.  The non-linear geometry of the collision cell allows the axis of the ion

source and the first quadrupole to be offset from the axis of the third quadrupole.

Ex. 1004 ¶59.

King discloses the use of its mass spectrometer to perform the method

described in Claim 13.  Ex. 1037, 182-183; Ex. 1004 ¶60.  In one experiment, King

analyzes the daughter spectrum of a parent ion with an m/z of 81 from ionization

of a brass sample with a glow discharge plasma source.  Ex. 1037, 182-183; Ex.

1004 ¶60.   Each disclosure cited below is from this experiment unless otherwise

stated.

### 1.  <u>King Anticipates Claim 13</u>

As explained in Section XI.C, claim 13 is a method claim reciting a normal

operation of a prior art apparatus.  King discloses this prior art apparatus and the

claimed operation.

**[13Pre]:**  King discloses "[a] method of operating a [plasma] mass

spectrometer that incorporates a collision cell pressurized with a target gas [1 mtorr

of argon]."  Ex. 1037, 182-183; Ex. 1004 ¶61.

**Element [13A]:**  King discloses "generating an ion beam by introducing a

sample [an NBS C1109 brass sample] into a plasma [the glow discharge plasma]."

Ex. 1037, 182-83; Ex. 1004 ¶62.  The ion beam from the glow discharge plasma

including analyte ions having an analyte mass-to-charge ratio and unwanted ions

contains ions of analytical interest [atomic ions having an m/z of 81] and unwanted

ions [the polyatomic ions, $Ar_2H^+$ and $CuH_2O^+$ (both have an approximate m/z of

81) among other ions resulting from the plasma gas, the sample matrix, and the

vacuum gas components].  Ex. 1037, 182-83; Ex. 1004 ¶62.

**Element [13B]:**  King discloses "mass selecting at least a portion of the ion

beam [first quadrupole mass-selects the ion beam at the analyte mass-to-charge

ratio of 81] at the analyte mass-to-charge ratio."  Ex. 1037, 182-183; Ex. 1004

¶¶63-64.  As illustrated below, only ions having an m/z of 81 pass through the first

quadrupole, resulting in a mass selected ion beam.  Ex. 1004 ¶¶63-64.



**Element [13C]:**  King discloses "transmitting at least a portion of the ion

beam into the collision cell" because only ions having an m/z of 81 from the ion

beam enter into the collision cell.  Ex. 1037, 182-183; Ex. 1004 ¶65.  As explained

above in Section VIII.B.5, any new product ions formed inside the collision cell

through reactions or dissociations would not have the m/z of 81.  Ex. 1004 ¶65.

For example, Cu and $H_2O$ would not enter into the collision cell to form new

interfering $CuH_2O^+$ ions at m/z = 81.  *Id*.  Thus, King's mass selecting step is

"effective substantially to minimize the formation in the collision cell of interfering

ions having the analyte mass to charge ratio" of 81.  *Id*.   As shown in the

illustration above, ions having m/z values of 41 and 63 (corresponding to the ions

$ArH^+$ and $Cu^+$, respectively) exit the collision cell following exposure to the

collision/reaction gas in the collision cell.

**Element [13D]:**  King discloses "receiving at least a portion of the ion beam

from the collision cell at a mass analyzer" because ions exiting the collision cell

are received by the third quadrupole mass analyzer.  Ex. 1037, 174; Ex. 1004 ¶66.

**Element [13E]:**  King discloses "mass analyzing the received ion beam at the

same analyte mass-to-charge ratio [m/z = 81] as in the mass selecting step [m/z =

81 (Element [13B])]."  Ex. 1037, 182-183; Ex. 1004 ¶¶67-68.  As illustrated

below, King seeks to obtain a mass spectrum of the ion beam received from the

collision cell (*i.e.*, "a daughter spectrum" of the parent ion m/z 81).  Ex. 1037, 182-

183; Ex. 1004 ¶¶67-68.  To do so, King configures the first quadrupole to mass

select at m/z of 81, and configures the third quadrupole to mass analyze the

received ion beam across a selected range of m/z ratios that includes the analyte

mass-to-charge ratio of 81.  Ex. 1037, 182-183; Ex. 1004 ¶¶67-68.  When the third

quadrupole is mass analyzing at the analyte mass-to-charge ratio of 81, it is mass

analyzing at the same mass-to-charge ratio as that of the first quadrupole.  Ex.

1004 ¶¶67-68.



As discussed in Section X.D. regarding the BRI of the phrase "at the same

analyte mass-to-charge ratio," claim 13 uses an open transitional phrase

"comprising."  The scope of claim 13 thus encompasses a method in which the

mass analysis step is performed at many m/z ratios, so long as one of the m/z ratios

is the analyte m/z ratio, just like King's method.

## 2.   <u>King Anticipates Independent Claim 28</u>

**[28Pre]:**  As explained in Section XI.B, claim 28 is an apparatus claim with an open claim language reciting a manner of operating a prior art apparatus.  King teaches a mass spectrometer with all the structural limitations of claim 28 and the recited operation.  Ex. 1004 ¶71.

**Element [28A]:**  King discloses "an inductively coupled plasma ion source [ICP-MS] for generating ions from a sample."  Ex. 1037, 172; Ex. 1004 ¶¶72-73. Specifically, King discloses "ICP-MS, which employs quadrupole mass analyzers exclusively," encounters the same spectroscopic interference problems observed with a glow discharge plasma.  *Id*.  King describes the purpose of its experiments as showing the removal of spectroscopic interferences by collision-induced dissociation.  *Id*., 171-172.  A POSA would have understood as of 1998 that an ICP source can be used in any of the experimental methods in King.  Ex. 1004 ¶¶72-73.  As explained in Section XI.A, a POSA would have "at once envisage[d]" that an ICP source can be used on a triple-quadrupole instrument to remove interfering ions by collision-induced dissociation.  Ex. 1004 ¶¶72-73.

King also discloses that "the generated ions including first atomic ions having a first mass-to-charge ratio and artefact ions having a mass-to-charge ratio

that interferes with the first mass-to-charge ratio" because a POSA would have

understood as of 1998 that ions generated from an ICP source include analyte ions

and artefact ions having the same mass-to-charge ratio.  Ex. 1004 ¶¶72-73.

**Element [28B]:**  As explained above in [13B], King discloses "an ion

optical device [the first quadrupole] disposed to receive at least a portion of an ion

beam generated by the ion source, the ion optical device [the first quadrupole]

being configured to mass select at least a portion of the ion beam generated by the

ion source at the first mass-to-charge ratio [m/z = 81], thereby removing, from the

ion beam, ions not having the first mass-to-charge ratio [m/z = 81]."  Ex. 1037,

182-183; Ex. 1004 ¶74.

**Element [28C]:**  As explained in [13C], King discloses "a collision cell

disposed to receive at least a portion of a mass selected ion beam from the ion

optical device" because the collision cell is receiving the ion beam after the first

quadrupole mass selects ions of m/z 81.  Ex. 1037, 174, 182-83; Ex. 1004 ¶75.

Upon entering the collision cell, the mass selected ion beam still has artefact ions

that have a mass-to-charge ratio that interferes with the first mass-to-charge ratio.

*Id.* at 182-83.  King also discloses that the collision cell is "configured to remove,

from the mass selected ion beam, artefact ions having a mass-to-charge ratio that

38

interferes with the first mass-to-charge ratio" because the collision cell is pressurized with argon that dissociates polyatomic ions having m/z of 81. Ex. 1037, 182-83; Ex. 1004 ¶75.

King further discloses "the ion optical device [first quadrupole] being configured substantially to minimize the formation in the collision cell of interfering artefact ions having the said first mass-to-charge ratio [m/z =81]," because a POSA would have understood that because the first quadrupole selects only ions of m/z of 81 to enter into the collision cell, any new ions formed from ions having m/z of 81 would not have m/z of 81, thereby substantially minimizing the formation of new interfering ions having m/z of 81. Ex. 1037, 174, 182-83; Ex. 1004 ¶75. This change is demonstrated by King's reported detection of signals at m/z = 41 and m/z = 63.

**Element [28D]:** As explained above in [13D]-[13E], King discloses "a mass analyzer [third quadrupole] disposed to receive at least a portion of the mass selected ion beam from the collision cell." King also discloses "the mass analyzer [third quadrupole] being configured to mass analyze the received ion beam at the same mass-to-charge ratio [m/z = 81] as the ion optical device [first quadrupole], wherein the mass analyzer [third quadrupole] is configured to detect the first

39

atomic ions when the same mass-to-charge ratio [m/z = 81] is the first mass-to-charge ratio [m/z = 81]." Ex. 1037, 182-183; Ex. 1004 ¶76.  Specifically, King configures the first quadrupole to mass select at m/z 81, and configures the third quadrupole to mass analyze the received ion beam at each m/z ratio within a range of m/z ratios that includes the first mass-to-charge ratio of 81.  Ex. 1004 ¶76. When the third quadrupole is mass analyzing at the first mass-to-charge ratio of 81, it is mass analyzing at the same mass-to-charge ratio as that of the first quadrupole. *Id*.

### 3.   <u>King Anticipates Many Dependent Claims</u>

**Claim 16:**  King discloses that "the mass selecting [at m/z of 81] is achieved by passing the ion beam through a first mass selective ion optical device [by configuring the first quadrupole to select at m/z = 81]." Ex. 1037, 174, 182-183; Ex. 1004 ¶69.

**Claim 17:**  King discloses "the first mass selective ion optical device is an RF quadrupole." *Id*. at 174 ("the first quadrupole, Q1, which can be operated in an r.f.-only mode … or in a mass filtering mode"); Ex. 1004 ¶70.  The '386 Patent identifies a quadrupole as a ion optical device.  Ex. 1001, 4:64-5:2; 5:30-33; Ex. 1004 ¶70.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

**Claim 41:**  King discloses "an inductively coupled plasma" for the same reasons as Element [28A].  Ex. 1004 ¶77.

**Claims 46-50:**  As explained above in Section XI.D, these dependent claims merely recite the intended results of operating a mass spectrometer with certain plasma gas, samples, collision gas.  Ex. 1004 ¶78.  Nevertheless, each limitation was well known as of 1998 as explained in Grounds 2-4.  Ex. 1004 ¶78.

**F.    Ground 2: King in Combination with Douglas-1989 Renders Obvious Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 44, and 47-49**

Douglas-1989 (Ex. 1029) was published in 1989 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶23.  Douglas-1989 is cited in the specification of the '386 Patent as admitted prior art.  Ex. 1001, 2:22-24.  But it was not discussed during the prosecution or reissue proceeding.

Douglas-1989 is a review article looking back over "the first decade of ICP-MS development."  Ex. 1029, 38; Ex. 1004 ¶79.  In particular, Douglas-1989 discloses a triple-quadrupole instrument using an ICP ion source, which is capable of operating in the modes specified by claims 13 and 28 of the '386 Patent, and other dependent claims.  *Id.*, 47-49; Ex. 1004 ¶79.

41

### 1.   <u>Motivation to Combine King and Douglas-1989</u>

A POSA would have been motivated to combine the teachings of Douglas-1989 with King, as Douglas-1989 is a detailed review of the use of the ICP-MS, which is one of the instruments referred to in King. Ex. 1037, 172; Ex. 1004 ¶80. In particular, King notes that users of ICP-MS had achieved varying degrees of success in eliminating interferences, and Douglas-1989 contains an extended discussion of eliminating interference in ICP-MS experiments. *Id.*; Ex. 1029, 47-49; Ex. 1004 ¶80. The applicant for the '386 Patent noted that the alleged invention could be used with a variety of sources and was not limited to ICP-MS. Ex. 1001, 1:15-23. In 1998, a POSA would have consulted mass spectrometry references relating to a variety of ion sources, and would certainly be inclined to combine the ICP-MS disclosures of Douglas-1989 with the GD-MS disclosures of King. Ex. 1004 ¶80. In fact, King and co-authors were following the work of Douglas in 1989, having cited Douglas papers from 1982 and 1985. Ex. 1037, 185; Ex. 1004 ¶80. Thus, both articles attempt to address the problem of interferences in elemental analysis performed by mass spectrometry with plasma sources. Ex. 1004 ¶80.

## 2. King and Douglas-1989 Render Obvious Independent Claim 28

**[28Pre]:** King discloses "a mass spectrometer" as follows. Ex. 1004 ¶85.

**Element [28A]:** King discloses all of the elements of claim 28 for the reasons set forth in Ground 1 for claim 28. But, if Patent-Owner argues that King does not disclose "an inductively coupled plasma ion source," then Douglas-1989 discloses an ICP source and it would have been obvious to modify King in view of Douglas-1989. Ex. 1004 ¶86.

King describes the purpose of its investigations as showing "the removal of molecular interferences by CID, the identification of ion composition from daughter spectra, and the prediction of interfered m/z from parent spectra." Ex. 1037, 173; Ex. 1004 ¶¶72-73, 86. The embodiments in King use a glow discharge source, but King teaches that the same interference problems need to be addressed for ICP sources as well. Ex. 1004 ¶¶72-73, 86. A POSA would have understood that the ICP source in Douglas-1989 can be used for the experiments in King. Ex. 1004 ¶¶72-73, 86. To the extent that King does not sufficiently disclose the use of an ICP source, King in combination with Douglas-1989 teaches this limitation. Ex. 1004 ¶¶72-73, 86.

43

The subject of Douglas-1989 is the ICP-MS instrument.  Ex. 1004 ¶86.  And as explained in Section IX.A, Thermo admitted during prosecution of the European counterpart to the '386 Patent that Douglas-1989 discloses an ICP triple-quadrupole mass spectrometer instrument that can operate in the mode claimed here, where the first and third quadrupoles mass select at the same mass-to-charge ratio.  Ex. 1041; Ex. 1029, 47.  Thus, Douglas-1989's ICP triple-quadrupole instrument meets all the structural limitations of claim 28 as explained in Section XI.B.  To the extent that Patent Owner argues that the recited mode of operation is a claim limitation, King discloses this mode of operation and Douglas-1989 discloses the use of an ICP source.  Ex. 1004 ¶¶86-89.  Thus, King in combination with Douglas-1989 renders claim 28 obvious.

**Elements [28B] and [28C]:**  King discloses [28B] and [28C] as discussed above.  Ex. 1004 ¶¶87-88.

**Element [28D]:**  King discloses [28D] as discussed above.  To the extent that Patent-Owner argues that King does not disclose that the first and third quadrupoles mass select "at the same mass-to-charge ratio," King in view of Douglas-1989 teaches this element.  Ex. 1004 ¶89.  King discloses a first quadrupole as "the ion optical device" mass selecting at the first mass-to-charge

44

ratio of atomic ions of interest in a collision-induced dissociation experiment.  Ex.

1037, 182-183; Ex. 1004 ¶89.

Douglas-1989 discloses a collision-induced dissociation experiment in

which the third quadrupole is the "mass analyzer" at the first mass-to-charge ratio

of atomic ions of interest.  Ex. 1029, 47-48; Ex. 1004 ¶89.  Douglas-1989 also

discloses an ion-molecule reaction experiment where the third quadrupole is

scanned synchronously with the first quadrupole.  *Id*., 48; Ex. 1004 ¶89.  In that

experiment, the synchronous scanning is done at 16 amu offset (neutral gain scan),

obtaining the mass spectrum shown in Figure 2A and 2B.  *Id*.  A POSA would

have been motivated to use the synchronous scanning method of Douglas-1989 at

the same analyte mass-to-charge ratio on King's instrument (neutral loss of zero

scan) to detect one or more atomic ions in a sample.  Ex. 1004 ¶89.  Thus, King in

combination with Douglas-1989 renders claim 13 obvious.

### 3.    King and Douglas-1989 Render Obvious Independent Claim 13

**Elements [13Pre]-[13C]**: King discloses [13Pre]-[13C] as discussed above.

Ex. 1004 ¶81.

**Elements [13D]-[13E]**:  King discloses [13D] and [13E]; but if Patent-

Owner argues otherwise, it would have been obvious to modify King in view of

Douglas-1989 for the same reasons as Element [28D].  Ex. 1004 ¶82.

### 4.   King and Douglas-1989 Render Obvious Dependent Claims

**Claim 15:** Douglas-1989 discloses an ICP-MS-MS experiment where "mass

selecting and mass analyzing comprise scanning synchronously" because the third

quadrupole, which is part of the mass analyzer, is scanned synchronously with the

first quadrupole, which is an ion optical device.  Ex. 1029, 48; Ex. 1004 ¶83.  In

Douglas-1989, the synchronous scanning is done at 16 amu offset.  *Id.* ("The third

quad was scanned synchronously with the first quad 16 mass units higher…"); Ex.

1004 ¶83.  As described above for Claims 13 and 28, King discloses using the

triple-quad mass spectrometer to mass analyze the received ion beam at the same

analyte mass-to-charge ratio as the source ion selected at Q1, meaning the offset

between Q1 and Q3 is zero.  Ex. 1037, 182-183.  Using the synchronous scanning

method of Douglas-1989 with the zero offset disclosed in King would have been

obvious, because if a POSA would have been applying King's method on a sample

containing two or more analyte ions with first and second m/z ratios, respectively,

a POSA would have been motivated to configure the first and third quadrupoles to

46

scan at the first m/z ratio at the same time, and then to scan at the second m/z ratio

at the same time (synchronous scanning).  Ex. 1004 ¶83.

**Claims 16-17:**  King discloses these claims for the same reasons as Element

[13B] and claims 16-17 in Ground 1.  Ex. 1004 ¶84.

**Claim 29:**  The King/Douglas-1989 combination teaches claim 29 for the

same reasons as claim 15 discussed above.  Ex. 1004 ¶90.

**Claim 30:**  As explained above in Elements [13D]-[13E], King discloses a

mass analyzer that can be configured to mass select the ion beam from the collision

cell at the first mass-to-charge ratio.  Ex. 1037, 182-183; Ex. 1004 ¶91.

**Claims 31-32:**  As explained above in claims 16-17, King discloses an RF

quadrupole as a mass selective first ion optical device.  Ex. 1004 ¶¶92-93.

**Claim 34:**  King discloses a middle "r.f.-only quadrupole, Q2, of non-linear

geometry" as the second ion optical device in the collision cell for containing the

ion beam.  Ex. 1037, 174; Ex. 1004 ¶94.

**Claim 37:**  Douglas-1989 discloses an ICP-MS-MS experiment that

includes "mass analyzing the received ion beam at [each of the m/z ratios of $CeO^+$

and $TbO^+$, which is 16 amu higher than] the mass selecting step [of $Ce^+$ and $Tb^+$,

respectively]."  Ex. 1029, 48, Figure 11(B); Ex. 1004 ¶95.  Douglas-1989's

47

experiment "is performed at a plurality of analyte mass to charge ratios [each $Ce^+$ and $Tb^+$ has its own m/z ratio]." *Id.*; Ex. 1004 ¶95.

For the same reasons as Element [28D] and claim 15, King discloses mass analyzing and mass selecting "at the same analyte mass to charge ratio."  A POSA would be motivated to applying King's method of scanning at the same analyte mass-to-charge ratio (neutral loss of zero scan) when looking at a sample with multiple source ions such as that disclosed by Douglas-1989.  Ex. 1004 ¶95.

**Claim 38:**  Douglas-1989 discloses "obtaining a mass spectrum of the ion beam [the mass spectrum in Figure 11(B)] by a synchronous scan [the third quadrupole was scanned synchronously with the first quadrupole] that mass analyzes the received ion beam at [each of the m/z ratios of $CeO^+$ and $TbO^+$ which is 16 amu higher than] the mass selecting step [of $Ce^+$ and $Tb^+$, respectively] at the plurality of analyte mass to charge ratios."  Ex. 1029, 48, Figure 11(B); Ex. 1004 ¶96.

For the same reasons as Element [28D] and claim 15, King discloses mass analyzing and mass selecting "at the same analyte mass to charge ratio."

**Claim 40:** Douglas-1989 discloses using air instead of argon "as the collision gas," which is the target gas in the collision cell. Ex. 1029, 48; Ex. 1004 ¶97.

**Claim 41:** For the same reasons as Elements [28Pre] and [28A], King in view of Douglas-1989 teaches "an inductively coupled plasma source." Ex. 1004 ¶98.

**Claim 44:** As explained for claim 37, Douglas-1989 discloses an ICP-MS-MS experiment using cerium and terbium in the source, producing initially ions of $Ce^+$, $CeO^+$ and $Tb^+$. Douglas-1989 discloses that the ion optical device (Q1) mass selects at the mass-to-charge ratio for each of the $Ce^+$ ion [first mass-to-charge ratio] and the $Tb^+$ ion [second mass-to-charge ratio]. Ex. 1029, 48. Douglas-1989 further discloses that the mass analyzer is configured to detect at each of the m/z ratios of $CeO^+$ and $TbO^+$, which is 16 amu higher. *Id*.

For the same reasons as Element [28D] and claim 15, King discloses mass analyzing and mass selecting "at the same mass to charge ratio," when the same mass-to-charge ratio is the "second mass-to-charge ratio." A POSA would be motivated to applying King's method of scanning at the same analyte mass-to-

49

charge ratio (neutral loss of zero scan) when looking at a sample with multiple source ions such as that disclosed by Douglas-1989.  Ex. 1004 ¶99.

**Claim 47:**  King discloses "the artefact ion include molecular ions [$Ar_2H^+$ and $CuH_2O^+$]."  Ex. 1037, 175, 183; Ex. 1004 ¶100.

**Claim 48:**  King discloses collision-induced dissociations in which "the artefact ions [$Ar_2H^+$ and $CuH_2O^+$] are reacted or collided with a collision gas [argon] in the collision cell to form ions having mass-to-charge ratios that do not interfere with the first mass-to-charge ratio [m/z 81], thereby removing artefact ions."  Ex. 1037, 183; Ex. 1004 ¶101.

**Claim 49:**  King discloses collision-induced dissociations in which "some of the artefact ions [$Ar_2H^+$ and $CuH_2O^+$] are collided with the collision gas [argon] to form ions that have lower mass-to-charge ratios than the first mass-to-charge ratio."  *Id*.; Ex. 1004 ¶102.

## G.   Ground 3:  King in Combination with Douglas-1989 and Eiden Renders Obvious Claims 43, 46, and 50

Eiden (Ex. 1023) was published in January 1997 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶22.  Eiden is listed in the "Reference Cited" section of the '386 Patent.  The '386 Patent cites to another paper by the

same first author and describes the research as teaching reactive collisions that use hydrogen to remove interfering ions.  Ex. 1001, 2:24-28.

Eiden discloses an ICP mass spectrometer with a lens stack, a collision cell, and an ion trap as a mass analyzer.  Ex. 1023, 38, Figure 1; Ex. 1004 ¶103.  Eiden also discloses several beneficial ion-molecule reactions for removing interfering ions in ICP-MS.  *Id.*, 37; Ex. 1004 ¶103.

A POSA would have been motivated to combine the teachings of Eiden, Douglas-1989, and King because they all relate to the use of a collision cell to remove interfering ions encountered in plasma mass spectrometry.  Ex. 1004 ¶104. King discusses using a collision cell to remove interfering ions.  Ex. 1037, 171. Douglas-1989 discusses "ICP-MS-MS combined with ion molecule chemistry may provide a way around persistent interferences."  Ex. 1029, 48.  Eiden reports "a different and novel application of ion/molecule reactions, namely, to simplify or otherwise alter elemental mass spectra."  Ex. 1023, 37.  Eiden improves the combined teachings of King and Douglas-1989 by teaching new, beneficial ion-molecule reactions that can be used on triple-quadrupole instruments to remove interfering ions.  *Id.*; Ex. 1004 ¶104.

**Claims 43 and 46:**  Eiden specifically discloses pressurizing the collision cell with hydrogen.  Ex. 1023, 38-39; Ex. 1004 ¶¶105-106.

**Claim 50:**  Eiden discloses certain ion-molecule reactions in which "some of the artefact ions [$^{89}Y^+$ and $^{90}Zr^+$] are reacted with the collision gas [oxygen] to form ions [$YO^+$ and $ZrO^+$] that have higher mass-to-charge ratios than the first mass-to-charge ratio [$^{88}Sr^+$ ion]."  Ex. 1023, 41.  A POSA would have been motivated to perform Eiden's ion-molecule reactions on King's and/or Douglas-1989's instruments to achieve these higher m/z ratios.  Ex. 1004 ¶107.

### H.   Ground 4:  King in Combination with Douglas-1989 and Speakman Render Obvious Claims 1-3, 6-8, 10, 12, 18-20, 22-23, 33, 35-36, 39, 42-43 and 45-46

Speakman qualifies as prior art under 35 U.S.C. § 102(e) because the non-provisional patent application that led to the issuance of Speakman on April 24, 2001 was filed on May 30, 1997.  Speakman discloses a mass spectrometer with an ICP source, an ion optical device, an enclosed hexapole as a collision cell (in Figure 1), and a mass analyzer (*e.g.*, in Figure 3).  Ex. 1024, 8:42-9:35.  Speakman further discloses methods of using inert gases as a collision gas to remove interfering ions to improve the detection of the instrument.  *Id.*, 6:18-44.

52

The '386 Patent acknowledges that a European counterpart of Speakman, EP Patent Application No. 0813228A1 ("Micromass"), discloses the use of a collision cell to remove unwanted artefact ions. Ex. 1001, 1:53–56. During the prosecution of the '470 Patent, the examiner rejected the originally filed claim 1 as obvious in view of Micromass and two other prior art references. Ex. 1002, 2-3. In response, the applicant amended claim 1 to require that the first ion optical device is a mass selective device. Ex. 1003, 8. The applicant argued that Micromass does not disclose that the first ion optical device is a mass selective device, and does not teach that pre-collision mass filtering and post-collision mass analyzing are operating at the same m/z value. Ex. 1003, 10-11. The examiner did not mention Micromass again during prosecution or reissue proceeding.

As discussed above, King and Douglas-1989 both disclose a first quadrupole as the first mass selective ion optical device. The combination of King and Douglas-1989 with Speakman – namely, combining King's and Douglas-1989's first mass selective device with Speakman's instrument – was not considered by the examiners during the prosecution or reissue proceeding.

Moreover, a POSA would have been motivated to combine the teachings of Speakman, Douglas-1989, and King because they all relate to the use of a collision

53

cell to remove interfering ions encountered in plasma mass spectrometry.  Ex.

1004 ¶¶109-110.  In fact, Speakman explicitly mentions King and Douglas-1989.

Ex. 1024, 1:57–2:20.  It discusses that in Douglas-1989's work "a triple

quadrupole spectrometer was fitted with an ICP source with the aim of dissociating

unwanted polyatomic ions in the centre quadrupole." *Id.*  It also discusses that

King "described the use of collision-induced dissociation to remove polyatomic

ion interferences in glow-discharge mass spectrometry.  Like Douglas-1989, they

employed a triple-quadrupole mass spectrometer and used the centre quadrupole as

a collision cell." *Id.*

Speakman improves the combined teaching of King and Douglas-1989 by

teaching the use of inert gases like helium to remove interfering ions.  Ex. 1024,

4:16-17, 8:14-21; Ex. 1004 ¶110.  Moreover, while King describes differential

pumping, it does not explicitly discuss the evacuated chambers, their respective

apertures, pumps, and relative pressures of the triple-quadrupole instrument,

whereas Speakman does.  *Id.*  Speakman thus further improves King and Douglas-

1989 by teaching the use of multiple vacuum pumping stages for the first mass

selective device, the collision cell, and the mass analyzer, respectively, to remove

background gas.  *Id.*  Thus, a POSA would have been motivated to combine the

instrument specifics in Speakman with King's and Douglas-1989's instruments and pre-collision mass filtering modes of operation because all concern plasma mass spectrometers and removal of interfering ions. *Id.*

### 1.   King in view of Douglas-1989 and Speakman Render Obvious Independent Claim 1

**[1Pre]**:  King discloses a glow-discharge mass spectrometer.  Ex. 1037, 173-174.  Ex. 1004 ¶111.

**Element [1A]**:  King discloses performing the function for this element by disclosing "generating ions from a sample introduced into a plasma [the glow discharge of an NBS C1109]." *Id.*, 182-183; Ex. 1004 ¶113.  King also discloses the structure for performing this function as a glow discharge plasma ion source. *Id.*; Ex. 1004 ¶113.

But if Patent Owner argues that this means-plus-function term covers only the structure of an ICP source, Douglas-1989 and Speakman disclose this element. Douglas-1989 discloses performing the function for this element by disclosing "generating ions [$Ce^+$, $Tb^+$, and $CeO^+$] from a sample [cerium and terbium] introduced into a plasma"; and the structure for performing this function as an ICP source.  Ex. 1029, 47-48; Ex. 1004 ¶113.  Speakman also discloses a plasma

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

(inductively-coupled or microwave-induced) ion source to generate ions from a

sample.  Ex. 1024, 1:3–6; 8:42–47; Ex. 1004 ¶113.  Thus, King in view of

Douglas-1989 and Speakman teaches this element.

Element [1B]:  King in Figure 1 discloses "a sampling aperture (2) [a 0.5-

mm ion exit orifice into the ion optics assembly] for transmitting some of the ions

into an evacuated expansion chamber (3) [*i.e.*, the chamber that contains the ion

optics assembly and pumped by the turbomolecular pump] along a first axis (9)

[the axis of the ion source] to form an ion beam."  Ex. 1037, 173-174, Figure 1

(shown below); Ex. 1004 ¶¶114-115.



Fig. 1. Glow discharge ion source consisting of direct insertion probe and source block.

Speakman in Figure 1 also discloses a sampling aperture (in a sampling cone

3) for transmitting ions into an evacuated expansion chamber (evacuated region 6)

along the first axis (the axis of the nozzle-interface).  Ex. 1024, 8:47-53; Figure 1

(shown below); Ex. 1004 ¶¶116-117.



**Element [1C]:**  King discloses "a second aperture (5) [final lens of the ion

optics assembly (ca. 2.5-mm aperture)] for transmitting some of the ion beam into

a first evacuated chamber (6) [the analyzing chamber region pumped by a $170\,l\,s^{-1}$

turbomolecular pump]."  Ex. 1037, 173-174; Ex. 1004 ¶118.

But if Patent-Owner argues that King does not disclose "a first evacuated

chamber," Speakman in Figure 1 discloses a second aperture (in a skimmer 5) for

transmitting some of the ion beam into the first evacuated chamber (evacuated

region 8).  Ex. 1024, 8:49-59; Ex. 1004 ¶118.

**Element [1D]:**  Speakman in Figure 1 discloses a first pump (a turbomolecular pump) for maintaining the first evacuated chamber (evacuated region 8) at a high vacuum (approximately $10^{-2}$ torr).  Ex. 1024, 8:54-59.  The '386 Patent teaches that pressures in these ranges as "high vacuum."  Ex. 1001, 6:36-41; Ex. 1004 ¶119.

**Element [1E]:**  King discloses "a first ion optical device (17) [first quadrupole] located in the first evacuated chamber (6) for containing the ion beam wherein the first ion optical device (17) [first quadrupole] is a mass selective device [in a mass filter mode (selecting a mass window)]."  Ex. 1037, 173-174; Ex. 1004 ¶120.  Speakman in Figure 1 discloses an ion optical device (electrostatic lens element 10) in the first evacuated chamber evacuated chamber (evacuated region 8).  Ex. 1024, 8:54-65; Ex. 1004 ¶120.  A POSA would have been motivated to put King's first quadrupole in a first evacuated chamber as taught by Speakman to reduce background gas.  Ex. 1004 ¶120.

**Element [1F]:**  Speakman in Figure 1 discloses a third aperture (in the electrostatic lens element 10) for transmitting the ion beam into a second evacuated chamber (evacuated chamber 11).  Ex. 1024, 8:54-65; Ex. 1004 ¶121.

**Element [1G]:**  Speakman also discloses a second pump (another turbomolecular pump) for maintaining the second evacuated chamber (evacuated region 8) at a pressure of about $10^{-3}$ torr, which is lower than the pressure (approximately $10^{-2}$ torr) of the first evacuated chamber (region 6).  *Id*.; Ex. 1004 ¶121.

**Element [1H]:**  King discloses "a collision cell (24) [an r.f.-only quadrupole, Q2, of nonlinear geometry which serves as a collision cell] having an entrance aperture (27) and an exit aperture (28) and pressurized with a target gas (26) [argon], (20)."  Ex. 1037, 173-174; Ex. 1004 ¶122.  Speakman in Figure 1 discloses a hexapole collision cell comprised of six electrodes at 13-15 enclosed by a tube 21 pressurized with an inert gas.  Ex. 1024, 11:37-41; Ex. 1004 ¶122.

**Element [1I]:**  King discloses "a second ion optical device (25) [an r.f.-only quadrupole, Q2, of nonlinear geometry] located in the collision cell (24) for containing the ion beam."  Ex. 1037, 173-174; Ex. 1004 ¶123.  Speakman in Figure 1 discloses a hexapole collision cell comprised of six electrodes at 13-15 enclosed by a tube (21).  Ex. 1024, 11:37-41; Ex. 1004 ¶123.  The hexapole is the second ion optical device for containing the ion beam.  Ex. 1004 ¶123.

**Element [1J]:**  As discussed above in Grounds 1 and 2, King discloses

performing the function for the element "the mass-to-charge analyzing means" by

disclosing experiments analyzing ions based on their m/z ratios; and the structure

for this element as the third quadrupole.  Ex. 1037, 173-174, 182-183.

King further discloses that the "[third quadrupole] is configured to mass

analyze the ion beam to produce a mass spectrum of the ion beam such that both

the first ion optical device (17) [first quadrupole] and the mass-to-charge ratio

analyzing means (37) [third quadrupole] operate at the same mass to charge ratio

[m/z of 81]."  *Id*., 182-183.  This configuration substantially minimizes "the

formation in the collision cell of interfering ions having the said mass to charge

ratio," for the same reasons set forth in Element [28C].  King also discloses "a

second axis" because the ions exiting the nonlinear collision cell travel along a

second axis of the mass analyzer.  Ex. 1037, 174; Ex. 1004 ¶¶125-127.

Similarly, Speakman in Figures 1 and 3 discloses a fourth aperture (19) for

transmitting the ion beam into a third evacuated chamber (evacuated chamber 20)

containing a mass-to-charge analyzing means (a conventional quadrupole mass

analyzer) disposed along a second axis (the entrance axis 32 of the mass analyzer).

Ex. 1024, 9:14-31; Figure 3 (shown below); Ex. 1004 ¶¶125-127.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

*FIG. 3*



**Element [1K]:**  King's instrument uses a non-linear collision cell such that

the ion beam from the collision cell is transmitted along the "second axis," and a

third RF quadrupole as the "mass-to-charge ratio analyzing means."  Ex. 1037,

174; Ex. 1004 ¶¶128-130.  As discussed above in Grounds 1 and 2 for claim [13],

King alone or in combination with Douglas-1989 teaches operating the first optical

ion device and the mass analyzer at the same mass-to-charge ratio, and producing a

mass spectrum of the resulting ion beam.

Moreover, a POSA viewing Figure 3 of Speakman would have known that Speakman discloses a third pump connected to port 28 for maintaining the third evacuated chamber at a high vacuum. Ex. 1004 ¶¶128-130. A POSA also would have understood that a mass analyzer and the detector would typically be operated at a pressure lower than the previous chamber. *Id*. King discloses the operating pressure of its quadrupole mass analyzer as $10^{-5}$ torr. Ex. 1037, 173. Speakman teaches maintaining the second evacuated chamber (evacuated region 8) at a pressure of about $10^{-3}$ torr. Ex. 1024, 8:54-65. Therefore, King in view of Speakman teaches using a pressure at the mass analyzer chamber at least one order of magnitude lower than the pressures of the previous chambers. Ex. 1004 ¶¶128-130.

### 2.   <u>King in view of Douglas-1989 and Speakman Render Obvious Many Dependent Claims</u>

**Claim 2:** Speakman discloses the pressure of the first evacuated chamber (region 6) is approximately $10^{-2}$ torr, which is about $10^{-2}$ mbar. Ex. 1024, 8:54-65; Ex. 1004 ¶131.

**Claim 3:** Determining the optimal pressure for each vacuum pumping stage was routine and known in the art as of 1998. Ex. 1004 ¶131. For example,

Speakman discloses the pressure of the first evacuated chamber (region 6) is approximately $10^{-2}$ torr, which is about $10^{-2}$ mbar.  Ex. 1024, 8:54-65; Ex. 1004 ¶131.  A POSA would have recognized that there is nothing significant about the narrow range of $1\text{-}2 \times 10^{-3}$ mbar.  Ex. 1004 ¶131; *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955).  ("[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.").  As such, King in view of Speakman teaches the features of claims 2-3.

**Claim 6:**  King discloses "the mass-to-charge ratio analyzing means (37) [the third quadrupole … (r.f. only or mass filtering)] includes a main mass filter which preferably is an RF quadrupole."  Ex. 1037, 174; Ex. 1004 ¶132.

**Claim 7:**  King's instrument has a mass selective RF quadrupole as the "first ion optical device."  Ex. 1037, 174; Ex. 1044 ¶133.

**Claims 8 and 23:**  King discloses "the second ion optical device (25) [an r.f.-only quadrupole, Q2, of nonlinear geometry] is an RF quadrupole."  *Id*.; Ex. 1004 ¶¶134, 143.

**Claim 10:**  King discloses "the second axis (36) of the mass to charge ratio analyzing means (37) is offset from the first axis (9)" because the ion beam travels

along the first axis into the second quadrupole of nonlinear geometry as a collision

cell, and exits the collision cell along the second axis.  *Id*.; Ex. 1004 ¶¶135-136.

Speakman in Figure 1 discloses a first axis (the axis of the nozzle-interface)

that is offset from a second axis (the entrance axis 32 of the mass analyzer).  Ex.

1024, 9:14-31; Ex. 1004 ¶¶135-136.

**Claim 12:** King/Douglas-1989/Speakman teach "the first ion optical device

and the mass-to-charge analyzing means are configured to scan synchronously" for

the same reasons as claim 15 in Ground 2.  Ex. 1004 ¶137.

**Claim 18:**  King/Douglas-1989/Speakman teach "the first mass selective ion

optical device is located in a first evacuated chamber maintained at high vacuum"

for the same reasons as Elements [1D] and [1E].  Ex. 1004 ¶138.

**Claim 19:**  Speakman discloses "the first evacuated chamber [region 6] is

maintained at a pressure of approximately $10^{-2}$ to $10^{-4}$ mbar [approximately $10^{-2}$

torr]."  Ex. 1024, 8:54-65; Ex. 1004 ¶139.

**Claim 20:**  The King/Speakman combination teaches this claim for the same

reason as claim 3.  Ex. 1004 ¶140.

**Claim 22:**  King discloses "the collision cell [an r.f.-only quadrupole, Q2, of

nonlinear geometry which serves as a collision cell]" and "the ion beam being

contained … by a second ion optical device [r.f. only quadrupole Q2]."  Ex. 1037, 173-174; Ex. 1004 ¶¶141-142.

Speakman in Figure 1 discloses a hexapole collision cell comprised of six electrodes at 13-15 enclosed by a tube (21).  Ex. 1024, 11:37-41; Ex. 1004 ¶¶141-142.  The hexapole is the second ion optical device for containing the ion beam. *Id*., 8:54-65; Ex. 1004 ¶¶141-142.  Speakman also discloses maintaining the second evacuated chamber (evacuated region 8) at a pressure of about $10^{-3}$ torr, which is lower than the pressure (approximately $10^{-2}$ torr) of the first evacuated chamber (region 6).  *Id*.; Ex. 1004 ¶¶141-142.

**Claim 33:**  King/Douglas-1989/Speakman teaches claim 33 for the same reasons as Elements [1E], [1H], and [1J].  Ex. 1004 ¶144.

**Claims 35, 39, 42, and 45:**  King discloses that the glow discharge source operates at a pressure of 1 mtorr argon.  Ex. 1037 at 182.  Douglas-1989 discloses an ICP source, which typically uses argon as the plasma gas.  Ex. 1029 at 47 (discussing argon-based interfering ions).

Speakman discloses a first vacuum pump for maintaining a first evacuated chamber (evacuated region 8) at a high vacuum (approximately $10^{-2}$ torr) before the collision cell.  Ex. 1024, 8:54-59.  This vacuum pump of the first evacuated

chamber removes the general background gas load, *e.g.*, the plasma argon gas,

preventing it from entering into the collision cell, as explained in the '386 Patent.

Ex. 1001, 3:49-60.  Consequently, the collision does not contain a significant

partial pressure of argon.  Ex. 1004 ¶¶145-146, 148-149, 150, 152.

**Claim 36:**  The King/Douglas-1989/Speakman combination teaches claim

36 for the same reasons as claim 38.  Ex. 1004 ¶147.

**Claims 43 and 46:**  Speakman discloses "the collision cell [hexapole ion

guide (12) enclosed by a tube (21) in Figure 1] is pressurized with helium

[helium]."  Ex. 1024, 3:37–40; 4:10–15; 11:37-46.  In view of Speakman, a POSA

would have been motivated to use helium as a collision gas in King's and/or

Douglas-1989's instruments.  Ex. 1004 ¶¶151, 153.  Thus, King in view of

Douglas-1989 and Speakman teaches the limitations of claims 43 and 46.

I.   **Ground 5:  King in Combination with Douglas-1989, Speakman, and Yost Renders Obvious Claims 4, 5, 14, 25-27, 39, 42, and 45**

Yost (Ex. 1015) was published in 1983 and thus qualifies as prior art under

35 U.S.C. § 102(b).  Ex. 1008 ¶21.  Yost is a review paper on the instrumentation

of tandem mass spectrometry, particularly triple-quadrupole instruments, as of

1983.  Ex. 1004 ¶154.

A POSA would have motivated to combine the teachings in King, Douglas-1989, Speakman, and Yost. King and Douglas-1989 both discuss the use of triple-quadrupole instrument to remove interfering ions in elemental analysis. Ex. 1037, 171-173; Ex. 1029, 47-48; Ex. 1004 ¶155. Speakman teaches the use of multiple vacuum pumping stages and offset axes for ICP-MS to reduce the background gas loading. Ex 1024, 5:10-30; Ex. 1004 ¶155. Yost provides a review of the triple-quadrupole instruments and other tandem mass spectrometers, their components, and operations as of 1983. Ex. 1004 ¶155. Yost improves King/Douglas-1989/Speakman by teaching various structural components, arrangements, and operations of tandem mass spectrometers to improve detection for elemental analysis. Ex. 1004 ¶155. Particularly, King uses a modified Finnigan MAT series 4500 triple-quadrupole instrument, and Yost discusses a Finnigan MAT TSQ triple-quadrupole instrument. Ex. 1037, 173; Ex. 1015, Figure 5; Ex. 1004 ¶155.

**Claim 4:** Figure 5 of Yost shows a Finnigan MAT TSQ triple-stage quadrupole instrument drawn to scale. Ex. 1015, Figure 5.



**Figure 5.**   Scale drawing (side view) of the Finnigan MAT TSQ triple-stage quadrupole MS/MS instrument (15).

In this Finnigan MAT TSQ instrument, "a gap of [close to] 2 cm between the third aperture (19) and the entrance aperture (27) of the collision cell (24)."  Ex. 1015, Figure 5; Ex. 1004 ¶¶156-157.  In view of Speakman and Yost, a POSA would have been motivated to try a gap of at least 2 cm between the third aperture and the entrance of the collision cell to reduce background gas loading on the collision cell in King's or Douglas-1989's instruments.  Ex. 1004 ¶¶156-157; *In re Aller*, 220 F.2d at 456 ("[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation.").

68

**Claims 5 and 14:**  Yost discloses that in the Finnigan MAT TSQ instrument, "a distance of 90 to 200 mm is maintained between the ion source and an entrance aperture of the collision cell." Ex. 1015, Figure 5; Ex. 1004 ¶158.  In view of Yost, a POSA would have been motivated to put a distance of 90 to 200 mm between the ion source and the collision cell to reduce background gas loading on the collision cell in King's instrument.  Ex. 1004 ¶158.

**Claim 25:**  King in view of Speakman teaches "transmitting at least a portion of the ion beam from the ion source through a sampling aperture into an evacuated expansion chamber along a first axis, into the first evacuated chamber through a second aperture" for the same reasons as Elements [1B] and [1C].

King in view of Speakman also teaches "transmitting at least a portion of the mass selected ion beam into the collision cell includes transmitting at least a portion of the ion beam into the second evacuated chamber through a third aperture" for the same reasons as Elements [1F]-[1H].

The King/Douglas-1989/Speakman/Yost combination teaches that "a gap of [close to] 2 cm is maintained between the third aperture and an entrance aperture of the collision cell," for the same reasons as claim 4.  Ex. 1004 ¶159.

**Claim 26:**  King in view of Speakman teaches this claim for the same reasons as Elements [1J] and [1K].  Ex. 1004 ¶160.

**Claim 27:**  King in view of Speakman teaches this claim for the same reasons as claim 10.  Ex. 1004 ¶161.

**Claims 39, 42, and 45**: King discloses that the glow discharge source operates at a pressure of 1 mtorr argon.  Ex. 1037, 182; Ex. 1004 ¶162.

Douglas-1989 discloses an ICP source, which typically uses argon as the plasma gas.  Ex. 1029, 47 (discussing argon-based interfering ions); Ex. 1004 ¶162.

Speakman discloses a first vacuum pump for maintaining a first evacuated chamber (evacuated region 8) at a high vacuum (approximately $10^{-2}$ torr) before the collision cell.  Ex. 1024, 8:54-59; Ex. 1004 ¶163.  This vacuum pump of the first evacuated chamber removes the general background gas load, *e.g.*, the plasma argon gas, preventing it from entering into the collision cell, as explained in the '386 Patent.  Ex. 1001, 3:49-60; Ex. 1004 ¶163.

Moreover, in the Finnigan instrument of Yost Figure 5, the distance between the ion source and the entrance aperture of the collision cell is 90 to 200 mm.  Ex. 1015, Figure 5; Ex. 1004 ¶164.  This distance allows the flow of the background

gas to diverge from the ion beam and reduces the gas load on the collision cell, as explained in the '386 Patent.  Ex. 1001, 4:8-59; Ex. 1004 ¶164.  Consequently, the collision cell does not contain a significant partial pressure of argon.  Ex. 1004 ¶164.

## XII.   CONCLUSION

Petitioner respectfully requests that this petition be granted, that *inter partes* review be instituted, and that claims 1-8, 10, 12-20, 22-23, and 25-50 of the '386 Patent be found unpatentable and cancelled.

## XIII.   CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for the Petitioner declares that the argument section of this Petition (Sections I, III-XII) has a total of 13,978 words, according to the word count tool in Microsoft Word™.

DATED:  December 13, 2017          Respectfully Submitted,

By:  /Brian M. Buroker/
Brian M. Buroker
(Reg. No. 39125)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.,
Washington, DC 20036-5306
Tel:  202-955-8541
bburoker@gibsondunn.com
*Attorney for Petitioner*

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## CERTIFICATE OF SERVICE

The undersigned certifies service pursuant to 37 C.F.R. §§ 42.6(e) and

42.105(a), (b) on the Patent-Owner via UPS overnight mail of a copy of this

Petition for *Inter Partes* Review and supporting materials at the Patent-Owner at

the correspondence address of record for the '386 Patent:

David B. Raczkowski, or To Whom It May Concern
Kilpatrick, Townsend & Stockton, LLC
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111.

DATED:  December 13, 2017          By:  /Brian M. Buroker/
                                   (Reg. No. 39125)

                                   *Attorney for Petitioner*

# EXHIBIT B

IPR No. 2018-00313

UNITED STATES PATENT AND TRADEMARK OFFICE


BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Agilent Technologies, Inc.,
Petitioner

v.

Thermo Fisher Scientific Inc. and
Thermo Fisher Scientific (Bremen) GmbH,
Patent Owner.

_____

Case No.  <u>Unassigned</u>

U.S. Patent No. RE45,386

_____

**Petition for *Inter Partes* Review of U.S. Patent No. RE45,386**

Mail Stop **PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................1

II.    MANDATORY NOTICES ....................................................................1

       A.    Real Parties-in-Interest.............................................................1

       B.    Related Matters.........................................................................1

       C.    Lead and Back-Up Counsel.......................................................2

III.   PAYMENT OF FEES .........................................................................3

IV.    STANDING .........................................................................................3

V.     IDENTIFICATION OF CHALLENGE AND STATEMENT OF
       PRECISE RELIEF REQUESTED .......................................................3

VI.    THRESHOLD REQUIREMENT FOR INTER PARTES REVIEW ............3

VII.   STATEMENT OF REASONS FOR THE RELIEF REQUESTED ..............4

       A.    Grounds ....................................................................................4

       B.    Priority Date of the '386 Patent................................................5

VIII.  STATE OF THE ART ..........................................................................5

       A.    Person of Ordinary Skill in the Art ...........................................5

       B.    Scope and Content of the Art Before September 1998......................5

             1.    Mass Spectrometry.........................................................5

             2.    Quadrupole Mass Analyzer..............................................6

             3.    Tandem Mass Spectrometry ............................................7

             4.    Plasma Ion Source........................................................15

             5.    Spectroscopic Interferences ..........................................15

             6.    Photons and Neutral Species..........................................17

IX.    THE '386 PATENT ...........................................................................18

       A.    Patent-Owner's Admissions to European Patent Office ....................18

       B.    The '386 Patent Claims .............................................................19

X.     CLAIM CONSTRUCTION ...............................................................27

i

**TABLE OF CONTENTS** (*continued*)

Page

A. "means (1) for generating ions from a sample introduced into a plasma" (Claim 1).............................................................27

B. "mass-to-charge ratio analyzing means (37)" (Claim 1) ...................27

C. "configured to" (Claim 28) .................................................28

D. "at the same mass-to-charge ratio"; "at the same analyte mass-to-charge ratio" (Claims 1, 13, and 28) ......................................28

XI. GROUNDS FOR UNPATENTABILITY ...................................................29

A. General Principles .............................................................29

**B. Apparatus Claims Reciting Manners of Operation** ......................30

**C. Method Claims Reciting Operations of an Apparatus** .................31

**D. Claim Elements Directed to the Intended Use of a Component** ........................................................................31

E. Ground 1: Douglas-1989 in combination with Johnston Renders Obvious Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 47-50...........................................................................32

    **1. Motivation to Combine Johnston and Douglas-1989** ..........33

    2. Douglas-1989 and Johnston Render Obvious Claim 13...........34

    3. Douglas-1989 and Johnston Render Obvious Claim 28...........37

    4. Douglas-1989 and Johnston Render Obvious Dependent Claims ............................................................41

F. Ground 2: Douglas-1989 in Combination with Johnston and Whitehouse Render Obvious Claims 18-20 and 33. ..........................45

    1. Motivation to Combine Douglas-1989 and Johnston with Whitehouse.......................................................45

    2. Douglas-1989, Johnston and Whitehouse Render Obvious Claims 18-20 and 33 ..............................................46

*Petition for Inter Partes Review*
*of U.S. Patent No. 8,057,840*

## TABLE OF CONTENTS (*continued*)

Page

G. Ground 3: Douglas-1989 in Combination with Louris Renders Obvious Claims Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 47-50 ................................................................47

H. Ground 4: Douglas-1989 in Combination with Louris and Whitehouse Render Obvious Claims 18-20 and 33 ............................49

I. Ground 5:  Tanner-Patent in Combination with Rowan Renders Obvious Claims 13 and 28 ....................................................50

    **1.** **Motivation to Combine Tanner-Patent and Rowan** ...........54

    **2.** **Tanner-Patent in combination with Rowan renders obvious Claim 28** ..................................................56

    **3.** **Tanner-Patent in Combination with Rowan Renders Obvious Claim 13** ..................................................59

J. Ground 6:  Tanner-Patent in Combination with Rowan and Kishi Renders Obvious Claims 1, 5-10, 14, 16-17, 23-24, 31-34, 35, 39-50 ..............................................................60

    1. Tanner-Patent in view of Rowan and Kishi Renders Obvious Independent Claim 1 ...................................62

    **2.** **Tanner-Patent in Combination with Rowan and Kishi Renders Obvious certain Dependent Claims** .......................67

K. Ground 7:  Tanner-Patent in Combination with Rowan, Kishi, and Turner Renders Obvious Claims 11 and 21......................72

XII. CONCLUSION...........................................................................75

XIII. CERTIFICATE OF WORD COUNT .........................................................76

iii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Aller,*
  220 F.2d at 456 ...................................................................................66

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,*
  320 F.3d 1339 (Fed. Cir. 2003) ..........................................................32

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.,*
  246 F. 3d 1368 (Fed. Cir. 2001) .........................................................32

*Catalina Marketing Intern. v. Coolsavings.com,*
  289 F. 3d 801 (Fed. Cir. 2002) ...........................................................31

*Cuozzo Speed Techs., LLC v. Lee,*
  136 S. Ct. 2131 (2016)........................................................................28

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,*
  909 F.2d 1464 (Fed. Cir. 1990) ..........................................................31

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.,*
  780 F.3d 1376 (Fed. Cir. 2015) ..........................................................31

*In re King,*
  801 F.2d 1324 (Fed. Cir. 1986) ..........................................................32

*Ex parte Masham,*
  2 U.S.P.Q. 2d 1647 (Bd. Pat. App. & Inter. 1987).............................32

*Ex Parte Mewherter,*
  Appeal No. 2012-007692 (P.T.A.B. May 8, 2013) .............................33

*Petition for Inter Partes Review*
*of U.S. Patent No. 8,057,840*

**TABLE OF AUTHORITIES** *(continued)*

<u>Page(s)</u>

*In re Petering,*
  301 F.2d 676 (1962)...........................................................................31

*Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*
  No. 11–484–RGA, 2013 WL 3830416 (D. Del. July 23, 2013)........................29

*Schering Corp. v. Geneva Pharms.,*
  339 F.3d 1373 (Fed. Cir. 2003) .........................................................30

**Statutes**

35 U.S.C. § 314(a) ................................................................................3

35 USC § 103 ....................................................................................31

**Regulations**

37 C.F.R. § 42.100(b) ..........................................................................28

v

## TABLE OF EXHIBITS

| Exhibit Number | Document |
|---|---|
| 1001 | U.S. Patent No. RE45,386 ("the '386 Patent") |
| 1002 | Prosecution History of U.S. Patent No. 7,202,470 ("'470 Patent"), January 3, 2002 Non-final Rejection. |
| 1003 | Prosecution History of '470 Patent, July 9, 2002 Amendment and Remarks. |
| 1004 | Declaration of Richard Yost, Ph.D. |
| 1005 | The Complaint (served copy) |
| 1006 | Tanner, Scott D., and Vladimir I. Baranov. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). II. Reduction of interferences produced within the cell." *Journal of the American Society for Mass Spectrometry* 10.11 (1999): 1083-1094.  ("Tanner") |
| 1007 | U.S. Patent No. 6,191,417 ("Douglas") |
| 1008 | Declaration of Sylvia Hall-Ellis, Ph.D. |
| 1009 | JPH10214591A ("Saito") |
| 1010 | Certified Translation of JPH10214591A ("Saito") |
| 1011 | Baranov, Vladimir, and Scott D. Tanner. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). Part 1. The rf-field energy contribution in thermodynamics of ion-molecule reactions." *Journal of Analytical Atomic Spectrometry* 14, no. 8 (1999): 1133-1142.  ("Baranov") |
| 1012 | PCT International Application – International Publication Number WO 00/16375 ("PCT375") |
| 1013 | U.S. Patent No. 6,340,814 ("Vandermey") |
| 1014 | McLafferty, Fred W. "Tandem mass spectrometry." *Science* (1981): 280-287. |
| 1015 | Yost, Richard A., and Dean D. Fetterolf.  "Tandem mass spectrometry (MS/MS) instrumentation." *Mass Spectrometry Reviews* 2, no. 1 (1983): 1-45. |

## TABLE OF EXHIBITS *(continued)*

| Exhibit Number | Document |
|---|---|
| 1016 | Miller, Philip E., and M. Bonner Denton. "The quadrupole mass filter: basic operating concepts." *J. Chem. Educ.* 63, no. 7 (1986): 617-623. |
| 1017 | Yost, R. A., and C. G. Enke. "Triple quadrupole mass spectrometry for direct mixture analysis and structure elucidation." *Analytical Chemistry* 51, no. 12 (1979): 1251-1264. |
| 1018 | European Patent Application Publication No. EP0237259A2 |
| 1019 | U.S. Patent No. 4,234,791 ("Enke") |
| 1020 | U.S. Patent No. 6,093,929 ("Javahery") |
| 1021 | Dawson, P. H., J. B. French, J. A. Buckley, D. J. Douglas, and D. Simmons.  "The use of triple quadrupoles for sequential mass spectrometry: 1—The instrument parameters." *Journal of Mass Spectrometry* 17, no. 5 (1982): 205-211. |
| 1022 | Johnston, M., "Energy Filtering in Triple Quadrupole MS/MS," *Finnigan MAT*, San Jose, California, USA, no. 203, 1984. ("Johnston") |
| 1023 | Eiden, Gregory C., Charles J. Barinaga, and David W. Koppenaal. "Beneficial ion/molecule reactions in elemental mass spectrometry." *Rapid Communications in Mass Spectrometry* 11, no. 1 (1997): 37-42. |
| 1024 | U.S. Patent No. 6,222,185 ("Speakman") |
| 1025 | U.S. Patent No. 6,011,259 ("Whitehouse") |
| 1026 | Koppenaal, David W. "Atomic mass spectrometry." *Analytical Chemistry* 64, no. 12 (1992): 320R-342R. |
| 1027 | Sass, Samuel, and Timothy L. Fisher. "Chemical ionization and electron impact mass spectrometry of some organophosphonate compounds." *Journal of Mass* |

*Petition for Inter Partes Review*
*of U.S. Patent No. 8,057,840*

## TABLE OF EXHIBITS *(continued)*

| Exhibit Number | Document |
|---|---|
| | *Spectrometry* 14, no. 5 (1979): 257-264. |
| 1028 | King, F. L., and W. W. Harrison. "Glow discharge mass spectrometry: an introduction to the technique and its utility." *Mass Spectrometry Reviews* 9, no. 3 (1990): 285-317. |
| 1029 | Douglas, D. J. "Some current perspectives on ICP-MS." *Canadian Journal of Spectroscopy* 34, no. 2 (1989): 38-49. ("Douglas-1989") |
| 1030 | Louris, John N., Larry G. Wright, R. Graham Cooks, and Alan E. Schoen. "New scan modes accessed with a hybrid mass spectrometer." *Analytical Chemistry* 57, no. 14 (1985): 2918-2924. ("Louris") |
| 1031 | Houk, R. S. "Elemental and isotopic analysis by inductively coupled plasma mass spectrometry." *Accounts of Chemical Research* 27, no. 11 (1994): 333-339. |
| 1032 | Tanner, Scott D., Vladimir I. Baranov, and Dmitry R. Bandura. "Reaction cells and collision cells for ICP-MS: a tutorial review." *Spectrochimica Acta Part B: Atomic Spectroscopy* 57, no. 9 (2002): 1361-1452. |
| 1033 | Rowan, John T., and R. S. Houk. "Attenuation of polyatomic ion interferences in inductively coupled plasma mass spectrometry by gas-phase collisions." *Applied Spectroscopy* 43, no. 6 (1989): 976-980. |
| 1034 | Kishi, Yoko. "A benchtop inductively coupled plasma mass spectrometer." HEWLETT PACKARD JOURNAL 48 (1997): 72-79. ("Kishi") |
| 1035 | Montaser, Akbar et al., *An Introduction to ICP Spectrometries for Elemental Analysis* 1 in Inductively Coupled Plasma Mass Spectrometry (Akbar Montaser, ed. 1998). |
| 1036 | U.S. Patent No. 6,140,638 ("Tanner-Patent") |

## TABLE OF EXHIBITS *(continued)*

| Exhibit Number | Document |
|---|---|
| 1037 | King, F.L., et al., "Collision-Induced Dissociation of Polyatomic Ions in Glow Discharge Mass Spectrometry," *International Journal of Mass Spectrometry and Ion Processes*, 1989, vol. 89, pp. 171-185. |
| 1038 | Turner, Patrick, et al.,  "Instrumentation For Low and High-Resolution ICP/MS": Inductively Coupled Plasma Mass Spectrometry, Publication Wiley-VCH, edited by A. Montaser, 1998, p. 421-501.  ("Turner") |
| 1039 | Terzić, I., and D. Ćirić. "The double cylindrical electrostatic sector as an ion energy analyzer." *Nuclear Instruments and Methods* 166, no. 3 (1979): 419-423. ("Terzic") |
| 1040 | 1992 Pittcon (The Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy) "Practical MS/MS Analysis" Short Course, Lecture 7 |
| 1041 | May 12, 2015 Response Regarding European Patent Application No. 14175305.3 |

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## I.    <u>INTRODUCTION</u>

Pursuant to 35 U.S.C. § 311, Agilent Technologies, Inc. ("Agilent" or "Petitioner") submits this petition for *inter partes* review ("IPR"), seeking cancellation of Claims 1-50 of U.S. Patent No. RE45,386 ("the '386 Patent," Ex. 1001).  These claims are unpatentable under 35 U.S.C. §§ 102 and 103 over the prior art references identified and applied in this petition.

## II.    <u>MANDATORY NOTICES</u>

Pursuant to 37 C.F.R. § 42.8, Petitioner provides the following mandatory disclosures:

### A.    <u>Real Parties-in-Interest</u>

Agilent Technologies, Inc. ("Agilent") is the real party-in-interest.

### B.    <u>Related Matters</u>

Pursuant to 37 C.F.R. § 42.8(b)(2), the '386 Patent is the subject of a patent litigation suit brought by Patent Owner (*see* Ex. 1004).  Petitioner is concurrently filing another petition for IPR of the '386 Patent; and two petitions for IPR of two other patents asserted in that litigation: related U.S. Patent No. 7,230,232 and U.S. Patent No. RE45,553, respectively.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

### C.   Lead and Back-Up Counsel

Petitioner provides the following designation of counsel:

| Lead Counsel | Back-up Counsel |
|---|---|
| Brian M. Buroker<br>(Reg. No. 39125)<br>Gibson, Dunn & Crutcher LLP<br>1050 Connecticut Avenue, N.W.,<br>Washington, D.C. 20036-5306<br>Tel:  202-955-8541<br>bburoker@gibsondunn.com | Anne Y. Brody<br>(Reg. No. 54612)<br>Gibson, Dunn & Crutcher LLP<br>3161 Michelson Drive<br>Irvine, CA 92612-4412<br>Tel:  949-451-4192<br>abrody@gibsondunn.com |
| | David L. Glandorf<br>(Reg. No. 62222)<br>Gibson, Dunn & Crutcher LLP<br>1801 California Street<br>Denver, CO 80202-4200<br>Tel:  303-298-5726<br>dglandorf@gibsondunn.com |

A Power of Attorney accompanies this petition in accordance with 37 C.F.R.

§ 42.10(b).  Service via hand delivery or postal mail may be made at the addresses

of the lead and back-up counsel above.  Petitioner hereby consents to electronic

service, and service via electronic mail may be made at the email addresses

provided above for the lead and back-up counsel.

2

## III.   **PAYMENT OF FEES**

Pursuant to 37 C.F.R. §§ 42.103 and 42.15(a), $37600 is being paid via

deposit account 501408.  Any additional fees due in connection with this petition

may be charged to the foregoing account.

## IV.   **STANDING**

Pursuant to 37 C.F.R. § 42.104(a), Petitioner certifies that the '386 Patent is

available for IPR and that Petitioner is not barred or estopped from requesting IPR

of the claims on the grounds identified herein.

## V.   **IDENTIFICATION OF CHALLENGE AND STATEMENT OF PRECISE RELIEF REQUESTED**

Pursuant to 37 C.F.R. § 42.104(b), Petitioner requests that the Board institute

*inter partes* review of claims 1, 5-11, 13-21, 23-24, 28-35, 37-50 of the '386 Patent

on one or more grounds under pre-AIA 35 U.S.C. §§ 102 and/or 103.

## VI.   **THRESHOLD REQUIREMENT FOR INTER PARTES REVIEW**

Under 35 U.S.C. § 314(a), institution of *inter partes* review requires "a

reasonable likelihood that the petitioner would prevail with respect to at least 1 of

the claims challenged in the petition."  This petition meets this threshold for each

of the asserted grounds of unpatentability.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## VII.  <u>STATEMENT OF REASONS FOR THE RELIEF REQUESTED</u>

Petitioner requests institution on the seven grounds:

### A.   <u>Grounds</u>

| | |
|---|---|
| Ground 1: | Douglas-1989 in Combination with Johnston Renders Obvious Claims  13, 15-17, 28-32, 34, 37-38, 40-41, 47-50 under § 103 |
| Ground 2: | Douglas-1989 in Combination with Johnston and Whitehouse Renders Obvious Claims 18-20 and 33 under § 103 |
| Ground 3: | Douglas-1989 in Combination with Louris Renders Obvious Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 47-50 under § 103 |
| Ground 4: | Douglas-1989 in Combination with Louris and Whitehouse Renders Obvious Claims 18-20 and 33 under § 103 |
| Ground 5: | Tanner-Patent in Combination with Rowan Renders Obvious Claims 13 and 28 under § 103 |
| Ground 6: | Tanner-Patent in Combination with Rowan and Kishi Renders Obvious Claims 1, 5-10, 14, 16-17, 23-24, 31-34, 35, 39-50  under § 103 |
| Ground 7: | Tanner-Patent in Combination with Rowan, Kishi, and Turner Renders Obvious Claims 11 and 21 under § 103 |

The Declaration of Richard Yost, Ph.D., a world-renowned expert in mass spectrometry, accompanies this petition.  Ex. 1004.

4

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

### B.    Priority Date of the '386 Patent

For purposes of this petition, Agilent assumes that the claims of the '386

Patent are entitled to a priority date of September 16, 1998.

## VIII.  STATE OF THE ART

### A.    Person of Ordinary Skill in the Art

A person of ordinary skill in the art in September 1998 would have a Ph.D. or

a Master's degree, or an equivalent education or practical experience, in chemistry,

physics, or a related field, and at least two-to-three years of experience in

developing the instrumentation and/or the applications of plasma ionization mass

spectrometry and/or tandem mass spectrometry (hereinafter, "POSA").  Ex. 1004

¶¶20-22.

### B.    Scope and Content of the Art Before September 1998

#### 1.    Mass Spectrometry

Mass spectrometry ("MS") is an analytical technique used to identify and

quantify chemical elements and compounds (i.e., atoms and molecules,

respectively) in a sample based on the atomic mass and charge state of the

constituents in the composition.  Ex. 1014, 281-282; Ex. 1004 ¶32.

5

Typically, a sample containing atoms or molecules of interest is introduced into the ion source of a mass spectrometer. *Id.*; Ex. 1015, 6-9; Ex. 1004 ¶¶33-34. The ion source induces either a positive or a negative charge in the neutral atoms and molecules, generating positive or negative ions. Ex. 1014, 281-282; Ex. 1015, 6-9; Ex. 1004 ¶¶33-34. In most instruments, only the positive ions are electrostatically guided by ion optics into a portion of the mass spectrometer called a "mass analyzer." Ex. 1014, 281-282; Ex. 1015, 9; Ex. 1004 ¶¶33-34. The mass analyzer allows ions of a specific mass-to-charge ratio (m/z) to pass through to a detector apparatus while preventing all other ions from reaching the detector when the detector is measuring ions of a set m/z value. Ex. 1015, 16; Ex. 1004 ¶¶33-34.

## 2.  **Quadrupole Mass Analyzer**

A quadrupole is the most common mass analyzer used in modern mass spectrometry. Ex. 1016, 617; Ex. 1004 ¶35. It comprises four parallel rods arranged in a radial array at 90° intervals, with opposite pairs of rods electrically connected. *Id.*, 618; Ex. 1004 ¶35. There are two main modes of operating a quadrupole: RF-only and RF-DC mode. *Id.*, 621-622; Ex. 1004 ¶35. In the RF-only mode, the quadrupole would transmit all ions above a certain m/z cutoff ("total ion mode"). *Id.*; Ex. 1004 ¶35. When a combination of RF and DC

voltages is applied between the rod pairs, the quadrupole transmits ions between upper and lower m/z cutoffs. *Id.*; Ex. 1004 ¶35.  As the DC-to-RF ratio increases, the quadrupole's transmission band narrows. *Id.*; Ex. 1004 ¶35.  At a certain DC-to-RF ratio, this transmission band would be so narrow as to allow only ions of a specific integer m/z to pass through ("unit mass resolution"). *Id.*; Ex. 1004 ¶35.  If the magnitude of the DC and RF voltages is continuously increased over time while keeping the DC/RF ratio constant, the mass filter will scan over a range of m/z values and generate a mass spectrum ("full-scan mode").  Ex. 1016, 621; Ex. 1004 ¶35.

### 3.   <u>Tandem Mass Spectrometry</u>

Quadrupole mass spectrometers may have two or more quadrupoles arranged in tandem.  Exs. 1018-1020; Ex. 1004 ¶36.  Each of the quadrupoles can be designed to operate independently and/or with one another.  Exs. 1018-1020; Ex. 1004 ¶36.

Dr. Yost and his colleagues were the first to introduce a RF-driven collision cell in a triple-quadrupole instrument.  Ex. 1019; Ex. 1004 ¶37.  This instrument comprised a first quadrupole, an enclosed RF-only quadrupole used as a collision/reaction cell, and a third quadrupole. *Id.*, Figure 2; Ex. 1004 ¶37.  In that

7

device, the first quadrupole mass filters the selected ions of interest. *Id.*, 9:14-20;

10:12-17; Ex. 1004 ¶37.  The second RF-only quadrupole is part of a

collision/reaction cell pressurized with a gas, where fragmentation and/or reactions

of the ions may take place. *Id.*, 5:51-64; 9:27-61; Ex. 1004 ¶37.  The third

quadrupole mass analyzes the resulting ions transmitted from the collision cell. *Id.*

at 9:14-20; 10:12-17; Ex. 1004 ¶37.  Such triple-quadrupole instruments are also

known as tandem mass or MS/MS spectrometers.  Exs. 1014-1016; Ex. 1004 ¶37.

There are a few fundamental control parameters in the triple-quadrupole

instrument.  Exs. 1014-1015, 1016, 1021-1022; Ex. 1004 ¶38.  For instance, each

of the first and third quadrupoles can be individually set to pass only ions of a

single m/z, ions within a range of m/z ratios, or all ions (above a lower m/z limit

inherent in the quadrupole).  Ex. 1015, 3-5; Ex. 1021, 207-211; Ex. 1022, 1; Ex.

1004 ¶38.  Where either a range of ions or all ions are passed by a quadrupole, that

may be accomplished by either (i) allowing all ions in the selected range of m/z

values to pass at once, or (ii) incrementally scanning over a range of m/z values

such that at any given time only those ions having an m/z value within the open

"window" will pass through the quadrupole.  Ex. 1004 ¶38.  The middle

quadrupole can be pressurized with a target gas (acting as a collision/reaction cell) or not pressurized.  Ex. 1015, 3-5; Ex. 1004 ¶38.  These user-selectable parameters provide a variety of operational modes in a triple-quadrupole instrument.  Exs. 1014-1015, 1016, 1021-1022; Ex. 1004 ¶¶39-49.

Figure 2 below depicts tandem MS (MS/MS) modes commonly used on a triple-quadrupole instrument.  Ex. 1004 ¶42.  In each of the four schemes of Figure 2, collision/reaction gas is introduced into the central quadrupole Q2, which is operating in RF-only mode.  *Id*.  Interaction with the collision/reaction gas might cause: fragmentation of polyatomic species, energy transfer, charge transfer, and/or ion-molecule reactions between the affected ions and the collision/reaction gas. Exs. 1028-1029; Exs. 1032-1033; Ex. 1004 ¶42.  Fragmentation results in new ions with lower m/z values, sometimes referred to as a neutral loss; energy transfer may result in ions with less kinetic energy, charge transfer may neutralize an interfering ion; and ion-molecule reactions may as result in new ions with new, often higher, m/z values, sometimes referred to as a neutral gain.  Exs. 1028-1029; Exs. 1032-1033; Ex. 1004 ¶42.



10

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

**Figure 2.  MS/MS scan modes on a triple-quadrupole mass spectrometer.**

Daughter Scan: In the top scheme of Figure 2, Q1 is set to pass only ions
with a specific m/z value, often referred to as "parent ions."  Ex. 1015, 3; Ex. 1017,
1252; Ex. 1004 ¶43.  Q3 incrementally scans over a user-specified range of m/z
values from low to high.  Ex. 1004 ¶43.  This mode may be used to identify all the
"daughter ions" formed in Q2 by either collisional fragmentation of the selected
parent ion, or reaction of the collision/reaction gas with the selected parent ion.  *Id*.
If no reaction with the parent ion occurs, Q3 would pass the parent ion when Q3
scans over the m/z value of the parent ion. *Id*.

Parent Scan: In the second scheme of Figure 2, Q1 incrementally scans a
user-specified range of m/z values from low to high, and Q3 is set at a fixed m/z
value to pass only daughter ions with that specific m/z value.  Ex. 1004 ¶44.  This
type of scan may be used to identify all the parent ions from the ion source that
form the selected daughter ion by collision or reaction in Q2.  Ex. 1015, 3; Ex.
1017, 1252; Ex. 1004 ¶44.

Neutral Loss [or Gain] Scan:  In the third scheme of Figure 2, Q1 and Q3 are
both set to scan synchronously over an equivalent user-selected range of m/z

values with a fixed difference in m/z values. Ex. 1004 ¶45.  The scheme depicts a

neutral loss; i.e., a mass shift from a parent ion with a higher m/z value to a

daughter ion having a lower m/z value as a result of collisions/reactions.  *Id*.  This

scan may be used to identify all the daughter ions which arise from a specific

neutral loss known or hypothesized.  Ex. 1015, 3; Ex. 1017, 1252; Ex. 1004 ¶45.

Also, using a reaction gas, ions transmitted by Q1 could react in Q2 to form

product ions of higher m/z.  These could be monitored by a neutral gain scan, with

Q3 synchronously scanning with a positive mass offset from Q1.  Ex. 1004 ¶45.

    Neutral Loss of Zero Scan.   Where ions of interest that pass through Q1 do

not fragment or react in the collision cell and thus retain their initial m/z value, the

neutral offset is zero.  Ex. 1004 ¶¶46-48.  If there are interfering ions that also pass

through Q1, they may fragment to form lower m/z ions or react to form higher m/z

ions in Q2.  *Id*.  Under these circumstances, Q1 and Q3 are synchronously scanned

with no offset.  *Id*. That is, both Q1 and Q3 are set to transmit ions having the same

m/z value.  Ex. 1022, Figs. 2 and 4; Ex. 1030, 2924; Ex. 1004 ¶¶46-48.  Neutral

loss of zero scan modes were known and routinely used since the 1980's.  Ex.

1030, 2919, 2924; Ex. 1022, 1-3; Ex. 1040; Ex. 1004 ¶¶46-48.

Selected Reaction Monitoring (SRM): In the last scheme of Figure 2, each of Q1 and Q3 are set to filter out all but either a single parent ion and single daughter ion at selected m/z values, or a series of selected parent ion/daughter ion pairs.  Ex. 1015, 3-5; Ex. 1017, 1252; Ex. 1004 ¶49; Ex. 1029, 47-49 (describing an SRM experiment in which the parent ion resulted in a 16 amu mass shift after reacting with a target gas in Q2); Ex. 1004 ¶49.

A schematic of a triple-quadrupole instrument available in the 1980s is shown below.  Ex. 1015, 21; Figure 5.  This instrument offered automatic control and data handling by a computer system. *Id*.; Ex. 1004 ¶50.



**Figure 5.**   Scale drawing (side view) of the Finnigan MAT TSQ triple-stage quadrupole MS/MS instrument (15).

Moreover, the quadrupoles may be placed in separate chambers with one or more vacuum pumps.  Exs. 1020, 1025; Ex. 1004 ¶¶50-51.  The use of differential pumping in mass spectrometers has been implemented by researchers and on commercial instruments for over 40 years.  Exs. 1018, 1020, 1025; Ex. 1004 ¶¶50-51.  The introduction of ion sources that operate at pressures higher than those at which mass analyzers and detectors can efficiently operate has made differential pumping a common element of most modern mass spectrometers.  Ex. 1004 ¶¶50-51.  High vacuum is required in the mass analysis and detection region of the mass spectrometer system for two primary reasons—first, to increase the mean-free-path of ions (i.e., how far ions travel between collisions with background gas molecules) to prevent collisions from diverting ions, and second, to prevent arcing of the high voltages generally employed in mass analyzers and detectors.  *Id.* Since the primary source of gas into the vacuum system arises from the ion source, the pressures in successive stage of vacuum pumping generally are highest in the first stage (by the ion source) and are lowest in the last stage (mass analyzer and detector).  Ex. 1035, 18-19; Ex. 1004 ¶¶50-51.

### 4.   Plasma Ion Source

All ion sources serve the same purpose—to convert atoms and/or molecules in a sample into ions that can be conveyed into a mass analyzer.  Ex. 1015, 6-9; Exs. 1026-1028; Ex. 1004 ¶¶52-53.  A number of ion sources have been developed for analyzing the elemental species (atoms) in a sample.  Ex. 1026; Ex. 1004 ¶¶52-53.  Classic ion sources for ionizing atoms include a DC arc and an AC spark.  Exs. 1026, 1029; Ex. 1004 ¶¶52-53.  The preferred ionization source for the past twenty years is the inductively coupled plasma ("ICP").  Ex. 1031, 333; Ex. 1032, 1431-1444; Ex. 1004 ¶¶52-53.  The ICP ion source typically uses argon gas to form a plasma and converts the sample into atomic ions.  Ex. 1031, 333; Ex. 1004 ¶¶52-53.  Other common types of plasma ion sources for elemental analysis are microwave-induced plasma ("MIP") and glow discharge plasma ("GD").  Ex. 1026, 322-326; Exs. 1028-1029; Ex. 1004 ¶¶52-53.

### 5.   Spectroscopic Interferences

In elemental mass spectrometry, only certain atomic ions from the ion source are of interest.  Ex. 1026, 321; Ex. 1004 ¶54.  However, one significant problem with plasma ion sources remains to be other atomic or molecular ions from the ion source that have m/z ratios similar to those of the atomic ions of interest.  Ex.

1024, 1:7-32; Ex. 1004 ¶54.  They would interfere with the detection of the atomic

ions of interest.  *Id*.  For example, the polyatomic ion $^{40}Ar^{16}O^+$ can interfere with

the detection of $^{56}Fe^+$.  Ex. 1033, 976; Ex. 1004 ¶54.  These interfering ions come

from the plasma gas, the sample matrix, and/or the vacuum background gases,

alone or in combination.  Ex. 1029, 47; Ex. 1012, 3:34–4:10; Ex. 1004 ¶54.

Researchers have used a collision/reaction cell to reduce the number of

interfering ions that reach the detector, and thereby reduce their impact on

elemental analysis.  Exs. 1006; 1012; 1023-1024; 1028-1029; 1032-1033; Ex. 1004

¶¶55-57.  As a result of the collisions/reactions with a target gas, interfering ions

from the ion source may form new ions with m/z ratios different from that of the

atomic ion of interest and thereby no longer interfere with the detection.  Exs.

1028-1029; Exs. 1032-1033; Ex. 1033, 979-980; Ex. 1004 ¶¶55-57.

However, there may also be other ions in the ion beam with m/z ratios

different from that of the atomic ion of interest.  Ex. 1033, 979-980; Ex. 1004

¶¶55-57.  These ions may form new product ions in the collision/reaction cell with

an m/z ratio similar to that of the atomic ion of interest (*i.e.*, new interfering ions).

*Id*.; Ex. 1004 ¶¶55-57.  Consequently, researchers suggested using a mass selective

device to filter out these ions before the collision cell. *Id*.; Ex. 1004 ¶¶55-57. By allowing only ions with the m/z of interest to enter into the collision cell, any new product ions formed in the cell would probably not have that m/z of interest. *Id*.; Ex. 1004 ¶¶55-57. Thus, the formation of new interfering ions is reduced by mass selecting the ions prior to the collision cell. *Id*.; Ex. 1004 ¶¶55-57.

### 6.  **Photons and Neutral Species**

Many ion sources inevitably generate some amount of neutral species and photons, including ICP and GD sources. Ex. 1012, 3:34–4:10; Ex. 1018, 2:1-19; Ex. 1004 ¶58. In the absence of other means to divert their path (*e.g.*, vacuum systems), these neutral species and photons are assumed to travel in a straight line from the ion source to the detector, increasing the background noise. Ex. 1018, 2:57-3:20; Ex. 1004 ¶58. To reduce such background noise, many instruments use ion optics to bend the path of the ions so that the ions would either travel around a photon stop or be sent off-axis towards a detector mounted off-axis. Ex. 1034, 2-3; Ex. 1004 ¶58. In contrast, the neutral species and the photons would still travel in a straight line and strike the photon stop or not be bent towards an off-axis detector. *Id*.; Ex. 1018, 2:57-3:20; Ex. 1004 ¶58.

## IX.    THE '386 PATENT

The '386 Patent is a reissue from U.S. Patent No. 7,202,470.  The '470 patent

claimed priority to a GB patent application 98202104, filed on September 16,

1998.  The reissue application was filed on September 19, 2013 (Application

Number 14/032,096).

### A.    Patent-Owner's Admissions to European Patent Office

During the European prosecution of substantially similar claims to those

challenged in this petition, Thermo admitted that Douglas-1989 (Ex. 1029)

disclosed an ICP triple-quadrupole instrument that could be operated such that the

same range of mass-to-charge ratio is selected at the first and third quadrupoles.

Ex. 1041, 1-3 (discussing "D3," which is Ex. 1029 ("Douglas-1989")).  According

to Thermo, the novelty of the claimed invention is the configuration of prior art

instrumentation in a mode that was "not routinely used."  *Id.*, 1.  In other words,

Thermo only argued that the distinguishing feature is the configuration of the prior

art instrument such that the same range of mass-to-charge ratio is selected at the

first and third quadrupoles.  *Id.*, 2.  Moreover, as acknowledged by Thermo,

Douglas-1989's experiment disclosed synchronous scanning of the first and third

quadrupoles at a constant offset of 16 (neutral gain scan).  *Id.*

18

### B.    The '386 Patent Claims

The '386 Patent has three independent claims—Claim 1, 13, and 28.  Claim 1 is an apparatus claim for a mass spectrometer with three evacuated chambers, three pumps, a collision cell, and multiple apertures between chambers.

Claim 13 is a method claim for operating a mass spectrometer where there is mass selection before the collision cell and mass analyzing after the collision cell.

Claim 28 is an apparatus claim for a mass spectrometer which includes a plasma ion source, an ion optical device, a collision cell, and a mass analyzer.  The originally issued claim 28 recites a plasma ion source, whereas the reissued claim 28 requires an ICP source.

The full text of the claims can be found in the chart below.  In the following discussion, brackets are used to identify claim elements (*e.g.*, "[1E]")..

| '386 Patent |
|---|
| **[1Pre.]** A mass spectrometer comprising: |
| **[1A.]** means (1) for generating ions from a sample introduced into a plasma; |
| **[1B.]** a sampling aperture (2) for transmitting some of the ions into an evacuated expansion chamber (3) along a first axis (9) to form an ion beam; |

| |
|---|
| **[1C.]** a second aperture (5) for transmitting some of the ion beam into a first evacuated chamber (6); |
| **[1D.]** a first pump (7) for maintaining the first evacuated chamber (6) at high vacuum; |
| **[1E.]** a first ion optical device (17) located in the first evacuated chamber (6) for containing the ion beam wherein the first ion optical device (17) is a mass selective device; |
| **[1F.]** a third aperture (19) for transmitting the ion beam into a second evacuated chamber (20); |
| **[1G.]** a second pump (21) for maintaining the second evacuated chamber (20) at a lower pressure than the first evacuated chamber (6); |
| **[1H.]** a collision cell (24) having an entrance aperture (27) and an exit aperture (28) and pressurized with a target gas (26), the collision cell (24) being disposed in the second evacuated chamber (20); |
| **[1I.]** a second ion optical device (25) located in the collision cell (24) for containing the ion beam; |
| **[1J.]** a fourth aperture (32) for transmitting the ion beam into a third evacuated chamber (33) containing mass-to-charge ratio analyzing means (37) disposed along a second axis (36), wherein the mass-to-charge analyzing means is configured to mass analyze the ion beam to produce a mass spectrum of the ion beam such that both the first ion optical device (17) and the mass-to-charge ratio analyzing means (37) operate at the same mass to charge ratio, so as substantially to minimize the formation in the collision cell of interfering ions having the said mass to charge ratio; and |
| **[1K.]** a third pump (39) for maintaining the third evacuated chamber (33) at lower pressure than the second evacuated chamber (20). |
| **2.** A mass spectrometer according to claim **1**, wherein the first evacuated chamber (6) is maintained at a pressure of approximately $10^{-2}$ to $10^{-4}$ mbar. |

**3.** A mass spectrometer according to claim **1**, wherein the first evacuated chamber (6) is maintained at a pressure of approximately $1\text{-}2\times10^{-3}$ mbar.

**4.** A mass spectrometer according to claim **1**, including a gap of at least 2 cm between the third aperture (19) and the entrance aperture (27) of the collision cell (24).

**5.** A mass spectrometer according to claim **1**, wherein the distance between the ion source (1) and the entrance aperture (27) of the collision cell (24) is 90 to 200 mm.

**6.** A mass spectrometer according to claim **1**, wherein the mass-to-charge ratio analyzing means (37) includes a main mass filter which preferably is an RF quadrupole.

**7.** A mass spectrometer according to claim **1**, wherein the first ion optical device (17) is an RF quadrupole.

**8.** A mass spectrometer according to claim **1**, wherein the second ion optical device (25) is an RF quadrupole.

**9.** A mass spectrometer according to claim **1**, wherein the second ion optical device (25) is mass selective.

**10.** A mass spectrometer according to claim **1**, wherein the second axis (36) of the mass to charge ratio analyzing means (37) is offset from the first axis (9).

**11.** A mass spectrometer according to claim **1**, wherein the first evacuated chamber (6) is divided into a first region (14) adjacent to the expansion chamber containing an extractor lens (8) driven at a negative potential, and a second region (15) adjacent to the collision cell (24) in which the ion optical device (17) is located, by a large diameter aperture (11) and the aperture is sealable by means of a flat plate (12) on an O-ring seal (13).

**12.** A mass spectrometer according to claim **1**, wherein the first ion optical device and the mass-to-charge analyzing means are configured to scan synchronously.

**[13Pre]** A method of operating a mass spectrometer that incorporates a collision cell pressurized with a target gas, the method comprising:

**[13A.]** generating an ion beam by introducing a sample into a plasma, the ion beam including analyte ions having an analyte mass to charge ratio and unwanted ions;

**[13B.]** mass selecting at least a portion of the ion beam at the analyte mass to charge ratio;

**[13C.]** transmitting at least a portion of the mass selected ion beam into the collision cell, the mass selecting step being effective substantially to minimize the formation in the collision cell of interfering ions having the analyte mass to charge ratio;

**[13D.]** receiving at least a portion of the ion beam from the collision cell at a mass analyzer; and

**[13E.]** mass analyzing the received ion beam at the same analyte mass to charge ratio as in the mass selecting step.

**14.** A method according to claim **13**, wherein a distance of 90 to 200 mm is maintained between the ion source and an entrance aperture of the collision cell.

**15.** A method according to claim **13**, wherein mass selecting and mass analyzing comprise scanning synchronously.

**16.** A method according to claim **13**, wherein the mass selecting is achieved by passing the ion beam through a first mass selective ion optical device.

**17.** A method according to claim **16**, wherein the first mass selective ion optical device is an RF quadrupole.

**18.** A method according to claim **16**, wherein the first mass selective ion optical device is located in a first evacuated chamber maintained at high vacuum.

**19.** A method according to claim **18**, wherein the first evacuated chamber is maintained at a pressure of approximately $10^{-2}$ to $10^{-4}$ mbar.

**20.** A method according to claim **18**, wherein the first evacuated chamber is maintained at a pressure of approximately $1\text{-}2\times10^{-3}$ mbar.

**21.** A method according to claim **18**, wherein the first evacuated chamber is divided into a first region adjacent to the expansion chamber containing an extractor lens driven at a negative potential, and a second region adjacent to the collision cell, by a large diameter aperture and the aperture is sealable by means of a flat plate on an O-ring seal.

**22.** A method according to claim **18**, wherein the collision cell is located in a second evacuated chamber operated at lower pressure than the first evacuated chamber, the ion beam being contained in the second evacuated chamber by a second ion optical device.

**23.** A method according to claim **22**, wherein the second ion optical device is an RF quadrupole.

**24.** A method according to claim **22**, wherein the second ion optical device is mass selective.

**25.** A method according to claim **22**, further comprising transmitting at least a portion of the ion beam from the ion source through a sampling aperture into an evacuated expansion chamber along a first axis, into the first evacuated chamber through a second aperture; wherein transmitting at least a portion of the mass selected ion beam into the collision cell includes transmitting at least a portion of the ion beam into the second evacuated chamber through a third aperture, wherein a gap of at least 2 cm is maintained between the third aperture and an entrance aperture of the collision cell.

**26.** A method according to claim **25**, wherein the mass analyzer is located in a third evacuated chamber operated at lower pressure than the second evacuated chamber, the mass analyzer being disposed along a second axis.

**27.** A method according to claim **26**, wherein the second axis is offset from the first axis.

**28.** A mass spectrometer comprising:

| |
|---|
| **[28A.]** an inductively coupled plasma ion source for generating ions from a sample, the generated ions including first atomic ions having a first mass-to-charge ratio and artefact ions having a mass-to-charge ratio that interferes with the first mass-to-charge ratio; |
| **[28B.]** an ion optical device disposed to receive at least a portion of an ion beam generated by the ion source, the ion optical device being configured to mass select at least a portion of the ion beam generated by the ion source at the first mass-to-charge ratio, thereby removing, from the ion beam, ions not having the first mass-to-charge ratio; |
| **[28C.]** a collision cell disposed to receive at least a portion of a mass selected ion beam from the ion optical device and configured to remove, from the mass selected ion beam, artefact ions having a mass-to-charge ratio that interferes with the first mass-to-charge ratio, the ion optical device being configured substantially to minimize the formation in the collision cell of interfering artefact ions having the said first mass-to-charge ratio; and |
| **[28D.]** a mass analyzer disposed to receive at least a portion of the mass selected ion beam from the collision cell, the mass analyzer being configured to mass analyze the received ion beam at the same mass-to-charge ratio as the ion optical device, wherein the mass analyzer is configured to detect the first atomic ions when the same mass-to-charge ratio is the first mass-to-charge ratio. |
| **29.** A mass spectrometer according to claim **28**, wherein the ion optical device and the mass analyzer are configured to scan synchronously. |
| **30.** A mass spectrometer according to claim **28**, wherein the mass analyzer is configured to mass select the ion beam received from the collision cell at the mass-to-charge ratio. |
| **31.** A mass spectrometer according to claim **28**, wherein the ion optical device comprises a first RF quadrupole. |
| **32.** A mass spectrometer according to claim **31**, wherein the mass analyzer comprises a second RF quadrupole. |

**33.** A mass spectrometer according to claim **28**, wherein the ion optical device is disposed in a first evacuated chamber, the collision cell is disposed in a second evacuated chamber, and the mass analyzer is disposed in a third evacuated chamber.

**34.** A mass spectrometer according to claim **28**, further comprising a second ion optical device located in the collision cell for containing the ion beam.

**35**. A mass spectrometer according to claim 1, wherein the means (1) for generating ions from a sample introduced into a plasma uses argon, and wherein the collision cell does not contain a significant partial pressure of argon.

**36.** A mass spectrometer according to claim 1, wherein the operation of the first ion optical device (17) and the mass-to-charge ratio analyzing means (37) at the same mass to charge ratio to produce the mass spectrum of mass-to-charge ratios includes synchronously scanning the first ion optical device (17) and the mass-to-charge ratio analyzing means (37) over a spectrum of mass-to-charge ratios.

**37.** The method according to claim **13**, wherein mass analyzing the received ion beam at the same analyte mass to charge ratio as in the mass selecting step is performed at a plurality of analyte mass to charge ratios.

**38.** The method according to claim **37**, further comprising:

obtaining a mass spectrum of the ion beam by a synchronous scan that mass analyzes the received ion beam at the same analyte mass to charge ratio as in the mass selecting step at the plurality of analyte mass to charge ratios.

**39.** The method according to claim **13**, wherein the collision cell does not contain a significant partial pressure of argon.

**40.** The method according to claim **13**, wherein the collision cell is pressurized with a target gas that is not argon.

**41.** The method according to claim **13**, wherein the plasma is an inductively coupled plasma.

**42.** The method according to claim **41**, wherein the inductively coupled plasma includes argon, and wherein the collision cell does not contain a significant partial pressure of argon.

**43.** The method according to claim **42**, wherein the collision cell is pressurized with helium or hydrogen.

**44.** A mass spectrometer according to claim **28**, wherein the generated ions further include second atomic ions having a second mass-to-charge ratio and artefact ions having a mass-to-charge ratio that interferes with the second mass-to-charge ratio, wherein the ion optical device is further configured to mass select at least a portion of the ion beam generated by the ion source at the second mass-to-charge ratio, and wherein the mass analyzer is configured to detect the second atomic ions when the same mass-to-charge ratio is the second mass-to-charge ratio.

**45.** A mass spectrometer according to claim **28**, wherein the inductively coupled plasma includes argon, and wherein the collision cell does not contain a significant partial pressure of argon.

**46.** A mass spectrometer according to claim **45**, wherein the collision cell is pressurized with helium or hydrogen.

**47.** A mass spectrometer according to claim **28**, wherein the artefact ion include molecular ions.

**48.** A mass spectrometer according to claim **28**, wherein the artefact ions are reacted or collided with a collision gas in the collision cell to form ions having mass-to-charge ratios that do not interfere with the first mass-to-charge ratio, thereby removing artefact ions.

**49.** A mass spectrometer according to claim **48**, wherein at least some of the artefact ions are collided with the collision gas to form ions that have lower mass-to-charge ratios than the first mass-to-charge ratio.

**50.** A mass spectrometer according to claim **48**, wherein at least some of the artefact ions are reacted with the collision gas to form ions that have higher mass-to-charge ratios than the first mass-to-charge ratio.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## X.    CLAIM CONSTRUCTION

A claim in *inter partes* review is given the broadest reasonable interpretation

("BRI") in light of the specification.  37 C.F.R. § 42.100(b); *see also*, *Cuozzo*

*Speed Techs., LLC v. Lee*, 136 S. Ct. 2131 (2016).  Petitioner proposes the

following BRIs:

### A.    "means (1) for generating ions from a sample introduced into a plasma" (Claim 1)

The function for this means-plus-function term is "generating ions from a

sample introduced into a plasma."  The corresponding structure includes: (1) an

ICP ion source based on 6:26-27; and (2) other plasma ion sources based on 1:15-

23, and claims 13 and 41.

### B.    "mass-to-charge ratio analyzing means (37)" (Claim 1)

The function for this means-plus-function term is "analyzing ions based on

their mass-to-charge ratios."  The corresponding structure includes: an RF

quadrupole, a magnetic sector, and a time-of-flight ("TOF") mass analyzer based

on the disclosures at 4:60-64 and claim 6.

27

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

### C.   <u>**"configured to" (Claim 28)**</u>

Claim 28 uses the phrase "configured to" three times, each in reference to a mode of operation of the mass spectrometer.  While an instrument that is configured to operate in a certain mode must be capable of operating in that mode, courts have rejected the narrow interpretation that the claimed mode has to be the default setting.  *Riverbed Tech., Inc. v. Silver Peak Sys., Inc*. No. 11–484–RGA, 2013 WL 3830416, at *1 (D. Del. July 23, 2013) (holding that a system is "configured to" perform a function "[i]f the system is expressly created so that the user may take advantage of" that function, "[e]ven if the enablement of the function is not the default setting").  There is nothing in the prosecution history or specification here that suggests that "configured to" must be the sole or even default setting.  According, the BRI of "configured to" is "enabled for use by the user to."

### D.   <u>**"at the same mass-to-charge ratio"; "at the same analyte mass-to-charge ratio" (Claims 1, 13, and 28)**</u>

Claims 1 and 28 describe that the mass analyzer operates "at the same mass-to-charge ratio" as the ion optical device.  Claim 13 describes that the step of mass analyzing to be "at the same analyte mass-to-charge ratio" as the mass selecting

28

step.  The BRI of this term is "at one or more mass-to-charge ratios, one of which is the mass-to-charge ratio of an analyte ion."

The claim language and the other claims support this BRI.  Claim 13 describes a method of operating a mass spectrometer using the transitional phrase "comprising" in an open-ended manner.  Claims 37 and 38 depend on Claim 13, and further describe that the step of mass analyzing is performed at a plurality of analyte m/z ratios.  These claim elements do not explicitly exclude mass analyzing at m/z ratios other than the analyte m/z ratios.  In other words, these claims' scope encompass a method in which the mass analysis step is performed at many m/z ratios, so long as one of the m/z ratios is the analyte m/z ratio.  In that case, the step of mass analyzing would still be "at the same mass-to-charge ratio" as the mass selecting step.

## XI.   GROUNDS FOR UNPATENTABILITY

### A.   General Principles

Under 35 U.S.C. § 102, if a single prior art reference discloses each limitation of the claimed invention, a patent claim is anticipated and invalid.  *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Moreover, "a reference can anticipate a claim even if it 'd[oes] not expressly spell

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

out' all the limitations arranged or combined as in the claim, if a person of skill in

the art, reading the reference, would 'at once envisage' the claimed arrangement or

combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376,

1381 (Fed. Cir. 2015) (quoting *In re Petering*, 301 F.2d 676, 681 (1962)).

Under 35 USC § 103, a patent claim is obvious and invalid "if the

differences between the subject matter sought to be patented and the prior art are

such that the subject matter as a whole would have been obvious at the time the

invention was made to a person having ordinary skill in the art to which said

subject matter pertains." Multiple pieces of prior art render the claims of the '386

Patent anticipated and/or obvious.

### B.   Apparatus Claims Reciting Manners of Operation

"[A]pparatus claims cover what a device *is,* not what a device *does*."

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469 (Fed. Cir.

1990) (emphasis in original).  "[T]he patentability of apparatus or composition

claims depends on the claimed structure, not on the use or purpose of that

structure." *Catalina Marketing Intern. v. Coolsavings. Com*, 289 F. 3d 801, 809

(Fed. Cir. 2002).  Thus, a claim containing a "recitation with respect to the manner

in which a claimed apparatus is intended to be employed does not differentiate the

claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the apparatus claim. *Ex parte Masham*, 2 U.S.P.Q. 2d 1647 (Bd. Pat. App. & Inter. 1987).

### C.      Method Claims Reciting Operations of an Apparatus

When a prior art apparatus is the same as the apparatus described in a claim for carrying out a claimed method, the prior art apparatus presumably will perform the claimed method in its normal and usual operation. *See In re King,* 801 F.2d 1324 (Fed. Cir. 1986). Moreover, when a prior art reference describes using a prior art apparatus towards a particular purpose, a claimed method is anticipated if the claim merely recites newly discovered results of using the same apparatus for the same purpose. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc*., 246 F. 3d 1368 (Fed. Cir. 2001).

### D.      Claim Elements Directed to the Intended Use of a Component

Statements of an intended use or purpose of a component in a claimed structure or composition are not included in invalidity analysis under Sections 102 and 103. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2003). "Although such statements often appear in the claim's preamble, a statement of intended use or purpose can appear elsewhere in a

claim." *Ex Parte Mewherter*, Appeal No. 2012-007692, Decision on Appeal at 18-19 (P.T.A.B. May 8, 2013).

**Claims 46-50:**  Claims 46-50 ultimately depend from the apparatus Claim 28.  These claims only state the intended results of using certain plasma gas, sample, collision gas, and/or pressures.  These claims do not add any further structural limitations to the claimed apparatus.  Accordingly, prior art that discloses the apparatus of Claim 28 anticipates (or render obvious) Claims 46-50 regardless of whether the prior art discloses the results of using these gases and samples.

### E.   Ground 1: Douglas-1989 in combination with Johnston Renders Obvious Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 47-50

Douglas-1989 was published in 1989 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008, ¶21.  Douglas-1989 is cited in the specification of the '386 Patent as admitted prior art.  Ex. 1001 at 2:22-24.  Johnston (Ex. 1022) is a Finnigan MAT publication, published and publicly available as of 1984. Ex. 1004.  As explained by Dr. Yost, such Finnigan MAT publications were distributed by the company at the time of publication and were known and available to POSAs.  Ex. 1004 ¶60.  As further evidence of its availability, Johnston was cited in peer reviewed articles in the art shortly, such as Analytical Chemistry (Ex. 1030),

shortly after publication, and is cited on the face of the '553 patent. Neither

Douglas-1989 nor Johnston were discussed during the prosecution of the original

patent or reissue.

### 1.   Motivation to Combine Johnston and Douglas-1989

A POSA would have been motivated to combine the teachings of Douglas-

1989 with Johnston, as the subject of both is the triple-quad spectrometer. Ex.

1006 at 172. Ex. 1004 ¶61. Douglas-1989 describes a triple quad mass

spectrometer using an ICP source, while Johnston teaches a variety of modes for

using a triple quad mass spectrometer which includes a generic ion "Source".

More specifically, each reference describes a mode of operation where both the

first and third quad are operated in mass selective mode, and scanned together with

a set mass offset, with a collision cell in between the two quadrupoles. Ex. 1022 at

1; Ex. 1029 at 48. The applicant for the '386 Patent noted that the alleged

invention could be used with a variety of sources and was not limited to ICP-MS,

and accordingly a POSA would not have hesitated in 1998 to consult references

from mass spectrometry using a variety of sources, and would certainly be inclined

to combine the ICP triple quadrupole teachings of Douglas-1989 with the general

triple quadrupole teachings of Johnston. Ex. 1004 ¶61.

33

## 2.    <u>Douglas-1989 and Johnston Render Obvious Claim 13</u>

**[13Pre]:**  Both Douglas-1989 and Johnston teach methods "of operating a

mass spectrometer that incorporates a collision cell pressurized with a target

[collision] gas." Ex. 1004 ¶62. Douglas-1989 employed air as the target gas to

pressure the collision cell.  Ex. 1029 at 48.  Johnston shows the collision gas in

Quadrupole 2 as seen, for example, in Figure 4 as indicated (Ex. 1022 at 2)::



*Figure 4.  Energy filtering (Neutral loss of Zero). Both mass analyzers are scanned
over the same mass range at the same time. Only ions which survive collisions
intact are transmitted through the analyzer.*

**Element [13A]:**  Both references "generate an ion beam" with the "ion

beam including analyte ions" and "unwanted ions."  Douglas-1989 specifies that

the ion beam is generate by introducing a sample [cerium and terbium] into a

plasma, specifically an ICP.  Ex. 1029 at 47.  Each reference identifies the

presence of "analyte ions" and "unwanted ions" [interferences]. Ex. 1029 at 2; Ex. 1022 at 47.  Ex. 1004 ¶63.  All ions have a mass-to-charge ratio.  *Id*.

**Element [13B]:**  Both references disclose "mass selecting at least a portion of the ion beam at the analyte mass-to-charge ratio" using the first quadrupole. Ex. 1006 at 47 (selecting $Ce^+$, $Tb^+$ and $CeO^+$); Ex. 1022, Figure 3 (mass selecting one ion source product "M+"; Figure 4 (scanning over a mass range, selecting one mass-to-charge ratio at any moment); Ex. 1004 ¶64.

**Element [13C]:**  Both references disclose "transmitting at least a portion of the ion beam into the collision cell" because only the potion of the ion beam that is ions having the selected analyte mass-to-charge ratio enter into the collision cell. Ex. 1029 48; Ex. 1022 at 2.  Any new product ions formed inside the collision cell through reactions or dissociations would have an m/z other than the m/z selected by the first quadrupole, such that no new ions would be formed at the analyte m/z. Ex. 1004 ¶65.  For example, Douglas-1989 teaches the formation of $CeO^+$ from $Ce^+$.  $CeO^+$ has a different m/z compared to $Ce^+$.  Ex. 1029 at 48.

**Element [13D]:**  Both references disclose "receiving at least a portion of the ion beam from the collision cell at a mass analyzer" because ions exiting the

collision cell are received by the third quadrupole mass analyzer.  Ex. 1004 ¶73;

Ex. 1029 at 48; Ex. 1022 at 2; Ex. 1004 ¶66.

**Element [13E]:**  Johnston teaches "mass analyzing the received ion beam at

the same analyte mass to charge ratio as the mass selecting step."  Ex. 1017 at 2

("both mass analyzers must be scanned over the same mass range at the same

time."); Figure 4:



*Figure 4.  Energy filtering (Neutral loss of Zero).  Both mass analyzers are scanned over the same mass range at the same time.  Only ions which survive collisions intact are transmitted through the analyzer.*

Ex. 1004 ¶67-68. Johnston also refers to this mode of operation as a "neutral loss

of zero," meaning that there is an offset of zero between the mass selecting at the

first quadrupole and the third quadrupole, which would mean analyzing the ion

beam at the same mass-to-charge ratio that was originally selected at the first

quadrupole.  Douglas-1989 discloses mass analyzing the received beam at a

constant offset, but chose an example using a mass offset of zero.  Ex. 1029 at 48.

A person of skill in the art would understand that this mass offset can be set to any number, including zero as disclosed in Johnston.  Ex. 1004 ¶68.  A POSA might be motivated to perform an offset of zero experiment to determine which ion source products (analyte ions) undergo fragmentation or reaction in the collision cell, for example.  Ex. 1022 at 2.

### 3.   **Douglas-1989 and Johnston Render Obvious Claim 28**

**[28Pre]:**  Both Douglas-1989 and Johnston disclose a mass spectrometer. Ex. 1029 at 48; Ex. 1022 at 1; Ex. 1004 ¶69.

**Element [28A]:**  Douglas-1989 discloses an ICP triple quadrupole mass spectrometer, including an ICP ion source for generating ions from a sample, including analyte and unwanted [interference] ions.  Ex. 1029 at 47. Each reference identifies the presence of "analyte ions" and "unwanted ions" [interferences]. Ex. 1029 at 46, 48.  All ions have a mass-to-charge ratio.  Ex. 1002; Ex. 1004 ¶70.

**Element [28B]:**  Both references disclose an ion optical device [the first quadrupole of the triple quadrupole mass spectrometer] disposed to receive the ion beam from the ion source, with the ion source being configured to mass select only ions having a first mass-to-charge ratio.  Ex. 1004 ¶71; Ex. 1006 at 47 (selecting $Ce^+$, $Tb^+$ and $CeO^+$); Ex. 1022, Figure 3 (mass selecting one ion source product

"M$^+$"; Figure 4 (scanning over a mass range, selecting one mass-to-charge ratio at

any moment).  Figure 3 from Douglas-1989 shows the ion beam (highlighted)

coming from the source to the first quadrupole, and mass selecting only M$^+$, but

not x$^+$ or y$^+$:



Figure 3. Formation and mass selection of secondary ion products by collision-activated dissociation. The selected parent ion (M$^+$) fragments, producing daughter ions (M$_1^+$, M$_2^+$, M$_3^+$, M$_4^+$) for mass analysis in quadrupole 3.

**Element [28C]:**  Each reference "a collision cell disposed to receive at least

a portion of a mass selected ion beam from the ion optical device and configured to

remove, from the mass selected ion beam, artefact ions having a mass-to-charge

ratio that interferes with the first mass-to-charge ratio."  Ex. 1029 at 47

(configuring the collision cell to remove interferences through dissociation or

reaction [ion molecule chemistry]); Ex. 1022 at 2 (configuring collision cell to

filter out interferences by fragmentation); Ex. 1004 ¶72.  Furthermore, both

references teach the minimization of the formation of interfering ions within the

collision cell, because only ions having the selected mass-to-charge ratio are allowed to enter into the collision cell.  Ex. 1029 at 48; Ex. 1022 at 2.  Any new product ions formed inside the collision cell through reaction or dissociation would necessarily have an m/z other than the m/z selected by the first quadrupole.  For example, Douglas-1989 teaches the formation of $CeO^+$ from $Ce^+$.  $CeO^+$ has a different m/z compared to $Ce^+$.  Ex. 1029 at 48.  See also Ex. 1022 at Figure 4 ("Rejection of new ion products").

**Element [28D]:**  Both references disclose "a mass analyzer disposed to receive at least a portion of the ion beam from the collision cell" because ions exiting the collision cell are received by the third quadrupole mass analyzer.  Ex. 1029 at 48; Ex. 1022 at 2; Ex. 1004 ¶73.  Johnston teaches "mass analyzing the received ion beam at the same analyte mass to charge ratio as the mass selecting step."  Ex. 1017 at 2 ("both mass analyzers must be scanned over the same mass range at the same time."); Figure 4:



*Figure 4.* Energy filtering (Neutral loss of Zero). Both mass analyzers are scanned over the same mass range at the same time. Only ions which survive collisions intact are transmitted through the analyzer.

Johnston also refers to this mode as a "neutral loss of zero," meaning that there is an offset of zero between the mass selecting at the first quadrupole and the third quadrupole, which would mean analyzing the ion beam at the same mass-to-charge ratio that was originally selected at the first quadrupole. Douglas-1989 discloses mass analyzing the received beam at a constant offset, but chose an example using a mass offset of zero. Ex. 1029 at 48. A person of skill in the art would understand that this mass offset can be set to any number, including zero as disclosed in Johnston. Ex. 1004 ¶74. A POSA might be motivated to perform an offset of zero experiment to determine which ion source products (analyte ions) undergo fragmentation or reaction in the collision cell, for example. Ex. 1022 at 2; Ex. 1004 ¶74.

### 4.   Douglas-1989 and Johnston Render Obvious Dependent Claims

**Claims 15 and 29:** Each of Douglas-1989 and Johnston disclose the mass selecting and mass analyzing steps scanning synchronously.  Ex. 1029 at 48; Ex. 1022 at 2 ("both mass analyzers must be scanned over the same mass range at the same time").  Each reference discloses that the instrument is configured to do so, and is in fact operated in that way.  Ex. 1004 ¶75.

**Claims 16, 17 and 31**: Both Douglas-1989 and Johnston mass select by passing the ion beam through a mass selection ion optical device, which is specifically an RF quadrupole. Ex. 1029 at 46; Ex. 1022 at 2 (Figures 3 and 4); Ex. 1004 ¶76.

**Claim 30:** The mass analyzer in each of the Douglas-1989 and Johnston reference is configured to mass analyze at a particular mass-to-charge ratio, which is accomplished by configuring the third quadrupole to mass select at that mass-to-charge ratio.  Ex. 1004 ¶77. Johnston teaches that the mass analyzer mass selects [quadrupole 3] the same mass-to-chare ratio [neutral loss of zero] as first mass-to-charge ratio [quadrupole 1]:

41

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*



*Figure 4. Energy filtering (Neutral loss of Zero). Both mass analyzers are scanned over the same mass range at the same time. Only ions which survive collisions intact are transmitted through the analyzer.*

**Claim 32**: Both references disclose a mass analyzer which comprises a RF quadrupole [quadrupole 3]. Ex. 1029 at 46; Ex. 1022 at 2 (Figures 3 and 4); Ex. 1004 ¶78.

**Claim 34:** Both Douglas-1989 and Johnston uses a triple quadrupole instrument with the collision cell comprising the middle quadrupole, which is an ion optical device that contains the ion beam. Ex. 1004 ¶79; Ex. 1029 at 46; Ex. 1022 at 2 (Figures 3 and 4(shown below with collision cell highlighted)):

42



*Figure 4. Energy filtering (Neutral loss of Zero). Both mass analyzers are scanned over the same mass range at the same time. Only ions which survive collisions intact are transmitted through the analyzer.*

**Claims 37-38, 44:** Both Douglas-1989 and Johnston teach mass analyzing the ion beam at two or more ("a plurality") analyte mass-to-charge ratios, and obtaining a mass spectrum by synchronously scanning across those multiple ratios. Ex. 1029 at 48; Ex. 1022 at 2 ("both mass analyzers must be scanned over the same mass range at the same time"). Each reference discloses that the instrument is configured to do so, and is in fact operated in that way. Ex. 1004 ¶80. Mass spectra obtained by this process is shown in Douglas-1989 (Ex. 1029) at Figure 11, and in Johnston (Ex. 1022) at Figures 13 and 14. *Id*.

**Claim 40:** Douglas-1989 uses air, not argon, as the target gas to pressurize the collision cell. Ex. 1029 at 48; Ex. 1004 ¶81.

43

**Claim 41:** Douglas-1989 teaches the use of an ICP triple quadrupole mass spectrometer, including an ICP ion source for generating ions from a sample, including analyte and unwanted [interference] ions.  Ex. 1029 at 47; Ex. 1004 ¶82.

**Claims 47-50:** Johnston discloses artefact ions [interferences] that include molecular ions.  Ex. 1022 at 2.  Specifically Johnston discusses interferences that can be removed by fragmentation in the collision cell.  *Id*. Only molecular ions can fragment.  Ex. 1004 ¶83-85.

**Claims 47-48:**  Johnston teaches the removal of artefact ions [interferences] through fragmentation by collision in the collision cell, which results in the formation of ions having a lower mass-to-charge ratio.  These new ions are rejected by the third quadrupole, such that the artefact ions have been removed and therefore do not interfere with analyte ions.  Ex. 1004 ¶90-91; Ex. 1022 at 2 ("[O]nly unfragmented ions may pass completely through the system...Ions that lose any neutral fragment will be rejected by the final mass analyzer."); Figure 4 (showing removal of artefact ions such as $M^+$ after fragmentation). Ex. 1004 ¶83-84.

**Claim 50:**  Douglas-1989 teaches the reaction of ions in the collision cell with the collision gas [oxygen] to form ions having a higher mass-to-charge ratio.

Ex. 1029 at 48.  Ions having a higher mass-to-charge ratio would not interfere with

the first mass-to-charge ratio.  Ex. 1004 ¶85. Douglas-1989 explicitly suggests that

such reactions in the collision cell "may provide a way around persistent

interferences."  Ex. 1029 at 48.

### F.   Ground 2: Douglas-1989 in Combination with Johnston and Whitehouse Render Obvious Claims 18-20 and 33.

#### 1.   Motivation to Combine Douglas-1989 and Johnston with Whitehouse

Whitehouse (Ex. 1025) qualifies as prior art under 35 U.S.C. § 102(e)

because the non-provisional patent application that led to the issuance of

Whitehouse on January 4, 2000 was filed on August 9, 1996.  Whitehouse is not

cited on the cover of the '470 and '386 Patents.

While Johnston describes differential pumping, it does not explicitly discuss

the evacuated chambers, their respective apertures, pumps, and relative pressures

of the triple quadrupole instrument, whereas Whitehouse does.  A POSA would

have been motivated to combine the instrument specifics in Whitehouse with

Johnston's modes of operation and Douglas-1989's ICP ion source because all

concern the subject of the use of triple quadrupole mass spectrometers and

Whitehouse teaches the advantage of having multiple vacuum pumping stages to

reduce neutral background gas and to improve the detection of analyte ions.  Ex.

1004 ¶87; Ex. 1025 at 10:50-59.  The glow-discharge ion source used in Johnston

and the ICP ion source used in Douglas-1989 are two of the ion sources used in

Whitehouse.  *Id*. Furthermore, all three references are concerned with obtaining a

mass spectrum of a sample passing through a collision cell.

### 2.   Douglas-1989, Johnston and Whitehouse Render Obvious Claims 18-20 and 33

**Claim 18:**  Johnston/Douglas-1989/Whitehouse teach "the first mass

selective ion optical device is located in a first evacuated chamber maintained at

high vacuum" for the same reasons as Elements [1D] and [1E].  A POSA would

understand that the triple quadrupole instruments of Johnston and Douglas-1989

would contain the first quadrupole, which operates as a mass selective device, in an

evacuated chamber at high vacuum.  Ex. 1029 at 39; Ex. 1004 ¶88. Whitehouse

disclose typical pressures for this chamber at "approximately $10^{-2}$ to $10^{-4}$ mbar

[between $5x10^{-4}$ and $1x10^{-2}$ torr (i.e. between $6.7x10^{-4}$ and $1.3x10^{-2}$ mbarr)]."  Ex.

1025 at 21:46-49.

**Claim 19:**  Whitehouse discloses "the first evacuated chamber [second

vacuum pumping stage] is maintained at a pressure of approximately $10^{-2}$ to $10^{-4}$

46

mbar [between $5x10^{-4}$ and $1x10^{-2}$ torr (i.e. between $6.7x10^{-4}$ and $1.3x10^{-2}$ mbarr)]."

Ex. 1025 at 21:46-49; Ex. 1004 ¶88.

**Claim 20:**  The Johnston/Douglas-1989/Whitehouse combination teaches

the limitations of this claim for the same reason as claim 19. There is nothing

particularly special or effective about this pressure range.  Ex. 1004 ¶88.

**Claim 33:** As above, Whitehouse discloses the first optical device, collision

cell, and mass analyzing means in three separate chambers.  Ex. 1004 ¶89.

### G.      Ground 3: Douglas-1989 in Combination with Louris Renders Obvious Claims Claims 13, 15-17, 28-32, 34, 37-38, 40-41, 47-50

Louris (Ex. 1030) is a 1985 review article on MS scan modes that qualifies

and thus qualifies as prior art under 35 U.S.C § 102(b).  Ex. 1008, ¶25.  Louris was

not cited or discussed during prosecution of the '470 Patent or its reissue.  Louris

teaches a number of scan modes using tandem mass spectrometers, including the

neutral loss of zero scan required by many of the claims of the '386 patent. Ex.

1030; Ex. 1004 ¶90.

A POSA would have been motivated to combine the teachings of Douglas-

1989 with Louris, understanding that the scan modes described in Louris allow for

additional types of MS experiments to be performed using the IPC-triple

quadrupole mass spectrometer of Douglas-1989. Ex. 1030 at 2919 (Table 1); Ex.

1029 at 47; Ex. 1004 ¶90-91. The "constant mass addition scan" described by

Douglas-1989 is an example of the "neutral loss or gain" scan type in Louris. Ex.

1029 at 48; Ex. 1030 at 2919. A POSA would have been motivated to perform the

similar neutral loss of zero scan type described by Louris using the Douglas

instrument, as a way to monitor unconverted reactant. Ex. 1030 at 2924 ("The

advantage of this approach is that it represents all loss (reaction) mechanisms

cumulatively"); Ex. 1004 ¶91. A POSA would have understood that performing

Louris' neutral loss of zero mode experiment using the Douglas triple quadrupole

configuration would require only a routine adjustment of the mass offset to zero.

Ex. 1004 ¶91-92. Louris' scan modes can be used on a triple quadrupole with a

collision cell. Ex. 1004 ¶90; Ex. 1029 at 2924 (citing Ex. 1022). As stated above,

a POSA would have consulted MS references using a variety of ion sources. *Id*.

**Claim 13:** Douglas-1989 with Louris discloses this element for the same

reasons as Claim 13 in Ground 1, with Louris providing the motivation to perform

the neutral loss of zero mode instead of Johnston. Ex. 1030 at 2924; Ex. 1004 ¶92.

**Claim 28:**  Douglas-1989 with Louris discloses this element for the same reasons as Claim 28 in Ground 1, with Louris providing the motivation to perform the neutral loss of zero mode instead of Johnston.  Ex. 1030 at 2924; Ex. 1004 ¶93.

**Claims 15-17, 29-32, 34, 37-38, 40-41, 47-50:**  Douglas-1989 with Louris discloses Claims 15-17, 29-32, 34, 37-38, 40-41, 47-50 for the same reasons as the respective claims in Ground 1, with Louris providing the motivation to perform the neutral loss of zero mode instead of Johnston.  Ex. 1030 at 2924; Ex. 1004 ¶¶94-104.

### H.   Ground 4: Douglas-1989 in Combination with Louris and Whitehouse Render Obvious Claims 18-20 and 33

Similar to Ground 2, a POSA would have been motivated to combine the instrument specifics in Whitehouse with the scan modes of Louris and Douglas-1989's ICP ion source because all concern the subject of tandem mass spectrometers, and Whitehouse teaches the advantage of having multiple vacuum pumping stages to reduce neutral background gas and to improve the detection of analyte ions.  Ex. 1004 ¶87; Ex. 1025 at 10:50-59.

**Claims 18-20:**  Douglas-1989 with Louris and Whitehouse discloses Claims 18-20 and 33 for the same reasons as the respective claims in Ground 2, with

Louris providing the motivation to perform the neutral loss of zero mode instead of Johnston.  Ex. 1025 at 21:46-49; Ex. 1030 at 2924; Ex. 1004 ¶106-107.

## I.   Ground 5:  Tanner-Patent in Combination with Rowan Renders Obvious Claims 13 and 28

Tanner-Patent qualifies as prior art under 35 U.S.C. § 102(e) because the non-provisional patent application that led to the issuance of Tanner-Patent on October 31, 2000 was filed on May 29, 1998.

During prosecution of the '470 Patent, the applicant argued that Tanner-Patent failed to disclose or suggest an apparatus or method in which: (a) a mass selective ion optical device is placed before the collision cell; and (b) the mass selective ion optical device and the mass analyze operate at the same mass-to-charge ratio.  Ex 1002 (3/25/2003 Response; 9/22/2003 Response; 9/8/2003 Response).  Tanner-Patent was not discussed during the reissue proceeding.

Rowan was published in 1989 and thus qualifies as prior art under 35 U.S.C § 102(b).  Ex. 1008, ¶22.  Rowan was cited but not discussed during prosecution of the '470 Patent or its reissue.

Tanner-Patent's Figure 1 discloses a double-quadrupole mass spectrometer.  The ion source (12) is disclosed as being an ICP.  The first quadrupole (34) serves

a bandpass filter inside a collision cell (also called, a bandpass reactive collision

cell).  Ex. 1004 ¶115. Tanner-Patent discloses introducing reactive gases like

ammonia, hydrogen, and helium into the cell.  The second quadrupole (66) is a

mass analyzer before the detector (74).



Tanner-Patent also discloses a time-of-flight mass spectrometer in Figure 21.

The ion source (12) is typically an ICP or GD source.  Q1 is a mass selective

quadrupole, and the mass analyzer (212) is a conventional time-of-flight mass

analyzer.  Q2 may be a standard collision cell or a bandpass reactive collision cell.

This embodiment discloses each and every structural limitation of Claim [28].



FIG. 21

Rowan discloses the use of a collision cell in an ICP double-quadrupole instrument, as shown below, to reduce interfering ions.  Ex. 1033 at 976-977.  The first quadrupole serves as a collision/reaction cell and is not mass selective.  *Id*. The second quadrupole acts as a mass analyzer before the detector.  *Id*; Ex. 1004 ¶109.



In one experiment, Rowan uses Xe (xenon) as the collision gas to remove polyatomic ions $ArO^+$ and $ArN^+$ from interfering with the detection of $Fe^+$ and $Co^+$ ions. *Id*. at 977-978. In another experiment, Rowan uses $CH_4$ (methane) as the collision gas to remove the polyatomic ion $Ar_2^+$ from interfering with the detection of $As^+$ and $Se^+$ ions. *Id*. at 978; Ex. 1004 ¶110.

From these experiments, Rowan recognizes that ion-molecule reactions between polyatomic ions and the neutral collision gas are occurring inside the collision cell, which allow further removal of polyatomic ions. *Id*. at 979-980. But some of the ion-molecule reactions also generate new interfering product ions. *Id*; Ex. 1004 ¶111.

## 1.    Motivation to Combine Tanner-Patent and Rowan

Rowan recommends that "[f]uture instruments could readily incorporate features such as (1) mass analysis of the reactant ions before the collision cell." Ex. 1033 at 979.  As explained above, if only ions with an m/z ratio identical to that of the atomic ion of interest enter into the collision cell, these ions will form new product ions with new m/z ratios different from their original m/z.  Ex. 1004 ¶112.  These new ions will not interfere with the detection of the atomic ion of interest.  *Id*.  Thus, Rowan teaches that having a mass analysis of the ion beam before the collision cell reduces the formation of new interfering ions inside the collision cell.  Ex. 1004 ¶111-112.

Tanner-Patent also recognizes new interfering ions can form inside the collision cell from reactions between the ions and the collision gas.  Ex. 1004 ¶113; Ex. 1036 at 1:39-45; 6:28-36.  Tanner-Patent discusses that if the "precursor ions and intermediate ions (i.e. any ions formed in the sequence of reactions)" are rejected "before the reaction sequence produces ions which form isobaric interferences at desired m/z values," the detection of the atomic ions of interest would be greatly improved.  *Id*. at 6:36-41.  Ex. 1004 ¶114.

Tanner-Patent uses a bandpass reactive collision cell to filter these precursor and intermediate ions while they are in the collision cell to prevent the formation of new interfering ions. *Id.* at 6:66-7:3.  Tanner-Patent defines a mass bandpass window, having a low and high cutoff, that depends on the mass-to-charge ratios of the atomic ions of interest, the existing and new interfering ions. *Id.* at 8:3-9. Importantly, Tanner-Patent recognizes that "ions to be rejected are [commonly] of both lower and higher mass than those of the ions to be observed." *Id.* at 8:12-15; Ex. 1004 ¶114.  Thus, in light of Rowan's teaching, a POSA would have been motivated to modify Tanner-Patent's instrument to have a mass selective ion optical device prior to the collision cell.  As Rowan teaches, having a prior mass analysis to filter out ions with m/z ratios other than the m/z of the atomic ion reduces the formation of new interfering ions in the collision cell.  Ex. 1033 at 979. In fact, Tanner-Patent discloses an ICP mass spectrometer having a mass analyzing quadrupole in front of a (bandpass) collision cell in Figure 21.  Thus, a POSA would have been motivated to modify Tanner-Patent's instrument by adding an ion optical device to mass select at the first mass-to-charge ratio prior to the collision cell to reduce interfering ion formation.  Ex. 1004 ¶115.

55

**2.     Tanner-Patent in combination with Rowan renders obvious Claim 28**

As discussed in Section XI.B., claim 28 is an apparatus claim reciting a mode of operation.  The mass spectrometer disclosed in Figure 21 of Tanner-Patent meets all the structural limitations of claim 28.  But if Patent Owner argues that the recited mode of operation is a claim limitation, Tanner-Patent in view of Rowan teaches this limitation. Ex. 1004 ¶116-117.

**[28Pre]:**  The subject of both Tanner-Patent and Rowan is improvement in the resolving power of mass spectrometers.  Ex. 1036 at 1:9-11; Ex. 1033 at 976; Ex. 1004 ¶116-117.

**Element [28A]:**  Tanner-Patent discloses "an inductively coupled plasma ion source [ion source (12) in Figure 1] for generating ions from a sample, the generated ions including first atomic ions having a first mass-to-charge ratio [e.g., $Mg^+$, $Sc^+$, $Cu^+$, $Ge^+$, $Mn^+$, $Fe^+$, and $Co^+$] and artefact ions having a mass-to-charge ratio that interferes with the first mass-to-charge ratio [e.g., $Ar^+$, $ArH^+$, $ArO^+$, and $Ar_2^+$]."  Ex. 1036 at 3:57-60; 5:30-47 (experiments for Figures 3-6).  Ex. 1004 ¶ 118.

**Element [28B]:**  Tanner-Patent discloses "an ion optical device [a resolving mass spectrometer Q1 in Figure 21] disposed to receive at least a portion of an ion beam generated by the ion source."  Ex. 1036 at 11:52-67.  Tanner-Patent also discloses that "the ion optical device [analyzer Q1 in Figure 21]" can be "configured to mass select at least a portion of the ion beam generated by the ion source at the first mass-to-charge ratio [parent ions transmitted through analyzer Q1], thereby removing, from the ion beam, ions not having the first mass-to-charge ratio."  *Id*; Ex. 1004 ¶119.

To the extent that Tanner-Patent does not disclose an ion optical device configured to mass select at the first mass-to-charge ratio, a POSA would have been motivated to perform such mass analysis to reduce the formation of new interfering ions in the collision cell in light of Rowan's teaching.  Ex. 1033 at 980; Ex. 1004 ¶119.

**Element [28C]:**  Tanner-Patent teaches a "a collision cell [a collision cell Q2 in Figure 21] disposed to receive at least a portion of a mass selected ion beam from the ion optical device [a resolving mass spectrometer Q1 in Figure 21].  Ex. 1036 at 11:52-67.   In the experiments described for Figures 4-6, Tanner-Patent discloses that the collision cell can be "configured [pressurized with ammonia] to

remove, from the mass selected ion beam, artefact ions [$Ar^+$, $ArH^+$, $ArO^+$, and

$Ar_2^+$] having a mass-to-charge ratio that interferes with the first mass-to-charge

ratio [e.g. the m/z ratios of $Mn^+$, $Fe^+$, and $Co^+$]." *Id.* at 5:48-61; Ex. 1004 ¶120.

Tanner-Patent discloses that "the ion optical device [a resolving mass

spectrometer Q1 in Figure 21]" can be "configured substantially to minimize the

formation in the collision cell of interfering artefact ions having the said first mass-

to-charge ratio." Ex. 1036 at 11:52-67. By removing the ions not having the first

mass-to-charge ratio through the mass selection of the first optical device (*see*

Element [28B]), these ions will not be present to react and form new interfering

artefact ions, thus substantially in the collision cell of interfering artefact ions

having the said first mass-to-charge ratio. Ex. 1004 ¶120.

**Element [28D]:** Tanner-Patent discloses "a mass analyzer [mass analyzer

(66) in Figure 1 and the TOF mass analyzer (212) in Figure 21] disposed to receive

at least a portion of the mass selected ion beam from the collision cell." Ex. 1036

at 8:40-44; 11:63-67; Ex. 1004 ¶121.

Tanner-Patent also discloses that "the mass analyzer" can be "configured to

mass analyze the received ion beam at the same mass-to-charge ratio as the ion

optical device, wherein the mass analyzer is configured to detect the first atomic

ions when the same mass-to-charge ratio is the first mass-to-charge ratio [e.g., the

m/z ratios of $Mn^+$, $Fe^+$, and $Co^+$]."  For the same reasons as Element [28B],

Tanner-Patent in view of Rowan discloses a mass analyzer "configured to mass

analyze the received ion beam at the same mass-to-charge ratio as the ion optical

device." Ex. 1004 ¶¶121-122.

### 3.      Tanner-Patent in Combination with Rowan Renders Obvious Claim 13

As explained in Section XI.C, claim 13 is a method claim reciting a normal

operation of a prior art apparatus.  Tanner-Patent in view of Rowan teaches the

limitations of claim 13 for the same reasons it teaches the limitations of claim 28.

Specifically, Element [13Pre] is disclosed for the same reasons as Element [28Pre].

*See also*, Ex. 1004 ¶123. Element [13A] is disclosed for the same reasons as

Element [28A].  *See also*, Ex. 1004 ¶124.  Element [13B] is disclosed for the same

reasons as Element [28B].  *See also*, Ex. 1004 ¶125. Element [13C] is disclosed for

the same reasons as [28C].  *See also*, Ex. 1004 ¶126. Elements [13D] and [13E] are

disclosed for the same reasons as Element [28D].  *Id.*

**J.      Ground 6:  Tanner-Patent in Combination with Rowan and Kishi Renders Obvious Claims 1, 5-10, 14, 16-17, 23-24, 31-34, 35, 39-50**

Kishi (Ex. 1034) was published in August 1997 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶23. Kishi describes a commercial ICP-MS instrument, HP 4500, for elemental analysis. Ex. 1034 at 1. This instrument has three evacuation chambers – an expansion chamber, a chamber for ion optic devices, and a chamber for the quadrupole mass analyzer – to achieve differential vacuum pumping.  *Id.*; Ex. 1004 ¶127.

Kishi teaches that "[t]he configuration of the ion lens system is one of the key design issues because it directly affects the ion transmission efficiency of an ICP-MS system."  Ex. 1034 at 1-2.  Kishi discloses an ion optics system comprised of "Einzel" lenses and two "Omega" lenses in an evacuation chamber, as shown below.  *Id.* at 2 (Figure 3).  The Einzel lenses are traditional electrostatic lenses, and the Omega lenses bend the path of the ions in the beam.  *Id.*  This ion optics system focuses and deflects the ions in the beam.  *Id.*  Moreover, the detector can be mounted off the axis of the ion source to prevent the neutral components and photons from reaching the detector.  *Id.*; Ex. 1004 ¶128.



**Fig. 3.** *Ion lens system. (a) HP 4500 omega lens system. (b) Photon stop system.*

A POSA would have been motivated to combine the teachings of Tanner-Patent, Rowan, and Kishi.  Tanner-Patent and Rowan both teach methods for improving the resolving power of ICP mass spectrometers.  Kishi teaches methods for improving the detection of ICP mass spectrometer using ion optics systems. Kishi improves Tanner-Patent by teaching a deflector lens system to deflect the ion path such that the detector can be mounted off the axis of the ion source to avoid the neutral species and photons. Ex. 1004 ¶129.

### 1.   <u>Tanner-Patent in view of Rowan and Kishi Renders Obvious Independent Claim 1</u>

**[1Pre]:**  Tanner-Patent discloses a mass spectrometer as follows, as does Kishi and Tanner-Patent.  Ex. 1036; Ex. 1014; Ex. 1004 ¶130.

**Element [1A]:**  Tanner-Patent discloses performing the function for this element by disclosing "generation ions [e.g., $Mg^+$, $Sc^+$, $Cu^+$, $Ge^+$, $Mn^+$, $Fe^+$, and $Co^+$] from a sample introduced into a plasma."  Ex. 1036 at 3:57-60; 5:30-47; Ex. 1036 at 3:57-60; 5:30-47; 5:52-6:6 (experiments for Figures 3-6); Ex. 1004 ¶131. Tanner-Patent discloses the structure for this element as "a conventional inductively coupled plasma source."  Ex. 1036 at 3:57-59; Ex. 1004 ¶131.

**Element [1B]:**  Tanner-Patent discloses "a sampling aperture (2) [orifice (14) in Figure 1, and an aperture after the ion source (12) in Figure 21] for transmitting some of the ions into an evacuated expansion chamber (3)  [first vacuum chamber (18) in Figure 1, and Q1 chamber in Figure 21] …  to form an ion beam."  Ex. 1036 at 3:61-64, Figures 1 and 21; Ex. 1004 ¶132.

Kishi discloses "a sampling aperture (2) [orifice in the sampling cone] for transmitting some of the ions into an evacuated expansion chamber (3) along a first

axis (9) [before the deflector lenses] to form an ion beam."  Ex. 1034, Figures 1

and 3; Ex. 1004 ¶133.



*Fig. 1.  HP 4500 ICP-MS schematic diagram.*



Kishi discloses "a first axis" because Kishi uses a deflector such that the ions

travel along a first axis of the ion source (i.e. through the extraction and Einzel

lenses) and are deflected to a second axis of the mass analyzer, which is the axis in

line with the dectector.  Ex. 1034 at 2; Ex. 1004 ¶134, 143.  As discussed above, a

POSA would have been motivated to improve Tanner-Patent's instrument in view of Kishi by using a deflector so that the detector may be mounted off the axis of the ion source to avoid neutral species and photons. Ex. 1004 ¶134.

**Element [1C]**: Tanner-Patent discloses "a second aperture (5) [orifice 22 in a skimmer plate 24] for transmitting some of the ion beam." Ex. 1036 at 3:61-64, Figure 1. In Figure 21, Tanner-Patent also discloses "a second aperture [for the Q1 chamber] for transmitting some of the ion beam into a first evacuated chamber [containing Q1]." *Id.*, Figure 21; Ex. 1004 ¶135.

**Element [1D]**: Kishi discloses in Figure 1 "a first pump (7) [turbo pump] for maintaining the first evacuated chamber (6) [the ion optics chamber] at high vacuum." Ex. 1034 at 1, Figure 1. Moreover, because Tanner-Patent in Figure 21 discloses a first evacuated chamber as described in Element [1C], Tanner-Patent implicitly discloses a vacuum pump to evacuate this chamber. Nonetheless, a POSA would have been motivated to improve Tanner-Patent's instrument in view of Kishi by adding a first pump to evacuate the first evacuated chamber to reduce background gas loading. Ex. 1004 ¶136.

**Element [1E]:** Tanner-Patent discloses Element [1E] for the same reasons as Element [28B]. Ex. 1004 ¶119, 137.

64

**Element [1F]:** Tanner-Patent discloses "a third aperture (19) [entrance aperture (38) into collision cell] for transmitting the ion beam into a second evacuated chamber (20) [second vacuum chamber (28)]." Ex. 1036 at 3:64-67, Figures 1 and 21. Ex. 1004 ¶138.

**Element [1G]:** Tanner-Patent discloses "a second pump (21) [turbo pump 30 which is backed by a mechanical pump] for maintaining the second evacuated chamber (20) [second vacuum chamber 28] at a lower pressure than the first evacuated chamber (6)." Ex. 1036 at 3:64-67, Figure 1. Ex. 1004 ¶139.

**Element [1H]:** In Figure 1, Tanner-Patent discloses "a collision cell (24) [collision cell 41] having an entrance aperture (27) [entrance aperture 38] and an exit aperture (28) [exit aperture 40] and pressurized with a target gas (26) [reactive gas like ammonia], the collision cell (24) being disposed in the second evacuated chamber (20) [second vacuum chamber 28]." Ex. 1036 at 3:64-67; 4:5-10, Figure 1. Ex. 1004 ¶140.

**Element [1I]:** Tanner-Patent discloses "a second ion optical device (25) [quadrupole 34] located in the collision cell (24) [collision cell 41] for containing the ion beam." *Id*. at 4:5-10, Figure 1. Ex. 1004 ¶141.

**Element [1J]:**  Tanner-Patent discloses performing the function for the element "the mass-to-charge analyzing means" by disclosing experiments analyzing ions based on their m/z ratios.  *Id*. at 3:57-60; 5:30-47 (experiments for Figures 3-6).  Tanner-Patent discloses the structure for this element as a quadrupole mass analyzer (66).  *Id*. at 4:19-37, Figure 1; Ex. 1004 ¶142.

Tanner-Patent discloses "a fourth aperture (32) [orifice 40] for transmitting the ion beam into a third evacuated chamber (33) [a third vacuum chamber 60] containing mass-to-charge ratio analyzing means (37) [mass analyzer 66 (which is typically a quadrupole)]."  *Id*. at 4:25-38.  Tanner-Patent also discloses that "the mass-to-charge analyzing means [Quadrupole 66] is configured to mass analyze the ion beam to produce a mass spectrum of the ion beam [e.g. the mass spectra in Figures 4-6]."  *Id*., and at Figures 4-6; Ex. 1004 ¶143.

For the same reasons as Elements [28B] and [28D], Tanner-Patent discloses that "both the first ion optical device (17) and the mass-to-charge ratio analyzing means (37) operate at the same mass to charge ratio, so as substantially to minimize the formation in the collision cell of interfering ions having the said mass to charge ratio." Ex. 1004 ¶ 119, 121-22, 143.

66

For the same reasons as Element [1B], Kishi discloses "a second axis" because Kishi uses a deflector such that the ions exits the deflector along a second axis of the quadrupole mass analyzer.  Ex. 1034 at 2, Figure 3. ; Ex. 1004 ¶¶132-134, 143.

**Element [1K]:** Tanner-Patent discloses "a third pump (39) [high vacuum turbo pump 62] for maintaining the third evacuated chamber (33) [third vacuum chamber 60] at lower pressure than the second evacuated chamber (20) [second vacuum chamber 28]."  Ex. 1036 at 3:66-67; 4:25-28; Ex. 1004 ¶144.

## 2. <u>Tanner-Patent in Combination with Rowan and Kishi Renders Obvious certain Dependent Claims</u>

**Claims 5 and 14:**  Rowan's instrument in Figure 1 (drawn to scale) discloses that "a distance of 90 to 200 mm is maintained between the ion source and an entrance aperture of the collision cell."  Ex. 1033 at 977, Figure 1; Ex. 1004 ¶145. A POSA would have been motivated to apply a gap of this distance to reduce the background gas loading on the collision cell.   Ex. 1004 ¶145; see *In re Aller*, 220 F.2d 455, 456 (C.C.P.A. 1955).

**Claim 6**:  Tanner-Patent discloses "the mass-to-charge ratio analyzing means (37) [mass analyzer 66 (which is typically a quadrupole)] includes a main

mass filter which preferably is an RF quadrupole [Quadrupole 66 has RF and DC

applied to its rods]." Ex. 1036 at 4:29-34; Ex. 1004 ¶146.

**Claim 7:** Tanner-Patent discloses "the first ion optical device (17) [a

resolving mass spectrometer Q1 that is typically a quadrupole in Figure 21] is an

RF quadrupole." Ex. 1036 at 11:52-62, Figure 21. Ex. 1004 ¶147.

**Claims 8 and 23:** Tanner-Patent discloses "the second ion optical device

(25) [quadrupole 34 inside a collision cell in Figure 1] is an RF quadrupole." Ex.

1036 at 4:5-9; 11:58-62 (a standard collision cell Q2 that is typically a quadrupole,

in Figure 21). Ex. 1004 ¶148.

**Claims 9 and 24:** Tanner-Patent discloses "the second ion optical device

(25) is mass selective [the collision cell 41 is operated to reject precursor or

intermediate ions]." *Id*. at 6:36-37; 12:12-15 ("the collision cell Q2 may be

operated with an appropriate bandpass defined by a high mass cutoff, to restrict the

upper mass range of ions introduced into the flight tube 216"). Ex. 1004 ¶149.

**Claim 10:** For the same reasons as Elements [1B] and [1J], Tanner-Patent

in view of Rowan and Kishi teaches the limitations of this claim. Ex. 1004 ¶132-

34, 142-43, 150.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

**Claim 16:**  Tanner-Patent discloses the limitations of claim 16 for the same reasons as Elements [28B] and [28D].  Ex. 1004 ¶119, 121-22 151.

**Claim 17:**  Tanner-Patent discloses the limitations of claim 17 for the same reasons as claim 7. Ex. 1004 ¶147, 152.

**Claim 31:**  Tanner-Patent discloses the limitations of claim 31 for the same reasons as claim 7. Ex. 1004 ¶147, 153.

**Claim 32:**  Tanner-Patent discloses the limitations of claim 32 for the same reasons as Element [28D]. Ex. 1004 ¶121-22, 154.

**Claim 33:**  Tanner-Patent in view of Rowan and Kishi teaches all the elements of this claim for the same reasons as claim 1, particularly Elements [1E], [1H], and [1J]. Ex. 1004 ¶137, 140, 142-43, 155.

**Claim 34:**  Tanner-Patent discloses "a second ion optical device [quadrupole 34] located in the collision cell [collision cell 41] for containing the ion beam." *Id.* at 4:5-10, Figure 1; Ex. 1004 ¶156.

**Claim 39:**  Tanner-Patent in view of Rowan teaches "the collision cell does not contain a significant partial pressure of argon" because the collision cell is pressurized with a different gas.  Tanner-Patent discloses using ammonia or a mixture of hydrogen and helium as the target gases in the collision cell.  Ex. 1036

69

at 5:50, 10:58-11:28.  Rowan also discloses the use of Xe, methane, and ethane as the target gases for use in the collision cell.  Ex. 1033 at 978, 980; Ex. 1004 ¶157.

**Claim 40:**  Tanner-Patent discloses "the collision cell is pressurized with a target gas that is not argon" for the same reasons as claim 39. Ex. 1004 ¶157-58.

**Claim 41:**  Tanner-Patent discloses "an [argon] inductively coupled plasma."  Ex. 1036 at 3:58-59; claim 32.  Ex. 1004 ¶159.

**Claims 35, 42, and 45:**  Tanner-Patent in view of Rowan and Kishi teaches "the inductively coupled plasma includes argon, and wherein the collision cell does not contain a significant partial pressure of argon" for the same reasons as claims 39 and 41. Ex. 1004 ¶157-160.

**Claims 43 and 46:**  Tanner-Patent discloses "the collision cell is pressurized with helium or hydrogen [a collision gas mixture containing 40% hydrogen in helium]."  Ex. 1036 at 10:58-11:28.  Ex. 1004 ¶161.

**Claim 44:**  Tanner-Patent in view of Rowan teaches all the limitations of claim 44 for the same reasons as claim 28.  Specifically, Tanner-Patent in view of Rowan teaches Element [44A] for the same reasons as Element [28A].  Ex. 1004 ¶118. Tanner-Patent in view of Rowan teaches Element [44B] for the same reasons

as Element [28B].  Ex. 1004 ¶119. Tanner-Patent in view of Rowan teaches

Element [44C] for the same reasons as Element [28D].  Ex. 1004 ¶ 120-22; 162.

**Claim 47:**  Rowan discloses "artefact ions include molecular ions [such as

$ArH^+$ or $H_2O^+$]."  Ex. 1033 at 977.  Tanner-Patent also discloses "artefact ions

include molecular ions [$ArH^+$, $ArO^+$, and $Ar_2^+$]."  Ex. 1036 at 3:57-60;  Ex. 1004

¶163.

**Claim 49:**  Rowan discloses collision-induced dissociations in which "some

of the artefact ions [$ArO^+$ and $ArN^+$] are collided with the collision gas [Xe] to

form ions that have lower mass-to-charge ratios than the first mass-to-charge

ratio."  Ex. 1033 at 978. Ex. 1004 ¶164.

**Claim 50:**  Rowan discloses "at least some of the artefact ions [$ArH^+$] are

reacted with the collision gas [Xe] to form ions [$XeH^+$] that have higher mass-to-

charge ratios than the first mass-to-charge ratio."  *Id.* at 979; Ex. 1004 ¶165.

**Claim 48:**  Rowan discloses all the limitations of claim 48 for the same

reasons as claims 49 and 50. Ex. 1004 ¶164-66.

### K.   Ground 7:  Tanner-Patent in Combination with Rowan, Kishi, and Turner Renders Obvious Claims 11 and 21

Turner (Ex. 1099) was published in April 1998 and thus qualifies as prior art

under 35 U.S.C. § 102(a).  Ex. 1008 ¶24.  Turner is a book chapter reviewing the

instrumentation of ICP-MS as of 1998. Ex. 1004 ¶156.  Figure 6.1 shows the

principal components of an ICP-MS instrument and an optional close-off valve in

the optics chamber. Ex. 1099 at 423.



**Figure 6.1**   Principal components of the quadrupole ICPMS system. Ions are created in the ICP and transferred into the mass spectrometer through the MS interface. After separation according to mass-to-charge ratio, ions are collected at the detector and the ion beam intensities are reported by the data system.

A POSA would have been motivated to combine the teachings of Tanner-Patent, Rowan, Kishi, and Turner. Ex. 1004 ¶157.  Tanner-Patent, Rowan, and Kishi all teach methods for improving the resolving power of ICP mass spectrometers.  Turner reviews the various components of the ICP-MS instruments, including collision-cell based ICP-MS.  Ex. 1099 at 476-479.  Turner discusses Rowan's use of a collision cell in a double-quadrupole instrument to remove interfering ions.  *Id*.  Turner also discusses the HP4500 instrument and its deflector lens as disclosed by Kishi.  *Id*. at  427, Figure 6.3.  A POSA would understand that the instrument specifics in Turner are typical to the mass spectrometers of Tanner-Patent, Rowan and Kishi.  Ex. 1004 ¶157.

**Claim 21:**  Kishi discloses "the first evacuated chamber [the chamber after the skimmer cone in Figure 8] is divided into a first region [the extraction lens chamber] adjacent to the expansion chamber containing an extractor lens driven at a negative potential [extraction lens 1 (-160V) and extraction lens 2 (-70V)] and a second region [the ion optics chamber] … by a large diameter aperture and the aperture is sealable by means of a flat plate."  *Id*. at 2-3, Figure 8 (enlarged below); Ex. 1004 ¶158.

73



a flat plate to seal a large aperture

Turner also discloses "the first evacuated chamber [the chamber after the skimmer cone] is divided into a first region [a chamber (extraction lens not shown)] adjacent to the expansion chamber and a second region [the ion optics chamber] … by a large diameter aperture and the aperture is sealable by [a close-off valve]."  Ex. 1099, Figure 6.1; Ex. 1004 ¶159.

Turner also discussed that in ICP-MS, the ions are formed under atmospheric conditions, but most mass analyzers require a vacuum of $10^{-5}$ torr to avoid high-

voltage discharges and to minimize the effects of collisions with ions.  *Id*. at  433.

In most instruments, when the ICP source is off, the expansion chamber returns to

atmospheric pressure, while the chambers containing the ion optics, quadrupole(s)

and the detector are maintained at high vacuum and are generally closed off from

the expansion chamber.  Ex. 1004 ¶159.   In view of Rowan, Kishi and Turner, a

POSA would have been motivated to improve Tanner-Patent's instrument by

dividing the extraction lens and the ion optic device into two chambers and put a

sealable flat plate between them, in order to keep the ion optics and the

quadrupoles at a high vacuum when the ICP source is off.  *Id*.  Moreover, the use

of an O-ring to seal the flat plate was well known in the art as of 1998.  *Id*.

**Claim 11:**  Tanner-Patent in view of Rowan, Kishi, and Turner teach all the

limitations of claim 11 for the same reasons as claim 21.  Ex. 1004 ¶158-59.

## XII.   <u>CONCLUSION</u>

Petitioner respectfully requests that this petition be granted, that *inter partes*

review be instituted, and that all claims of the '386 Patent be found unpatentable

and cancelled.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,386*

## XIII.  <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for the Petitioner declares that the argument section of this Petition (Sections I, III-XII) has a total of 13963 words, according to the word count tool in Microsoft Word™.

DATED:  December 14, 2017                    Respectfully Submitted,

 */s/* Brian M. Buroker
Brian M. Buroker
(Reg. No. 39125)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.,
Washington, D.C. 20036-5306
Tel:  202-955-8541
bburoker@gibsondunn.com

*Attorney for Petitioner*

76

## CERTIFICATE OF SERVICE

The undersigned certifies service pursuant to 37 C.F.R. §§ 42.6(e) and

42.105(a), (b) on the Patent-Owner via UPS overnight mail of a copy of this

Petition for *Inter Partes* Review and supporting materials at the Patent-Owner at

the correspondence address of record for the '386 Patent:

> David B. Raczkowski, or To Whom It May Concern
> Kilpatrick, Townsend & Stockton, LLC
> Two Embarcadero Center, Suite 1900
> San Francisco, CA 94111.

DATED: December 14, 2017      By: /Brian M. Buroker/
                             (Reg. No. 39125)

*Attorney for Petitioner*

102418840.1

77

# EXHIBIT C

## IPR No. 2018-00297

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

Agilent Technologies, Inc.,
Petitioner

v.

Thermo Fisher Scientific Inc. and
Thermo Fisher Scientific (Bremen) GmbH,
Patent Owner.

———————————————

Case No. <u>Unassigned</u>

U.S. Patent No. RE45,553

———————————————

**Petition for *Inter Partes* Review of U.S. Patent No. RE45,553**

Mail Stop **PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................5

II. MANDATORY NOTICES .............................................................5

 A. Real Parties in Interest...........................................................5

 B. Related Matters.......................................................................5

 C. Lead and Backup Counsel ......................................................6

III. PAYMENT OF FEES ....................................................................7

IV. STANDING ....................................................................................7

V. IDENTIFICATION OF CHALLENGE AND STATEMENT OF
PRECISE RELIEF REQUESTED ..................................................7

VI. THRESHOLD REQUIREMENT FOR *INTER PARTES* REVIEW .............7

VII. STATEMENT OF REASONS FOR THE RELIEF REQUESTED ..............8

 A. Grounds ..................................................................................8

 B. Priority Date of the '553 Patent.............................................9

VIII. STATE OF THE ART.....................................................................9

 A. Person of Skill in the Art........................................................9

 B. Scope and Content of the Art Before May 2002..................10

  1. Mass Spectrometry....................................................10

  2. Quadrupole Mass Analyzer.......................................11

  3. Photons and Neutral Species.....................................12

IX. THE '553 PATENT.......................................................................13

 A. Summary of Prosecution and Reissue Histories .................13

 B. The '553 Patent Claims .......................................................14

X. CLAIM CONSTRUCTION ..........................................................15

XI. GROUNDS FOR UNPATENTABILITY ......................................17

 A. General Principles ................................................................17

i

# TABLE OF CONTENTS
### (continued)

**Page**

B.    Apparatus Claims Reciting Manners of Operation ..............................18

C.    Method Claims Reciting Operations of an Apparatus ........................18

D.    Claim Elements Directed to the Intended Use of a Component ........................................................................................19

E.    Ground 1: PCT375 Anticipates Claims 1–5, 8–10, 12–15, 18–21, 25–35, 38, 41, 43, 46, 48, 51, 53, 56, 58, 61, 63, 66 Under § 102(b) ...................................................................................20

      1.    PCT375 Anticipates Claim 1 ................................................22

      2.    PCT375 Anticipates Claim 13 ..............................................26

      3.    PCT375 Anticipates Claim 18 ..............................................28

      4.    PCT375 Anticipates Claims 28 and 32 ..................................29

      5.    PCT375 Anticipates Claim 25 ..............................................32

      6.    PCT375 Anticipates Many Dependent Claims ........................33

F.    Ground 2:  PCT375 Renders Obvious Claim 11................................40

G.    Ground 3:  Tanner Anticipates Claims 1, 4–6, 8–9, 12–13, 16, 18–19, 22, 24–25, 28, 31–32, 35, 38–41, 43–46, 48–51, 53–56, 58–61, 63–66 Under § 102(b) .................................................43

      1.    Tanner Anticipates Claim 1 ..................................................45

      2.    Tanner Anticipates Claim 13 ................................................47

      3.    Tanner Anticipates Claim 18 ................................................48

      4.    Tanner Anticipates Claim 25 ................................................49

      5.    Tanner Anticipates Claims 28 and 32 ....................................50

      6.    Tanner Anticipates Many Dependent Claims ..........................52

H.    Ground 4:  Douglas in Combination with Tanner Renders Obvious Claims 1-6, 8-9, 12-16, 18-22, and 24-66 Under § 103 ...................................................................................54

ii

**TABLE OF CONTENTS**
(continued)

1.      Douglas in Combination with Tanner Renders Obvious Claim 1 .................................................................56

2.      Motivation to Combine Douglas and Tanner ..........................58

3.      Douglas in Combination with Tanner Renders Obvious Several Additional Independent Claims ...................................59

4.      Douglas in Combination with Tanner Renders Obvious Claim 13 ................................................................60

5.      Douglas in Combination with Tanner Renders Obvious Claim 18 ................................................................61

6.      Douglas in Combination with Tanner Renders Obvious Claim 25 ................................................................62

7.      Douglas in Combination with Tanner Renders Obvious Claims 28 and 32 ........................................................63

8.      Douglas in Combination with Tanner Renders Obvious Dependent Claims on Certain Sub-Ranges.............................64

9.      Douglas in Combination with Tanner Renders Obvious Other Dependent Claims.............................................65

I.      Ground 5: Vandermey in Combination with Douglas and Tanner Renders Obvious Claims 6–7, 16–17, 22–23, 37, 42, 47, 52, 57, and 62 ...............................................68

J.      Ground 6: Saito Anticipates Claims 1, 4–6, 12, 28, 32, 57, and 62. ...................................................70

1.      Saito Anticipates Claim 1 .......................................71

2.      Saito Anticipates Claims 28 and 32 ..........................73

3.      Saito Anticipates Several Dependent Claims ...........................73

K.      Ground 7:  Saito in Combination with Douglas Renders Obvious Claims 1–6, 12–16, 18, 20–22, 25–38, 42–43, 47–48, 52–53, 57–58, and 62–63 Under § 103 .........................74

## TABLE OF CONTENTS
(continued)

**Page**

1.  Motivation to Combine Saito and Douglas ............................... 75

2.  Claim 1 ............................................................................ 76

3.  Claim 13 .......................................................................... 76

4.  Claim 18 .......................................................................... 77

5.  Claim 25 .......................................................................... 77

6.  Claims 28 and 32 .............................................................. 78

7.  Dependent Claims on Certain Sub-ranges ............................. 78

8.  Other Dependent Claims .................................................... 79

XII.   CONCLUSION ......................................................................... 80

XIII.  CERTIFICATE OF WORD COUNT ........................................... 80

iv

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

## TABLE OF AUTHORITIES

**Cases**

*Atlas Powder Co. v. Ireco, Inc.*,
    190 F.3d 1342 (Fed. Cir. 1999) .......................................................................25

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
    320 F.3d 1339 (Fed. Cir. 2003) ......................................................................20

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ......................................................................19

*Catalina Marketing Int'l v. Coolsavings Com.*,
    289 F.3d 801 (Fed. Cir. 2002) ........................................................................18

*Cuozzo Speed Techs., LLC v. Lee*,
    136 S. Ct. 2131 (2016)....................................................................................15

*In re Gardiner*,
    171 F.2d 313 (C.C.P.A. 1948) ........................................................................18

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
    909 F.2d 1464 (Fed. Cir. 1990) ......................................................................18

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
    780 F.3d 1376 (Fed. Cir. 2015) ......................................................................17

*In re King*,
    801 F.2d 1324 (Fed. Cir. 1986) ......................................................................18

*Ex parte Masham*,
    2 U.S.P.Q. 2d 1647 (Bd. Pat. App. & Inter. 1987)........................................18

*Ex parte Mewherter*,
    Appeal No. 2012-007692, Decision on Appeal (P.T.A.B. May 8,
    2013) ................................................................................................................20

*In re Petering*,
    301 F.2d 676 (1962).........................................................................................17

*Schering Corp. v. Geneva Pharms.*,
    339 F.3d 1373 (Fed. Cir. 2003) ......................................................................17

*Petition for Inter Partes Review*
*of U.S. Patent No. 8,057,840*

TABLE OF AUTHORITIES (Cont'd.)

**Page(s)**

*Sunrace Roots Enterprise Co., Ltd. v. SRAM Corp.,*
   336 F.3d 1298 (Fed. Cir. 2003) .......................................................................16

**Statutes**

35 U.S.C. § 102 .............................................................................5, 7, 17, 19

35 U.S.C. § 102(b) ..........................................................8, 20, 21, 43, 54, 70

35 U.S.C. § 103 ............................................... 5, 8, 9, 17, 19, 54, 74

35 U.S.C. § 103(a) ..........................................................................13

35 U.S.C. § 311 ...............................................................................5

35 U.S.C. § 314(a) ...........................................................................7

**Regulations**

37 C.F.R. § 42.8 ...............................................................................5

37 C.F.R. § 42.8(b)(2).......................................................................5

37 C.F.R. § 42.10(b) .........................................................................6

37 C.F.R. § 42.15(a) .........................................................................7

37 C.F.R. § 42.100(b) ......................................................................15

37 C.F.R. § 42.103 ...........................................................................7

37 C.F.R. § 42.104(a)........................................................................7

37 C.F.R. § 42.104(b) .......................................................................7

TABLE OF EXHIBITS

| Petitioner's Exhibit No. | Document |
|---|---|
| 1001 | U.S. Patent No. RE45553E1 ("the '553 Patent") |
| 1002 | Prosecution History of U.S. Patent No. 7,211,788 ("'788 Patent"), May 8, 2006 Non-Final Rejection. |
| 1003 | Prosecution History of the '788 Patent, September 11, 2006 Amendment and Remarks. |
| 1004 | Declaration of Richard Yost, Ph.D. |
| 1005 | The Complaint  (served copy) |
| 1006 | Tanner, Scott D., and Vladimir I. Baranov. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). II. Reduction of interferences produced within the cell." *Journal of the American Society for Mass Spectrometry* 10.11 (1999): 1083-1094.  ("Tanner") |
| 1007 | U.S. Patent No. 6,191,417 ("Douglas") |
| 1008 | Declaration of Sylvia Hall-Ellis, Ph.D. |
| 1009 | JPH10214591A ("Saito") |
| 1010 | Certified Translation of JPH10214591A ("Saito") |
| 1011 | Baranov, Vladimir, and Scott D. Tanner. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). Part 1. The rf-field energy contribution in thermodynamics of ion-molecule reactions." *Journal of Analytical Atomic Spectrometry* 14, no. 8 (1999): 1133-1142.  ("Baranov") |
| 1012 | PCT International Application – International Publication Number WO 00/16375 ("PCT375") |
| 1013 | U.S. Patent No. 6,340,814 ("Vandermey") |
| 1014 | McLafferty, Fred W. "Tandem mass spectrometry." *Science* (1981): 280-287. |
| 1015 | Yost, Richard A., and Dean D. Fetterolf.  "Tandem mass spectrometry (MS/MS) instrumentation."  *Mass Spectrometry Reviews* 2, no. 1 (1983): 1-45. |

| Petitioner's Exhibit No. | Document |
|---|---|
| 1016 | Miller, Philip E., and M. Bonner Denton. "The quadrupole mass filter: basic operating concepts." *J. Chem. Educ.* 63, no. 7 (1986): 617-623. |
| 1017 | Yost, R. A., and C. G. Enke. "Triple quadrupole mass spectrometry for direct mixture analysis and structure elucidation." *Analytical Chemistry* 51, no. 12 (1979): 1251-1264. |
| 1018 | European Patent Application Publication No. EP0237259A2 |
| 1019 | U.S. Patent No. 4,234,791 ("Enke") |
| 1020 | U.S. Patent No. 6,093,929 ("Javahery") |
| 1021 | Dawson, P. H., J. B. French, J. A. Buckley, D. J. Douglas, and D. Simmons. "The use of triple quadrupoles for sequential mass spectrometry: 1—The instrument parameters." *Journal of Mass Spectrometry* 17, no. 5 (1982): 205-211. |
| 1022 | Johnston, M., "Energy Filtering in Triple Quadrupole MS/MS," *Finnigan MAT*, San Jose, California, USA, no. 203, 1984. |
| 1023 | Eiden, Gregory C., Charles J. Barinaga, and David W. Koppenaal. "Beneficial ion/molecule reactions in elemental mass spectrometry." *Rapid Communications in Mass Spectrometry* 11, no. 1 (1997): 37-42. |
| 1024 | U.S. Patent No. 6,222,185 ("Speakman") |
| 1025 | U.S. Patent No. 6,011,259 ("Whitehouse") |
| 1026 | Koppenaal, David W. "Atomic mass spectrometry." *Analytical Chemistry* 64, no. 12 (1992): 320R-342R. |
| 1027 | Sass, Samuel, and Timothy L. Fisher. "Chemical ionization and electron impact mass spectrometry of some organophosphonate compounds." *Journal of Mass Spectrometry* 14, no. 5 (1979): 257-264. |
| 1028 | King, F. L., and W. W. Harrison. "Glow discharge mass spectrometry: an introduction to the technique and its utility." *Mass Spectrometry Reviews* 9, no. 3 (1990): 285-317. |

| Petitioner's Exhibit No. | Document |
|---|---|
| 1029 | Douglas, D. J. "Some current perspectives on ICP-MS." *Canadian Journal of Spectroscopy* 34, no. 2 (1989): 38-49.  ("Douglas-1989") |
| 1030 | Louris, John N., Larry G. Wright, R. Graham Cooks, and Alan E. Schoen. "New scan modes accessed with a hybrid mass spectrometer." *Analytical Chemistry* 57, no. 14 (1985): 2918-2924. |
| 1031 | Houk, R. S. "Elemental and isotopic analysis by inductively coupled plasma mass spectrometry." *Accounts of Chemical Research* 27, no. 11 (1994): 333-339. |
| 1032 | Tanner, Scott D., Vladimir I. Baranov, and Dmitry R. Bandura. "Reaction cells and collision cells for ICP-MS: a tutorial review." *Spectrochimica Acta Part B: Atomic Spectroscopy* 57, no. 9 (2002): 1361-1452. |
| 1033 | Rowan, John T., and R. S. Houk. "Attenuation of polyatomic ion interferences in inductively coupled plasma mass spectrometry by gas-phase collisions." *Applied Spectroscopy* 43, no. 6 (1989): 976-980. |
| 1034 | Kishi, Yoko. "A benchtop inductively coupled plasma mass spectrometer."  HEWLETT PACKARD JOURNAL 48 (1997): 72-79.  ("Kishi") |
| 1035 | Montaser, Akbar et al., *An Introduction to ICP Spectrometries for Elemental Analysis* 1 in Inductively Coupled Plasma Mass Spectrometry (Akbar Montaser, ed. 1998). |
| 1036 | U.S. Patent No. 6,140,638 ("Tanner-Patent") |
| 1037 | King, F.L., et al., "Collision-Induced Dissociation of Polyatomic Ions in Glow Discharge Mass Spectrometry," *International Journal of Mass Spectrometry and Ion Processes*, 1989, vol. 89, pp. 171-185. |
| 1038 | Turner, Patrick, et al., "Instrumentation For Low and High-Resolution ICP/MS": Inductively Coupled Plasma Mass Spectrometry, Publication Wiley-VCH, edited by A. Montaser, 1998, p. 421-501.  ("Turner") |

| Petitioner's Exhibit No. | Document |
|---|---|
| 1039 | Terzić, I., and D. Ćirić. "The double cylindrical electrostatic sector as an ion energy analyzer." *Nuclear Instruments and Methods* 166, no. 3 (1979): 419-423.  ("Terzic") |
| 1040 | 1992 Pittcon (The Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy) "Practical MS/MS Analysis" Short Course, Lecture 7 |

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

## I.   <u>INTRODUCTION</u>

Pursuant to 35 U.S.C. § 311, Agilent Technologies, Inc. ("Agilent" or "Petitioner") submits this petition for *inter partes* review ("IPR"), seeking cancellation of Claims 1–66 of U.S. Patent No. RE45,553 ("the '553 Patent," Ex. 1001).  These claims are unpatentable under 35 U.S.C. §§ 102 and 103 over the prior art references identified and applied in this petition.

## II.   <u>MANDATORY NOTICES</u>

Pursuant to 37 C.F.R. § 42.8, Petitioner provides the following mandatory disclosures:

### A.   Real Parties in Interest

Agilent Technologies, Inc. ("Agilent") is the real party in interest.

### B.   Related Matters

Pursuant to 37 C.F.R. § 42.8(b)(2), the '553 Patent is the subject of a patent litigation suit brought by the Patent-Owner (see Ex. 1005).  Petitioner is also filing three petitions for IPR of two other patents asserted in that litigation: U.S. Patent Nos. 7,230,232 and RE45,386.

5

### C. LEAD AND BACK-UP COUNSEL

Petitioner provides the following designation of counsel:

| Lead Counsel | Back-up Counsel |
|---|---|
| Brian M. Buroker<br>(Reg. No. 39,125)<br>Gibson, Dunn & Crutcher LLP<br>1050 Connecticut Avenue, NW,<br>Washington, DC 20036-5306<br>Tel: 202-955-8541<br>bburoker@gibsondunn.com | Anne Y. Brody<br>(Reg. No. 54,612)<br>Gibson, Dunn & Crutcher LLP<br>3161 Michelson Drive<br>Irvine, CA 92612-4412<br>Tel: 949-451-4192<br>abrody@gibsondunn.com<br><br>David L. Glandorf<br>(Reg. No. 62,222)<br>Gibson, Dunn & Crutcher LLP<br>1801 California St.<br>Denver, CO 80202-2642<br>Tel: 303-298-5726<br>dglandorf@gibsondunn.com |

A Power of Attorney accompanies this petition in accordance with 37 C.F.R. § 42.10(b). Service via hand delivery or postal mail may be made at the addresses of the lead and back-up counsel above. Petitioner hereby consents to electronic service, and service via electronic mail may be made at the email addresses provided above for the lead and back-up counsel.

6

## III.   PAYMENT OF FEES

Pursuant to 37 C.F.R. §§ 42.103 and 42.15(a), $52,600 is being paid via deposit account 501408.  Any additional fees due in connection with this petition may be charged to the foregoing account.

## IV.   STANDING

Pursuant to 37 C.F.R. § 42.104(a), Petitioner certifies that the '553 Patent is available for IPR and that Petitioner is not barred or estopped from requesting IPR of the claims on the grounds identified herein.

## V.   IDENTIFICATION OF CHALLENGE AND STATEMENT OF PRECISE RELIEF REQUESTED

Pursuant to 37 C.F.R. § 42.104(b), Petitioner requests that the Board institute *inter partes* review of Claims 1-66 of the '553 Patent on one or more grounds under pre-AIA 35 U.S.C. §§ 102 and/or 103.

## VI.   THRESHOLD REQUIREMENT FOR *INTER PARTES* REVIEW

Under 35 U.S.C. § 314(a), institution of *inter partes* review requires "a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition."  This petition meets this threshold for each of the asserted grounds of unpatentability.

## VII.  <u>STATEMENT OF REASONS FOR THE RELIEF REQUESTED</u>

Petitioner predicates its challenge on five references.  Collectively, these references render each claim of the '553 Patent unpatentable based on the following seven grounds.

### A.    GROUNDS

- <u>GROUND 1</u>:  PCT375 anticipates claims 1–5, 8–10, 12–15, 18–21, 25–35, 38, 41, 43, 46, 48, 51, 53, 56, 58, 61, 63, 66 under § 102(b);

- <u>GROUND 2</u>:  PCT375 renders obvious claim 11 under § 103;

- <u>GROUND 3</u>:  Tanner anticipates claims 1, 4–6, 8–9, 12-13, 16, 18–19, 22, 24–25, 28, 31–32, 35, 38–41, 43–46, 48–51, 53–56, 58–61, 63–66 under § 102(b);

- <u>GROUND 4</u>:  Douglas in combination with Tanner renders obvious claims 1–6, 8–9, 12–16, 18–22, 24–66 under § 103;

- <u>GROUND 5</u>:  Vandermey in combination with Douglas and Tanner renders obvious claims 6–7, 16–17, 22–23, 37, 42, 47, 52, 57, 62 under § 103;

- <u>GROUND 6</u>:  Saito anticipates claims 1, 4–6, 12, 28, 32, 57, and 62 under § 102(b);

- <u>GROUND 7</u>:  Saito in combination with Douglas renders obvious claims 1–6, 12–16, 18, 20–22, 25–38, 42–43, 47–48, 52–53, 57–58, and 62–63 under § 103.

The Declaration of Richard Yost, Ph.D., a world-renowned expert in mass spectrometry, accompanies this petition.  Ex. 1004.

## B.    PRIORITY DATE OF THE '553 PATENT

The '553 patent is a reissue from U.S. Patent No. 7,211,788 (the "'788 Patent").  The reissue application was filed on September 19, 2013 (Application Number 14/032,110).  The '788 patent was filed on May 27, 2004 (Application Number 10/497,396), which ultimately claimed priority to a GB patent application 0210930.4, filed May 13, 2002.

For purposes of this petition, Agilent assumes that the claims are entitled to a priority date of May 13, 2002.

## VIII.  STATE OF THE ART

### A.    PERSON OF SKILL IN THE ART

A person of ordinary skill in the art in May 2002 would have a Ph.D. or a Master's degree, or an equivalent education or practical experience, in chemistry, physics, or a related field, and at least two to three years of experience in developing the instrumentation and/or the applications of tandem mass

9

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

spectrometry and/or quadrupole mass spectrometers (hereafter, "POSA").  Ex.

1004 ¶23.

### B. SCOPE AND CONTENT OF THE ART BEFORE MAY 2002

#### 1. *Mass Spectrometry*

Mass spectrometry ("MS") is an analytical technique used to identify and

quantify chemical elements and compounds (*i.e.*, atoms and molecules,

respectively) in a sample based on the atomic mass and charge state of the

constituents in the composition.  Ex. 1014, 281–82; Ex. 1004 ¶¶32-33.  Typically,

a sample containing atoms or molecules of interest is introduced into the ion source

of a mass spectrometer.  *Id.*; Ex. 1015, 6-9; Ex. 1004 ¶¶32-33.  The ion source

induces either a positive or a negative charge in the neutral atoms and molecules,

typically by adding or removing electron(s), generating positive or negative ions.

*Id.*, 281-282; Ex. 1015, 6-9; Ex. 1004 ¶¶32-33.  In most instruments, only the

positive ions are electrostatically guided by ion optics into a portion of the mass

spectrometer called a "mass analyzer."  *Id.*, 281-282; Ex. 1015, 9; Ex. 1004 ¶¶32-

33.  The mass analyzer allows ions of a specific mass-to-charge ratio (m/z or m/e)

to pass through to a detector while preventing all other ions from reaching the

detector when the detector is measuring ions of a set m/z value.  Ex. 1015,16; Ex.

1004 ¶¶32-33.

### 2.     *Quadrupole Mass Analyzer*

A quadrupole is the most common mass analyzer used in modern mass

spectrometry.  Ex. 1016, 617; Ex. 1004 ¶35.  It comprises four parallel rods

arranged in a radial array at 90° intervals, with opposite pairs of rods electrically

connected.  *Id*., 618; Ex. 1004 ¶35.  There are two main modes of operating a

quadrupole: RF-only and RF-DC mode.  *Id*., 621–22; Ex. 1004 ¶35.  When only an

RF voltage is applied between the rod pairs, the quadrupole would transmit all ions

above a certain m/z cutoff, generally termed "total ion mode."  *Id*.; Ex. 1004 ¶35.

When a combination of RF and DC voltages is applied between the rod pairs, the

quadrupole transmits ions between upper and lower m/z cutoffs, such that the mass

analyzer acts as a "mass filter" for the purpose of passing selected ions.  *Id*.; Ex.

1004 ¶35.  As the DC-to-RF ratio increases, the quadrupole's transmission band

narrows.  *Id*.; Ex. 1004 ¶35.  At a certain DC-to-RF ratio, this transmission band is

so narrow as to allow only ions of a specific integer m/z to pass through, generally

termed "unit mass resolution."  *Id*.; Ex. 1004 ¶35.  By selecting  (typically under

computer control) one or a series of DC and RF voltages (at constant DC/RF ratio),

one can select ions of one or a series of m/z ratios to be passed by the mass

analyzer, generally referred to as "selected ion monitoring," or SIM mode.  *Id*.; Ex.

1015, 3-5; Ex. 1017, 1251; Ex. 1004 ¶35.  If the magnitude of the DC and RF

voltages is continuously increased over time while keeping the DC/RF ratio

constant, the mass filter will scan over a range of m/z ratios and generate a mass

spectrum, generally termed "full-scan mode."  Ex. 1016, 621; Ex. 1004 ¶35.

Quadrupole mass spectrometers may have two, three, or more quadrupoles

arranged in tandem.  Exs. 1018–20; Ex. 1004 ¶36.  Each of the quadrupoles can be

designed to operate independently and/or with one another.  *Id*.; Ex. 1004 ¶¶36-49.

For example, a triple-quadrupole instrument may be operated in one of several

modes:  normal mass spectrum, daughter scan, parent scan, neutral loss scan, and

selected reaction monitoring.  *Id*.; Ex. 1004 ¶¶36-49.

### 3. *Photons and Neutral Species*

Many ion sources inevitably generate some amount of neutral species and

photons, including ICP, GD, chemical ionization, and electron ionization sources.

Ex. 1012, 3:35–4:4; Ex. 1004 ¶58.  In the absence of other means to divert their

path (*e.g.*, vacuum systems), these neutral species and photons are assumed to

travel in a straight line from the ion source to the detector, increasing the

background noise.  Ex. 1012, 4:24–33; Ex. 1004 ¶58.  To reduce such background

noise, many mass spectrometers use ion optics to bend the path of the ions so that

the ions would either travel around a photon stop or be sent off-axis towards a

detector mounted off-axis.  Ex. 1012, 6:15–21; Ex. 1004 ¶58.  In contrast, the

neutral species and the photons would still travel in a straight line and strike the

photon stop or not be bent towards an off-axis detector.  Ex. 1012, 6:15–21; Ex.

1004 ¶58.

## IX.    **THE '553 PATENT**

### A.    **SUMMARY OF PROSECUTION AND REISSUE HISTORIES**

During prosecution, the '788 patent was initially rejected under U.S.C. §

103(a) as being unpatentable over Douglas, in view of U.S. Patent Application

Publication No. 2001/0038069 by Whitehouse.  Ex. 1002, 2-3.  The applicant

overcame that combination by arguing that neither reference specifically taught a

configuration wherein the first quadrupole selects a sub-range of mass/charge

ratios, and the second quadrupole filters for "only ions of the said selected

mass/charge ratio."  Ex. 1003, 11-13.  Instead, according to the applicant, the

second quadrupole in Douglas, like the first quadrupole in the series, filtered for a

13

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

range of mass/charge ratios instead of a single, selected mass/charge ratio. *Id*.

Likewise, the applicant argued that the multipole ion guides in Whitehouse did not

select for a single mass/charge ratio. *Id*. Finally, the applicant contended that the

examiner failed to demonstrate motivation to combine the references. *Id*. During

reissue proceedings, no references were addressed in substantive communications

from the examiner.

At no time in the prosecution of the '553 Patent or the underlying

'788 Patent did the applicant or examiner distinguish the prior art based on the

apparatus elements of the mass spectrometer. On the contrary, the only distinction

ever offered during prosecution was the user's selection of the m/z ranges for

which the first and second quadrupoles would filter. *Id*. This claimed operation of

the mass spectrometer did not require any modification of the instrumentation, as

described in the grounds below.

### B.   THE '553 PATENT CLAIMS

The alleged inventions claimed in the '553 Patent are directed to a mass

filter apparatus comprised of an ion source and two mass filter stages in series, and

methods of use thereof. Ex. 1004 ¶21. The first mass filter stage acts as the

"sacrificial filter," and the second mass filter stage serves as the "analysis filter." Ex. 1001, 5:44–47. The '533 Patent explains that "the sacrificial filter acts to pre-filter the beam before it enters the analysis filter." *Id.*, 5:48–53.

The '553 Patent has five independent claims: apparatus claim 1, and method claims 13, 18, 25, and 28.

## X.   CLAIM CONSTRUCTION

In *inter partes* review, claims receive the broadest reasonable interpretation ("BRI") supported by the specification. 37 C.F.R. § 42.100(b); *Cuozzo Speed Techs., LLC v. Lee*, 136 S.Ct. 2131, 2142 (2016). At least the following term requires construction:

**Elements [1C], [13B], [18B], [32B] — "a sub-range of mass/charge ratios which includes a selected mass/charge ratio"**

This term defines the range of m/z ratios of the ions transmitted through the first mass filter stage in Claims 1, 13, 18, 28, and 32. The BRI of this term is "one or more m/z ratios, including at least an m/z ratio selected by the second mass filter stage." The claims themselves support the BRI of this term.

15

First, the "sub-range" of m/z ratios describes a subset of the range of m/z ratios.  And the m/z ratios within the sub-range do not have to be continuous.

Second, the "sub-range" of m/z ratios can be as narrow as a single selected m/z ratio.  Notably, Claim 36 depends on Claim 1, and further requires that "the band pass width of the first filter stage being broader than the band pass width of the second filter stage."  Accordingly, with respect to claim 1, the bandpass width of the first filter stage need not be broader than—and can be identical to—the bandpass width of the second filter stage, which selects only a single m/z ratio. *Sunrace Roots Enterprise Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (finding the claim differentiation presumption "especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim").

Similarly, Claim 28 recites an additional limitation for the term "sub-range," namely, "the sub-range being broader than the selected mass/charge ratio."  But this additional limitation is not found in similar independent Claims 1, 13, 18, or 32.  Without this additional limitation, the term "sub-range" does not have to be broader than the selected m/z ratio.

16

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

## XI.    GROUNDS FOR UNPATENTABILITY

### A.    GENERAL PRINCIPLES

Under 35 U.S.C. § 102, if a single prior art reference discloses each limitation of the claimed invention, a patent claim is anticipated and invalid. *Schering Corp. v. Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). Moreover, "a reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *In re Petering*, 301 F.2d 676, 681 (1962)).

Under 35 USC § 103, a patent claim is obvious and invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." Multiple pieces of prior art render the claims of the '553 Patent anticipated and/or obvious.

17

## B.   APPARATUS CLAIMS RECITING MANNERS OF OPERATION

"[A]pparatus claims cover what a device *is,* not what a device *does*."

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469 (Fed. Cir.

1990) (emphasis in original).  "[T]he patentability of apparatus or composition

claims depends on the claimed structure, not on the use or purpose of that

structure."  *Catalina Marketing Int'l v. Coolsavings.Com.*, 289 F.3d 801, 809 (Fed.

Cir. 2002); *In re Gardiner*, 171 F.2d 313, 315-16 (C.C.P.A. 1948) ("It is trite to

state that the patentability of apparatus claims must be shown in the structure

claimed and not merely upon a use, function, or result thereof.").  Thus, a claim

containing a "recitation with respect to the manner in which a claimed apparatus is

intended to be employed does not differentiate the claimed apparatus from a prior

art apparatus" if the prior art apparatus teaches all the structural limitations of the

apparatus claim.  *Ex parte Masham*, 2 U.S.P.Q. 2d 1647 (Bd. Pat. App. & Inter.

1987).

## C.   METHOD CLAIMS RECITING OPERATIONS OF AN APPARATUS

When a prior art apparatus is the same as the apparatus described in a claim

for carrying out a claimed method, the prior art apparatus presumably will perform

the claimed method in its normal and usual operation.  *See In re King,* 801 F.2d

1324 (Fed. Cir. 1986).  Moreover, when a prior art reference describes using a

prior art apparatus towards a particular purpose, a claimed method is anticipated if

the claim merely recites newly discovered results of using the same apparatus for

the same purpose.  *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d

1368 (Fed. Cir. 2001).

### D.   CLAIM ELEMENTS DIRECTED TO THE INTENDED USE OF A COMPONENT

**[1Pre.] — Mass filter apparatus for filtering a beam of ions having mass/charge ratios in a range of mass/charge ratios to transmit ions of a selected mass/charge ratio in the said range, comprising:**

**[13Pre.] — A method for filtering a beam of ions having mass/charge ratios within a range of mass/charge ratios to transmit ions of a selected mass/charge ratio in said range, the method comprising:**

**[18Pre.] — A method for producing a mass spectrum of an ion beam having mass/charge ratios within a range of mass/charge ratios, comprising:**

**[28Pre.] — A method of improving the resolving power of a mass spectrometer, comprising:**

**Element [32A.] — emitting an ion beam from a beam source into a first mass filter stage, the ions in the beam having mass/charge ratios within a range of mass/charge ratios,**

Statements of an intended use or purpose of a component in a claimed

structure or composition are not included in invalidity analysis under Sections 102

and 103.  *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,

320 F.3d 1339, 1345 (Fed. Cir. 2003) ("[A]n intended use or purpose usually will

not limit the scope of the claim because such statements usually do no more than

define a context in which the invention operates.").  "Although such statements

often appear in the claim's preamble, a statement of intended use or purpose can

appear elsewhere in a claim." *Ex parte Mewherter*, Appeal No. 2012-007692,

Decision on Appeal at 18–19 (P.T.A.B. May 8, 2013) (internal annotations

omitted).

The preambles above merely state the intended purposes of the mass filter

apparatus or the methods claimed therein, respectively.  They do not limit the

scopes of their respective claims in any way.  Accordingly, prior art that discloses

the claimed apparatus or method anticipates (or renders obvious) these claims

regardless of whether the prior art explicitly teaches the stated purpose.

### E.   GROUND 1: PCT375 ANTICIPATES CLAIMS 1–5, 8–10, 12–15, 18–21, 25–35, 38, 41, 43, 46, 48, 51, 53, 56, 58, 61, 63, 66 UNDER § 102(B)

PCT375 (Ex. 1012) is an international patent application published under the

patent cooperation treaty ("PCT") and listing the same inventor as the '553 patent.

It has an international publication date of March 23, 2000, and thus qualifies as

prior art under 35 U.S.C. § 102(b).  U.S. Patent 7,202,470 is the United States equivalent of PCT375, and was cited on the face of the '553 patent.

EP1114437 is the European equivalent of PCT375.  The '553 Patent states that "EP1114437 discloses a method and apparatus for removing ions from an ion beam to reduce the gas load on the collision cell which serves to minimise the formation, or reformation, of unwanted artefact ions in the collision cell."  Ex. 1001, 2:49-52.  But the '533 Patent does not discuss the two mass filtering stages disclosed therein.  PCT375 and/or any of its foreign equivalents were not discussed during the prosecution or reissue proceeding.

PCT375 discloses an ICP mass spectrometer with two quadrupoles in tandem.  Ex. 1012, 5:13–23; Ex. 1004 ¶60.  Both quadrupoles are operated preferably as mass selective ion optical devices.  *Id.*, 8:11–31; Ex. 1004 ¶60.  PCT375 further teaches vacuum pumps and pressure ranges for the respective chambers.  *Id.*, 7:18–28; Ex. 1004 ¶60.  Thus, PCT375 teaches all the structural limitations of the apparatus Claim 1 and many of its dependent Claims.  *Id.*, 7:18–28, 8:11–31; Ex. 1004 ¶60.

Moreover, PCT375 discloses operation of a mass spectrometer according to the methods of claims 13, 18, 25, 28, and 32. *Id.*, 6:15–9:6; Ex. 1004 ¶61. Thus, PCT375 anticipates these claims and many of their respective dependent claims.

### 1.    *PCT375 Anticipates Claim 1*

**[1Pre.] — Mass filter apparatus for filtering a beam of ions having mass/charge ratios in a range of mass/charge ratios to transmit ions of a selected mass/charge ratio in the said range, comprising:**

Although the preamble is nonlimiting (*supra*, XI.D.), PCT375 nevertheless discloses a mass filter apparatus that fulfills the recited purpose of filtering a beam of ions in a range of m/z ratios. Ex. 1012, 5:13–23.

Moreover, as discussed in Section XI.B., Claim 1 is an apparatus claim reciting a manner of operation. And PCT375 discloses an apparatus that meets all the structural limitations of Claim 1 and is capable of operating as described. *Id.*, 6:15–9:6. Thus, PCT375 anticipates Claim 1. To the extent that it is held to require transmitting only a selected range of ions, that Element is present as discussed in Elements 1C and 1D below.

**Element [1A.] — an ion beam source for emitting the ion beam,**

PCT375 discloses an "ion beam source" in the form of an inductively coupled plasma source that emits an ion beam.  Ex. 1012, 1:18–30, 9:7–14; Ex. 1004 ¶64.

**Element [1B.] — first and second mass filter stages in series to receive the beam from the beam source, and a vacuum system arranged to maintain both the first and second filter stages at operating pressures below $10^{-3}$ torr,**

PCT375 discloses two quadrupoles that are the recited "first and second mass filter stages in series," as can be clearly seen in Figure 2.  Ex. 1012, Fig. 2; Ex. 1004 ¶65.  In PCT375, the ion beam passes from the beam source to a first ion optical device located in a first evacuated chamber and eventually to a mass analyzer located in a third evacuated chamber.  *Id*., 5:3–29; Ex. 1004 ¶65.  PCT375 discloses that the first ion optical device may be a "mass selective device" that "can be driven so as to transmit only ions of a specific mass to charge ratio (m/e) or a range of m/e" and "functions as an auxiliary mass filter."  *Id*., 8:9–16; Ex. 1004 ¶65.  Therefore, the first optical device, which PCT375 refers to as the "auxiliary mass filter," is a first mass filter stage.  Ex. 1004 ¶65.  PCT375's mass analyzer may "include[] a main mass filter."  *Id*., 8:5–8; Ex. 1004 ¶65.  Therefore, PCT375's main mass filter is a "second mass filter stage."  Ex. 1004 ¶65.  The

filter stages are in series, as the ion beam passes from the source to the auxiliary

mass filter and then eventually to the main mass filter.  *Id*., 8:17–20; Ex. 1004 ¶65.

Figure 2 (annotations added) shows ICP ion source 1 directing an ion beam into

the first filter stage located in first evacuated chamber 6 and then, in series, to mass

filter 37 (the second filter stage) in the third evacuated chamber 33.  Ex. 1004 ¶65.



Fig.2.

PCT375 discloses a vacuum system that maintains both filters at a pressure

below $10^{-3}$ torr.  First, it discloses that the first evacuated chamber is maintained at

a pressure of $10^{-2}$ to $10^{-4}$ mbar, which is $10^{-2}$ to $10^{-4}$ torr.[1]  *Id*., 5:30–32, 11:5–10;

---

[1]  1 mbar is equivalent to approximately 0.75 torr.

Ex. 1004 ¶66.  Because the disclosed range overlaps with the claimed range of

"below $10^{-3}$ torr," PCT375 discloses this limitation.  *See Atlas Powder Co. v. Ireco,*

*Inc.*, 190 F.3d 1342, 1345 (Fed. Cir. 1999) (finding anticipation because prior art

references disclose compositions with ingredients identical to those of the claimed

compositions in overlapping amounts).  Second, PCT375 discloses that the third

evacuated chamber 33 is maintained at a pressure "less than $10^{-4}$ mbar, typically

about $10^{-6}$ mbar." *Id.*, 14:25–31; Ex. 1004 ¶66.

**Element [1C.] — wherein the first mass filter stage is configured to select for transmission on to the second filter stage only ions having a sub-range of mass/charge ratios which includes the selected mass/charge ratio;**

PCT375 discloses that the first filter stage is configured to select only a

particular m/e or range of m/e, which is a sub-range of the range of ions emitted

from the ion source.  Ex. 1012, 8:9–16; Ex. 1004 ¶67.  PCT375 further discloses

that the second filter stage selects ions of the same m/e as the first filter stage.  *Id*.,

8:17–23; Ex. 1004 ¶67.  As the m/e ranges at the first and second filter stages are

the same, the second range (the selected range) is necessarily included in the first

range (the sub-range).  Ex. 1004 ¶67.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

**Element [1D.] — the second mass filter stage is configured to select only ions of the said selected mass/charge ratio.**

PCT375 discloses that the second filter stage only selects ions of the same m/e as the first filter stage for mass analysis.  Ex. 1012, 8:9–23; Ex. 1004 ¶68.

These ions correspond to the claimed selected mass/charge range.  Ex. 1004 ¶68.

## 2.   *PCT375 Anticipates Claim 13*

**[13Pre.] — A method for filtering a beam of ions having mass/charge ratios within a range of mass/charge ratios to transmit ions of a selected mass/charge ratio in said range, the method comprising:**

Even if the preamble of method Claim 13 were limiting (which it is not), PCT375 discloses a method of filtering a beam of ions.  *Id.*, 5:13–23.  Because claim 13's method tracks the purpose of the mass filter apparatus of Claim 1, claim 1 is anticipated for the same reasons as Claim 13.  Ex. 1004 ¶78.

**Element [13A.] — emitting the ion beam from a beam source into a first mass filter stage that is arranged in series with a second mass filter stage,**

PCT375 discloses emitting an ion beam source from an "inductively coupled plasma" source.  Ex. 1012, 1:18–30, 9:7–14; Ex. 1004 ¶79.  The ion beam passes from the source to a first ion optical device located in a first evacuated chamber and eventually to a mass analyzing means located in a third evacuated chamber.

26

*Id.*, 5:3–29; Ex. 1004 ¶79.  PCT375 discloses that the first ion optical device is preferably a "mass selective device" that "can be driven so as to transmit only ions of a specific mass to charge ratio (m/e) or a range of m/e" and "functions as an auxiliary mass filter." *Id.*, 8:9–16; Ex. 1004 ¶79.  The filter stages are in series, as the ion beam passes from the source to the auxiliary mass filter and then eventually to the main mass filter, as explained for element [1B] above.  *Id.*, 8:17–20; Ex. 1004 ¶79.

**Element [13B.] — selecting at the first mass filter stage for transmission on to the second mass filter stage only ions having a sub-range of mass/charge ratios which includes the selected mass/charge ratio, and**

PCT375 discloses Element 13B for the same reasons as Element 1C.  *Id.*, 8:9–23; Ex. 1004 ¶80.

**Element [13C.] — selecting at the second mass filter stage only ions having the selected mass/charge ratio,**

PCT375 discloses Element 13C for the same reasons as Element 1D.  Ex. 1004 ¶81.

**Element [13D.] — wherein the first and second filter stages operate at pressures below $10^{-3}$ torr.**

27

PCT375 discloses Element 13D for the same reasons as Element 1B.  *Id.*,

Figure 2, 5:3–29, 8:5–8, 8:17–20; Ex. 1004 ¶82.

### 3.    *PCT375 Anticipates Claim 18*

**[18Pre.] — *supra*.**

Although the preamble is nonlimiting (*see* Section XI.D.), PCT375 discloses

a method for producing a mass spectrum of an ion beam.  *Id.*, 2:27-32, 5:13–23;

Ex. 1004 ¶85.

**Element [18A.] — emitting the ion beam from a beam source into a first mass
filter stage,**

**Element [18B.] — selecting only ions having a sub-range of mass/charge ratios
which includes a selected mass/charge ratio at the first mass filter
stage for transmission on to a second mass filter stage arranged in
series with the first mass filter stage,**

**Element [18C.] — selecting only ions having the selected mass/charge ratio at
the second mass filter stage for transmission on to a detector for
detecting any ions having the selected mass/charge ratio,**

**Element [18F.] — wherein the first and second filter stages operate at
pressures below $10^{-3}$ torr.**

These claim elements are substantively identical to Elements [13A.]–[13D.]

and are thus disclosed in PCT375 for the reasons above.  Ex. 1004 ¶¶87-90; *supra*,

at XI.E.2.

28

**Element [18D.] — controlling the second filter stage so that the selected mass/charge ratio is scanned over a scanned range, and**

**Element [18E.] — detecting the number of ions selected by the second filter stage at any given mass/charge ratio to provide a mass spectrum,**

PCT375 discloses scanning the first and second mass filter stages. Ex. 1012, 8:36–9:4; Ex. 1004 ¶89. The result of scanning the mass filter stage at the mass analyzing means (*i.e.*, before the detector) is a mass spectrum. *Id.*, 5:24–29; Ex. 1004 ¶89. The detector detects the number of ions selected at any given moment. *Id.*; Ex. 1004 ¶89.

### 4.    *PCT375 Anticipates Claims 28 and 32*

**[28Pre.] — *supra.***

**[32Pre.] — A method for reducing the deposition of material on multipole elements of a primary resolving filter of a mass spectrometer, comprising:**

PCT375 anticipates Claims 28 and 32 based on the same disclosures. As explained above in Section XI.D., the preambles of these claims are nonlimiting. Even if they were somehow limiting, PCT375's experiments are directed toward the same purpose and achieve the same results. *Id.*, 1:31–2:7; Ex. 1004 ¶¶99, 108.

**Element [28A.] — emitting an ion beam from a beam source into a first mass filter stage that is in series with a second mass filter stage, the ions**

29

**in the beam having mass/charge ratios within a range of mass/charge ratios,**

**Element [32A.] —** *supra.*

PCT375 discloses emitting an ion beam source from an "inductively coupled plasma" source. *Id.*, 1:18–30, 9:7–14; Ex. 1004 ¶¶100, 109. The ion beam passes from the source to a first ion optical device located in a first evacuated chamber and eventually to a mass analyzing means located in a third evacuated chamber. *Id.*, 5:3–29; Ex. 1004 ¶¶100, 109. PCT375 discloses that the first ion optical device is preferably a "mass selective device" that "can be driven so as to transmit only ions of a specific mass to charge ratio (m/e) or a range of m/e" and "functions as an auxiliary mass filter." *Id.*, 8:9–16; Ex. 1004 ¶¶100, 109. The filter stages are in series, as the ion beam passes from the source to the auxiliary mass filter and then, eventually, to the main mass filter, as explained for Element [1B.] above. *Id.*, 8:17–20; Ex. 1004 ¶¶100, 109.

**Element [28B.] — selecting at the first mass filter stage only ions having a sub-range of mass/charge ratios which includes a selected mass/charge ratio, the range being broader than the sub-range, the sub-range being broader than the selected mass/charge ratio,**

**Element [28C.] — receiving only ions in said sub-range at the second mass filter stage,**

30

**Element [32B.] —** *supra.*

**Element [32C.] — receiving only ions in said sub-range at a second mass filter stage in series with said first mass filter stage, said second mass filter stage constituting said primary resolving filter, and**

PCT375 discloses passing ions in the sub-range from the first filter stage to the second filter stage. *Id.*, 8:17–20; Ex. 1004 ¶¶101-102, 109-110.  PCT375 discloses mass selecting at the second filter stage the ions of the same m/z as the first filter stage for analysis. *Id.*, 8:23–9:4; Ex. 1004 ¶¶101-102, 109-110.  These ions correspond to the claimed "selected" mass/charge range. *Id.*; Ex. 1004 ¶¶101-102, 109-110.  Furthermore, PCT375 discloses that the sub-range at the filter stage (the "auxiliary filter") can be a range of m/z, which is broader than the selected mass/charge range at the second filter stage. *Id.*, 8:9–16; Ex. 1004 ¶¶101-102, 109-110.

**Element [28D.] — selecting at the second mass filter stage only ions having the selected mass/charge ratio,**

**Element [28E.] — whereby the second filter stage can operate with reduced ion beam current.**

**Element [32D.] — selecting at the second mass filter stage only ions having a selected mass/charge ratio within the sub-range,**

**Element [32E.] — thereby reducing the number of ions rejected in said primary resolving filter.**

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

In the experiments described in Elements [28B.] and [32B.], the quadrupole mass filter selects analyte ions having a particular mass/charge ratio.  Because the first mass filter removes ions having m/z ratios outside of the transmission bandpass, the downstream quadrupole mass filter operates with an ion current of reduced intensity.  Ex. 1004 ¶¶103-104, 111-112.  PCT375 describes an identical experiment.  *Id.*, 8:36–9:4 ("The ion beam that leaves the devices is much less intense . . . .").

PCT375 also teaches filtering the range of ions at the auxiliary mass filter to a single mass-to-charge ratio or range, which would decrease the number of ions that reach the main mass filter, which corresponds to the claimed "primary resolving filter."  Ex. 1012, 8:12-20; Ex. 1004 ¶112.

### 5.    *PCT375 Anticipates Claim 25*

**[25Pre.] — selecting at the second mass filter for transmission on to the detector or output only the filtered ions, the second mass filter being disposed between the first mass filter and the detector or output.**

PCT375 discloses this limitation for the same reasons it discloses each limitation of Claim 1 and Element [13D].  *Id.*, Figure 2, 5:3–29, 8:5–8, 8:17–20; Ex. 1004 ¶94.

32

**Element [25A.] — emitting the ion beam from a beam source into a first mass filter,**

PCT375 discloses the limitation of Element [25A] for the same reasons it discloses Element [13A].  Ex. 1012, 8:9–23; Ex. 1004 ¶95.

**Element [25B.] — selecting at the first mass filter for transmission on to a second mass filter only ions having a range of mass/charge ratios which includes the mass/charge ratio of the filtered ions, the range being broader than the mass/charge ratio and narrower than the array of mass/charge ratios of the ion beam, and**

PCT375 discloses the limitation of Element [25B] for the same reasons it discloses Element [13B].  Ex. 1012, 8:9–23; Ex. 1004 ¶96.

**Element [25C.] — selecting at the second mass filter for transmission on to the detector or output only the filtered ions, the second mass filter being disposed between the first mass filter and the detector or output.**

PCT375 discloses the limitation of Element [25C] for the same reasons it discloses Element [13C].  *Id.*; Ex. 1004 ¶96.

### 6.    *PCT375 Anticipates Many Dependent Claims*

**Claim [2.] — An apparatus according to claim 1, wherein the ions within the sub-range comprise 1%, or less, of the ions within the beam.**

**Claim [3.] — An apparatus according to claim 1, wherein the ions within the sub-range comprise 0.01%, or less, of the ions within the beam.**

33

**Claim [14.] — A method according to claim 13, wherein the ions within the sub-range comprise 1%, or less, of the ions within the beam.**

**Claim [15.] — A method according to claim 13, wherein the ions within the sub-range comprise 0.01%, or less, of the ions within the beam.**

**Claim [20.] — A method according to claim 18, wherein the ions within the sub-range comprise 1%, or less, of the ions within the beam.**

**Claim [21.] — A method according to claim 18, wherein the ions within the sub-range comprise 0.01%, or less, of the ions within the beam.**

**Claim [26.] — A method according to claim 25, wherein the ions within the range comprise 1%, or less, of the ions within the beam.**

**Claim [27.] — A method according to claim 25, wherein the ions within the range comprise 0.01%, or less, of the ions within the beam.**

**Claim [29.] — A method according to claim 28, wherein the ions within the sub-range comprise 1%, or less, of the ions within the beam.**

**Claim [30.] — A method according to claim 28, wherein the ions within the sub-range comprise 0.01%, or less, of the ions within the beam.**

**Claim [33.] — A method according to claim 32, wherein the ions within the sub-range comprise 1%, or less, of the ions within the beam.**

**Claim [34.] — A method according to claim 32, wherein the ions within the sub-range comprise 0.01%, or less, of the ions within the beam.**

Each of the dependent claims listed here requires that the ions within the sub-range comprise 1% or less, or 0.01% or less, of the ions within the beam.

Ordinarily most of the ions that are produced in a mass spectrometer consist of the

plasma gas, not the sample. *Id.*, 1:37–2:4. Necessarily then, as explained in

PCT375, "the most abundant ions in the plasma beam are rejected by the mass

selective device." *Id.*, 9:7–11. Dr. Yost concurs, emphasizing that the actual ratio

of sample to plasma ions in any particular experiment would depend on the sample

used, as well as the sub-range selected by the user. Ex. 1004 ¶¶69-71. However,

Dr. Yost attests that the selection of a sub-range of a single m/z would result in

ions within the sub-range comprising less than 0.01% of the ions in the beam. *Id.*

Furthermore, PCT375 discloses synchronously scanning the auxiliary mass

filter across a specific mass-to-charge ratio. Ex. 1012, 8:36–9:6; Ex. 1004 ¶70. A

POSA would understand that when scanning through various particular mass-to-

charge ratios, some will have effectively no ions present, which means that the

percentage of the ions within the beam that are in the sub-range would be

effectively zero. Ex. 1004 ¶70.

**Claim [4.] — An apparatus according to claim 1, wherein each filter stage
comprises a multi-pole analyzer.**

**Claim [5.] — An apparatus according to claim 4, wherein each filter stage
comprises rods in a quadrupole arrangement**

PCT375 explains that each of the filter stages is preferably a quadrupole

arrangement, which is a multipole analyzer.  Ex. 1012, 8:5–16; Ex. 1004 ¶¶72-73.

**Claim [8.] — An apparatus according to claim 1, further comprising a scanner for controlling the second filter stage so that the mass/charge ratio of transmitted ions is scanned over a scanned range to provide a mass spectrum.**

**Claim [9.] — An apparatus according to claim 8, wherein the scanner is arranged to control also the first filter stage so that a center point of the sub-range of mass/charge ratios transmitted by said first filter stage substantially tracks the scanned mass/charge ratio transmitted by the second filter stage.**

**Claim [19.] — A method according to claim 18, further comprising controlling the mass/charge of ions selected by the first filter stage so that a center point of the sub-range of mass/charge ratios selected by said first filter stage substantially tracks the selected mass/charge ratio during scanning of the selected mass/charge ratio by the second filter stage.**

**Claim [38.] — An apparatus according to claim 1, further comprising a scanner configured to scan the first filter stage and the second filter stage together to provide a mass spectrum.**

**Claim [41.] — An apparatus according to claim 8, wherein the scanned range is the sub-range.**

**Claim [43.] — A method according to claim 13, further comprising:  scanning the first mass filter stage and the second mass filter stage together to provide a mass spectrum.**

**Claim [46.] — A method according to claim 13, further comprising:  scanning the second mass filter stage over a scanned range to provide a mass spectrum, wherein the scanned range is the sub-range.**

**Claim [48.] — A method according to claim 18, wherein the first mass filter stage and the second mass filter stage are scanned together to provide the mass spectrum.**

**Claim [51.] — A method according to claim 18, wherein the scanned range is the sub-range.**

**Claim [53.] — A method according to claim 25, further comprising:  scanning the first mass filter and the second mass filter together to provide a mass spectrum.**

**Claim [56.] — A method according to claim 25, further comprising:  scanning the second mass filter over a scanned range to provide a mass spectrum, wherein the scanned range is the range.**

**Claim [58.] — A method according to claim 28, further comprising:  scanning the first mass filter stage and the second mass filter stage together to provide a mass spectrum.**

**Claim [61.] — A method according to claim 28, further comprising:  scanning the second mass filter stage over a scanned range to provide a mass spectrum, wherein the scanned range is the sub-range.**

**Claim [63.] — The method of claim 32, wherein the first mass filter stage and the second mass filter stage are scanned together to provide a mass spectrum.**

**Claim [66.] — The method of claim 32, further comprising:  scanning the second mass filter stage over a scanned range to provide a mass spectrum, wherein the scanned range is the sub-range.**

PCT375 discloses scanning the two filter stages (the "auxiliary mass filter" and the "main mass filter") synchronously, such that the same m/e is being filtered at each stage. *Id.*, 8:37–9:6; Ex. 1004 ¶¶74-75. The result of the synchronous scan is a mass spectrum. *Id.*; Ex. 1004 ¶¶74-75. The total range scanned for each of the two filters is the same, comprising the entire sub-range. *Id.*; Ex. 1004 ¶¶74-75. Furthermore, as the total range scanned for the two filters is the same, the center of the scan ranges for the two mass filters is substantially the same. *Id.*; Ex. 1004 ¶¶74-75. This method would necessarily mean that the center point of the sub-range of mass/charge ratios selected by said first filter stage would substantially track the selected mass/charge ratio during scanning. Ex. 1004 ¶91. Thus, each of the claims set forth above is disclosed in PCT375. Ex. 1004 ¶¶74-75, 91, 116-127.

**Claim [10.] — An apparatus according to claim 1, wherein the first filter stage is arranged off axis with respect to the second filter stage.**

PCT375 discloses that the axis of the mass analyzing means (which corresponds to the claimed second filter stage) is preferably offset from the first axis (which corresponds to the claimed first filter stage). *Id.*, 9:20–23; Ex. 1004 ¶76. In particular, PCT375 discloses that the first axis is the ion beam at element 9 in Figure 2 (annotation added), which continues through the first and second

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

evacuated chambers (6 and 20).  The second axis, 36, is along the mass analyzing

means 37 in chamber 33.  *Id.*, 16:32–35.



Fig.2.

**Claim [12.] — Mass spectrometer comprising a mass filter apparatus according to claim 1.**

PCT375 discloses that the two-stage mass filter apparatus described in the

independent claims above is incorporated into a mass spectrometer.  *Id.*, 1:6–14,

5:1–25; Ex. 1004 ¶77.

**Claims [31.] — A method according to claim 28, wherein the first and second filter stages operate at pressures below $10^{-3}$ torr.**

**Claim [35.] — A method according to claim 32, wherein the first and second filter stages operate at pressures below $10^{-3}$ torr.**

PCT375 discloses maintaining the first evacuated chamber at a pressure of

$10^{-2}$ to $10^{-4}$ mbar, which is $10^{-2}$ to $10^{-4}$ torr. *Id.*, 5:30–32; 11:5–10; Ex. 1004 ¶¶107,

115.  PCT375 discloses maintaining the third evacuated chamber 33 at a pressure

"less than $10^{-4}$ mbar, typically about $10^{-6}$ mbar." *Id.*, 14:25–31; Ex. 1004 ¶¶107,

115.

### F.    GROUND 2:  PCT375 RENDERS OBVIOUS CLAIM 11

**Claim [11.] — An apparatus according to claim 10, wherein the longitudinal
axis of the first filter stage is arranged to intersect with the
longitudinal axis of the second filter stage substantially at the end
of the second filter stage nearest to the first filter stage.**

Figures 1 and 2 of PCT375 together teach a mass filter apparatus "wherein

the longitudinal axis of the first filter stage [an ion optical device (17)] is arranged

to intersect with the longitudinal axis of the second filter stage [mass analyzer (37)]

substantially at the end of the second filter stage nearest to the first filter stage."

*Id.*, Figures 1 and 2; Ex. 1004 ¶¶128-130.

Specifically, PCT375 describes a prior art ICP mass spectrometer in

Figure 1. *Id.*, 10:11–30; Ex. 1004 ¶¶128-130.  In this earlier mass spectrometer,

the ion optical device (17) is a lens stack in one evacuated chamber (60), and the

mass analyzer (37) is in a separate evacuated chamber (33). *Id.*  As shown in

Figure 1, the longitudinal axis of the ion optical device intersects with the

longitudinal axis of the mass analyzer substantially at the end of the mass analyzer

nearest to the ion optical device. *Id.*; Ex. 1004 ¶¶128-130.

Fig.1.



PCT375 also describes an embodiment of the present invention in Figure 2.

*Id.*, 10:31–33, Figure 2 (annotations added); Ex. 1004 ¶¶128-130.  It states that in

this embodiment, the evacuated chamber (60) of the prior art is divided into two

chambers, the first evacuated chamber (6) and a second evacuated chamber (20).

*Id.*, 11:3–5.  The ion optical device (17) is the first filter stage in the first evacuated

chamber.  *Id.* at 12:8–9.  The mass analyzer (37) is the second filter stage in the

third evacuated chamber (33).  *Id.*

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*



Fig.2.

As explained above regarding Claim 10, PCT375 further states that preferably the second axis of the mass analyzer is offset from the first axis of the ion source (1) and the ion optical device (17). *Id.*, 9:20–21.  Based on this teaching and the two mass spectrometers in Figures 1 and 2, a POSA would have understood that one way for the two axes to be offset from each other is for the longitudinal axis of the first filter stage (the ion optical device) to intersect the longitudinal axis of the second filter stage (the mass analyzer).  Ex. 1004 ¶¶128-130.  A POSA would also have at once envisaged that the intersection could be placed substantially at the end of the second filter stage (the mass analyzer) nearest to the first filter stage (the ion optical device).  *Id.*

42

### G.   GROUND 3:  TANNER ANTICIPATES CLAIMS 1, 4–6, 8–9, 12–13, 16, 18–19, 22, 24–25, 28, 31–32, 35, 38–41, 43–46, 48–51, 53–56, 58–61, 63–66 UNDER § 102(B)

Tanner (Ex. 1006) was published in 1999 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶21.  Tanner was not submitted or discussed during the prosecution and the reissue proceeding.

As detailed below, Tanner discloses an ICP mass spectrometer with two quadrupoles in tandem.  Ex. 1006, 1086-87; Ex. 1004 ¶131.  The first quadrupole is a bandpass filter,[2] and the second quadrupole is a mass analyzer.  *Id.*; Ex. 1004 ¶131.  Tanner further discloses vacuum pumps for their respective chambers.  *Id.*; Ex. 1004 ¶131.  As explained in Section XI.B, Tanner discloses all the structural limitations of apparatus Claim 1 and many of its dependent claims.  *Id.*

Tanner states that "the basic configuration of these instruments has been described previously" in Baranov (Ex. 1011).  *Id.*, 1087.  For illustration purposes

---

[2]  A mass filter that allows transmission of ions above a specified m/z ratio is commonly referred to a "highpass filter," passing all ions higher than the set value.  Similarly, a quadrupole used as a "lowpass filter" transmits all ions lower than a high m/z threshold.  Ex. 1004 ¶131 n.4. A "bandpass filter" transmits ions in a range, or band, spanning between high and low m/z cutoff values.  *Id.*

only, a schematic of the instrumental configuration from Figure 11 of Baranov is

shown below.  Ex. 1011, 1139; Fig. 11 (annotations added).



**Fig. 11** Schematic of the instrumental configuration. The dynamic reaction cell (DRC) is described in the text. The dashed line indicates a remotely manipulated mechanism which vents the DRC into the high vacuum chamber when reaction gas is not required.

Moreover, as explained in Section XI.C, Tanner's instrument performs the

methods of claims 13, 18, 25, 28, and 32 during normal operation.  Ex. 1004 ¶133.

Thus, Tanner anticipates these claims and many of their respective dependent

claims.

### 1.    *Tanner Anticipates Claim 1*

**[1Pre.]** — Although the preamble is nonlimiting (*see* Section XI.D), Tanner nevertheless discloses a mass filter apparatus that fulfills the recited purpose of filtering a beam of ions in a range of m/z ratios. *Id.*, 1085; Ex. 1004 ¶134.

Moreover, as discussed in Section XI.B., claim 1 is an apparatus claim reciting a manner of operation. And Tanner discloses an apparatus that meets all the structural limitations of claim 1 and is capable of operating as described. *Id.*, 1088; Ex. 1004 ¶135.

**Element [1A.]** — Tanner discloses an ion beam source, namely an inductively coupled plasma ion source. *Id.*, 1083; Ex. 1004 ¶136.

**Element [1B.]** — Tanner discloses two quadrupoles as the first and second mass filter stages in series. *Id.*, 1086; Ex. 1004 ¶137. The first mass filter stage is a mass filter stage, capable of operating in a bandpass mode which selects ions in a range of mass-to-charge ratios. *Id.*, 1083 (abstract), 1086; Ex. 1004 ¶137. The second mass filter stage is a "mass analyzer quadrupole." *Id.,* 1087; Ex. 1004 ¶137. Tanner discloses operating each filter stage at an operating pressure below $10^{-3}$ torr. *Id.* ("operating in the low $10^{-5}$ torr range").

45

**Element [1C.]** — Tanner discloses that "the quadrupole reaction cell offers the potential to define a mass bandpass window"; *i.e.*, it is configured to select only ions having a sub-range of m/z values between high and low m/z cutoff values. *Id.*, 1085; Ex. 1004 ¶138.  Tanner discloses two types of bandpass filters: a fixed bandpass filter and a dynamic bandpass filter.  *Id.*, 1086; Ex. 1004 ¶138.

In Tables 1 and 2, Tanner discloses experiments in which the bandpass filter selects ions having a sub-range of m/z ratios that includes a selected mass/charge ratio of an analyte ion.  *Id.*, 1089–90; Ex. 1004 ¶139.

**Element [1D.]** — As discussed above in Elements [1B.] and [1C.], Tanner discloses that the quadrupole mass filter as the second mass filter stage is configured to select only ions of the said mass/charge ratio.  Tanner discusses the "mass of the ion being analyzed in the downstream mass filter" and "the analyte mass being passed through the downstream mass filter."  *Id.*, 1086, 1091; Ex. 1004 ¶140.

46

### 2.    *Tanner Anticipates Claim 13*

**[13Pre.]** — Although the preamble is nonlimiting (*see* Section XI.D),

Tanner nevertheless discloses a method of filtering a beam of ions in the

experiment described for Figure 2.  *Id.*, 1088, Tables 1-2; Ex. 1004 ¶147.

**Element [13A.]** — In Figure 2 experiment, a sample containing 18 trace

elements is introduced to the ion source, which emits an ion beam into the

bandpass reaction cell as the first mass filter stage.  *Id.*, 1088; Ex. 1004 ¶148.

**Element [13B.]** — In Figure 2 experiment, Tanner sets the bandpass

reaction cell such that only ions having a sub-range of mass/charge ratios are

transmitted.  *Id.*, Figure 2 (caption); Ex. 1004 ¶149.  This sub-range of m/z ratios

includes the "selected mass/charge ratio" of each of the 18 trace elements in the

sample.  *Id.*, Tables 1-2; Ex. 1004 ¶149.  As Dr. Yost explains, in Tanner Figure 2

experiment, the quadrupole is operated in the bandpass filter mode, with RF and

DC voltages that place the ion of interest (*i.e.*, the ion synchronously scanned in

the following quadrupole mass filter, $m_{set}$) at Mathieu parameters of a = 0.005, q =

0.11.  *Id.*, Figure 2 (caption); Ex. 1004 ¶149.  Thus, there is a lower m/z limit (low

mass cut-off or "LMCO") as well as an upper m/z limit (high mass cut-off or

"HMCO"). *Id.* For $^{11}$B, for instance, the range of stable m/z values would be from ~m/z 2 to 20; for $^{208}$Pb, the range of stable m/z values would be from ~m/z 28 to 375. *Id.*

**Element [13C.]** — Tanner sets the quadrupole mass analyzer to select only ions having a specific m/z ratio of each of the 18 trace elements. Ex. 1006, Tables 1-2, Figure 2; Ex. 1004 ¶150.

**Element [13D.]** — The operating pressures of first and second mass filter stages are "below $10^{-3}$ torr" or roughly $10^{-5}$ torr. *Id.*, 1088 ("[the spectra] were obtained with the dynamic reaction cell vented to the high vacuum chamber and without addition of reaction gas (cell pressure ~2 x $10^{-5}$ torr)"), Tables 1-2; Ex. 1004 ¶151.

### 3.   *Tanner Anticipates Claim 18*

**[18Pre.]** — Although the preamble is nonlimiting (see Section XI.D), Tanner nevertheless discloses a method for producing a mass spectrum of an ion beam in Figure 2 experiment. *Id.*, 1088, Tables 1-2; Ex. 1004 ¶153.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

**Elements [18A.], [18B.], [18C.], [18F.]** — These claim elements are substantively identical to Elements [13A.]-[13D.] and are thus disclosed in Tanner for the reasons above. *Id.*, 1088, Tables 1-2; Ex. 1004 ¶¶154-159.

**Element [18D.]** —  As discussed above in Element [13C.], Tanner sets the quadrupole mass analyzer to scan at each specific m/z ratio of the 18 trace elements over a scanned range. *Id.*, 1087, Tables 1-2; Ex. 1004 ¶157.

**Element [18E.]** — Tanner detects the ions selected by the quadrupole at each of the m/z ratios. *Id.*, 1090; Ex. 1004 ¶158.

### 4.    *Tanner Anticipates Claim 25*

[**25Pre.]** — Tanner discloses this limitation for the same reasons it discloses each limitation of Claim 1 and Element [13D.]. *Id.*, 1088, Tables 1-2; Ex. 1004 ¶¶163-164.  Tanner discloses the limitation of Element [25A.] for the same reasons it discloses Element [13A.]. *Id.*; Ex. 1004 ¶165.  Tanner discloses the limitation of Element [25B.] for the same reasons it discloses Element [13B.]. *Id.*, 1085; Ex. 1004 ¶166.  Tanner discloses the limitation of Element [25C.] for the same reasons it discloses [13C.]. *Id.*, 1088, Tables 1-2; Ex. 1004 ¶167.

49

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

### 5.   *Tanner Anticipates Claims 28 and 32*

**[28Pre.], [32Pre.]** — Tanner anticipates Claims 28 and 32 based on the same disclosures, and so the two are addressed simultaneously.  Although the preamble is nonlimiting (*see* Section XI.D), Tanner nevertheless discloses methods that fulfill the recited purposes in these claims.  Ex. 1004 ¶¶168, 178.

**Elements [28A.], [32A.]** — Tanner discloses emitting an ion beam into a first mass filter stage in series with a second mass filter stage.  *Id.*, 1084–85; Ex. 1004 ¶¶169, 179.  In the experiments described therein, Tanner introduces samples into an ICP mass spectrometer having a bandpass filter and a quadrupole mass filter.  *Id.*, 1088 ("a 1-ppb mixed analyte sample"); Ex. 1004 ¶¶169, 179.  Tanner further discloses that the ion beam contains ions within a range of mass/charge ratios.  *Id.*, 1084–85 ("impurity gas"), Tables 1-2; Ex. 1004 ¶¶169, 179.

**Elements [28B.], [32B.]** — For the same reasons Tanner discloses Element [1C.], it discloses a sub-range at the first filter that is broader than the range and further discloses the second filter having a selected ratio within that sub-range.  *Id.*, 1085–86, 1089–90.

50

The Tanner Figure 2 experiment discloses this limitation for the same reasons as Element [13B.].  Ex. 1004 ¶¶170, 180.

The Tanner Figure 6 experiment sets the reaction cell's bandpass to be between 30 and 86 amu, and mass analyzes analyte ions having mass/charge ratios of 39, 40, 48, 52, 55, 56, 58, 60, 63, 65, 64, and 66, respectively, at the quadrupole mass filter.  *Id.*, 1091–92, Tables 1-2; Ex. 1004 ¶¶171, 181.

The Tanner Figure 8b experiment sets the reaction cell's bandpass to be between 19 and 55 amu, and mass analyzes analyte ions having a mass/charge ratio of 27 at the mass filter.  *Id.*, 1092–93, Tables 1-2; Ex. 1004 ¶¶172, 182.

The Tanner Figure 9 experiment sets the reaction cell's bandpass to be between 6–16 amu, and mass analyzes analyte ions having mass/charge ratios of 6 and 7 amu, respectively, at the mass filter.  *Id.*, 1093, Tables 1-2; Ex. 1004 ¶¶173, 183.

**Elements [28C.], [32C.]** — In the experiments described in Elements [28B.] and [32B.], the quadrupole mass filter as the primary resolving filter receives ions

within the transmission bandpass of the reaction cell. *Id.*, 1091–93, Tables 1-2; Ex. 1004 ¶¶174, 184.

**Elements [28D.], [28E.], [32D.], [32E.]** — In the experiments described in Elements [28B.] and [32B.], the quadrupole mass filter selects analyte ions having a particular mass/charge ratio within the transmission bandpass of the reaction cell. *Id.*, Tables 1-2; Ex. 1004 ¶¶175, 185.  Because the reaction cell filters out ions having m/z ratios outside of its transmission bandpass, the downstream quadrupole mass filter operates with a reduced number of ions (*i.e.,* a reduced ion beam current).  Ex. 1004 ¶¶176, 186.

### 6. *Tanner Anticipates Many Dependent Claims*

**Claims [4.], [5.], [6.], [16.], [22.]** — Tanner discloses a quadrupole bandpass reaction cell as the first mass filter stage, and a quadrupole mass analyzer as the second mass filter stage. *Id.*, 1086–87; Ex. 1004 ¶¶141-142.  Each of these quadrupoles has a DC and an AC voltage supply for applying driver voltages to the rods. *Id.*; Ex. 1004 ¶¶143, 152, 161.

**Claims [8.], [9.], [19.], [24.], [38.]** — In Tanner's dynamic bandpass cell instrument, "a center point of the sub-range of mass/charge ratios selected by said

first filter stage [the center point of the bandpass of the dynamic reaction cell]

substantially tracks the selected mass/charge ratio during scanning of the selected

mass/charge ratio by the second filter stage ['the mass bandpass window of the

[dynamic reaction cell] was dynamically adjusted with the reference **q** and **a**

defined for the mass being transmitted through the mass filter']." *Id.*, 1087; Ex.

1004 ¶145.  A POSA would have understood that Tanner discloses a scanner for

controlling the two filter stages as described in Claims 8, 9, 24, and 38.  Ex. 1004

¶¶144-145, 162, 188.

**Claim [12.]** — Tanner discloses a mass spectrometer comprising a two-

stage mass filter apparatus.  *Id.*; Ex. 1004 ¶146.

**Claims [31.], [35.]** — Tanner discloses the limitations of these claims for

the same reasons as it discloses Element [13D.].  *Id.*, 1088, Tables 1-2; Ex. 1004

¶¶177, 187.

**Claims [39.], [43.], [44.], [48.], [49.], [53.], [54.], [58.], [59.], [63.], [64.]** —

With the dynamic reaction cell, Tanner discloses a method in which the first mass

filter stage and the second mass filter stage are scanned together to provide a mass

spectrum, and the scan is stepped from transmission peak to another peak (also

53

called a jump scan).  *Id.*, 1087 ("The bandpass is adjusted on a per element basis;

that is, a value of **q** and of **a** is defined for each analyte in the peak hopping mode

and the bandpass is adjusted prior to measurement of each signal."); Ex. 1004

¶¶189-192, 195-196, 199-200, 203-204, 207-208.

**Claims [40.], [41.], [45.], [46.], [50.], [51.], [55.], [56.], [60.], [61.], [65.],**

**[66.]** — Tanner discloses a method wherein the scan is a smooth scan and the

scanned range is the sub-range.  *Id.*, 1086 ("the mass analyzer scanned through the

bandpass of the reaction cell"); Figure 2 (showing a smooth scan across mass-to-

charge ratios); Ex. 1004 ¶¶190, 193-194, 197-198, 201-202, 205-206, 209-210.

### H.  GROUND 4:  DOUGLAS IN COMBINATION WITH TANNER RENDERS OBVIOUS CLAIMS 1-6, 8-9, 12-16, 18-22, AND 24-66 UNDER § 103

Douglas (Ex. 1007) qualifies as prior art under 35 U.S.C. § 102(b) because it

was published on February 20, 2001.  The '553 Patent specification states that

Douglas "teaches a spectrometer comprising two filters operating with similar

mass resolution to improve the resolution of the whole device."  Ex. 1001, 2:43–

48.

During the prosecution of the '788 Patent, the applicant admitted that "Douglas teaches an apparatus having two mass filters arranged in series."  Ex. 1002, 11.  The applicant argued that in Douglas, however, "both filters pass essentially the same range of mass/charge ratios (*i.e.*, at the same resolution), but typically with a mass offset between them."  *Id.*  But that is wrong.

Douglas teaches a mass spectrometer with two quadrupoles, wherein each is operated in mass analyzing mode.  Ex. 1007, 2:65–67; Ex. 1004 ¶212.  Figure 7a of Douglas shows an embodiment of a double-quadrupole apparatus, which is reproduced below.  *Id.*, 5:35–38, Figure 7a (annotations added); Ex. 1004 ¶212.



**FIG. 7a**

Douglas teaches that the two quadrupoles operate in tandem and mass select ions with the same m/z ratio.  *Id.*, 9:13–17; Ex. 1004 ¶213.  Their two peak shapes

can then be combined to give a single, enhanced, higher resolution peak. *Id.*; Ex. 1004 ¶213. The two quadrupoles can be scanned with no mass shift or offset between them, or with a mass offset between them. *Id.*, 12:2–6, 11:44–47, Figures 11C and 12D; Ex. 1004 ¶213.

Douglas teaches that each quadrupole may operate at the same constant resolution. *Id.*, 13:15–16; Ex. 1004 ¶214. Significantly, Douglas also teaches that the two quadrupoles may just as easily operate at different resolutions. *Id.* at 13:25–27; Ex. 1004 ¶214.

### 1. *Douglas in Combination with Tanner Renders Obvious Claim 1*

**[1Pre.]** — Although the preamble is nonlimiting (*see* Section XI.D), Douglas nevertheless teaches a mass filter apparatus that fulfills the recited purpose of filtering a beam of ions in a range of m/z ratios. *Id.*, 12:2–6, 11:44-47; Ex. 1004 ¶¶217-218.

As discussed in Section XI.B., Claim 1 is an apparatus claim reciting a manner of operation. *Id.* Douglas discloses an apparatus that meets all the

structural limitations of Claim 1 and is capable of operating as described.  Ex. 1004 ¶217.

**Element [1A.]** — Douglas teaches "an inductively coupled plasma source" as an ion beam source for emitting the ion beam.  *Id.*, 13:43.; Ex. 1004 ¶219.

**Element [1B.]** — Douglas teaches two quadrupoles in tandem as the first and second mass filter stages in series.  *Id.*, 2:65–67; Ex. 1004 ¶220.  Douglas also teaches that quadrupoles typically "require pressures as low as $10^{-5}$ torr," *id.*, 18:44–45, and the mass filter apparatus described therein may operate at "a pressure of $2 \times 10^{[-4]}$ Torr, *i.e.*, a factor of 10 higher than is conventional or common."  *Id.* at 20:48–50; Ex. 1004 ¶220.

**Elements [1C.], [1D.]** — Douglas teaches two quadrupoles in series that are capable of operating in the manner described in Elements [1C.] and [1D.].  Ex. 1004 ¶221.  Douglas also teaches that the two quadrupoles mass select ions with the same m/z ratio.  *Id.*, 9:13–17; Ex. 1004 ¶221.  To do so, they may operate at different resolutions at the same tip of a given stability region.  *Id.*, 13:25–27; Ex. 1004 ¶221.  In other words, the first quadrupole may operate at a lower resolution (*i.e.*, to select ions having a sub-range of m/z ratios that includes the selected m/z

ratio) as described in Element [1C.], and the second quadrupole may operate at a

higher resolution (*i.e.*, to select only ions of the selected m/z ratio) as described in

Element [1D]. *Id.*; Ex. 1004 ¶221.

To the extent that the Board finds that Douglas does not teach Elements

[1C.] and [1D.], a POSA would have been motivated to operate the two mass filter

stages as described in Elements [1C.] and [1D.] in light of Tanner's teaching.

### 2.     *Motivation to Combine Douglas and Tanner*

As discussed in Ground 3, Tanner is directed to improving the detection of

ICP-MS using two mass filter stages.  Specifically, Tanner teaches the first mass

filter stage is a bandpass reaction cell, and the second mass filter stage is a

conventional quadrupole mass analyzer.  Ex. 1006, 1088, Tables 1-2; Ex. 1004

¶215.  Tanner teaches that a bandpass filter as the first filter stage eliminates

interfering ions and prevents the formation of new interfering ions before the ion

beam enters into the second mass analyzing stage.  *Id.*, 1086; Ex. 1004 ¶215.

Douglas is also directed to using two filter stages to improve the resolution

of ICP-MS.  Douglas discusses that the two filter stages may be in different

resolution at the same tip of a given stability region.  Ex. 1007, 13:25–27; Ex. 1004

¶216.  A POSA would have understood Douglas's teaching to mean that the first filter stage may be a bandpass filter (*i.e.*, at a lower resolution), and the second filter stage may be a conventional mass analyzer (*i.e.*, at a higher resolution).  Ex. 1004 ¶216.  In view of Tanner, a POSA would have been motivated to operate Douglas's instrument in a manner taught by Tanner—*i.e.*, having a bandpass filter as the first filter stage and a conventional mass analyzer as the second filter stage—to improve the resolution of ICP-MS.  Ex. 1004 ¶216.

### 3.    *Douglas in Combination with Tanner Renders Obvious Several Additional Independent Claims*

**Claim [13.], [18.], [25.], [28.], [32.]** — Douglas teaches experiments using an ICP source with two mass filter stages.  Ex. 1007, 13:35–15:55.  However, Douglas does not explicitly disclose an experiment with a first filter stage selecting ions having a sub-range of m/z ratios that includes a selected m/z ratio, and a second filter stage selecting ions having the selected m/z ratio in manners described in these claims.

As explained in Ground 3, Tanner teaches various methods of operating the two filter stages in manners as described in these claims.  Ex. 1006, 1086–87, Tables 1-2.  And as discussed in this Ground for Claim 1, in view of Tanner, a

POSA would have been motivated to operate the two filter stages in Douglas's instrument as described in these claims.  These methods are normal operations of a double-quadrupole mass spectrometer, as set forth in Section XI.C., and as shown by Tanner.

### 4.    *Douglas in Combination with Tanner Renders Obvious Claim 13*

**[13Pre.]** — Although the preamble is nonlimiting (*see* Section XI.D.), Douglas nevertheless teaches a method for filtering a beam of ions.  Ex. 1004 ¶234.

**Element [13A.]** — Douglas teaches emitting an ion beam containing $Co^+$ ions (m/z =59) into a first mass filter stage in series with a second mass filter stage.  Ex. 1007, 13:43–49 ("two quadrupoles operated in tandem"); Ex. 1004 ¶235.

**Elements [13B.]-[13C.]** — As described above in Ground 3 for Elements [13B.] and [13C.], Tanner teaches these two mass filter stages.  Ex. 1006, 1086–87.  A POSA would have been motivated to carry out Tanner's mass analysis on Douglas's instrument for the same reasons set forth above regarding Claim 1.  Ex. 1004 ¶236.

**Element [13D.]** — Douglas also teaches operating the first and second filter stages at pressures below $10^{-3}$ torr.  Ex. 1007, 18:44–45, 20:48–50; Ex. 1004 ¶237.

### 5.    *Douglas in Combination with Tanner Renders Obvious Claim 18*

**[18Pre.]** — Although the preamble is nonlimiting (*supra*, Section XI.D.), Douglas nevertheless teaches a method for producing a mass spectrum of an ion beam.  Ex. 1004 ¶241.

**Element [18A.]** — Douglas teaches emitting an ion beam containing $Co^+$ ions (m/z =59) into a first mass filter stage in series with a second mass filter stage. *Id.*, 13:43–49 ("two quadrupoles operated in tandem"); Ex. 1004 ¶242.

**Elements [18B.]-[18E.]** — As described above in Elements [18A.]-[18E.] in Ground 3, Tanner teaches such manner of operating these two mass filter stages. Ex. 1006, 1086–87; Ex. 1004 ¶243.  A POSA would have been motivated to carry out Tanner's mass analysis on Douglas's instrument for the same reasons set forth above regarding claim 1.

**Element [18F.]** — Douglas teaches this element for the same reasons it teaches Element [1B.].  Ex. 1004 ¶244.

### 6.   Douglas in Combination with Tanner Renders Obvious Claim 25

**[25Pre.]** — As discussed above in this Ground for Claim 1, Douglas teaches a mass spectrometer comprising an ion beam source for emitting the ion beam, a detector, and two mass filters disposed in series between the beam source and the detector (Ex. 1007, 3:17–18), the filters having the same operating pressures at or below $10^{-3}$ torr. *Id.*, 18:44–45, 20:48–50; Ex. 1004 ¶252.

**Element [25A.]** — Douglas teaches emitting an ion beam containing $Co^+$ ions (m/z =59) into a first mass filter stage in series with a second mass filter stage. *Id.*, 13:43–49 ("two quadrupoles operated in tandem"); Ex. 1004 ¶253.

**Elements [25B.]-[25C.]** — As described above in Elements [25B.]-[25C.] in Ground 3, Tanner teaches such manner of operating these two mass filter stages. Ex. 1006, 1086–87, Tables 1-2; Ex. 1004 ¶254.  A POSA would have been motivated to carry out Tanner's mass analysis on Douglas's instrument for the same reasons set forth above regarding claim 1.  Ex. 1004 ¶254.

### 7.   *Douglas in Combination with Tanner Renders Obvious Claims 28 and 32*

**[28Pre.], [32Pre.]** — Although the preamble is nonlimiting (*supra*, Section XI.D.), Douglas's methods nonetheless are used in part for the recited purpose. Ex. 1004 ¶¶257, 263.

**Elements [28A.]-[32A.]** — Douglas teaches emitting an ion beam containing $Co^+$ ions (m/z =59) into a first mass filter stage in series with a second mass filter stage.  Ex. 1012, 13:43–49 ("two quadrupoles operated in tandem"); Ex. 1004 ¶¶258, 264.  It was well known in the art as of 2002 that an ion beam generated from an ICP source would contain ions within a range of m/z ratios.  Ex. 1004 ¶¶258, 264.

**Elements [28B.],[28E.], [32B.], [32E.]** — As described above in Elements [28B.]–[28E.] and [32B.]–[32E.] in Ground 3, Tanner teaches such manner of operating these two mass filter stages.  Ex. 1006, 1086–87, Tables 1-2; Ex. 1004 ¶¶259, 265.  A POSA would have been motivated to carry out Tanner's mass analysis on Douglas's instrument for the same reasons set forth above regarding claim 1.  Ex. 1004 ¶¶259, 265.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

### 8.   Douglas in Combination with Tanner Renders Obvious Dependent Claims on Certain Sub-Ranges

**Claims [2.], [14.], [20.], [26.], [29.], [33.]** — These claims variously describe that "the ions within the sub-range comprise 1%, or less, of the ions within the beam." In the vast majority of situations, this reduction in ions occurs naturally whenever a mass filter is applied to the ion beam. Ex. 1012, 1:37–2:4; Ex. 1004 ¶¶223-225, 238-239, 247-248, 266-267.

**Claims [3.], [15.], [21.], [27.], [30.], [34.]** — These claims variously describe that "the ions within the sub-range comprise 0.01%, or less, of the ions within the beam." Again, in the vast majority of situations, this reduction in ions occurs naturally whenever a mass filter is applied to the ion beam. Ex. 1012, 1:37–2:4; Ex. 1004 ¶¶223-225, 238-239, 247-248, 266-267.

Notably, the '553 Patent does not explicitly teach how to obtain sub-ranges of 1% or less, or 0.01% or less, for the first mass filter stage (the sacrificial filter). Instead, it gives an example on a range of RF/DC ratios for the sacrificial filter to obtain a desired filter resolution. Ex. 1001, 7:29–35 ("[W]ilter resolution can be controlled by varying the RF to DC voltage ratio. . . . The ratio for the sacrificial

64

filter should lie between −5.983 to −6.00 [for ions having amu = 115 as an example]."); Ex. 1004 ¶¶223-225.

Before May 2002, it was routine in the art to adjust the RF/DC ratio to control the bandpass of a quadrupole. Ex. 1004 ¶¶223-225. After reviewing Douglas and Tanner, a POSA would have understood that the first quadrupole disclosed in Douglas can normally operate in certain RF/DC ratios when a specific result is desired, such as transmitting 0.01% of ions within the beam. *Id.* Thus, as discussed above in Sections XI.B. and XI.C., Douglas and Tanner anticipate these apparatus and the method claims. At the very least, these claims are rendered obvious in light of the combined teachings of Douglas and Tanner on adjusting RF/DC ratios to achieve certain resolution. Ex. 1007, 7:18–8:58; Ex. 1006, 1085–16; Ex. 1004 ¶¶223-225.

### 9. *Douglas in Combination with Tanner Renders Obvious Other Dependent Claims*

**Claims [4.], [5.], [6.], [16.], [22.]** — Douglas teaches a quadrupole analyzer, which is a multi-pole analyzer, for each mass filter stage. Ex. 1007, 2:65–67; Ex. 1004 ¶¶226-228. Each of these quadrupoles has a DC voltage supply and an AC

voltage supply for applying driver voltages to the rods.  *Id.*, 3:9–14, 3:59–62; Ex. 1004 ¶¶228, 240, 249.

**Claims [8.], [9.], [19.], [24.], [38.]** — As explained above in Ground 3 for Claims 8, 9, 19, 24, and 38, Tanner teaches the use of a dynamic bandpass filter as the first filter stage, which teaches the elements of Claims 8, 9, 19, 24, and 38.  Ex. 1006, 1086–87, Tables 1-2; Ex. 1004 ¶¶229-232, 245-246, 250-251, 271-272.

Likewise, Douglas discloses scanning the two mass filter stages synchronously over the same mass range, which would result in the center point of the sub-range substantially tracking the selected mass/charge ratio during scanning. Ex. 1007, 6:5–38, Figures 14–16; Ex. 1004 ¶¶229-232.

**Claim [12.]** — Douglas teaches a mass spectrometer comprising a two-stage mass filter apparatus.  *Id.*, 1:7–10, 2:65–67; Ex. 1004 ¶233.

**Claims [31.], [35.]** — Douglas also teaches operating the first and second filter stages at pressures below $10^{-3}$ torr.  Ex. 1007, 18:44–45, 20:48–50; Ex. 1004 ¶¶262, 268.

**Claim [36]** — Douglas in combination with Tanner discloses the limitations of this claim for the same reasons as Elements [1C.] and [1D.]. *Id.*, 13:25–27, 9:13–17; Ex. 1006, 1086–87, Tables 1-2; Ex. 1004 ¶269.

**Claims [37.], [42.], [47.], [52.], [57.], [62.]** — Douglas teaches experiments in which the first and second quadrupoles operate at the same stability region. *Id.*, 5:31–34 (third stability region), 5:43–53 (third stability region), 6:5–52, 14:30–43; Ex. 1004 ¶¶270, 275.

**Claims [39.], [43.], [44.], [48.], [49.], [53.], [54.], [58.], [59.], [63.], [64.]** — As described in Ground 3 for these claims, using the dynamic bandpass reaction cell, Tanner teaches a method in which the first mass filter stage and the second mass filter stage are scanned together to provide a mass spectrum and the scan is stepped from transmission peak to another peak. Ex. 1006, 1086–87, Tables 1-2; Ex. 1004 ¶¶273, 276-278.

Likewise, Douglas discloses scanning the two mass filter stages synchronously over the same mass range to provide a mass spectrum. Ex. 1007, 6:5–38, Figures 14-16; Ex. 1004 ¶¶273, 276-278.

**Claims [40.], [41.], [45.], [46.], [50.], [51.], [55.], [56.], [60.], [61.], [65.], [66.]** — As described in Ground 3 for these claims, using a fixed bandpass reaction cell, Tanner teaches a method wherein the scan is a smooth scan and the scanned range is the sub-range.  Ex. 1006, 1086–87, Tables 1-2; Ex. 1004 ¶274.

I.    **GROUND 5: VANDERMEY IN COMBINATION WITH DOUGLAS AND TANNER RENDERS OBVIOUS CLAIMS 6–7, 16–17, 22–23, 37, 42, 47, 52, 57, AND 62**

U.S. Patent No. 6,340,814 ("Vandermey," Ex. 1013) was issued on January 22, 2002 and thus qualifies as prior art under § 102(a).

A POSA would have been motivated to combine the teaching in Tanner and Douglas with the teaching in Vandermey.  Ex. 1004 ¶306.  Vandermey, like Douglas and Tanner, teaches improvements in the operation of mass spectrometers with multiple mass analysis stages.  *Id.*  Specifically, Vandermey teaches the operation of two quadrupole mass analyzers in order to have greater resolution of ion signals.  Ex. 1013 at Abstract; Ex. 1004 ¶306.  Similarly, Tanner teaches improvement in the removal of interferences to improve the resolution of ion signals.  Ex. 1009 at 1:9–14; Ex. 1004 ¶306.  Vandermey is cited on the face of the '553 patent.

**Claims [6.], [16.], [22.]** — Tanner and Douglas render obvious Claims [1], [13], and [18] as described above. Vandermey teaches the use of two quadrupole filter stages, configured to select certain mass to charge ratios. Ex. 1013, 4:56–60. Each quadrupole has a DC voltage supply and an AC voltage supply for applying a driver voltage [an RF voltage is applied] to the rods of each filter stage. *Id.*, 3:9–25; Ex. 1004 ¶307.

**Claims [7.], [17.], [23.]** — Vandermey teaches that AC voltage supply is attached to one quadrupole filter stage, and that the two quadrupole filter stages are electronically coupled by an RF coupler. *Id.*, 1:53–57; 3:9–25; 6:5–18; Ex. 1004 ¶308. The RF coupler in this case is the RF driver circuit that couple the two quadrupole filter stages in a controlled manner. *Id.*, 1:53–57; Ex. 1004 ¶308.

**Claims [37.], [42.], [47.], [52.], [57.], [62.]** — Tanner and Douglas render obvious Claims 1, 13, 18, 25, 38, and 32 as described above. Vandermey teaches operation of the first and second mass filter stages in the same stable operating system, specifically, the third stability region as shown in Figure 2. Ex. 1013, 3:51–4:14, Figure 2; Ex. 1004 ¶313.

69

## J.     GROUND 6: SAITO ANTICIPATES CLAIMS 1, 4–6, 12, 28, 32, 57, AND 62.

Saito is a Japanese Patent Application Publication published in January 1997 (Ex. 1009, and Ex. 1010 (a certified translation)).  It thus qualifies as prior art under § 102(b).  It is not cited in the '553 Patent, and was not discussed during the prosecution and reissue proceeding.

Saito discloses a double-quadrupole mass spectrometer for isotopic analysis. Ex. 1010, ¶¶[0048-0057], Figure 7 (annotations added).  Ex. 1004 ¶315.  The first quadrupole operates as a bandpass filter, and the second quadrupole operates as a mass analyzer.  *Id.*, ¶¶[0049-0065]; Ex. 1004 ¶315.  Saito further discloses an experiment for determining the abundance ratio of $^{12}CO_2$ and $^{13}CO_2$ using this instrument.  *Id.*, ¶¶[0050-0065]; Ex. 1004 ¶315.



【図7】 **Figure 7**

### 1.    *Saito Anticipates Claim 1*

**[1Pre.]** — Although the preamble is nonlimiting (*see* Section XI.D.), Saito nevertheless discloses a mass filter apparatus that fulfills the recited purpose of filtering a beam of ions in a range of m/z ratios.  Ex. 1004 ¶316.

Moreover, as discussed in Section XI.B., Claim 1 is an apparatus claim reciting a manner of operation.  Saito discloses an apparatus that meets all the structural limitations of Claim 1 and is capable of operating as described.  Thus, Saito anticipates Claim 1.

**Element [1A.] —** Saito discloses "an ion beam source [an ionization device 4] for emitting the ion beam." *Id.*, ¶¶[0011], [0057], Figure 7; Ex. 1004 ¶317.

**Element [1B.]** — Saito discloses "first and second mass filter stages in series" because it discloses the "front stage filter 34" and the "rear stage filter 40" in series. *Id.*, ¶¶[0049], [0057]; Ex. 1004 ¶318.  Saito further discloses "a vacuum system pump 12 in Figure 7," which can be arranged to "maintain both the first and second filter stages at operating pressures below $10^{-3}$ torr." *Id.*; Ex. 1004 ¶318.

**Element [1C.] —** Saito discloses that "the first mass filter stage [the front stage filter 34] is configured to select for transmission onto the second filter stage [the rear stage filter 40] only ions having a sub-range of mass/charge ratios [$^{12}CO_2$ (mass number 44) and $^{13}CO_2$ (mass number 45)] which includes the selected mass/charge ratio [$^{13}CO_2$ (mass number 45)]." *Id.*, ¶¶[0050-0052], [0063-0065], Figure 6; Ex. 1004 ¶319.

**Element [1D.]** — Saito discloses that "the second mass filter stage [the second stage filter 40] is configured to select only ions of the said selected

72

mass/charge ratio [$^{13}CO_2$ (mass number 45)].” *Id.*, ¶¶[0050-0052], [0063-0065],

Figure 6; Ex. 1004 ¶320.

### 2.    *Saito Anticipates Claims 28 and 32*

**[28Pre.] and [32Pre.]** — Saito anticipates Claims [28.] and [32.] based on

the same disclosures, and so these two claims will be discussed together here.  To

the extent that the preambles of method Claims [28.] and [32.] are limiting (which

they are not), Saito's experiment is performed toward the same purposes to achieve

the same results.  Ex. 1004 ¶¶325-332.

In addition, Saito discloses Elements [28A.] and [32A.] for the same reasons

it discloses Element [1A.].  Ex. 1004 ¶¶325-332.  Saito discloses Elements [28B.],

[28C.], [32B.], [32C.] for the same reasons it discloses Elements [1B.] and [1C.].

Ex. 1004 ¶¶325-332.  Saito discloses Elements [28D.], [28E.], [32D.], and [32E.]

for the same reasons it discloses Element [1D.].  Ex. 1004 ¶¶325-332.

### 3.    *Saito Anticipates Several Dependent Claims*

**Claim [4.]** — Saito discloses that "each filter stage comprises a multi-pole

analyzer [quadrupole filter]." *Id.*, ¶¶[0028], [0049]; Ex. 1004 ¶321.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

**Claim [5.]** — Saito discloses that "each filter stage comprises rods in a quadrupole arrangement [quadrupole filter]." *Id.*; Ex. 1004 ¶322.

**Claim [6.]** — Saito discloses "a DC voltage supply [U1 for the first filter stage and U2 for the second filter stage] and an AC voltage supply [V1 for the first filter stage and V2 for the second filter stage] for applying driver voltages to rods of each filter stage." *Id.*, ¶¶[0050-0051]; Ex. 1004 ¶323.

**Claim [12.]** — Saito discloses every limitation of this claim for the same reasons as it discloses Claim [1.].

**Claims [57.], [62.]** — Saito discloses "operating the first and second mass filters stages in a same stable operating region [the first stability region as shown in Figure 6]." *Id.*, ¶¶[0050–0051], Figure 6; Ex. 1004 ¶¶333-334.

**K.    GROUND 7:  SAITO IN COMBINATION WITH DOUGLAS RENDERS OBVIOUS CLAIMS 1–6, 12–16, 18, 20–22, 25–38, 42–43, 47–48, 52–53, 57–58, AND 62–63 UNDER § 103**

A POSA would have viewed Saito in combination with Douglas as teaching each element of claims 1–6, 12–16, 18, 20–22, 25–38, 42–43, 47–48, 52–53, 57–58, and 62–63.

74

### 1. *Motivation to Combine Saito and Douglas*

A POSA would have been motivated to combine the teaching in Douglas with Saito.  Ex. 1004 ¶¶336-337.  As discussed in Ground 4, Douglas teaches the use of two filter stages to improve the resolution of ICP-MS.  Douglas discusses that the two filter stages may be at different resolutions.  Ex. 1007, 13:25–27.  A POSA would have understood Douglas's teaching to mean that the first filter stage may be a bandpass filter (*i.e.*, at a lower resolution), and the second filter stage may be a conventional mass analyzer (*i.e.*, at a higher resolution), similar to the teaching in Saito.  Ex. 1004 ¶¶336-337.

Douglas improves Saito by teaching that the double-quadrupole instrument can be operated at the conventional pressure of $2 \times 10^{-5}$ torr for quadrupoles or at a slightly higher pressure.  Ex. 1007, 18:38–45; Ex. 1004 ¶¶336-337.  Specifically, Douglas teaches that the quadrupoles may be able to operate at a pressure of $2 \times 10^{-4}$ torr, a factor of 10 higher than the conventional pressure.  *Id.*, 20:46–50; Ex. 1004 ¶¶336-337.  Accordingly, lower speed and lower cost vacuum pumps can be used with these instruments.  *Id.*, 18:47–50; Ex. 1004 ¶¶336-337.  Thus, a POSA

would have been motivated to use the teaching in Douglas to operate Saito's

instrument at a pressure of $10^{-4}$ or $10^{-5}$ torr.  Ex. 1004 ¶¶336-337.

### 2.    Claim 1

As explained in Ground 6, Saito discloses every limitation of apparatus

Claim 1.  To the extent that Patent-Owner argues that Saito does not disclose a

vacuum system arranged to maintain operating pressures below $10^{-3}$ torr in Element

[1B.], Douglas teaches this limitation.  As discussed above, in view of Douglas's

teaching, a POSA would have been motivated to operate Saito's vacuum system to

maintain a pressure of $10^{-4}$ or $10^{-5}$ torr.  Ex. 1004 ¶338.  Thus, Saito in combination

with Douglas teaches every limitation of Claim 1.

### 3.    Claim 13

As for **[13Pre.]**, to the extent that the preamble of method claim 13 is

limiting (which it is not), Saito teaches a method of filter a beam of ions.  Saito in

view of Douglas teaches Element [13A.] for the same reasons it teaches Elements

[1A.] and [1B.].  Saito in view of Douglas teaches Element [13B.] for the same

reasons it teaches Element [1C.].  Saito in view of Douglas teaches Element [13C.]

for the same reasons it teaches Element [1D.].  Saito in view of Douglas teaches

Element [13D.] for the same reasons it teaches Element [1B.].

### 4.   Claim 18

As for **[18Pre.]** to the extent that the preamble of method claim 18 is limiting (which it is not), Saito teaches a method of producing a mass spectrum of an ion beam because Saito's instrument has a detector and a processing device to produce such mass spectrum.  Ex. 1004 ¶349.

**Elements [18A.], [18B.], [18C.], [18F.]** — These claim elements are substantively identical to Elements [13A.]-[13D.] and are thus taught by Saito in view of Douglas for the reasons above.

**Element [18D.]**:  As discussed above in Element [13C.], Saito sets the quadrupole mass analyzer to scan at mass number 45.  *Id*., ¶¶[0050-0052], [0063-0065], Figure 6; Ex. 1004 ¶351.

**Element [18E.]**:  Saito detects the number of ion selected at mass number 45 to provide a mass spectrum.  *Id*., ¶¶[0050-0052], [0063-0065], Figure 6; Ex. 1004 ¶352.

### 5.   Claim 25

As for [25Pre.], Saito in view of Douglas teaches this limitation for the same reasons it teaches each limitation of Claim 1 and Element [13D.].  Saito in view of

Douglas teaches the limitation of Element [25A.] for the same reasons it teaches Element [13A.].  Saito in view of Douglas teaches the limitation of Element [25B.] for the same reasons it teaches Element [13B.].  Saito in view of Douglas teaches the limitation of Element [25C.] for the same reasons it teaches Element [13C.].

### 6.    *Claims 28 and 32*

A POSA would have understood that Saito teaches each limitation of these claims for the same reasons discussed in Ground 6.

### 7.    *Dependent Claims on Certain Sub-ranges*

**Claims [2.], [14.], [20.], [26.], [29.], [33.]** — These claims variously describe that "the ions within the sub-range comprise 1%, or less, of the ions within the beam," which is ordinarily achieved automatically in the operation of a multi-quadrupole mass filter.  Ex. 1004 ¶¶339-340.

**Claims [3.], [15.], [21.], [27.], [30.], [34.]** — These claims variously describe that "the ions within the sub-range comprise 0.01%, or less, of the ions within the beam."  Ex. 1004 ¶¶339-340.

As discussed in Ground 4, a POSA would have known how to adjust the RF/DC ratio to control the bandpass of a quadrupole.  Ex. 1004 ¶¶339-340.  After

reviewing Saito and Douglas, a POSA would have understood that the first

quadrupole disclosed in Saito can normally operate in certain RF/DC ratios when a

specific result is desired, such as transmitting 1% of ions within the beam. *Id.*

Also, Saito teaches methods of determining the number of ions that passed through

a filter stage. *Id.*; Ex. 1010, ¶¶[0053-0054]. Thus, these claims are rendered

obvious in light of the combined teaching of Saito and Douglas.

### 8.   *Other Dependent Claims*

**Claims [4.], [5.], [6.], [12.]** — As discussed in Ground 6 for these claims

and in this ground for Element [1B.], Saito in view of Douglas teaches every

limitation of these claims.

**Claims [16.], [22.]** — Saito in view of Douglas teaches every limitation of

these claims for the same reason it teaches Claim 6. *Id.*

**Claims [31.], [35.]** — Saito in view of Douglas teaches every limitation of

these claims for the same reason it teaches Element [1B.]. *Id.*, ¶¶[0050-0052],

[0063-0065], Figure 6.

**Claim [36.]** — Saito in combination with Douglas discloses the limitations

of this claim for the same reasons as Elements [1C.] and [1D.] and Claim 6. *Id.*

79

**Claims [37.], [42.], [47.], [52.], [57.], [62.]** — Saito teaches experiments in which the first and second quadrupoles operate at the first stability region.  Ex. 1010, ¶¶[0048]–[0052], Figure 6; Ex. 1004 ¶369.

**Claims [38.], [43.], [48.], [53.], [58.], [63.]** — Douglas teaches scanning the two mass filter stages synchronously to provide a mass spectrum.  *Id*., 6:5–38, Figures 14–16; Ex. 1004 ¶370.  A POSA would have understood that Douglas discloses a scanner for controlling the two filter stages as described in Claim 38.  Ex. 1004 ¶370.

## XII.  CONCLUSION

For all of the reasons set forth above, there is a reasonable likelihood that the petitioner would prevail with respect to at least one of the sixty-six claims challenged in this petition.

## XIII.  CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for the Petitioner declares that the argument section of this Petition (Section I, III-XII) has a total of 13,935 words, according to the word count tool in Microsoft Word™.

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

DATED:  December 13, 2017          Respectfully Submitted,

                                   By:  /Brian M. Buroker/

                                   Brian M. Buroker
                                   (Reg. No. 39125)
                                   Gibson, Dunn & Crutcher LLP
                                   1050 Connecticut Avenue, NW,
                                   Washington, DC 20036-5306
                                   Tel:  202-955-8541
                                   bburoker@gibsondunn.com

                                   *Attorney for Petitioner*

*Petition for Inter Partes Review*
*of U.S. Patent No. RE45,553*

# <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies service pursuant to 37 C.F.R. §§ 42.6(e) and

42.105(a), (b) on the Patent-Owner via UPS overnight mail of a copy of this

Petition for *Inter Partes* Review and supporting materials at the Patent-Owner at

the correspondence address of record for the '553 Patent:

David B. Raczkowski, or To Whom It May Concern
Kilpatrick, Townsend & Stockton, LLC
Two Embarcadero Center, Suite 1900
San Francisco, CA 94111.

DATED:  December 13, 2017          By:  /Brian M. Buroker/ _____
                                   (Reg. No. 39125)

                                   *Attorney for Petitioner*

82

# EXHIBIT D

IPR No. 2018-00299

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

Agilent Technologies, Inc.,
Petitioner

v.

Thermo Fisher Scientific Inc. and
Thermo Fisher Scientific (Bremen) GmbH,
Patent Owner.

———————————————

Case No. <u>Unassigned</u>

U.S. Patent No. 7,230,232

———————————————

**Petition for *Inter Partes* Review of U.S. Patent No. 7,230,232**

Mail Stop **PATENT BOARD**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................................. 1

II. MANDATORY NOTICES ..................................................... 1

    A. Real Parties-in-Interest ................................................. 1

    B. Related Matters ............................................................... 1

    C. Lead and Back-Up Counsel ............................................ 1

III. PAYMENT OF FEES ............................................................ 2

IV. STANDING ........................................................................... 3

V. IDENTIFICATION OF CHALLENGE AND STATEMENT OF PRECISE RELIEF REQUESTED ........................................ 3

VI. THRESHOLD REQUIREMENT FOR INTER PARTES REVIEW ............ 3

VII. STATEMENT OF REASONS FOR THE RELIEF REQUESTED .............. 3

    A. Grounds .......................................................................... 4

    B. Priority Date of the '232 Patent ..................................... 4

VIII. STATE OF THE ART ............................................................ 5

    A. Person of Ordinary Skill in the Art ............................... 5

    B. Scope and Content of the Art Before September 1998 ......... 5

        1. Mass Spectrometry .................................................. 5

        2. Quadrupole Mass Analyzer ..................................... 6

        3. Tandem Mass Spectometry ...................................... 7

        4. Plasma Ion Source ................................................... 15

        5. Spectroscopic Interferences .................................... 16

        6. Photons and Neutral Species ................................... 17

IX. The '232 Patent Specification and Claims ................................ 18

X. GROUNDS FOR UNPATENTABILITY .................................. 23

    A. General Principles .......................................................... 23

**TABLE OF CONTENTS**
(continued)

B.      Apparatus Claims Reciting Manners of Operation .............................24

XI.  Method Claims Reciting Operations of an Apparatus .................................25

A.      Claim Elements Directed to the Intended Use of a
        Component ..............................................................................................25

B.      Ground 1:  Speakman Anticipates Claims 1-3, 6-12, and 16-
        34 .............................................................................................................26

        1.      Speakman Anticipates Claim 1 .................................................27

        2.      Speakman Anticipates Claim 23 ...............................................31

        3.      Speakman Anticipates Many Dependent Claims ....................33

C.      Ground 2:  Speakman in combination with King and King II
        renders obvious 1-3, 5-12, and 16-34.....................................................42

        1.      Speakman in combination with King and King II renders
                obvious claims 1-3, 6-12, and 16-34........................................45

        2.      Speakman in view of King and King II renders obvious
                claim 5 .......................................................................................46

D.      Ground 3:  Speakman in combination with Yost renders
        obvious claims 4 and 14 under § 103 .....................................................46

E.      Ground 4: Speakman in combination with Turner and Terzic
        renders obvious claims 13 and 15 under § 103 ..................................50

F.      Ground 5:  Tanner-Patent Anticipates Claims 1-3, 5-7, 17-20,
        23-24, 27, 29, and 34 .............................................................................53

        1.      Tanner-Patent Anticipates Claim 1 ..........................................55

        2.      Tanner-Patent Anticipates Claim 23 ........................................59

        3.      Tanner-Patent anticipates many dependent claims ..................60

G.      Ground 6:  Tanner-Patent in combination with Kishi renders
        obvious claims 1-3, 5-13, 16-34 under § 103 .....................................64

        1.      Tanner-Patent in combination with Kishi renders obvious
                claims 1-3, 5-7, 17-20, 23-24, 27, 29, and 34..........................65

**TABLE OF CONTENTS**
(continued)

<u>Page</u>

    2.    Tanner-Patent in combination with Kishi renders obvious claims 8-13, 16, 21-22, 25-26, 28, 30-33 .................................... 67

XII.  CONCLUSION ............................................................................ 72

XIII.  CERTIFICATE OF WORD COUNT .......................................... 73

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003) ........................................................25

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001) ........................................................25

*Catalina Marketing Intern. v. Coolsavings.Comm.*,
  289 F.3d 801 (Fed. Cir. 2002) .........................................................24

*In re Gardiner*,
  171 F.2d 313 (C.C.P.A. 1948) .........................................................24

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*,
  909 F.2d 1464 (Fed. Cir. 1990) ........................................................24

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
  780 F.3d 1376 (Fed. Cir. 2015) ........................................................24

*In re King*,
  801 F.2d 1324 (Fed. Cir. 1986) ........................................................25

*Ex parte Masham*,
  2 U.S.P.Q. 2d 1647 (Bd. Pat. App. & Inter. 1987) ............................25

*Ex Parte Mewherter*,
  Appeal No. 2012-007692, Decision on Appeal, 18-19 (P.T.A.B.
  May 8, 2013) .....................................................................................26

*In re Petering*,
  301 F.2d 676 (1962) ..........................................................................24

*Schering Corp. v. Geneva Pharms.*,
  339 F.3d 1373 (Fed. Cir. 2003) ........................................................23

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

## TABLE OF AUTHORITIES
### (continued)

Page(s)

**Statutes**

35 U.S.C. § 102 ................................................................................. 3

35 U.S.C. § 102(b) ............................................................... 41, 45, 50, 62

35 U.S.C. § 102(e) ..................................................................... 4, 26, 52

35 U.S.C. § 103 ..................................................................... 4, 24, 45, 50, 62

35 U.S.C. § 314(a) ............................................................................ 3

**Other Authorities**

U.S. Patent No. RE45,386 ............................................................... 1

U.S. Patent No. RE45,553 ............................................................... 1

**Regulations**

37 C.F.R. § 42.8(b)(2) ..................................................................... 1

37 C.F.R. § 42.104(b) ..................................................................... 3

## TABLE OF EXHIBITS

| Exhibit Number | Document |
|---|---|
| 1001 | U.S. Patent No. 7,230,232 ("the '232 Patent") |
| 1002 | RESERVED |
| 1003 | RESERVED |
| 1004 | Declaration of Richard Yost, Ph.D. |
| 1005 | The Complaint (served copy) |
| 1006 | Tanner, Scott D., and Vladimir I. Baranov. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). II. Reduction of interferences produced within the cell." *Journal of the American Society for Mass Spectrometry* 10.11 (1999): 1083-1094.  ("Tanner") |
| 1007 | U.S. Patent No. 6,191,417 ("Douglas") |
| 1008 | Declaration of Sylvia Hall-Ellis, Ph.D. |
| 1009 | JPH10214591A ("Saito") |
| 1010 | Certified Translation of JPH10214591A ("Saito") |
| 1011 | Baranov, Vladimir, and Scott D. Tanner. "A dynamic reaction cell for inductively coupled plasma mass spectrometry (ICP-DRC-MS). Part 1. The rf-field energy contribution in thermodynamics of ion-molecule reactions." *Journal of Analytical Atomic Spectrometry* 14, no. 8 (1999): 1133-1142.  ("Baranov") |
| 1012 | PCT International Application – International Publication Number WO 00/16375 ("PCT375") |
| 1013 | U.S. Patent No. 6,340,814 ("Vandermey") |
| 1014 | McLafferty, Fred W. "Tandem mass spectrometry." Science (1981): 280-287. |
| 1015 | Yost, Richard A., and Dean D. Fetterolf.  "Tandem mass spectrometry (MS/MS) instrumentation." *Mass Spectrometry Reviews* 2, no. 1 (1983): 1-45. |
| 1016 | Miller, Philip E., and M. Bonner Denton. "The quadrupole mass filter: basic operating concepts." *J. Chem. Educ.* 63, no. 7 (1986): 617-623. |

1

**TABLE OF EXHIBITS**

| Exhibit Number | Document |
|---|---|
| 1017 | Yost, R. A., and C. G. Enke. "Triple quadrupole mass spectrometry for direct mixture analysis and structure elucidation." *Analytical Chemistry* 51, no. 12 (1979): 1251-1264. |
| 1018 | European Patent Application Publication No. EP0237259A2 |
| 1019 | U.S. Patent No. 4,234,791 ("Enke") |
| 1020 | U.S. Patent No. 6,093,929 ("Javahery") |
| 1021 | Dawson, P. H., J. B. French, J. A. Buckley, D. J. Douglas, and D. Simmons. "The use of triple quadrupoles for sequential mass spectrometry: 1—The instrument parameters." *Journal of Mass Spectrometry* 17, no. 5 (1982): 205-211. |
| 1022 | Johnston, M., "Energy Filtering in Triple Quadrupole MS/MS," Finnigan MAT, San Jose, California, USA, No. 203, 1984. |
| 1023 | Eiden, Gregory C., Charles J. Barinaga, and David W. Koppenaal. "Beneficial ion/molecule reactions in elemental mass spectrometry." *Rapid Communications in Mass Spectrometry* 11, no. 1 (1997): 37-42. |
| 1024 | U.S. Patent No. 6,222,185 ("Speakman") |
| 1025 | U.S. Patent No. 6,011,259 ("Whitehouse") |
| 1026 | Koppenaal, David W. "Atomic mass spectrometry." *Analytical Chemistry* 64, no. 12 (1992): 320R-342R. |
| 1027 | Sass, Samuel, and Timothy L. Fisher. "Chemical ionization and electron impact mass spectrometry of some organophosphonate compounds." *Journal of Mass Spectrometry* 14, no. 5 (1979): 257-264. |
| 1028 | King, F. L., and W. W. Harrison. "Glow discharge mass spectrometry: an introduction to the technique and its utility." *Mass Spectrometry Reviews* 9, no. 3 (1990): 285- |

## TABLE OF EXHIBITS

| Exhibit Number | Document |
| --- | --- |
| | 317. |
| 1029 | Douglas, D. J. "Some current perspectives on ICP-MS." *Canadian Journal of Spectroscopy* 34, no. 2 (1989): 38-49. |
| 1030 | Louris, John N., Larry G. Wright, R. Graham Cooks, and Alan E. Schoen. "New scan modes accessed with a hybrid mass spectrometer." *Analytical Chemistry* 57, no. 14 (1985): 2918-2924. |
| 1031 | Houk, R. S. "Elemental and isotopic analysis by inductively coupled plasma mass spectrometry." *Accounts of Chemical Research* 27, no. 11 (1994): 333-339. |
| 1032 | Tanner, Scott D., Vladimir I. Baranov, and Dmitry R. Bandura. "Reaction cells and collision cells for ICP-MS: a tutorial review." *Spectrochimica Acta Part B: Atomic Spectroscopy* 57, no. 9 (2002): 1361-1452. |
| 1033 | Rowan, John T., and R. S. Houk. "Attenuation of polyatomic ion interferences in inductively coupled plasma mass spectrometry by gas-phase collisions." *Applied Spectroscopy* 43, no. 6 (1989): 976-980. |
| 1034 | Kishi, Yoko. "A benchtop inductively coupled plasma mass spectrometer." *HEWLETT PACKARD JOURNAL* 48 (1997): 72-79. ("Kishi") |
| 1035 | Montaser, Akbar et al., *An Introduction to ICP Spectrometries for Elemental Analysis* 1 in Inductively Coupled Plasma Mass Spectrometry (Akbar Montaser, ed. 1998). |
| 1036 | U.S. Patent No. 6,140,638 ("Tanner") |
| 1037 | King, F.L., et al., "Collision-Induced Dissociation of Polyatomic Ions in Glow Discharge Mass Spectrometry," *International Journal of Mass Spectrometry and Ion Processes*, 1989, vol. 89, pp. 171-185. |

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

## TABLE OF EXHIBITS

| Exhibit Number | Document |
|---|---|
| 1038 | Turner, Patrick, et al.,  "Instrumentation For Low and High-Resolution ICP/MS": Inductively Coupled Plasma Mass Spectrometry, *Publication Wiley-VCH*, edited by A. Montaser, 1998, p. 421-501.  ("Turner") |
| 1039 | Terzić, I., and D. Ćirić. "The double cylindrical electrostatic sector as an ion energy analyzer." *Nuclear Instruments and Methods* 166, no. 3 (1979): 419-423. ("Terzic") |
| 1040 | 1992 Pittcon (The Pittsburgh Conference on Analytical Chemistry and Applied Spectroscopy) "Practical MS/MS Analysis" Short Course, Lecture 7 |

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

## I.   INTRODUCTION

Pursuant to 35 U.S.C. § 311, Agilent Technologies, Inc. ("Agilent" or "Petitioner") submits this petition for *inter partes* review ("IPR"), seeking cancellation of claims 1-34 of U.S. Patent No. 7,230,232 ("the '232 Patent," Ex. 1001). These claims are unpatentable under 35 U.S.C. §§ 102 and 103 over the prior art references identified and applied in this petition.

## II.   MANDATORY NOTICES

Pursuant to 37 C.F.R. § 42.8, Petitioner provides the following mandatory disclosures:

### A.   Real Parties-in-Interest

Agilent Technologies, Inc. ("Agilent") is the real party-in-interest.

### B.   Related Matters

Pursuant to 37 C.F.R. § 42.8(b)(2), the '232 Patent is the subject of a patent litigation suit brought by Patent-Owner. *See* Ex. 1005. Petitioner is concurrently filing three other petitions for IPR of two other patents asserted in that litigation: related U.S. Patent No. RE45,386 and U.S. Patent No. RE45,553, respectively.

### C.   Lead and Back-Up Counsel

Petitioner provides the following designation of counsel:

1

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

| Lead Counsel | Back-up Counsel |
|---|---|
| Brian M. Buroker<br>(Reg. No. 39125)<br>Gibson, Dunn & Crutcher LLP<br>1050 Connecticut Avenue, N.W.<br>Washington, D.C. 20036-5306<br>Tel: 202-955-8541<br>bburoker@gibsondunn.com | Anne Y. Brody<br>(Reg. No. 54612)<br>Gibson, Dunn & Crutcher LLP<br>3161 Michelson Drive<br>Irvine, CA 92612-4412<br>Tel: 949-451-4192<br>abrody@gibsondunn.com |
| | David L. Glandorf<br>(Reg. No. 62222)<br>Gibson, Dunn & Crutcher LLP<br>1801 California Street<br>Denver, CO 80202-4200<br>Tel: 303-298-5726<br>dglandorf@gibsondunn.com |

A Power of Attorney accompanies this petition in accordance with 37 C.F.R. § 42.10(b). Service via hand delivery or postal mail may be made at the addresses of the lead and back-up counsel above. Petitioner hereby consents to electronic service, and service via electronic mail may be made at the email addresses provided above for the lead and back-up counsel.

## III. PAYMENT OF FEES

Pursuant to 37 C.F.R. §§ 42.103 and 42.15(a), $33,400 is being paid via deposit account 501408. Any additional fees due in connection with this petition may be charged to the foregoing account.

2

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

## IV.   STANDING

Pursuant to 37 C.F.R. § 42.104(a), Petitioner certifies that the '232 Patent is available for IPR and that Petitioner is not barred or estopped from requesting IPR of the claims on the grounds identified herein.

## V.   IDENTIFICATION OF CHALLENGE AND STATEMENT OF PRECISE RELIEF REQUESTED

Pursuant to 37 C.F.R. § 42.104(b), Petitioner requests that the Board institute *inter partes* review of all claims of the '232 Patent on one or more grounds under pre-AIA 35 U.S.C. §§ 102 and/or 103.

## VI.   THRESHOLD REQUIREMENT FOR INTER PARTES REVIEW

Under 35 U.S.C. § 314(a), institution of *inter partes* review requires "a reasonable likelihood that the petitioner would prevail with respect to at least one of the claims challenged in the petition." This petition meets this threshold for each of the asserted grounds of unpatentability.

## VII.   STATEMENT OF REASONS FOR THE RELIEF REQUESTED

Petitioner predicates its challenge on eight prior art references. These references render all claims of the '232 Patent unpatentable based on six grounds.

3

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

## A.    Grounds

Ground 1:  Speakman anticipates claims 1-3, 6-12, and 16-34 under § 102(e);

Ground 2:  Speakman in combination with King and King II renders obvious claims 1-3, 5-12, and 16-34 under § 103;

Ground 3:  Speakman in combination with Yost renders obvious claims 4 and 14 under § 103;

Ground 4:  Speakman in combination with Terzic renders obvious claims 13 and 15 under § 103;

Ground 5:  Tanner-Patent anticipates claims 1-3, 5-7, 17-20, 23-24, 27, 29, and 34 under § 102(e);

Ground 6:  Tanner-Patent in combination with Kishi renders obvious claims 1-3, 5 13, and 16-34 under § 103.

The Declaration of Richard Yost, Ph.D., a world-renowned expert in mass spectrometry, accompanies this petition.  Ex. 1004.

## B.    Priority Date of the '232 Patent

The '232 Patent issued from U.S. Application No. 11/299,250 and ultimately claims priority to Great Britain Patent Application No. GB9820210.4, filed on September 16, 1998.  For purposes of this petition only, Agilent assumes that the claims are entitled to a priority date of September 16, 1998.

4

## VIII.  STATE OF THE ART

### A.      Person of Ordinary Skill in the Art

A person of ordinary skill in the art in September 1998 would have a Ph.D. or a Master's degree, or an equivalent education or practical experience, in chemistry, physics, or a related field, and at least two-to-three years of experience in developing the instrumentation and/or the applications of plasma ionization mass spectrometry and/or tandem mass spectrometry (hereinafter, "POSA").  Ex. 1004 ¶¶20-22.

### B.      Scope and Content of the Art Before September 1998

#### 1.      <u>Mass Spectrometry</u>

Mass spectrometry ("MS") is an analytical technique used to identify and quantify chemical elements and compounds (*i.e.*, atoms and molecules, respectively) in a sample based on the atomic mass and charge state of the constituents in the composition.  Ex. 1014, 281-282; Ex. 1004 ¶29.

Typically, a sample containing atoms or molecules of interest is introduced into the ion source of a mass spectrometer.  Ex. 1014, 281-282; Ex. 1015, 6-9; Ex. 1004 ¶¶30-31.  The ion source induces either a positive or a negative charge in the neutral atoms and molecules, generating positive or negative ions.  Ex. 1014, 281-

282; Ex. 1015, 6-9; Ex. 1004 ¶¶30-31.  In most instruments, only the positive ions are electrostatically guided by ion optics into a portion of the mass spectrometer called a "mass analyzer."  Ex. 1014, 281-282; Ex. 1015, 9; Ex. 1004 ¶¶30-31.  The mass analyzer allows ions of a specific mass-to-charge ratio (m/z) to pass through to a detector apparatus while preventing all other ions from reaching the detector when the detector is measuring ions of a set m/z value.  Ex. 1015, 16; Ex. 1004 ¶¶30-31.

## 2.   Quadrupole Mass Analyzer

A quadrupole is the most common mass analyzer used in modern mass spectrometry.  Ex. 1016, 617; Ex. 1004 ¶32.  It comprises four parallel rods arranged in a radial array at 90° intervals, with opposite pairs of rods electrically connected.  *Id.*, 618; Ex. 1004 ¶32.  There are two main modes of operating a quadrupole: RF-only and RF-DC mode.  *Id.*, 621-622; Ex. 1004 ¶32.  In the RF-only mode, the quadrupole would transmit all ions above a certain m/z cutoff ("total ion mode").  *Id.*; Ex. 1004 ¶32.  When a combination of RF and DC voltages is applied between the rod pairs, the quadrupole transmits ions between upper and lower m/z cutoffs.  *Id.*; Ex. 1004 ¶32.  As the DC-to-RF ratio increases, the quadrupole's transmission band narrows.  *Id.*; Ex. 1004 ¶32.  At a certain DC-

to-RF ratio, this transmission band would be so narrow as to allow only ions of a specific integer m/z to pass through ("unit mass resolution"). *Id*.; Ex. 1004 ¶32. If the magnitude of the DC and RF voltages is continuously increased over time while keeping the DC/RF ratio constant, the mass filter will scan over a range of m/z values and generate a mass spectrum ("full-scan mode"). Ex. 1016, 621; Ex. 1004 ¶32.

### 3.    Tandem Mass Spectometry

Quadrupole mass spectrometers may have two or more quadrupoles arranged in tandem. Exs. 1018-1020; Ex. 1004 ¶33. Each of the quadrupoles can be designed to operate independently and/or with one another. Exs. 1018-1020; Ex. 1004 ¶33.

Dr. Yost and his colleagues were the first to introduce a RF-driven collision cell in a triple-quadrupole instrument. Ex. 1019; Ex. 1004 ¶34. This instrument comprised a first quadrupole, an enclosed RF-only quadrupole used as a collision/reaction cell, and a third quadrupole. *Id*., Figure 2; Ex. 1004 ¶34. In that device, the first quadrupole mass filters the selected ions of interest. *Id*., 9:14-20; 10:12-17; Ex. 1004 ¶34. The second RF-only quadrupole is part of a collision/reaction cell pressurized with a gas, where fragmentation and/or reactions

of the ions may take place.  *Id*., 5:51-64; 9:27-61; Ex. 1004 ¶34.  The third

quadrupole mass analyzes the resulting ions transmitted from the collision cell.  *Id*.

at 9:14-20; 10:12-17; Ex. 1004 ¶34.  Such triple-quadrupole instruments are also

known as tandem mass or MS/MS spectrometers.  Exs. 1014-1016; Ex. 1004 ¶34.

There are a few fundamental control parameters in the triple-quadrupole

instrument.  Exs. 1014-1015, 1016, 1021-1022; Ex. 1004 ¶35.  For instance, each

of the first and third quadrupoles can be individually set to pass only ions of a

single m/z, ions within a range of m/z ratios, or all ions (above a lower m/z limit

inherent in the quadrupole).  Ex. 1015, 3-5; Ex. 1021, 207-211; Ex. 1022, 1; Ex.

1004 ¶35.  Where either a range of ions or all ions are passed by a quadrupole, that

may be accomplished by either (i) allowing all ions in the selected range of m/z

values to pass at once, or (ii) incrementally scanning over a range of m/z values

such that at any given time only those ions having an m/z value within the open

"window" will pass through the quadrupole.  Ex. 1004 ¶35.  The middle

quadrupole can be pressurized with a target gas (acting as a collision/reaction cell)

or not pressurized.  Ex. 1015, 3-5; Ex. 1004 ¶35.  These user-selectable parameters

provide a variety of operational modes in a triple-quadrupole instrument.  Exs. 1014-1015, 1016, 1021-1022; Ex. 1004 ¶¶36-46.

Figure 2 below depicts tandem MS (MS/MS) modes commonly used on a triple-quadrupole instrument.  Ex. 1004 ¶39.  In each of the four schemes of Figure 2, collision/reaction gas is introduced into the central quadrupole Q2, which is operating in RF-only mode.  *Id*.  Interaction with the collision/reaction gas might cause: fragmentation of polyatomic species, energy transfer, charge transfer, and/or ion-molecule reactions between the affected ions and the collision/reaction gas. Exs. 1028-1029; Exs. 1032-1033; Ex. 1004 ¶39.  Fragmentation results in new ions with lower m/z values, sometimes referred to as a neutral loss; energy transfer may result in ions with less kinetic energy, charge transfer may neutralize an interfering ion; and ion-molecule reactions may result in new ions with new, often higher, m/z values, sometimes referred to as a neutral gain.  Exs. 1028-1029; Exs. 1032-1033; Ex. 1004 ¶39.



**Figure 2.  MS/MS scan modes on a triple-quadrupole mass spectrometer.**

<u>Daughter Scan</u>: In the top scheme of Figure 2, Q1 is set to pass only ions

with a specific m/z value, often referred to as "parent ions."  Ex. 1015, 3; Ex. 1017,

10

1252; Ex. 1004 ¶40.  Q3 incrementally scans over a user-specified range of m/z

values from low to high.  Ex. 1004 ¶40.  This mode may be used to identify all the

"daughter ions" formed in Q2 by either collisional fragmentation of the selected

parent ion, or reaction of the collision/reaction gas with the selected parent ion.  *Id*.

If no reaction with the parent ion occurs, Q3 would pass the parent ion when Q3

scans over the m/z value of the parent ion.  *Id*.  Notably, when interrogating

elemental samples, collisional fragmentation of selected ions would not be

expected to occur because the elements are already reduced to atomic ions from the

previous ionization process.  *Id*.

Parent Scan: In the second scheme of Figure 2, Q1 incrementally scans a

user-specified range of m/z values from low to high, and Q3 is set at a fixed m/z

value to pass only daughter ions with that specific m/z value.  Ex. 1004 ¶41.  This

type of scan may be used to identify all the parent ions from the ion source that

form the selected daughter ion by collision or reaction in Q2.  Ex. 1015, 3; Ex.

1017, 1252; Ex. 1004 ¶41.  If the daughter ion is initially present in the sample and

no reaction occurs in Q2, then the parent ion m/z value is the same as the daughter

ion m/z value.  Ex. 1004 ¶41.

11

Neutral Loss [or Gain] Scan:  In the third scheme of Figure 2, Q1 and Q3 are both set to scan synchronously over an equivalent user-selected range of m/z values with a fixed difference in m/z values (*e.g*, scanning of Q1 over a m/z value range of 80 to 100 with Q3 scanning a set m/z value range of 60 to 80).  Ex. 1004 ¶42.  The scheme depicts a neutral loss; *i.e.*, a mass shift from a parent ion with a higher m/z value to a daughter ion having a lower m/z value as a result of collisions/reactions.  *Id*.  This scan may be used to identify all the daughter ions which arise from a specific neutral loss known or hypothesized by the researcher during collision or reaction in Q2.  Ex. 1015, 3; Ex. 1017, 1252; Ex. 1004 ¶42.  Also, using a reaction gas, ions transmitted by Q1 could react in Q2 to form product ions of higher m/z.  These could be monitored by a neutral gain scan, with Q3 synchronously scanning with a positive mass offset from Q1.  Ex. 1004 ¶42.

Neutral Loss of Zero Scan.   Where ions of interest that pass through Q1 do not fragment or react in the collision cell and thus retain their initial m/z value, the neutral offset is zero.  Ex. 1004 ¶¶43-45.  If there are interfering ions that also pass through Q1, they may fragment to form lower m/z ions or react to form higher m/z ions in Q2.  *Id*.  Under these circumstances, Q1 and Q3 are synchronously scanned

with no offset.  *Id*. That is, both Q1 and Q3 are set to transmit ions having the same m/z value.  Ex. 1022, Figs. 2 and 4; Ex. 1030, 2924; Ex. 1004 ¶¶43-45.  Neutral loss of zero scan modes were known and routinely used since the 1980s.  Ex. 1030, 2919, 2924; Ex. 1022, 1-3; Ex. 1004 ¶¶43-45.

Selected Reaction Monitoring (SRM): In the last scheme of Figure 2, each of Q1 and Q3 are set to filter out all but either a single parent ion and single daughter ion at selected m/z values, or a series of selected parent ion/daughter ion pairs.  Ex. 1015, 3-5; Ex. 1017, 1252; Ex. 1004 ¶46.  In an SRM experiment, a researcher typically knows the m/z value of the parent ions and can predict the m/z value of the daughter ions resulting from collision/reaction in Q2.  Ex. 1029, 47-49 (describing an SRM experiment in which the parent ion resulted in a 16 amu mass shift after reacting with a target gas in Q2); Ex. 1004 ¶46.

A schematic of a triple-quadrupole instrument available in the 1980s is shown below.  Ex. 1015, 21; Figure 5.  This instrument offered automatic control and data handling by a computer system.  *Id*.; Ex. 1004 ¶47.



**Figure 5.**   Scale drawing (side view) of the Finnigan MAT TSQ triple-stage quadrupole MS/MS instrument (15).

Moreover, the quadrupoles may be placed in separate chambers with one or more vacuum pumps. Exs. 1020, 1025; Ex. 1004 ¶¶47-48.  The use of differential pumping in mass spectrometers has been implemented by researchers and on commercial instruments for over 40 years.  Exs. 1018, 1020, 1025; Ex. 1004 ¶¶47-48.  The introduction of ion sources that operate at pressures higher than those at which mass analyzers and detectors can efficiently operate has made differential pumping a common element of most modern mass spectrometers.  Ex. 1004 ¶¶47-48.  High vacuum is required in the mass analysis and detection region of the mass spectrometer system for two primary reasons – first, to increase the mean-free-path

14

of ions (*i.e.*, how far ions travel between collisions with background gas molecules) to prevent collisions from diverting ions, and second, to prevent arcing of the high voltages generally employed in mass analyzers and detectors. *Id*. Since the primary source of gas into the vacuum system arises from the ion source, the pressures in successive stage of vacuum pumping generally are highest in the first stage (by the ion source) and are lowest in the last stage (mass analyzer and detector). Ex. 1035, 18-19; Ex. 1004 ¶¶47-48.

### 4.   Plasma Ion Source

All ion sources serve the same purpose—to convert atoms and/or molecules in a sample into ions that can be conveyed into a mass analyzer. Ex. 1015, 6-9; Exs. 1026-1028; Ex. 1004 ¶¶49-50. A number of ion sources have been developed for analyzing the elemental species (atoms) in a sample. Ex. 1026; Ex. 1004 ¶¶49-50. Classic ion sources for ionizing atoms include a DC arc and an AC spark. Exs. 1026, 1029; Ex. 1004 ¶¶49-50. The preferred ionization source for the past twenty years is the inductively coupled plasma ("ICP"). Ex. 1031, 333; Ex. 1032, 1431-1444; Ex. 1004 ¶¶49-50. The ICP ion source typically uses argon gas to form a plasma and converts the sample into atomic ions. Ex. 1031, 333; Ex. 1004 ¶¶49-50. Other common types of plasma ion sources for elemental analysis are

15

microwave-induced plasma ("MIP") and glow discharge plasma ("GD").  Ex.

1026, 322-326; Exs. 1028-1029; Ex. 1004 ¶¶49-50.

### 5.      Spectroscopic Interferences

In elemental mass spectrometry, only certain atomic ions from the ion source

are of interest.  Ex. 1026, 321; Ex. 1004 ¶51.  However, one significant problem

with plasma ion sources remains to be other atomic or molecular ions from the ion

source that have m/z ratios similar to those of the atomic ions of interest.  Ex.

1024, 1:7-32; Ex. 1004 ¶51.  They would interfere with the detection of the atomic

ions of interest.  *Id*.  For example, the polyatomic ion $^{40}Ar^{16}O^+$ can interfere with

the detection of $^{56}Fe^+$.  Ex. 1033, 976; Ex. 1004 ¶51.  These interfering ions come

from the plasma gas, the sample matrix, and/or the vacuum background gases,

alone or in combination.  Ex. 1029, 47; Ex. 1012, 3:34–4:10; Ex. 1004 ¶51.

Researchers have used a collision/reaction cell to reduce the number of

interfering ions that reach the detector, and thereby reduce their impact on

elemental analysis.  Exs. 1006; 1012; 1023-1024; 1028-1029; 1032-1033; Ex. 1004

¶¶52-54.  As a result of the collisions/reactions with a target gas, interfering ions

from the ion source may form new ions with m/z ratios different from that of the

16

atomic ion of interest and thereby no longer interfere with the detection.  Exs. 1028-1029; Exs. 1032-1033; Ex. 1033, 979-980; Ex. 1004 ¶¶52-54.

However, there may also be other ions in the ion beam with m/z ratios different from that of the atomic ion of interest.  Ex. 1033, 979-980; Ex. 1004 ¶¶52-54.  These ions may form new product ions in the collision/reaction cell with an m/z ratio similar to that of the atomic ion of interest (*i.e.*, new interfering ions). *Id*.; Ex. 1004 ¶¶52-54.  Consequently, researchers suggested using a mass selective device to filter out these ions before the collision cell.  *Id*.; Ex. 1004 ¶¶52-54.  By allowing only ions with the m/z of interest to enter into the collision cell, any new product ions formed in the cell would probably not have that m/z of interest.  *Id*.; Ex. 1004 ¶¶52-54.   Thus, the formation of new interfering ions is reduced by mass selecting the ions prior to the collision cell.  *Id*.; Ex. 1004 ¶¶52-54.

### 6.   Photons and Neutral Species

Many ion sources inevitably generate some amount of neutral species and photons, including ICP and GD sources.  Ex. 1012, 3:34–4:10; Ex. 1018, 2:1-19; Ex. 1004 ¶55.  In the absence of other means to divert their path (*e.g.*, vacuum systems), these neutral species and photons are assumed to travel in a straight line from the ion source to the detector, increasing the background noise.  Ex. 1018,

17

2:57-3:20; Ex. 1004 ¶55.  To reduce such background noise, many instruments use

ion optics to bend the path of the ions so that the ions would either travel around a

photon stop or be sent off-axis towards a detector mounted off-axis.  Ex. 1034, 2-3;

Ex. 1004 ¶55.  In contrast, the neutral species and the photons would still travel in

a straight line and strike the photon stop or not be bent towards an off-axis

detector.  *Id*.; Ex. 1018, 2:57-3:20; Ex. 1004 ¶55.

## IX.    The '232 Patent Specification and Claims

The claims of the '232 Patent are directed to mass spectrometers and

methods for reducing gas loading from the plasma ion source on the collision cell

in a plasma mass spectrometer.  The '232 Patent acknowledges that the use of a

collision cell to remove unwanted artefact ions is known in the prior art.  Ex. 1001,

1:50-54.  It states that the gas loading from the plasma ion source on the collision

cell can be significant.  *Id.*, 2:45-47.  It further states that if the collision cell

contains a significant partial pressure of argon (the plasma gas), the instrument

may be affected in two ways: (1) the ion beam will be attenuated by the collisions

between the ions in the beam and neutral argon atoms; and (2) these collisions

form argon-containing interfering ions.  *Id.*, 3:3-9.  The alleged inventions

variously claimed in the '232 Patent aim to reduce gas loading by using an ion

optical device upstream of the collision cell, multiple vacuum pumping stages, and/or deflecting the ion beam.

The '232 Patent has only two independent claims, claims 1 and 23.  Claim 1 describes a mass spectrometer with three main structural components: a plasma ion source, an ion optical device, a collision cell, and a mass-to-charge ratio analyzer. The ion optical device is configured to reduce gas loading from the ion source on the collision cell.  Claim 23 describes a method of operating a mass spectrometer with four main steps: generating an ion beam, reducing gas loading upstream of a collision cell, pressurizing the collision cell with a target gas, receiving the ion beam from the collision cell in a mass-to-charge analyzer.

The full text of all the challenged claims can be found in the chart below, with an element-by-element breakdown for the independent claims.  In the following discussion, brackets are used to identify claim elements (*e.g.*, "[1D.]").

| Challenged Claims of '232 Patent |
|---|
| **[1PRE.]** A mass spectrometer, comprising: |
| **[1A.]** an ion source for generating an ion beam from a sample introduced into a plasma, the beam containing unwanted gas components and artifact ions; |
| **[1B.]** a collision cell within an evacuation chamber, the collision cell being disposed to receive at least a portion of the ion beam from the ion source and arranged to be |

19

| pressurized with a target gas for removing unwanted artifact ions from the ion beam in the collision cell; |
| --- |
| **[1C.]** an ion optical device configured upstream of the collision cell to reduce gas loading from the ion source on the collision cell; and |
| **[1D.]** a mass-to-charge ratio analyzer disposed within an analyzing chamber and arranged to receive at least a portion of the ion beam from the collision cell and to mass analyze the received ion beam to produce a mass spectrum of the received ion beam. |
| **2.** The mass spectrometer of claim **1**, further comprising an ion transmission-enhancing device, the ion transmission-enhancing device comprising the ion optical device. |
| **3.** The mass spectrometer of claim **1**, wherein the ion optical device comprises a quadrupole, multipole, ion guide, ion lens or sector. |
| **4.** The mass spectrometer of claim **3**, wherein the ion optical device comprises a magnetic sector. |
| **5.** The mass spectrometer of claim **1**, wherein the ion optical device is mass-selective. |
| **6.** The mass spectrometer of claim **1**, further comprising a sampling aperture configured to transmit some of the ions from the ion source into an evacuation expansion chamber upstream of the ion optical device. |
| **7.** The mass spectrometer of claim **6**, further comprising an aperture to transmit some of the ion beam from the expansion chamber into the evacuation chamber. |
| **8.** The mass spectrometer of claim **1**, wherein the mass spectrometer is configured to transmit ions of the ion beam through the ion optical device along an axis. |
| **9.** The mass spectrometer of claim **8**, wherein the mass spectrometer is configured such that neutral gas of the unwanted gas components diverges from the axis at the ion optical device. |
| **10.** The mass spectrometer of claim **9**, wherein the mass spectrometer is configured to deflect the ion beam off the axis upstream of the mass-to-charge analyzer. |

**11.** The mass spectrometer of claim **1**, wherein the mass spectrometer is configured such that the ion beam extends along a path that includes a first portion in which ions are transmitted along an axis and a second portion in which the ion beam is deflected off the axis upstream of the mass-to-charge analyzer.

**12.** The mass spectrometer of claim **11**, further comprising a deflector to deflect the ion beam off the axis upstream of the mass-to-charge analyzer.

**13.** The mass spectrometer of claim **12**, wherein the deflector comprises a double deflector.

**14.** The mass spectrometer of claim **12**, wherein the deflector comprises an electrostatic sector.

**15.** The mass spectrometer of claim **14**, wherein the electrostatic sector comprises two cylindrical electrostatic sectors in series.

**16.** The mass spectrometer of claim **11**, wherein the mass spectrometer is configured to deflect the ion beam off the axis downstream of the collision cell.

**17.** The mass spectrometer of claim **1**, wherein the mass spectrometer is configured such that the ion beam passes along a path and neutral gas of the unwanted gas components diverges from the path.

**18.** The mass spectrometer of claim **1**, wherein the ion optical device is configured such that the at least a portion of the ion beam received by the collision cell is substantially free of neutral gas components from the ion source.

**19.** The mass spectrometer of claim **1**, further comprising an ion optical device disposed within the collision cell, the ion optical device configured for containing the ion beam as it passes through the collision cell.

**20.** The mass spectrometer of claim **1**, further comprising a first pump for maintaining the evacuation chamber at a first vacuum pressure, and a second pump for maintaining the analyzing chamber at a second vacuum pressure.

**21.** The mass spectrometer of claim **1**, further comprising an intermediate evacuation chamber in which the ion optical device is disposed.

**22.** The mass spectrometer of claim **21**, further comprising a first pump for maintaining the intermediate evacuation chamber at a first vacuum pressure, and a second pump for maintaining the evacuation chamber at a second vacuum pressure lower than the first vacuum pressure.

**[23PRE.]** A method of operating a mass spectrometer, the method comprising the steps of:

**[23A.]** generating at an ion source an ion beam from a sample, the beam containing unwanted gas components and artifact ions from the ion source;

**[23B.]** reducing gas loading from the ion source on a collision cell, the reducing occurring upstream of the collision cell;

**[23C.]** pressurizing the collision cell with a target gas for removing unwanted artifact ions from the ion beam in the collision cell;

**[23D.]** receiving in the collision cell at least a portion of the ion beam substantially free of neutral gas components from the ion source; and

**[23E.]** receiving at least a portion of the ion beam from the collision cell in a mass-to-charge ratio analyzer.

**24.** The method of claim **23**, wherein reducing gas loading comprises passing the ion beam through a transmission enhancing device.

**25.** The method of claim **24**, wherein reducing gas loading comprises transmitting ions of the ion beam through the transmission enhancing device along a first axis.

**26.** The method of claim **24**, wherein reducing gas loading comprises diverging neutral gas of the unwanted gas components from the first axis.

**27.** The method of claim **24**, further comprising transmitting some of the ions from the ion source through a sampling aperture into an evacuated expansion chamber upstream of the transmission enhancing device.

**28.** The method of claim **24**, wherein the ion transmission enhancing device is located within an intermediate evacuation chamber, the collision cell is located within an evacuation chamber, and the method includes evacuating the intermediate evacuation

| chamber to a first vacuum pressure, and evacuating the evacuation chamber to a second vacuum pressure that is lower than the first pressure. |
| --- |
| **29.** The method of claim **23**, wherein the collision cell is located within an evacuation chamber, the mass-to-charge ratio analyzer is located within an analyzer chamber, and the method includes evacuating the evacuation chamber to a first vacuum pressure, evacuating the analyzer chamber to a second vacuum pressure that is lower than the first pressure. |
| **30.** The method of claim **23**, wherein the ion beam includes a portion in which ions are transmitted along an axis, and the method comprises deflecting the ion beam off the axis upstream of the mass-to-charge analyzer. |
| **31.** The method of claim **30**, wherein deflecting the ion beam includes electrostatically deflecting the ion beam. |
| **32.** The method of claim **30**, wherein deflecting the ion beam includes twice deflecting the ion beam. |
| **33.** The method of claim **30**, wherein the ion beam is deflected off the axis downstream of the collision cell. |
| **34.** The method of claim **23**, wherein the ion beam passes along a path and neutral gas of the unwanted gas components diverges from the path. |

## X.    GROUNDS FOR UNPATENTABILITY

### A.    General Principles

Under 35 U.S.C. § 102, if a single prior art reference discloses each

limitation of the claimed invention, a patent claim is anticipated.  *Schering Corp. v.*

*Geneva Pharms.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  Moreover, "a reference

can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations

arranged or combined as in the claim, if a person of skill in the art, reading the

23

reference, would 'at once envisage' the claimed arrangement or combination."

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir.

2015) (quoting *In re Petering*, 301 F.2d 676, 681 (1962)).

Under 35 USC § 103, a patent claim is obvious and invalid "if the

differences between the subject matter sought to be patented and the prior art are

such that the subject matter as a whole would have been obvious at the time the

invention was made to a person having ordinary skill in the art to which said

subject matter pertains."  Multiple pieces of prior art render the claims of the '232

Patent anticipated and/or obvious.

### B.   Apparatus Claims Reciting Manners of Operation

"[A]pparatus claims cover what a device *is,* not what a device *does*."

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,* 909 F.2d 1464, 1469 (Fed. Cir.

1990) (emphasis in original).  "[T]he patentability of apparatus or composition

claims depends on the claimed structure, not on the use or purpose of that

structure."  *Catalina Marketing Intern. v. Coolsavings.Comm.*, 289 F.3d 801, 809

(Fed. Cir. 2002); *In re Gardiner*, 171 F.2d 313, 315-16 (C.C.P.A. 1948) ("It is trite

to state that the patentability of apparatus claims must be shown in the structure

claimed and not merely upon a use, function, or result thereof.").  Thus, a claim

containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the structural limitations of the apparatus claim. *Ex parte Masham*, 2 U.S.P.Q. 2d 1647 (Bd. Pat. App. & Inter. 1987).

## XI.   Method Claims Reciting Operations of an Apparatus

When a prior art apparatus is the same as the apparatus described in a claim for carrying out a claimed method, the prior art apparatus presumably will perform the claimed method in its normal and usual operation. *In re King*, 801 F.2d 1324 (Fed. Cir. 1986). Moreover, when a prior art reference describes using a prior art apparatus towards a particular purpose, a claimed method is anticipated if the claim merely recites newly discovered results of using the same apparatus for the same purpose. *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368 (Fed. Cir. 2001).

### A.   Claim Elements Directed to the Intended Use of a Component

Statements of an intended use or purpose of a component in a claimed structure or composition are not included in invalidity analysis under Sections 102 and 103. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

F.3d 1339, 1345 (Fed. Cir. 2003) ("[A]n intended use or purpose usually will not limit the scope of the claim because such statements usually do no more than define a context in which the invention operates.").

"Although such statements often appear in the claim's preamble, a statement of intended use or purpose can appear elsewhere in a claim." *Ex Parte Mewherter*, Appeal No. 2012-007692, Decision on Appeal, 18-19 (P.T.A.B. May 8, 2013) (internal annotations omitted).

### B.     Ground 1:  Speakman Anticipates Claims 1-3, 6-12, and 16-34

Speakman (Ex. 1024) qualifies as prior art under 35 U.S.C. § 102(e) because the non-provisional patent application that led to the issuance of Speakman on April 24, 2001 was filed on May 30, 1997.  The '232 Patent acknowledges that a European counterpart of Speakman, EP Patent Application No. 0813228A1, discloses the use of a collision cell to remove unwanted artefact ions.  Ex. 1001, 1:50-53.  Speakman was not discussed in any substantive communications during prosecution of the '232 Patent.

Speakman discloses a mass spectrometer with a plasma ion source, an ion optical device, an enclosed hexapole as a collision cell (in Figure 1), and a mass analyzer (*e.g.*, in Figure 3).  Ex. 1024, 8:42-9:35, 11:37-67; Ex. 1004 ¶¶59-60.

26

Thus, Speakman discloses all the structural limitations of the apparatus claim 1 and methods of mass analysis that perform all the steps recited in method claim 23.

### 1.   <u>Speakman Anticipates Claim 1</u>

**[1PRE.]:**  Speakman discloses a plasma mass spectrometer.  Ex. 1024, 8:42-9:35, 11:37-67, Figures 1 and 3; Ex. 1004 ¶63.

**Element [1A.]:**  Speakman discloses "an ion source [a plasma (inductively-coupled or microwave induced)] for generating an ion beam from a sample introduced into a plasma." Ex. 1024, 1:3-6, 8:25-26, 8:42-47, (ICP source (1) and (2) in Figure 1 as shown below); Ex. 1004 ¶¶64-66.



*FIG. 1*

Speakman also discloses "the beam containing unwanted gas components [neutral particles from the plasma] and artifact ions [atomic or molecular ions such as $Ar^+$, $Ar^{++}$, $ArH^+$, $ArN^+$ and molecular ions such as oxides, argides and hydride ions]." Ex. 1024, 1:14-20, 9:30; Ex. 1004 ¶¶65-66.

**Element [1B.]:** Speakman discloses "a collision cell in an evacuation chamber" because in Figure 1, Speakman discloses a hexapole ion guide means (12) disposed in an evacuated chamber (11), and the front portion of the hexapole ion guide is enclosed by a tube (21). Ex. 1024, 8:66-9:14, 11:37-46, Figure 1; Ex. 1004 ¶¶67-68. The enclosed portion of the hexapole ion guide means serves as a collision cell into which an inert gas can be introduced through an inlet (22). Ex. 1024, 8:66-9:14, 11:37-46, Figure 1; Ex. 1004 ¶67. And because a portion of the ions generated from the plasma source are transmitted to the collision cell, the collision cell is "disposed to receive at least a portion of the ion beam from the ion source." Ex. 1024, 8:66-9:3, Figure 1; Ex. 1004 ¶67.

Speakman discloses that the collision cell is "arranged to be pressurized with a target gas [Speakman suggests helium, neon, argon, krypton, xenon, and/or nitrogen] for removing unwanted artifact ions from the ion beam in the collision

cell." Ex. 1024, 3:37-40, 4:10-15; Ex. 1004 ¶68. For example, Speakman teaches

that "the addition of 0.5% of xenon to a helium inert gas surprisingly has been

found to further reduce the intensity of oxygenated molecular ions, and

approximately 0.5% of hydrogen or water [to an inert gas] can result in a further

reduction of ions such as $Ar^+$." Ex. 1024, 8:17-21; Ex. 1004 ¶¶67-68.

**Element [1C.]:** Speakman discloses "an ion optical device [*e.g.*, an

electrostatic lens] configured upstream of the collision cell [Speakman's ion guide

means/tube]" because Speakman discloses that "electrostatic lens means are

provided between the nozzle-skimmer interface and the entrance of the ion-guiding

means." Ex. 1024, 7:51-8:8; Ex. 1004 ¶¶69-73. Figure 1 discloses an electrostatic

lens element (10) of hollow conical form upstream of the hexapole collision cell.

Ex. 1024, 8:59-65; Ex. 1004 ¶69.

Speakman discloses that the electrostatic lens can "reduce gas loading from

the ion source on the collision cell" because it is an ion transmission-enhancing

device and provides an additional vacuum pumping stage. Ex. 1004 ¶73. It

teaches that "the potential applied to the electrostatic lens means is adjusted to

improve the transmission efficiency of ions from the nozzle-skimmer interface to

the ion guiding means," which is the collision cell, (Ex. 1024, 7:63-65); and "when

the potential is correctly set, the lens means increases the transmission efficiency

by more than a factor of 100," (*id.*, 7:66-8:1).  *See also* Ex. 1004 ¶¶70-72.  A

POSA would have understood that because the electrostatic lens does not confine

the neutral gas components, the neutral gas components diverge at the lens, thereby

reducing the amount of gas components in the beam.  *Id.*  Speakman further

teaches that "the lens reduces the transmission of ions such as $ArO^+$, consequently

improving the detection sensitivity for Fe," thereby further reducing the amount of

unwanted ions in the beam.  Ex. 1024, 8:4-6; Ex. 1004 ¶70-73.

Speakman teaches that "[t]he lens electrode may also serve as a second

diaphragm to define an additional evacuated chamber and therefore provide an

additional stage of differential pumping between the nozzle-skimmer interface and

the ion-guiding means."  *Id.*, 7:59-63; Ex. 1004 ¶72.  A POSA would have

understood that having an additional vacuum pumping stage further reduces the

neutral gas components from the beam.  Ex. 1001, 3:49-67; Ex. 1004 ¶73.

**Element [1D.]:**  Speakman discloses "a mass-to-charge ratio analyzer

disposed within an analyzing chamber" because it discloses: (i) a quadrupole mass

analyzer in a chamber in Figure 3 (shown below); (ii) a magnetic sector in a

chamber in Figure 4; (iii) a time-of-flight mass analyzer in a chamber in Figure 5;

and (iv) an ion trap in a chamber in Figure 6. Ex. 1024, 9:22-11:36; Ex. 1004

¶¶74-75. These figures show that any of these mass analyzers can receive a

portion of the ion beam from the collision cell to produce a mass spectrum.



FIG. 3

### 2. Speakman Anticipates Claim 23

[23PRE.]: As explained in Section XI.C, claim 23 is a method claim

reciting a normal operation of a prior art apparatus. Speakman discloses methods

of mass analysis, using the plasma mass spectrometer, which perform all the steps of the method described in claim 23.  Ex. 1024, 6:15-44, claims 29-38; Ex. 1004 ¶109.

**Element [23A.]:**  Speakman discloses this element for the same reasons as Element [1A.].  Ex. 1024, 1:14-20, 9:30; Ex. 1004 ¶¶63-66, 109.

**Element [23B.]:**  Speakman discloses this element for the same reasons as Element [1C.].  Ex. 1024, 7:51-8:65; Ex. 1004 ¶¶69-73, 109.

**Element [23C.]:**  Speakman discloses this element for the same reasons as Element [1B.].  Ex. 1024, 8:66-9:14, 11:37-46, Figure 1; Ex. 1004 ¶¶67-68, 109.

**Element [23D.]:**  For the same reasons as Elements [1C.] and [23B.], Speakman discloses an ion optical device [an electrostatic lens] that enhances ion transmission and provides an additional vacuum pumping stage to further reduce neutral gas components.  Ex. 1024, 7:51-8:9, Figure 1; Ex. 1004 ¶¶69-73, 109.  Consequently, the portion of the ion beam received by the collision cell is substantially free of neutral gas components from the ion source.  Ex. 1024, 7:63-8:1, 6:31-44, 8:17-21; Ex. 1004 ¶¶63-75, 109.

**Element [23E.]:**  Speakman discloses this element for the same reasons as Element [1D.].  Ex. 1024, 9:22-11:36; Ex. 1004 ¶¶63-75, 109.

### 3.   <u>Speakman Anticipates Many Dependent Claims</u>

**Claim 2:**  For the same reasons as Element [1C.], Speakman discloses an "ion transmission-enhancing device comprising the ion optical device [electrostatic lens element]" because Speakman discloses that the electrostatic lens element enhances ion transmission.  Ex. 1004 ¶¶69-73, 109.  Specifically, Speakman teaches that "the potential applied to the electrostatic lens means is adjusted to improve the transmission efficiency of ions from the nozzle-skimmer interface to the ion guiding means (*i.e.*, the collision cell)," (Ex. 1024, 7:63-65); and "when the potential is correctly set, the lens means increases the transmission efficiency by more than a factor of 100" (Ex. 1024, 7:66-8:1).  *See also* Ex. 1004 ¶¶69-73, 76.

**Claim 3:**  For the same reasons as Element [1C.], Speakman discloses "the ion optical device comprises . . . ion lens [Speakman's electrostatic lens element is an ion lens]."  Ex. 1024, 7:51-8:8; Ex. 1004 ¶¶69-73, 77.

**Claim 6:**  Speakman in Figure 1 discloses "a sampling aperture [a sampling cone (3) with an aperture] to transmit some of the ions from the ion source [plasma torch (1)] into an evacuation expansion chamber [the region (6)] upstream of the

33

ion optical device [Speakman's electrostatic lens element]." Ex. 1024, 8:47-59,

Figure 1; Ex. 1004 ¶¶78-79.  As explained in Section VIII.B.5, the ions from the

ICP source enter through a sampling aperture into an evacuated chamber, which is

typically called an expansion chamber.  Ex. 1024, 8:47-59, Figure 1; Ex. 1004

¶¶73, 78-79.  In Speakman's instrument, the evacuated chamber designated as

region (6) is immediately after the sampling aperture and serves as an expansion

chamber.  Ex. 1024, 8:59-61, Figure 1; Ex. 1004 ¶78-79.

**Claim 7:**  Speakman in Figure 1 discloses "an aperture [a skimmer (5) with

an aperture] for transmitting some of the ion beam from the expansion chamber

[region (6)] to another evacuation chamber [an evacuated region (8)]."  Ex. 1024,

8:47-59, Figure 1; Ex. 1004 ¶¶80-81.

**Claim 8:**  Speakman discloses that "the mass spectrometer is configured to

transmit ions of the ion beam through the ion optical device [electrostatic lens

element] along an axis [the axis of the nozzle-skimmer interface]."  Ex. 1024,

8:59-61, 9:10-21, Figure 1; Ex. 1004 ¶¶82-83.

**Claim 9**:  Speakman discloses that "the mass spectrometer is configured

such that neutral gas of the unwanted gas components diverges from the axis [the

axis of the nozzle-skimmer interface] at the ion optical device [electrostatic lens

element]" because the electrostatic lens element provides "an additional stage of

differential pumping between the nozzle-skimmer interface and the ion-guiding

means" in Speakman's instrument.  Ex. 1024, 7:59-63; Ex. 1004 ¶¶84-87.  The

neutral gas components are not confined by the electrostatic lens, and so they

diverge from the axis of the beam and get pumped away as the ion beam passes

through the electrostatic lens into the evacuation chamber (8) upstream of the

collision cell.  Ex. 1024, 7:59-63; Ex. 1004 ¶¶84-87; Ex. 1001, 3:49-67.

**Claim 10:**  Speakman discloses "the mass spectrometer is configured to

deflect the ion beam off the axis upstream of the mass-to-charge analyzer" because

Speakman's instrument is configured such that the ions are transmitted along an

axis (*i.e.*, the axis (16) of the collision cell) and then are deflected off that axis (16)

upstream of the mass-to-charge analyzer to the axis (32) of the mass analyzer.  Ex.

1024, 9:19-21, Figure 1, 9:27-38, Figure 3; Ex. 1004 ¶¶88-90.

**Claim 11:**  For the same reasons as claim 8, Speakman discloses "the mass

spectrometer is configured such that the ion beam extends along a path that

includes a first portion in which ions are transmitted along an axis [of the nozzle-

35

interface]." Ex. 1024, 8:59-61, 9:10-21, Figure 1; Ex. 1004, 91-94. For the same reason as claim 10, Speakman discloses "a second portion in which the ion beam is deflected off the axis upstream of the mass-to-charge analyzer." Specifically, Speakman's instrument is configured such that the ions are transmitted along an axis of the nozzle interface and then are deflected to the axis (16) of the collision cell, and then again, are deflected off that axis (16) upstream of the mass-to-charge analyzer to the axis (32) of the mass analyzer. *Id.*, 9:19-21, Figure 1, 9:27-38, Figure 3; Ex. 1004 ¶¶91-94.

**Claim 12:** Speakman discloses a tapered electrode (18), which acts as a deflector to electrostatically deflect the ion beam upstream of the mass analyzer. Ex. 1024, 9:27-38, Figure 3; Ex. 1004 ¶95.

**Claim 16:** Speakman discloses claim 16 for the same reasons as claims 8 and 10. Ex. 1024, 9:19-21, Figure 1, 9:27-38, Figure 3; Ex. 1004 ¶¶96.

**Claim 17:** Speakman discloses "the mass spectrometer is configured such that the ion beam passes along a path and neutral gas of the unwanted gas components diverges from the path" because Speakman's instrument is configured such that the ion beam is twice deflected for the same reasons as claim 10, and the

neutral gas components are not deflected and thus diverge from the ion path.  Ex. 1024, 9:10-11, 9:35, Figure 1, Figure 3; Ex. 1004 ¶¶97-98.

**Claim 18:**  Speakman discloses "the ion optical device is configured such that the at least a portion of the ion beam received by the collision cell is substantially free of neutral gas components from the ion source" because for the same reasons as claim 9, the neutral gas components diverge from the ion path at the ion optical device.  So a portion of the ion beam received by the collision cell is substantially free of the neutral gas components from the ion source.  Ex. 1024, 7:59-63; Ex. 1004 ¶¶99-100.

**Claim 19:**  As discussed in Element [1B.], the collision cell is made of a hexapole ion guide enclosed by a tube.  An AC voltage can be applied to the hexapole ion guide such that the ions are transmitted in the space between the poles.  Ex. 1024, 4:6-9, 4:50-5:9, 12:1-10, Claim 1.  Thus, Speakman discloses "an ion optical device [hexapole ion guide] disposed within the collision cell, the ion optical device [hexapole ion guide] configured for containing the ion beam as it passes through the collision cell [when an AC voltage is applied]."  Ex. 1024, 8:66-9:14, 11:37-46, Figure 1; Ex. 1004 ¶101.

37

**Claim 20:**  Speakman discloses "a first pump [a turbomolecular pump] for maintaining the evacuation chamber [an evacuation chamber (11) that contains the hexapole collision cell in Figure 1] at a first vacuum pressure, and a second pump [another vacuum pump in Figure 3] for maintaining the analyzing chamber [second evacuated chamber (20) that contains a quadrupole mass filter (29) in Figure 3] at a second vacuum pressure."  Ex. 1024, 8:54-65, Figure 1, 9:22-35, Figure 3; Ex. 1004 ¶¶102-04.

**Claim 21:**  Speakman discloses "an intermediate evacuation chamber [an evacuated region 8] in which the ion optical device [electrostatic lens element 10] is disposed."  Ex. 1024, 8:54-65, Figure 1; Ex. 1004 ¶105.

**Claim 22:**  Speakman discloses "a first pump [a turbomolecular pump] for maintaining the intermediate evacuation chamber [an evacuated region 8 that contains the electrostatic lens element] at a first vacuum pressure, and a second pump [a turbomolecular pump] for maintaining the evacuation chamber [an evacuated chamber (11) that contains the hexapole collision cell] at a second vacuum pressure [about $10^{-3}$ torr] lower than the first vacuum pressure [approximately $10^{-2}$ torr]."   Ex. 1024, 8:54-65; Ex. 1004 ¶¶106-08.  Moreover, as

explained in Section XI.B, the pressure requirements are merely modes of operating the vacuum pumps and do not add any further structural limitations to this claim.

**Claim 24:**  For the same reasons as Elements [1C.] and [23B.], Speakman discloses "reducing gas loading comprises passing the ion beam through a transmission enhancing device [Speakman's electrostatic lens element enhances transmission]."  Ex. 1024, 7:51-8:65; Ex. 1004 ¶110.  Specifically, Speakman teaches that "the potential applied to the electrostatic lens means is adjusted to improve the transmission efficiency of ions" (Ex. 1024, 7:63-65); and "when the potential is correctly set, the lens means increases the transmission efficiency by more than a factor of 100," (*id.*, 7:66-8:1).

**Claim 25:**  Speakman discloses that "reducing gas loading comprises transmitting ions of the ion beam through the transmission enhancing device [electrostatic lens element] along a first axis [the axis of the nozzle-skimmer interface]."  *Id.*, 9:10-21, Figure 1; Ex. 1004 ¶111.  As discussed above in Element [1C.], this electrostatic lens is an ion transmission enhancing device.

**Claim 26:**  Speakman discloses the limitations of this claim for the same reasons as claims 9 and 17.  Ex. 1024, 9:10-11, 9:35, Figure 1, Figure 3; Ex. 1004 ¶112.

**Claim 27:** Speakman discloses claim 27 for the same reasons as claim 6. Ex. 1004 ¶113.

**Claim 28:**  Speakman discloses claim 28 for the same reasons as claims 21-22.  Ex. 1024, 8:54-65, Figure 1; Ex. 1004 ¶114.

**Claim 29:**  Speakman discloses "the collision cell is located within an evacuation chamber" and "the mass-to-charge ratio analyzer is located within an analyzer chamber" for the same reasons as claim 20.  Ex. 1024, 8:54-65, Figure 1, 9:22-35, Figure 3; Ex. 1004 ¶¶115-18.

Speakman discloses "the method includes evacuating the evacuation chamber to a first vacuum pressure, evacuating the analyzer chamber to a second vacuum pressure that is lower than the first pressure" as follows.  Because these two chambers have two different pumps, Speakman's instrument can maintain the pressure of the analytical chamber to be lower or higher than, or similar to the pressure of the evacuation chamber that contains the collision cell.  Ex. 1024, 8:54-

9:35, Figure 1, Figure 3; Ex. 1004 ¶¶115-18.  As discussed in Section XI.A, a

POSA would have "at once envisage[d]" that one of the three alternatives is that

the pressure in the analyzing chamber is lower than that of the chamber containing

the collision cell.  Ex. 1004 ¶¶115-18.

**Claim 30:**  Speakman discloses claim 30 for the same reasons as claim 11.

**Claim 31:**  Speakman discloses "deflecting the ion beam includes

electrostatically deflecting the ion beam" for the same reasons as claim 12.

**Claim 32:**  Speakman discloses "deflecting the ion beam includes twice

deflecting the ion beam" because in Speakman's instrument, the ion beam is

deflected once at the entrance of the collision cell, and a second time at the tapered

electrode between the exit of the collision cell and the mass analyzer.  Ex. 1024,

9:19-21, Figure 1, 9:27-38, Figure 3; Ex. 1004 ¶¶121-23.

**Claim 33:**  Speakman discloses "the ion beam is deflected off the axis

downstream of the collision cell" for the same reasons as claims 10 and 32.  Ex.

1004 ¶124.

**Claim 34:**  Speakman discloses claim 34 for the same reasons as claim 17.

*Id.* ¶125.

**C.     Ground 2:  Speakman in combination with King and King II renders obvious 1-3, 5-12, and 16-34**

King (Ex. 1037) was published in 1989 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶24.  King II (Ex. 1028) was published in 1990 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶22.

King discloses plasma triple-quadrupole mass spectrometers for elemental analysis.  Specifically, King discloses a glow-discharge triple quadrupole mass spectrometer.  Ex. 1037, 171-72; Ex. 1004 ¶¶127-30.  The first and third quadrupoles can operate in RF-only mode (passing ions above an m/z cutoff) or in a mass selective mode.  Ex. 1037, 180-83.  The second quadrupole in the collision cell operates in RF-only mode and has a nonlinear geometry.  *Id.*  A schematic of this instrument was later disclosed in the King II review paper.  Ex. 1028, 302-303, Figure 13.



**Figure 13.** A glow discharge ion source adapted to a triple quadrupole mass spectrometer.

In King's instrument, the first quadrupole acts as an ion optical device. Ex. 1037, 174; Ex. 1028, Figure 13; Ex. 1004 ¶¶132-34. In one of King's experiments, the first quadrupole serves as a mass selective device that enhances transmission of specific analyte ions and does not confine the neutral gas components. Ex. 1037, 183; Ex. 1004 ¶¶127-31. In other experiments, the first quadrupole serves as an ion guide that enhances the transmission of all ions with m/z ratios above a low m/z cutoff. Ex. 1037, 181-83; Ex. 1004 ¶¶127-30. In either mode, the neutral gas components diverge as the beam moves through the first quadrupole, thereby reducing gas loading on the collision cell. Ex. 1037, 175; Ex. 1004 ¶¶127-30.

King II reviews King's instrument and the collision-induced dissociation experiments described therein.  It discusses that the nonlinear collision cell in King's instrument "serves effectively to remove neutral species from the ion beam reaching the detector."  Ex. 1028, 303; Ex. 1004 ¶¶132-34.  It also teaches that the "utilization of various tandem mass spectrometry techniques such as daughter, parent, and neutral loss spectra permits the prediction and identification of isobaric interferences due to polyatomic ions."  Ex. 1028, 303; Ex. 1004 ¶¶132-33.

A POSA would have been motivated to combine the teachings of Speakman King, and King II, because they all relate to elemental analysis using plasma mass spectrometry and attempt to remove interfering ions using a collision cell.  In fact, Speakman explicitly mentions King.  Ex. 1024, 2:15-20.  It discusses that King "described the use of collision-induced dissociation to remove polyatomic ion interferences in glow-discharge mass spectrometry … [King] employed a triple quadrupole mass spectrometer and used the centre quadrupole as a collision cell." *Id.*

Moreover, Speakman attempts to use other inert gases instead of argon to induce dissociations of polyatomic ions.  Ex. 1024, 5:63-6:4; Ex. 1004 ¶134.  King

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

and King II improve Speakman by teaching that a mass selective ion optical device like a quadrupole upstream of a collision cell allows one to utilize various tandem mass spectrometry techniques to remove, identify, and/or predict polyatomic interferences.  Ex. 1004 ¶134.

### 1.     Speakman in combination with King and King II renders obvious claims 1-3, 6-12, and 16-34

As explained in Ground 1, Speakman discloses each and every limitation of Claims 1-3, 6-12, and 16-34.  To the extent that Patent-Owner argues that Speakman does not disclose an ion optical device to reduce gas loading from the ion source on a collision cell in Elements [1C.] and [23B.], King and King II teach a mass-selective ion optical device (a quadrupole) upstream of the collision cell. Ex. 1037, 174; Ex. 1028, 303.  It was well known as of 1998 that a mass-selective ion optical device increases ion-transmission, while the neutral gas components diverge from the beam as they are not confined by the ion optical device.  Ex. 1004 ¶¶126-37.  Moreover, King and King II both teach, various tandem mass spectrometry techniques that allow the identification of atomic ions and polyatomic interfering ions in elemental analysis.  Ex. 1037, 174-75; Ex. 1028, 303.  In view of King and King II, a POSA would have been motivated to improve

45

Speakman's instrument by adding a mass-selective ion optical device (a quadrupole) upstream of the collision cell.  Ex. 1004 ¶¶126-37.

### 2.     Speakman in view of King and King II renders obvious claim 5

**Claim 5:**  The combined teachings of Speakman, King, and King II disclose the features of claim 5 because, as discussed for claim 1, King and King II teach a mass-selective ion optical device.  Ex. 1037, 174; Ex. 1028, 303; Ex. 1004 ¶¶135-36.

### D.     Ground 3:  Speakman in combination with Yost renders obvious claims 4 and 14 under § 103

Yost (Ex. 1015) was published in 1983 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶21.  Yost is a review paper on the instrumentation of tandem mass spectrometry, particularly triple quadrupole and other tandem instruments, as of 1983.  Yost discloses that a research group at Purdue University designed a hybrid mass spectrometer that "incorporate[d] a magnetic sector followed by an RF-only quadrupole collision cell and a quadrupole mass filter." Ex. 1039, 29; Ex. 1004 ¶¶138-40.  Yost teaches that "[c]ompared with the tandem quadrupole instruments, the hybrid provides better mass resolution in the first stage and allows collisions to be observed at collision energies up to a few hundred

46

volts." Ex. 1039, 29.  In Figure 8, Yost discloses a VG 70-70 hybrid instrument with an electrostatic sector, magnetic section, a quadrupole collision cell and a quadrupole mass analyzer. *Id.*, 30.



**Figure 8.**   Scale drawing (top view) of the VG 70-70 EQ hybrid two-sector/two-quadrupole MS/MS instrument (19).

A POSA would have been motivated to combine Yost with the teaching of Speakman.  Ex. 1004 ¶140.  Speakman teaches using a hexapole collision cell and inert gases to remove interfering ions in ICP-MS.  Ex. 1024, 8:66-9:14, 11:37-46. Moreover, Speakman in Figure 4 discloses a magnetic sector as one of the preferred mass analyzers for isotopic ratio determination. *Id.*, 9:55-61, Figure 4.

Yost improves the teaching of Speakman by teaching that a magnetic sector can be placed upstream of the collision cell to provide better mass resolution and to

allow for higher collision energies.  Ex. 1039, 29-30; Ex. 1004 ¶¶139-40.  Yost

discusses the various designs and operations of tandem mass spectrometers,

including sector-based instruments, as of 1983.  Ex. 1039, 29-30.  A POSA would

have been motivated to combine the teachings of Yost and Speakman to design a

better tandem mass spectrometer for elemental analysis.  Ex. 1004 ¶140.

**Claim 4:**  As discussed immediately above, Speakman and Yost teach that

"the ion optical device comprises a magnetic sector."  A POSA would have been

motivated to improve Speakman's instrument by using a magnetic sector as an ion

optical device upstream of the collision cell.  Ex. 1004 ¶¶141-42.

Turner (Ex. 1038) provides an example of the way that a POSA would read

and combine the teachings of Speakman and Yost.  Turner is a book chapter

review of the various components of the ICP-MS instruments as of 1998, including

mass analyzers and collision cells used in ICP-MS.  Ex. 1038, 436-479.  Turner

discusses Speakman's hexapole collision-cell ICP-MS instrument and the initial

conclusions from the experiment results.  *Id.*, 477-479.  Turner also discusses the

use of a magnetic sector as a mass analyzer in high-resolution ICP-MS, as in Yost.

*Id.*, 446-49; Ex. 1004 ¶142.

With respect to Speakman's hexapole collision cell ICP-MS, Turner discusses that this instrument uses "a hexapole collision cell to thermalize the ions transmitted through the MS interface" and "to reduce mass spectral interferences resulting from argon-based molecular ions." Ex. 1038, 477.  Compared to other approaches like a "cold plasma" to reduce unwanted ions, "the collision cell ICPMS approach removes unwanted ions while operating with a hot plasma." *Id.*, 479.  "The sensitivity of the system remains excellent," even though additional molecular ions are introduced. *Id.*

With respect to a magnetic mass analyzer, Turner discusses that the concepts of a high-resolution ICPMS based on the use of a magnetic sector to separate ions. *Id.*, 446.  Turner teaches that typically, "high-resolution ICPMS is the preferred method for investigating low levels of components in complicated matrices." *Id.*, 455.

Turner's example shows that a POSA would understand that Speakman and Yost should be combined so that a magnetic sector is placed upstream of the collision cell to provide better mass resolution and to allow for higher collision energies.  Ex. 1015, 29-30.

**Claim 14:**  A POSA would have been motivated to combine Speakman with the electrostatic sensor in Yost.  Ex. 1039, 29-30; Ex. 1024, 8:66-9:14, 11:37-46; Ex. 1004 ¶¶146-47.

Turner provides an example of how a POSA at the time would understand the combination of Yost and Speakman. Turner includes a curved electrostatic sensor to overcome the energy spread problems that arise from use of a magnetic sector as a mass-selective ion optical device.  Ex. 1038, 446-450.  Turner's electrostatic sector is upstream of the collision cell as set forth in the combination of Yost and Speakman.  *Id.*  As the ions travel through the curved electrostatic sector, they are deflected off the axis of the ion source.  *Id.*  As Turner demonstrates, for the same reasons set forth in this Ground above, a POSA would have been motivated to modify Speakman's instrument by using an electrostatic sector to deflect the ions and to improve the resolution of the instrument.  Ex. 1004 ¶¶146-48.

E.     **Ground 4: Speakman in combination with Turner and Terzic renders obvious claims 13 and 15 under § 103**

Terzic (Ex. 1039) was published in 1979 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶25.  Terzic discloses a double curved electrostatic

sector that "consists of two identical cylindrical electrostatic sectors." *Id.*, 419, and

Figure 2 (shown below). Thus, it was well known as of 1998 that an electrostatic

sector can be made of a double cylindrical electrostatic sector. Ex. 1004 ¶¶149-50.



Fig. 2. Schematic diagram of the analyzer. A – object position (entrance slit with width $s_1'$), C – image position (exit slit with width $s_2'$).

In addition to the reasons for combining Speakman and Yost (*supra*, 53-57),

a POSA would have been motivated to combine Terzic with these references.

Speakman and Yost discuss improving the resolution of a mass spectrometer using

a magnetic sector. Ex. 1024, 5:31-46, 10:39-51; Ex. 1039, 29-30. Terzic teaches a

curved double electrostatic sector that can improve the resolution and transmission of ions in mass and energy analyzers.

Turner provides an example of how a POSA would combine the teachings of Terzic and Speakman. Specifically, Turner uses a curved electrostatic sector upstream of the collision cell as described in Terzic and Speakman respectively, in order to overcome the energy spread problems if a magnetic sector is used as a mass analyzer. Ex. 1038, 49-50; Ex. 1004 ¶¶151-52.

**Claim 13:** Terzic discloses a "deflector [that] comprises a double deflector." Specifically, Terzic teaches an electrostatic sector comprised of two curved cylindrical electrostatic sectors. Ex. 1039, 419. Terzic Figure 2 shows ions are deflected the first time as they pass through the first sector, and then are deflected a second time as they pass through the second sector. *Id.*, 420. A POSA would have understood that Terzic's electrostatic sector also functions as a double deflector. Ex. 1004 ¶153. And for the same reasons set forth above, in view of Yost and Terzic, a POSA would have been motivated to use Terzic's double electrostatic sector on Speakman's instrument to improve the instrument's resolving power and reduce neutral background gas. Ex. 1004 ¶¶150-53. Turner

provides an example of how a POSA would view and combine the disclosures in Yost, Speakman, and Terzic as of 1998.  Ex. 1004 ¶153.

**Claim 15:**  Terzic discloses that an "electrostatic sector comprises two cylindrical electrostatic sectors in series."  Ex. 1039, 419.  For the same reasons described in claims 4, 13, and 14, a POSA would have been motivated to use Terzic's double electrostatic sector on Speakman's instrument to improve the instrument's resolving power and reduce neutral background gas.  Ex. 1004 ¶154.

### F.    Ground 5:  Tanner-Patent Anticipates Claims 1-3, 5-7, 17-20, 23-24, 27, 29, and 34

Tanner-Patent (Ex. 1036) qualifies as prior art under 35 U.S.C. § 102(e) because the non-provisional patent application that led to the issuance of Tanner-Patent on October 31, 2000 was filed on May 29, 1998.  Tanner-Patent is cited on Page 2 of the '232 Patent, but its substance was not discussed during the prosecution.

Tanner-Patent discloses a double-quadrupole mass spectrometer in Figure 1. The ion source (12) is typically an ICP or GD source.  Ex. 1036, 3:55-60.  The first quadrupole (34) serves a bandpass filter inside a collision cell (collectively called, a bandpass reactive collision cell).  *Id.*, 4:2-8, 4:20-25, 8:3-44.  Reactive gases like

ammonia, hydrogen, and helium can be introduced into the cell.  *Id.*, 7:59-62, 11:6-

13.  The second quadrupole (66) acts as a mass analyzer before the detector (74).

*Id.*, 4:26-35; Ex. 1004 ¶¶155-56.



Tanner-Patent also discloses a time-of-flight mass spectrometer in Figure 21.

Ex. 1036, 11:53-12:38.  The ion source (12) is also an ICP or GD source.  *Id.*  Q1

is a mass selective quadrupole, and the mass analyzer (212) is a conventional time-of-flight mass analyzer.  *Id.*  Q2 may be a standard collision cell or a bandpass reactive collision cell.  *Id.*; Ex. 1004 ¶¶157-58.



FIG. 21

### 1.    Tanner-Patent Anticipates Claim 1

**[1PRE.]:**  Tanner-Patent discloses plasma mass spectrometers.  Ex. 1004 ¶¶158-59.

**Element [1A.]:**  Tanner-Patent discloses "an ion source [a plasma ion source (12) in Figures 1 and 21] for generating an ion beam from a sample introduced into a plasma."  Ex. 1036, 3:55-60, 11:53-12:38; Ex. 1004 ¶¶159-63.

Tanner-Patent also discloses "the beam containing unwanted gas components [neutral metastable species] and artifact ions [$Ar^+$, $ArH^+$, $ArO^+$, and $Ar_2^+$]."  Ex. 1036, 1:52-55, 5:30-61; Ex. 1004 ¶¶164-65.

Tanner-Patent discloses a series of experiments performed using the instrument disclosed in Figure 1.  In the experiments described for Figures 3-4, Tanner-Patent further discloses that the ion source generates artefact ions like $Ar^+$, $ArH^+$, $ArO^+$, and $Ar_2^+$.  Ex. 1036, 5:30-61.  These artefact ions have m/z ratios that interfere with the detection of atomic ions, Mg, Sc, Cu, and Ge.  *Id.*  In the experiments described for Figures 5-6, these artefact ions interfere with the detection of atomic ions, Mn, Fe, and Co.  *Id.*, 5:62-6:13, 7:28-39; Ex. 1004 ¶¶164-65.

Tanner-Patent discloses that the beam has unwanted neutral gas components where it states that "non-spectral interferences are also commonly encountered,"

which "typically derive from neutral metastable species, and produce an elevated continuum background." *Id.*, 1:52-55; Ex. 1004 ¶¶163-65.

**Element [1B.]:**  Tanner-Patent discloses "a collision cell [collision cell 41 in Figure 1 and Q2 in Figure 21] within an evacuation chamber [second evacuated chamber 28]." Ex. 1036, 3:66-67, 4:5-8, 11:63-64, Figures 1 and 21.  The collision cell is placed after the ion source "to receive at least a portion of the ion beam from the ion source." *Id.*, Figures 1 and 21; Ex. 1004 ¶¶166-67.

Tanner-Patent discloses that the collision cell is "arranged to be pressurized with a target gas [ammonia] for removing unwanted artifact ions from the ion beam in the collision cell." Ex. 1036, 5:48-57, 5:62-6:13.  In the experiments described for Figures 5-6, the collision cell is pressurized with a reactive gas, ammonia. *Id.*, 5:62-6:13, 7:28-39.  Artefact ions like $Ar^+$, $ArH^+$, $ArO^+$, and $Ar_2^+$ react with ammonia and form product ions with m/z ratios that do not interfere with the detection of the atomic ions like Mn, Fe, and Co. *Id.*  These product ions are removed from the ion beam as they pass through the mass analyzer. *Id.*; Ex. 1004 ¶¶166-67.

**Element [1C.]:**  Tanner-Patent discloses "an ion optical device [any desired conventional ion optical device in Figure 1, and the quadrupole Q1 in Figure 21] configured upstream of the collision cell to reduce gas loading from the ion source on the collision cell."  Ex. 1036, 3:64-4:2, Figure 1, 11:52-62, Figure 21. Specifically, for the instrument in Figure 1, Tanner-Patent discusses that "[t]he ions continue through an orifice 22 in a skimmer plate 24, through any desired conventional ion optics 26 in a second vacuum chamber 28" to the collision cell. *Id.*, 3:64-4:2.  As Dr. Yost explains, a conventional ion optical device enhances ion transmission and does not confine any neutral gas components, and so the neutral gas components diverge under vacuum.  Ex. 1004 ¶¶168-69.  As such, the ion optical device reduces gas loading from the ion source onto the collision cell.  *Id.*

In Figure 21, Tanner-Patent discloses a mass selective quadrupole (Q1) that receives a portion of the ion beam from the ICP source and is upstream of the collision cell.  Ex. 1036, 11:52-62.  Here, Q1 is the ion optical device that can be configured to mass select at the first mass-to-charge ratio of the first atomic ion and does not confine the neutral gas components.  *Id.*; Ex. 1004 ¶¶168-69.

58

**Element [1D.]:**  Tanner-Patent discloses in Figure 1 "a mass-to-charge ratio analyzer [a mass analyzer 66] disposed within an analyzing chamber [third vacuum chamber (60)]."  Ex. 1036, 4:25-38.  Tanner-Patent further discloses that the mass analyzer (66) in Figure 1 is "arranged to receive at least a portion of the ion beam from the collision cell and to mass analyze the received ion beam to produce a mass spectrum of the received ion beam."  *Id.*  Specifically, for the experiments described therein, the mass analyzer produces a mass spectrum of the received ion beam from the collision cell.  *See id.*, Figures 5-6; Ex. 1004 ¶¶170-71.

Tanner-Patent's Figure 21 discloses a time-of-flight mass analyzer (212) in an evacuation chamber (*i.e.*, an analyzing chamber) that receives the ion beam from the collision cell (Q2).  Ex. 1036, 12:1-11; Ex. 1004 ¶¶170-71.

### 2.    Tanner-Patent Anticipates Claim 23

**[23PRE.]:** Tanner-Patent discloses experiments that teach all the steps of claim 23 using the instrument in Figure 1.  *Id.*, 5:48-6:13, 7:28-47, 8:45-11:38; Ex. 1004 ¶188, Section XI.C.  Tanner-Patent discloses a method of operating a mass spectrometer as follows.

**Elements [23A-23C.]:**  Tanner-Patent discloses these element for the same reasons as Elements [1A-1C.].

59

**Element [23D.]:**  Tanner-Patent discloses "receiving in the collision cell at least a portion of the ion beam substantially free of neutral gas components from the ion source" because Tanner-Patent uses an ion optical device upstream of the collision cell.  Ex. 1036, 3:64-4:2.  The ion optical device does not confine any neutral gas components, and consequently, the neutral gas components diverge while the ions pass through the ion optical device into the collision cell.  Ex. 1004 ¶¶168-71.  Thus, the portion of the ion beam received by the collision cell is substantially free of the neutral gas components from the ion source.

**Element [23E.]:**  Tanner-Patent discloses this element for the same reason as Element [1D.].

### 3. Tanner-Patent anticipates many dependent claims

**Claim 2:**  For the same reasons as Element [1C.], Tanner-Patent discloses an "ion transmission-enhancing device comprising the ion optical device [quadrupole Q1 in Figure 21]."  Ex. 1036, 11:52-62.  A POSA as of 1998 would have understood that a quadrupole enhances ion transmission.  Ex. 1004 ¶172.

**Claim 3:**  For the same reasons as Element [1C.], Tanner-Patent discloses that "the ion optical device comprises . . . ion lens [any desired conventional ion

optics 26]." Ex. 1036, 3:64-4:2. A POSA as of 1998 would have understood that

an ion lens is a conventional ion optical device. Ex. 1004 ¶173.

**Claim 5:** For the same reasons as Element [1C.], Tanner-Patent discloses

that "the ion optical device [resolving quadrupole mass spectrometer Q1] is mass

selective." Ex. 1036, 11:52-62; Ex. 1004 ¶174.

**Claim 6:** Tanner-Patent discloses in Figure 1 "a sampling aperture [a

sampling plate (16) with an aperture (14)] configured to transmit some of the ions

from the ion source [plasma source (12)] into an evacuation expansion chamber

[first vacuum chamber (18)] upstream of the ion optical device [conventional ion

optics]." Ex. 1036, 3:60-67; Ex. 1004 ¶¶175-76.

**Claim 7:** Tanner-Patent in Figure 1 discloses "an aperture [a skimmer plate

(24) with an aperture (22)] for transmitting some of the ion beam from the

expansion chamber [first vacuum chamber (18)] to another evacuation chamber [a

second vacuum chamber (28)]." Ex. 1036, 3:60-67; Ex. 1004 ¶¶177-78.

**Claim 17:** Tanner-Patent discloses the limitations of this claim for the same

reasons as Elements [1C.] and [23D.]. Ex. 1004 ¶179.

**Claim 18:**  Tanner-Patent discloses that "the ion optical device is configured such that the at least a portion of the ion beam received by the collision cell is substantially free of neutral gas components from the ion source" for the same reasons as Elements [1C.] and [23D.].  Ex. 1004 ¶¶180-82.

**Claim 19:**  Tanner-Patent discloses "an ion optical device [quadrupole (34) in Figure 1] disposed within the collision cell [collision cell (41)]."  Ex. 1036, 3:64-4:2.  Tanner-Patent further discloses "the ion optical device [quadrupole (34)] configured for containing the ion beam as it passes through the collision cell [collision cell (41)]" because quadrupole (34) may operate as an RF-only device, *i.e.*, as an ion transmission device, or as a bandpass filter when low level DC voltage is also applied to the rods.  Ex. 1036, 5:4-19; Ex. 1004 ¶¶183-84.

**Claim 20:**  Tanner-Patent discloses "a first pump [high vacuum turbo pump (30)] for maintaining the evacuation chamber [second vacuum chamber (28)] at a first vacuum pressure, and a second pump [high vacuum turbo pump (62)] for maintaining the analyzing chamber [third vacuum chamber (60)] at a second vacuum pressure."  Ex. 1036, 3:66-67, 4:26-37, Figure 1; Ex. 1004 ¶¶185-87.

**Claim 24:**  Tanner-Patent discloses the limitations of this claim for the same reasons as Elements [1C.] and [23D.].

**Claim 27:**  Tanner-Patent discloses claim 27 for the same reasons as claim 6.

**Claim 29:**  Tanner-Patent discloses "the collision cell [collision cell (41)] is located within an evacuation chamber [second vacuum chamber (28)], the mass-to-charge ratio analyzer [mass analyzer (66)] is located within an analyzer chamber [third vacuum chamber (60)]."  Ex. 1036, 3:66-67, 4:26-37, Figure 1; Ex. 1004 ¶¶191-93.

Tanner-Patent discloses "the method includes evacuating the evacuation chamber to a first vacuum pressure, evacuating the analyzer chamber to a second vacuum pressure that is lower than the first pressure" as follows.  Because these two chambers each has a high vacuum pump, Tanner-Patent's instrument can maintain the pressure of the analytical chamber to be lower or higher than, or similar to the pressure of the evacuation chamber that contains the collision cell.  Ex. 1004 ¶¶191-93.  As discussed in Section XI.A, a POSA would have "at once

envisage[d]" that one of the three alternatives is that the pressure in the analyzing chamber is lower than that of the chamber containing the collision cell.  *Id.*

**Claim 34:**  Tanner-Patent discloses the limitations of this claim for the same reasons as Elements [1C.] and [23D.].

### G.  Ground 6:  Tanner-Patent in combination with Kishi renders obvious claims 1-3, 5-13, 16-34 under § 103

Kishi (Ex. 1034) was published in August 1997 and thus qualifies as prior art under 35 U.S.C. § 102(b).  Ex. 1008 ¶23.  Kishi is not on the cover of the '232 Patent.  Its substance was not discussed during the prosecution of the '232 Patent.

Kishi describes a commercial ICP-MS instrument, HP 4500, for elemental analysis.  Ex. 1004 ¶197.  This instrument has three evacuation chambers – an expansion chamber, a chamber for ion optic devices, and a chamber for the quadrupole mass analyzer – to achieve differential vacuum pumping, as diagrammed below.  Ex. 1034, 1.

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*



*Fig. 1. HP 4500 ICP-MS schematic diagram.*

### 1.   Tanner-Patent in combination with Kishi renders obvious claims 1-3, 5-7, 17-20, 23-24, 27, 29, and 34

As explained in Ground 5, Tanner-Patent discloses each and every limitation of claims 1-3, 5-7, 17-19, 23-24, 27, 29, and 34.  Ex. 1004 ¶¶195-200. To the extent that Patent-Owner argues that Tanner-Patent does not disclose an ion optical device upstream of the collision cell, Kishi discloses this limitation.

A POSA would have been motivated to combine the teachings of Tanner-Patent and Kishi because both relate to improving the detection in ICP-MS.  *Id.* Tanner-Patent teaches using a bandpass collision cell to remove interfering ions.

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

*Id.*  Kishi teaches using ion optics and deflectors to reduce background gas components to improve detection in ICP-MS.  *Id.*



Kishi improves Tanner-Patent by teaching an evacuation chamber containing ion optics systems.  Kishi teaches that "[t]he configuration of the ion lens system is one of the key design issues because it directly affects the ion transmission efficiency of an ICP-MS system."  Ex. 1034, 2; Ex. 1004 ¶¶199-200. Kishi discloses an ion optics system comprised of "Einzel" lenses and two "Omega" lenses in an evacuation chamber, as shown below. Ex. 1034, 2.  The Einzel lenses are traditional electrostatic lenses, and the Omega lenses bend the path of the ions in the beam.  *Id.*  The Einzel lenses focus the ions in the beam while the neutral gas components get pumped away from the evacuated chamber. *Id.*

66

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

Kishi also improves Tanner-Patent by teaching a deflector lens system (omega lenses) that bends the path of the ions such that the detector can be mounted off the axis of the ion source. Kishi teaches "[an] optics system [that] contains two omega lenses, the omega+ and omega- lenses, which bend the ion beam, allowing the quadrupole and detector to be mounted off-axis." *Id.*, 2. Together, the two omega lenses comprise a double deflector, which electrostatically deflects the ion beam twice. *Id.* Specifically, the ions get deflected once as they pass through the first omega lens, and a second time as they pass through the second omega lens. *Id.* Consequently, the neutral gas components diverge from the path of the ions before the quadrupole mass analyzer. *Id.*; Ex. 1004 ¶¶199-200.

## 2. Tanner-Patent in combination with Kishi renders obvious claims 8-13, 16, 21-22, 25-26, 28, 30-33

**Claim 8:** Kishi discloses that "the mass spectrometer is configured to transmit ions of the ion beam through the ion optical device [Einzel lenses] along an axis [of the plasma ion source]." Ex. 1034, 2-3. As explained above, in view of Kishi, a POSA would have been motivated to improve Tanner-Patent's instrument by adding ion optics and deflector lenses. Ex. 1004 ¶203.

67

**Claim 9:**  Tanner-Patent discloses that "the mass spectrometer is configured such that neutral gas of the unwanted gas components diverges from the axis at the ion optical device" for the same reasons as Elements [1C.] and [23D.].  *Id.* ¶204.

**Claim 10:**  Kishi discloses that "the mass spectrometer is configured to deflect the ion beam off the axis upstream of the mass-to-charge analyzer" because in Kishi's instrument, the ions are transmitted along a first axis of the ion source and then are deflected before the mass analyzer.  Ex. 1034, 2-3.  In view of Kishi, a POSA would have been motivated to improve Tanner-Patent's instrument by adding deflector lenses upstream of the mass analyzer.  Ex. 1004 ¶¶205-07.

**Claim 11:**  For the same reasons as claim 8, Kishi discloses that "the mass spectrometer is configured such that the ion beam extends along a path that includes a first portion in which ions are transmitted [through the Einzel lenses] along an axis [of the plasma ion source]."  Ex. 1034, 2-3.  For the same reasons as claim 10, Kishi discloses "a second portion in which the ion beam is deflected off the axis upstream of the mass-to-charge analyzer," because in Kishi's instrument, the ions are transmitted along a first axis of the ion source and then are deflected before the mass analyzer.  *Id.*  As explained above, in view of Kishi, a POSA

would have been motivated to improve Tanner-Patent's instrument by adding ion

optics and deflector lenses.  Ex. 1004 ¶¶208-09.

**Claim 12:**  Kishi discloses "a deflector [omega lenses] to deflect the ion

beam off the axis upstream of the mass-to-charge analyzer [quadrupole]."  Ex.

1034, 2-3.  In view of Kishi, a POSA would have been motivated to improve

Tanner-Patent's instrument by adding deflector lenses upstream of the mass

analyzer.  Ex. 1004 ¶210.

**Claim 13:**  Kishi discloses "the deflector [omega lenses] comprises a double

deflector" because the ions get deflected once as they pass through the first omega

lens, and a second time as they pass through the second omega lens.  Ex. 1034, 2-3.

In view of Kishi, a POSA would have been motivated to improve Tanner-Patent's

instrument by adding a double deflector.  Ex. 1004 ¶¶211-13.

**Claim 16:**  Kishi discloses "the mass spectrometer is configured to deflect

the ion beam off the axis" before the mass analyzer.  Ex. 1034. 2-3.  In view of

Kishi, a POSA would have been motivated to place Kishi's deflector upstream or

"downstream of the collision cell," or both, in Tanner-Patent's instrument.  Ex.

1004 ¶214.

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

**Claim 21:**  Kishi discloses "an intermediate evacuation chamber [a vacuum chamber with a turbo pump] in which the ion optical device [Einzel and Omega lenses] is disposed." Ex. 1034, 1-3.  For the same reasons as claim 1, in view of Kishi, a POSA would have been motivated to improve Tanner-Patent's instrument by adding an evacuation chamber containing ion optics systems.  Ex. 1004 ¶215.

**Claim 22:**  Kishi discloses "a first pump [a turbo pump] for maintaining the intermediate evacuation chamber [the chamber containing the Einzel and Omega lenses] at a first vacuum pressure." Ex. 1034, 1-3.  And Tanner-Patent discloses in Figure 1 "a second pump [a high vacuum pump (30)] for maintaining the evacuation chamber [a second vacuum chamber (28)] at a second vacuum pressure lower than the first vacuum pressure." Ex. 1036, 3:66-67, Figure 1.

As explained in Section XI.B, the pressure requirements are merely modes of operating the vacuum pumps and do not add any further structural limitations to this apparatus claim.  Ex. 1004 ¶¶216-19.  To the extent that Patent-Owner argues that they are claim limitations, it was routine in the art as of 1998 to adjust the pressures in these evacuation chambers for optimal experiment conditions, *e.g.*, to

maintain the pressure of one evacuation chamber to be higher or lower than that of the adjacent evacuation chamber. *Id.*

**Claim 25:**  Kishi discloses "reducing gas loading comprises transmitting ions of the ion beam through the transmission enhancing device [Einsel lenses] along a first axis [of the plasma ion source]."  In view of Kishi, a POSA would have been motivated to improve Tanner-Patent's instrument by deflecting the ions using Kishi's deflector lenses onto a second axis of the mass analyzer.  Ex. 1004 ¶¶220-22.

**Claim 26:**  Tanner-Patent in view of Kishi discloses claim 26 for the same reasons as claims 9 and 18.  *Id.* ¶223.

**Claim 28:**  Tanner-Patent in view of Kishi discloses claim 28 for the same reasons as claims 21 and 22.  *Id.* ¶224.

**Claim 30:**  Kishi discloses that "the ion beam includes a portion in which ions are transmitted along an axis [of the plasma ion source]."  Ex. 1034, 2-3. Kishi further discloses that "the method comprises deflecting [via the omega lenses] the ion beam off the axis upstream of the mass-to-charge analyzer [quadrupole]."  *Id.*  In view of Kishi, a POSA would have been motivated to place

Kishi's deflector upstream of the mass analyzer in Tanner-Patent's instrument.  Ex. 1004 ¶225.

**Claim 31:**  Kishi discloses "deflecting the ion beam includes electrostatically deflecting the ion beam [by setting omega+ lens (4V) and omega- lens (-5V)]."  Ex. 1034, 2-3, Figure 3(a).  In view of Kishi, a POSA would have been motivated to place Kishi's deflector in Tanner-Patent's instrument to electrostatically deflect the ion beam.  Ex. 1004 ¶226-29.

**Claim 32:**  Tanner-Patent in view of Kishi discloses claim 32 for the same reasons as claim 13.  *Id.* ¶230.

**Claim 33:**  Tanner-Patent in view of Kishi discloses claim 33 for the same reasons as claim 16.  *Id.* ¶231.

## XII.   CONCLUSION

Petitioner respectfully requests that this petition be granted, that *inter partes* review be instituted, and that all claims of the '232 Patent be found unpatentable and cancelled.

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

## XIII.  CERTIFICATE OF WORD COUNT

Pursuant to 37 C.F.R. § 42.24, the undersigned attorney for the Petitioner declares that the argument section of this Petition (Sections I, III-XII) has a total of 13,090 words, according to the word count tool in Microsoft Word™.

DATED:  December 13, 2017          Respectfully Submitted,

By:  /Brian M. Buroker/
Brian M. Buroker
(Reg. No. 39125)
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.,
Washington, D.C. 20036-5306
Tel:  202-955-8541
bburoker@gibsondunn.com

*Attorney for Petitioner*

*Petition for Inter Partes Review*
*of U.S. Patent No. 7,230,232*

## CERTIFICATE OF SERVICE

The undersigned certifies service pursuant to 37 C.F.R. §§ 42.6(e) and

42.105(a), (b) on the Patent-Owner via UPS overnight mail of a copy of this

Petition for *Inter Partes* Review and supporting materials at the Patent-Owner at

the correspondence address of record for the '232 Patent:


    Thermo Finnigan LLC
    Legal Department
    355 River Oaks Parkway
    San Jose, CA 95134


DATED:  December 13, 2017    By:  /Brian M. Buroker/
    (Reg. No. 39125)

    *Attorney for Petitioner*

74

# EXHIBIT E

# Patent Trial and Appeal Board Statistics

3/31/2017





**6700 Total AIA Petitions\***

Cumulative from 09/16/2012

6139 92%

510 7%

51 1%

- ■ Total IPR Petitions
- ■ Total CBM Petitions
- ■ Total PGR Petitions

**Narrative:**
This pie chart shows the total number of cumulative AIA petitions filed to date broken out by trial type (i.e., IPR, CBM, and PGR).

**\*Data current as of:** 3/31/2017



**2**



**Narrative:**
This bar graph depicts the number of AIA petitions filed each fiscal year, with each bar showing the filings for that fiscal year by trial type (i.e., IPR, CBM, and PGR).

**\*Data current as of:** 3/31/2017











**Narrative:**

These line graphs display the number of IPR, CBM, and PGR petitions filed each month and the total number of all petitions filed each month for the last 2 years.

**\*Data current as of:** 3/31/2017



**4**



**1044 Total AIA Petitions in FY 17***
**(Technology Breakdown)**

- Electrical/Computer - TCs 2100, 2400, 2600, 2800
- Mechanical/Business Method - TCs 3600, 3700
- Chemical - TC 1700
- Bio/Pharma - TC 1600
- Design - TC 2900



1683 Total AIA Petitions in FY 16*
(Technology Breakdown)

1897 Total AIA Petitions in FY 15*
(Technology Breakdown)

**Narrative:**
This pie chart shows the total number of AIA petitions filed in the current fiscal year to date as well as the number and percentage of these petitions broken down by technology.

**\*Data current as of:** 3/31/2017



5



**IPR - Number of Patent Owner Preliminary Responses by Fiscal Year**



**CBM - Number of Patent Owner Preliminary Responses by Fiscal Year**



**PGR - Number of Patent Owner Preliminary Responses by Fiscal Year**

### Narrative:
These three sets of bar graphs show the number of patent owner preliminary responses filed and waived/not filed each fiscal year in IPR, CBM, and PGR proceedings.

**\*Data current as of:** 3/31/2017



**6**



## Percent of Petitions Instituted, by Technology

Mechanical/Business Methods (876 of 1221 petitions): **72%**

Electrical/Computer (1988 of 2820 petitions): **70%**

Design (14 of 33 petitions): **42%**

Chemical (218 of 321 petitions): **68%**

Biotechnology/Pharma (286 of 456 petitions): **63%**

**Narrative:**
This chart shows the percentage of petitions instituted of all decisions on petition, by technology area.

**\*Data current as of:** 3/31/2017



7







### Narrative:

These three sets of bar graphs show the number of decisions on institution by fiscal year broken out by trials instituted (including joinders) and trials denied in IPR, CBM, and PGR proceedings.  A trial that is instituted in part is counted as an institution in these bar graphs.

**\*Data current as of:** 3/31/2017



**8**







**Narrative:**
These three sets of bar graphs show settlements in AIA trials broken down by settlements that occurred prior to institution and settlements that occurred after institution in IPR, CBM, and PGR proceedings.

**\*Data current as of:** 3/31/2017



**9**

# Disposition of IPR Petitions Completed to Date*



**Narrative:**

This graph shows a stepping stone visual depicting the outcomes for all IPR petitions filed to-date that have reached a final disposition.

**4563**
Total Petitions

**2157**
Trials Not Instituted

**2406**
Trials Instituted

**1317**
Petitions Denied

**840**
Terminated Before Institution Decision:
**759** Settled
**54** Dismissed
**27** Request for Adverse Judgement

**829**
Terminated After Institution Decision:
**593** Settled
**25** Dismissed
**211** Request for Adverse Judgement

**1577**
Trials Completed (Reached Final Written Decision)

**1029 Trials**
All Instituted Claims Unpatentable (**23%** of Total Petitions, **43%** of Trials Instituted, **65%** of Final Written Decisions)

**248 Trials**
Some Instituted Claims Unpatentable (**5%** of Total Petitions, **10%** of Trials Instituted, **16%** of Final Written Decisions)

**300 Trials**
No Instituted Claims Unpatentable (**7%** of Total Petitions, **12%** of Trials Instituted, **19%** of Final Written Decisions)

**\*Data current as of:** 3/31/2017

**10**

# Disposition of CBM Petitions Completed to Date*



**Narrative:**
This graph shows a stepping stone visual depicting the outcomes for all CBM petitions filed to-date that have reached a final disposition.

**\*Data current as of:** 3/31/2017

11



# IPR Petitions Terminated to Date*

■ 5172 Claims Found Patentable by PTAB in Final Written Decision

■ 8243 Claims Remaining Patentable (Not Subject to Final Written Decision)

■ 2674 Claims Cancelled or Disclaimed by Patent Owner

■ 37283 Claims Challenged but Not Instituted

■ 86036 Claims Not Challenged

**156096** — Total Number of Claims Available to be Challenged within 4563 Petitions

**70060** — Claims Challenged

**32777** — Claims Instituted

**16688** — Claims Found Unpatentable by PTAB in Final Written Decision

**Narrative:**
This visual contains four cylinders. The first cylinder shows the total number of claims available to be challenged in the IPR petitions filed. The second cylinder shows the number of claims actually challenged and not challenged. The third cylinder shows the number of claims on which trial was instituted and not instituted. The fourth cylinder shows the total number claims found unpatentable in a final written decision, the number of claims canceled or disclaimed by patent owner after institution, the number of claims remaining patentable (not subject to a final written decision), and the number of claims found patentable by the PTAB.

**Note:** "Completed" petitions include terminations (before or after a decision on institution) due to settlement, request for adverse judgment, or dismissal; final written decisions; and decisions denying institution.

**\*Data current as of:** 3/31/2017



12



## CBM Petitions Terminated to Date*

- 190 Claims Found Patentable by PTAB in Final Written Decision
- 1164 Claims Remaining Patentable (Not Subject to Final Written Decision)
- 302 Claims Cancelled or Disclaimed by Patent Owner
- 4749 Claims Challenged but Not Instituted
- 7236 Claims Not Challenged

**15998** — Total Number of Claims Available to be Challenged within 446 Petitions

**8762** — Claims Challenged

**4013** — Claims Instituted

**2357** — Claims Found Unpatentable by PTAB in Final Written Decision

**Narrative:**
This visual contains four cylinders. The first cylinder shows the total number of claims available to be challenged in the CBM petitions filed. The second cylinder shows the number of claims actually challenged and not challenged. The third cylinder shows the number of claims on which trial was instituted and not instituted. The fourth cylinder shows the total number claims found unpatentable in a final written decision, the number of claims canceled or disclaimed by patent owner after institution, the number of claims remaining patentable (not subject to a final written decision), and the number of claims found patentable by the PTAB.

**Note:** "Completed" petitions include terminations (before or after a decision on institution) due to settlement, request for adverse judgment, or dismissal; final written decisions; and decisions denying institution.

**\*Data current as of:** 3/31/2017



**13**

## Trial Outcomes for Instituted Claims, by Technology



**Narrative:**
This chart shows claim outcomes for instituted trials, by technology area.

**Note:** Claims involved in instituted trials that settle or are dismissed are not depicted. Accordingly, a bar may not add up to 100%.

**\*Data current as of:** 3/31/2017

* Includes IPR and CBM trial outcomes



**14**

